## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

VILLAGE OF OLD MILL CREEK, *et al.*,

        Plaintiffs-Appellants

    v.                     No. 17-2433

ANTHONY M. STAR, *et. al.*,

        Defendants-Appellees.

---

ELECTRIC POWER SUPPLY ASSOCIATION, *et al.*,

        Plaintiffs-Appellants,

    v.                     No. 17-2445

ANTHONY M. STAR, *et al.*,

        Defendants-Appellees.

On Appeal From a Final Judgment of the United States District Court for the
Northern District of Illinois, Nos. 17- cv-1163, 17-cv-1164

## APPELLANTS' JOINT APPENDIX

Patrick N. Giordano
   *Counsel of Record*
GIORDANO & ASSOCIATES
1710 Wesley Avenue
Evanston, IL 60201
(847)905-0539
Email: patrickgiordano@dereglaw.com

Paul G. Neilan
LAW OFFICES OF PAUL G. NEILAN, P.C.
1954 First St. #390
Highland Park, IL 60035
847.266.0464
pgneilan@energy.law.pro

Counsel for plaintiffs-Appellants Village
of Old Mill Creek, *et al.*

Donald B. Verrilli, Jr.
   *Counsel of Record*
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW
Washington, DC 20004
Telephone: (202) 220-1100
Email: Donald.Verrilli@mto.com

Counsel for Plaintiffs-Appellants
Electric Power Supply Association,
*et al.*

Additional Counsel For Plaintiffs-Appellants Electric Power Supply Association, *et al.*

Jonathan D. Schiller
David A. Barrett
BOIES, SCHILLER FLEXNER LLP
575 Lexington Ave., 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Email: *dbarrett@bsfllp.com*
        jschiller@bsfllp.com

Stuart H. Singer
Pascual Oliu
BOIES, SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Email: *ssinger@bsfllp.com*
        poliu@bsfllp.com

Leonard A. Gail
Suyash Agrawal
Paul J. Berks
MASSEY & GAIL LLP
50 E. Washington St., Suite 400
Chicago, IL 60602
Telephone: (312) 283-1590
*Email: lgail@masseygail.com*
        *sagrawal@masseygail.com*
        pberks@masseygail.com

Henry Weissmann
Fred A. Rowley, Jr.
Mark R. Yohalem
MUNGER, TOLLES & OLSON LLP
350 South Grand Ave., Ste. 5000
Los Angeles, CA 90071
Telephone: (213) 683-9100
Email: *Henry.Weissmann@mto.com*
        *Fred.Rowley@mto.com*
        Mark.Yohalem@mto.com

Jonathan S. Massey
MASSEY & GAIL LLP
1325 G Street, N.W., Suite 500
Washington, DC 20005
Telephone: (202) 652-4511
*Email: jmassey@masseygail.com*

# TABLE OF CONTENTS

*ESPA et. al. v. Star*, No. 17-2455 (appeal of No. 17-1164 (N.D. Ill))

Complaint (ECF 1) ...................................................................................A.1

Declaration of David W. Deramus, Ph.D. (ECF 38-3) ...............................A.43

Brief of PJM Interconnection, L.L.C. As Amicus Curiae
In Opposition To Motion To Dismiss (ECF 88).........................................A.92

    Ex. F -- PJM Open Access Transmission Tariff (excerpts) ...........A.109

*Village of Old Mill Creek et al. v. Star*, No. 17-2433
(appeal of No 17-1163 (N.D. Ill))

Complaint (ECF 1)....................................................................................A.128

Declaration of Jeanne Jones (ECF 13-2) ...................................................A.162

Affidavit of Roger W. Turner (ECF 30-1)..................................................A.164

Affidavit of Scott Fraser (ECF 30-2) .........................................................A.166

Office of the Governor Press Release (December 7, 2016) (ECF 30-3) .....A.167

Crain's Chicago Business, Why Rauner Should Veto Exelon's Bailout (December 5, 2016) (ECF 30-4).....................................................................................A.169

ComEd Rider ZEA Zero Emission Adjustment Tariff (ECF 65, 65-1).......A.171

ComEd Electricity Bill to Plaintiff Ferrite International Company
(June 13, 2017) (ECF 70)..........................................................................A.191

**Relevant Statutory Provisions**

Future Energy Jobs Act (excerpts)..............................................................A.193

Federal Power Act (excerpts).....................................................................A.202

    16 U.S.C. § 824.............................................................................A.202

    16 U.S.C. § 824d...........................................................................A.205

    16 U.S.C. § 824e...........................................................................A.208

    16 U.S.C. § 825p...........................................................................A.211

Illinois Customer Choice and Rate Relief Law of 1997 (excerpts) ............................. A.212

    220 ILCS 5/16-101A ........................................................................................ A.212

    220 ILCS 5/16-111 (g) ................................................................................... A.214

    220 ILCS 5/16-115 ......................................................................................... A.221

    220 ILCS 5/16-118 ......................................................................................... A.226

20 ILCS 3855/1-10 .................................................................................................. A.229

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELECTRIC POWER SUPPLY ASSOCIATION, DYNEGY INC., EASTERN GENERATION, LLC, NRG ENERGY, INC., and CALPINE CORPORATION, | ) ) ) ) ) ) | |
| Plaintiffs | ) ) | Case No. 17-cv-01164 |
| v. | ) ) | Judge |
| ANTHONY M. STAR, in his official capacity as Director of the Illinois Power Agency, and BRIEN J. SHEAHAN,  JOHN R. ROSALES, SADZI MARTHA OLIVA, MIGUEL DEL VALLE, and SHERINA MAYE EDWARDS, in their official capacities as Commissioners of the Illinois Commerce Commission, | ) ) ) ) ) ) ) ) ) ) ) | Magistrate |
| Defendants | ) | |

## **COMPLAINT**

1.      This case arises from unlawful Illinois legislation, the so-called Future

Energy Jobs Act ("FEJA"),[1] to the extent it amended the Illinois Power Agency

Act ("IPAA"), 20 ILCS 3855,[2] in a manner that intrudes on the exclusive authority

---

[1] FEJA, Public Act 099-0906 (12/7/16), available at
http://www.ilga.gov/legislation/publicacts/99/PDF/099-0906.pdf.  This lawsuit only challenges
the portions of FEJA that amended IPAA to create the Zero Emissions Credit program for
nuclear generators.
[2] The FEJA amendments to IPAA become effective on June 1, 2017, and all citations in this
Complaint are to the post-June 1 version of the IPAA.

1

**A.1**

of the Federal Energy Regulatory Commission ("FERC") over "the sale of electric energy at wholesale in interstate commerce" pursuant to the Federal Power Act ("FPA"), 16 U.S.C. § 824(b)(1).

2.     FERC has determined that competitive market forces best set wholesale energy prices and thus has mandated and approved auction-based markets for wholesale electric energy sales in Illinois and across regions which serve over two-thirds of the population of the United States.  Under this system, the forces of competition have benefited consumers but have impaired the financial viability of the Clinton and Quad Cities nuclear generating plants, to the point where Exelon, the owner of both of these plants, decided to close them unless the State bailed them out with billions of dollars in subsidies, to be paid by Illinois electricity consumers.

3.     Seeking to change the results of the FERC-approved market-based auction system, the Illinois General Assembly enacted FEJA, *inter alia*, to prop up these two uneconomic nuclear power plants and keep them in the market for at least ten more years, via so-called Zero Emissions Credits ("ZECs").  Unless enjoined or eliminated, these credits will result in Illinois' captive ratepayers overpaying an estimated $235 million per year over ten years to Exelon.

4.     The ZEC program invades FERC's exclusive regulatory field by directly altering the revenue to be paid to the nuclear generators.  The ZECs

2

**A.2**

provide the nuclear plants with substantial out-of-market payments for each MWh of electricity they produce, thus effectively replacing the auction clearing price received by these plants with the alternative, higher price preferred by the Illinois General Assembly.

5. Under FEJA's ZEC program, the actual dollar amount of the ZECs is expressly tethered to the price of electricity in the FERC-regulated wholesale markets. That is, nuclear generators are entitled to ZECs if, but only if, wholesale electricity prices are at a level that the "environmental benefits" of the nuclear plants will "cease to exist" without subsidies. 20 ILCS 3855/1-75(d-5)(1)(C). Furthermore, the amount of the subsidies is to be adjusted as wholesale prices fluctuate, and there is no entitlement to any ZECs if wholesale market prices established under FERC's auspices rise above a specified level. *Id.* (d-5)(1)(B).

6. If the ZEC program goes into effect, as it is scheduled to do in June 2017, it will profoundly disrupt the FERC-approved energy market auction structure and result in the transfer of hundreds of millions of dollars a year of ratepayer funds to Exelon at the expense of other generators that would have been economically viable without discriminatory subsidies. Those very same subsidies that artificially sustain a few uneconomic units impair the financial outlook for generators that are competing on the basis of FERC regulated market rules. The shareholders-owners of these companies invested capital because the Federal

3

**A.3**

Power Act prohibits rates that are "unjust, unreasonable, unduly discriminatory or preferential," as the rates in the FEJA undoubtedly are. 16 U.S.C. § 824e.

7. At current wholesale prices, for every megawatt hour ("MWh") of energy the subsidized nuclear plants sell into the FERC-jurisdictional market, the nuclear units will receive a premium of more than 70 percent from the Illinois ratepayers through ZECs. That is, for each MWh sold, they will receive the locational price of energy, which is currently around $18 and $25 per MWh at Quad Cities and Clinton respectively, plus a 2017 $16.50 ZEC payment subsidy (with possible increases in future years), funded entirely by Illinois consumers. As a result, in 2017 the Clinton and Quad Cities plants will be paid a total of $34.50 or $41.50 per MWh of energy that they sell in FERC-regulated wholesale markets, while a competing energy generator at the same location would receive just $18 or $25 per MWh. The bonus payments to the subsidized nuclear plants are scheduled to adjust over the ten-year life of the program, changing based on current wholesale capacity and energy prices.

8. The ZEC payments will disrupt the economically efficient functioning of the FERC-regulated energy and capacity market auctions. The artificial retention of uneconomic nuclear units in the market has a dramatic effect on wholesale market prices subject to FERC's exclusive jurisdiction.

**A.4**

9.     The prospect of these out-of-market payments has already caused Exelon to reverse its decision to close the Clinton and Quad Cities facilities, preventing the Illinois energy markets from reaching the efficient market equilibrium that the FERC-mandated wholesale markets would have otherwise produced.

10.     If the ZECs go into effect, Illinois's *retail* ratepayers will be forced to fund an effort by the General Assembly to artificially depress *wholesale* market prices, which disrupts the FERC-approved auctions and market processes. The nuclear plants will not retire as scheduled, but will continue to bid into the wholesale market auctions, with the incentive and ability to offer their supply of electricity into the auctions at artificially lower prices (*i.e.*, at prices that do not fully cover their costs). The result of these below-cost bids will be below market prices in the wholesale market. This will harm other generators, including the Plaintiffs, because the lower auction prices will result in lower revenues. In the long term, lower prices will force some generators who are more efficient than the ZEC recipients to exit the market and will deter potential new generators – including generators of renewable sources of energy – from entering the market.

11.     Paradoxically, the artificially suppressed wholesale market prices are likely to result in higher energy bills for retail ratepayers as they are forced to pay the nuclear subsidy as a charge on their retail electric bills. Consumers will also

5

**A.5**

experience higher wholesale prices over the long-run, since providers of capital will be unwilling to enter the markets without adding a significant risk premium to reflect the fact that the State is undermining FERC's ability to provide just and reasonable rates.

12.     The ZEC program is unlawful because it operates in the area of FERC's exclusive jurisdiction, and federal law thus field preempts it under the Supremacy Clause of the United States Constitution.  On field preemption grounds, the Supreme Court recently invalidated similar Maryland measures in *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016).  Moreover, the ZEC program is conflict-preempted, as it stands as an obstacle to the intended functioning of the FERC-jurisdictional markets.  The ZEC program results in a mix of energy resources that will be far less economically efficient than if the markets were allowed to work as designed.

13.     The ZEC program is also invalid under the dormant Commerce Clause.  The ZECs solely benefit certain in-state wholesale producers of nuclear energy in Illinois, to the disadvantage of out-of-state producers who compete in the wholesale market.  The General Assembly has thus failed to regulate evenhandedly to effectuate a legitimate local public interest, and the effects of its regulation on interstate commerce are more than incidental.  For all of these reasons, the Court should enter appropriate declaratory and injunctive relief.

6

**A.6**

14.     Although the reduction of carbon emissions is important, this can be achieved much more effectively by means that would neither discriminate against interstate or international commerce nor frustrate the progress competitive markets have been delivering in the form of environmental benefits.  If Illinois truly believes that Clinton and Quad Cities require additional revenues to achieve environmental goals, it is entitled to petition FERC to adopt market rule changes or take other steps to increase market prices to levels sufficient to allow the nuclear generators to recover their costs.

## PARTIES

15.     Plaintiff Electric Power Supply Association ("EPSA") is the national trade association representing leading competitive independent power producers and marketers, and is incorporated under the laws of the District of Columbia. EPSA's member companies are involved in competitive wholesale and retail electricity markets, with significant financial investments in electric generation and electricity marketing operations in Illinois and throughout the United States. EPSA seeks to bring the benefits of competition to all power customers.  Many EPSA members actively participate in the Illinois-area FERC-regulated wholesale electricity auctions.[3]

---

[3] The views expressed in this filing represent the position of EPSA as an organization, but not necessarily the views of any particular member with respect to any issue.

**A.7**

16.     Plaintiff Dynegy Inc. ("Dynegy") owns and operates more than 31,000 MW of power-generating capacity throughout the Midwest, Northeast, Mid-Atlantic and Texas and two retail electric companies serving businesses and residents in Illinois, Ohio, and Pennsylvania.  In Illinois, Dynegy owns 12 power plants, totaling more than 9,000 MW of generation.  Dynegy's retail companies serve approximately 840,000 Illinois residential customers through municipal, township and county aggregation, and approximately 20,000 Illinois commercial and industrial customers.  Through subsidiaries, Dynegy actively participates in the Illinois-area FERC-regulated wholesale electricity auctions.

17.     Plaintiff Eastern Generation, LLC ("Eastern") owns and operates, through its subsidiaries, 72 generating units at seven facilities with a total average capacity of 4,961 MW.  The facilities are located in Illinois, Michigan, New York, and Ohio.  Eastern actively participates in the Illinois-area FERC-regulated wholesale electricity auctions.

18.     Plaintiff NRG Energy, Inc. ("NRG") is the largest independent power producer in the United States with over 50,000 MW of diverse resources – powered by solar, wind, nuclear, gas, coal, oil, and cogeneration – and is one of the nation's largest competitive retail energy suppliers, with roughly three million retail customers.  In Illinois, NRG owns six power plants, totaling approximately

8

**A.8**

4,326 MW of generation.  Through its ownership of these resources, NRG actively participates in the Illinois-area FERC-regulated wholesale electricity auctions.

19.     Calpine Corporation ("Calpine") is a Delaware corporation engaged, through various subsidiaries, in the development, financing, acquisition, ownership, and operation of independent power production facilities and the wholesale and retail marketing of electricity in the United States and Canada. Calpine has a fleet of 81 power plants in operation or under construction, representing approximately 26,000 MW of generating capacity, including the Geysers geothermal facilities, the largest geothermal complex in the world, located in Northern California.  Through wholesale operations and its retail business, Calpine's subsidiaries serve customers in 24 states, Canada, and Mexico.  Calpine subsidiaries own the Zion Energy Center in Illinois and actively participate in the MISO and PJM FERC-regulated wholesale electricity auctions.

20.     Defendant Anthony M. Star is the Director of the Illinois Power Agency ("IPA), which has specific authority to implement and enforce the FEJA ZEC program.  Mr. Star is sued here only in his official capacity.

21.     Defendants Brien J. Sheahan, John R. Rosales, Sadzi Martha Oliva, Miguel del Valle, and Sherina Maye Edwards are Commissioners of the Illinois Commerce Commission ("ICC"), which has specific authority to implement and

A.9

enforce the FEJA ZEC program.  The commissioners are sued here only in their official capacity.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this case, under 28 U.S.C. § 1331, because the claims arise under federal law, specifically the Supremacy Clause and the Commerce Clause of the U.S. Constitution, and under 28 U.S.C. § 1983.

23.     This Court has the authority to grant the requested declaratory relief under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, and authority to grant the requested injunctive relief under 28 U.S.C. § 1651(a) and Federal Rule of Civil Procedure 65.

24.     This Court has jurisdiction to order prospective relief in the form of a declaratory judgment or an injunction against Defendants in their official capacities as officials of the Illinois agencies responsible for implementing and administering the challenged ZEC program.  *Ex parte Young*, 209 U.S. 123, 129 (1908).

25.     Venue is properly in this district pursuant to 28 U.S.C. § 1391, because the Defendants reside in this district, as the IPA has its headquarters in this district, and the ICC has a major office here.

## FACTS

A.10

**Exclusive Federal Jurisdiction Over the Wholesale Electricity Market**

26.    Under the FPA, FERC has exclusive regulatory authority, to the

exclusion of state and local governments, over "the transmission of electric energy

in interstate commerce" and "the sale of electric energy at wholesale in interstate

commerce." 16 U.S.C. § 824(b)(1); *see also id.* § 824(d) (defining a "wholesale

sale as a sale of electric energy to a buyer "for resale" to another buyer). This

exclusive authority extends to the imposition of any charges "in connection with"

wholesale rates, and the enacting of any "rules and regulations affecting or

pertaining to such rates or charges." *Id*. §§ 824d(a), 824e(a).

27.    The scope of interstate regulation has grown over the years, as

technological developments made it increasingly possible to transmit energy over

long distances. Local delivery networks gave way to the modern "grid" network,

with electricity constantly moving in interstate commerce throughout the United

States.

28.    FERC is exclusively empowered to regulate the interstate wholesale

market to ensure, *inter alia*, that rates are "just and reasonable." 16 U.S.C.

§ 824d(a). In determining whether a state regulation interferes with this authority,

courts consider "the *target* at which the state law *aims*," and "measures aimed

directly at interstate purchasers and wholesales for resale" are preempted. *Oneok,*

*Inc. v. Learjet, Inc*., 135 S. Ct. 1591, 1599 (2015). State actions that "*directly*

**A.11**

affect the wholesale rate" are likewise invalid. *FERC v. Electric Power Supply Ass'n*, 136 S. Ct. 760, 772 (2016) (quotation omitted). The Supremacy Clause preempts any state regulation that effectively alters the wholesale rate a generator will receive. *Hughes*, 136 S. Ct. at 1297-99.

### The FERC Regulatory Regime, MISO, and PJM

29.    Instead of directly setting wholesale rates, FERC has opted to regulate by using market-based auctions that are administered to establish the "just and reasonable rates" the FPA requires. FERC has explained that it relies on market processes "to bring more efficient, lower cost power to the Nation's electricity consumers." *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.*, FERC Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996).

30.    FERC authorizes and regulates "independent system operators" ("ISOs") and "regional transmission organizations" ("RTOs") to oversee the interstate auctions that are part of such market processes. The largest part of the state of Illinois is in a region where wholesale electricity is bought and sold via auctions conducted by an ISO called the Midcontinent Independent System Operator, Inc. ("MISO"), which serves all or parts of 15 U.S. states (as far south as Louisiana) and the Canadian province of Manitoba. The remainder of the state, including Chicago and parts of northern Illinois, is in a region where wholesale

**A.12**

electricity is bought and sold via auctions conducted by an RTO called PJM

Interconnection, L.L.C. ("PJM"), which serves all or parts of thirteen states (as far

east as New Jersey) and the District of Columbia. The energy suppliers in MISO's

and PJM's wholesale auctions include generators and demand-response entities

(aggregators of customers capable of reducing their electric demand) located inside

and outside of Illinois. MISO's and PJM's auctions are interstate wholesale

markets regulated by FERC.

31.    MISO and PJM operate two distinct types of wholesale auctions:

energy and capacity (among others, which have less direct bearing on this

Complaint). There are two types of energy auctions – "day-ahead" and "real-

time."

### *Energy Markets*

32.    With respect to the energy market, the goal of both the day-ahead and

real-time auctions is to ensure that the MISO and PJM "dispatch" (that is, turn on

and regulate the output level of) sufficient generation resources to meet the actual

amount of power used by consumers – or "load" in energy parlance – at any given

moment. Unlike most other commodities, electricity cannot at this time be

economically stored in appreciable quantities. If the amount of generation on the

system falls short of demand levels, the grid operator will take a series of FERC-

mandated steps to limit the negative consequences, starting with voltage reductions

13

**A.13**

or "brownouts" and ending, in more severe cases, with load shedding or "rotating blackouts" to restore balance. If these measures to reduce load to meet available supply are not successful, uncontrolled widespread blackouts may result.

33. MISO and PJM aim to prevent a supply/demand mismatch by running sophisticated day-ahead and real-time energy markets that take into account physical limitations on the transmission lines, generator availability, predicted energy usage, and many other factors. Because the transmission system has various physical limitations, the price of power varies by location, with electricity costing more in some parts of Illinois than in others.

34. In the day-ahead energy market, generators bid the price at which they are willing to generate a particular quantity of electricity for next-day delivery. In the real-time energy markets, MISO and PJM prices increase or decrease, signaling the need for participating generators to produce more or less electricity as real-time conditions change.

35. In the energy auctions, MISO and PJM accept bids from generators, beginning with the lowest and moving up until enough bids are accepted to fully satisfy the demand. MISO and PJM determine separate energy prices, every five minutes, for hundreds of individual locations across their respective territories. The price of the final bid that satisfies all demand for a given location is known as the "market clearing price" or "locational-based marginal price" and is paid

14

**A.14**

uniformly to all successful supply-side bidders in that location. The wholesale price of electricity in both the day-ahead and real-time energy markets can rise very steeply at times of peak demand. Markets naturally deploy the most efficient and cheapest generators first; additional quantity must be provided by less efficient generators that cost more to run.

36. Unlike other types of generators, which can be turned on and off, or adjusted quickly to produce more or less energy, as conditions warrant, nuclear generators run continuously at maximum output. Because they have no alternative to selling their output in the MISO and PJM energy auctions, they typically bid into the day-ahead markets as "price takers," meaning that they will sell their entire output at whatever clearing price the market determines, even during times of oversupply when the price may be negative (in which case the generators would actually pay money for the right to download their output to the grid). Large inflexible units such as these nuclear units can actually frustrate system operators and can trigger a need to curtail intermittent renewables during such times. A large price-taking unit significantly decreases energy-market prices paid to competitors, as it injects large quantities of energy into the grid, which lowers market-clearing prices. As long as energy market prices, on average, are higher than the nuclear unit's marginal operating costs, this may be financially sustainable for a nuclear unit, since the total revenues earned will exceed the unit's costs of production.

**A.15**

Recent decreases in natural gas fired energy production costs, however, largely driven by access to cheap shale gas, have decreased prevailing energy prices below the level necessary to keep some nuclear units operating.

*Capacity Markets*

37.     In order to ensure that MISO and PJM have the electricity-producing resources (the generating capacity) they need to operate the grid reliably, MISO and PJM operate capacity auctions.  On an annual basis, MISO and PJM calculate how much generating capacity is needed to allow the electric grid to run reliably under forecasted peak demand and in the presence of significant losses of generating and transmission facilities.  MISO and PJM establish the amount of electricity generation capacity that retail electric suppliers ("load serving entities" or "LSEs") in their respective territories are required to purchase in order to meet customer demand under peak conditions.  LSEs can meet their capacity obligations either through bilateral contracts with generation-owners (or with generation that they own), or through the MISO and PJM administered auction markets for reliability products known as capacity (the "Installed Capacity" or "ICAP" auctions), which FERC established.

38.     In contrast to the energy auctions, where *electricity itself* is bought and sold, capacity auctions are for the purchase and sale of *options* to purchase electricity.  MISO or PJM, as a buyer of a capacity market option, receives the

16

**A.16**

right, at its sole discretion, to call upon the seller of the option (a power generator) to produce a specified amount of energy if and when needed. Each generator that sells capacity in the MISO and PJM capacity markets is required to participate in the day-ahead energy market, and to respond in real-time, if conditions warrant. While the buyer of an option – in this case, MISO or PJM – need not exercise its option to require the seller to produce energy, the capacity markets ensure that the grid will have the *ability* to furnish the amount of energy needed by consumers at any given moment in time.

39.     The amount of capacity that LSEs are required to purchase in the MISO and PJM capacity markets is determined through rigorous reliability planning processes overseen by FERC. Under FERC oversight, MISO purchases annual capacity obligations one month before the relevant delivery period. PJM, by contrast, purchases capacity three years ahead. Either way, each ISO/RTO determines the required amount of capacity in its respective territories according to the FERC-approved rules governing the capacity market, which results in a zonal capacity market price (*i.e.*, the auction may result in separate prices for each of the various sub-zones within the MISO and PJM regions). FERC also approves key parameters of the capacity market auction, including the installed reserve margin and total quantity of capacity to be procured. In PJM, FERC has approved the use of an administratively determined "downward sloping" demand curve that

17

**A.17**

establishes the price LSEs are required to pay for capacity in various reliability scenarios and in various locations. In MISO, FERC has approved the use of a "vertical" demand curve to determine the price-quantity pair.

40.    As supplies of capacity are reduced (signaling a heightened risk to reliability), capacity prices increase to induce additional infrastructure investments. As supplies of capacity become more abundant (signaling a potential over-supply), capacity prices decrease, leading to the potential closure of inefficient generating units. Under FERC's auspices, MISO and PJM have carefully calibrated their rules to ensure that consumers receive the desired level of electrical-system reliability at the lowest possible price. Over time, the FERC-approved market design is self-correcting and leads to efficient economic equilibrium. The costs of capacity purchased in the MISO and PJM capacity auctions are apportioned to LSEs on a volumetric-share basis.

41.    In the capacity auctions, generators offer to sell a certain amount of capacity at a certain price at a certain location. As with the energy auctions, the capacity offers in each of the capacity zones are "stacked" from lowest to highest, and bids are accepted until the requisite total demand has been met. The last and highest offer price needed to meet the demand in each zone establishes the market-clearing price for that zone. Any generator that offered at or below this price "clears" in the market and is paid the clearing price. Such a generator in turn is

generally obligated to deliver, if called upon in the day-ahead or real-time energy markets, the amount of electricity to match the capacity that had cleared the auction in that generator's accepted offer. The generators whose offers are above the clearing price receive no payment and have no delivery obligation.

42.     The auction's stacking mechanism creates an incentive for capacity providers to be efficient and cost effective in order to be selected. It creates price signals for new capacity to enter the market for generators that can supply capacity at prices below the clearing price. On the other hand, the market provides price signals for existing generators to exit the market if they are unable to beat the clearing price.

*Total Market Compensation*

43.     The total compensation a generator receives in the market is the sum of its energy market and capacity market revenues (as well as ancillary services, which account for only a small part of a generator's total earning potential).

44.     An uneconomic generator will likely remain in the market if it receives a State subsidy of its energy and/or capacity market earnings rather than retire because it is no longer competitive. In both cases, because subsidized

generators would be uneconomic in the absence of the subsidy, the subsidy distorts wholesale market price signals and directly interferes with the way in which FERC intends wholesale markets to function.

### How Zero Emission Credits Distort the Wholesale Market

45.     The Illinois ZEC program created by FEJA distorts the functioning of the FERC-regulated energy and capacity markets in the MISO and PJM regions and nationwide.

46.     Under the ZEC subsidy program, an uneconomic nuclear generator receives a higher price per MWh of energy it sells into the wholesale energy market than the rate established pursuant to FERC-approved market rules.  Illinois retail ratepayers fund the difference between the wholesale energy rate authorized by FERC and the higher, subsidized rate, established by the State.  This state-determined "revised" price contradicts FERC's determination that MISO- and PJM-determined clearing prices are the just, reasonable and not unduly discriminatory or preferential rate.  Under the stacking mechanism used to set prices in the MISO and PJM markets, moreover, the artificial retention of the uneconomic nuclear generators in the wholesale markets adds additional (uneconomic) supply in the energy market, which harms competitors (and economic efficiency) by artificially reducing wholesale energy prices and forcing otherwise economic generation (*i.e.*, non-subsidized generation that is more

20

**A.20**

efficient than the nuclear units at issue) to inefficiently leave the market. In addition, the ZEC subsidies will deter the entry of new efficient suppliers, including suppliers of renewable energy, and the long-term result will be higher prices to consumers and businesses.

47.     Forced subsidization of the nuclear generators by retail customers equally distorts wholesale *capacity* market auction outcomes. Under the stacking mechanism, the retention of otherwise uneconomic producers artificially increases the supply of capacity, which directly leads to lower prices. Exelon expressly announced that the Clinton and Quad Cities plants would shut down unless the ZEC program was enacted. The artificial retention of generators in the capacity market that should have retired contravenes the economically efficient market structure that MISO and PJM designed and FERC approved.

48.     In addition, FERC has previously acted to prevent the exercise of buyer-side, or monopsony, market power from infecting the capacity market. Buyer-side market power occurs when a state entity or other large buyer of capacity is able to effectuate the receipt of an above market payment to a limited quantity of supply in order to enable that supplier to enter or remain in the market at an artificially low price and at the same time cause a centralized market clearing price reduction such that the entity (or the customers upon which it seeks to benefit) will realize a net savings on the balance of their in-market purchases

21

needed to serve their needs. These uneconomic units, in turn, lower capacity prices in the FERC-jurisdictional market by suppressing the clearing price in the auction, which reduces a buyer's total payment for capacity. Because capacity market prices are sensitive to even small shifts in the supply/demand balance, the effect of lower capacity prices and corresponding decrease in total capacity market costs can be large. To prevent this economically inefficient outcome, FERC has been vigilant in protecting the capacity markets from distortion by means of state subsidies that would undercut the critical investment price signals from the auction markets. FERC has recognized that if left unchecked, state subsidies would lead to higher prices overall to the detriment of consumers over the long run.

49. In this case, by artificially retaining the otherwise uneconomic nuclear units, Illinois is using the ZEC subsidy to exert a large depressive effect on energy and capacity prices. While artificially depressed (below-market) energy and capacity prices may save Illinois ratepayers money in the short run, these savings will be offset by both the increased costs of the ZECs themselves and by the enormous forgone benefits of competition and the ability to retain and attract more efficient generation over the long run. In fact, PJM has calculated the benefits of competitive markets to its consumers. PJM finds its services offer approximately $2.8 billion to $3.1 billion per year to consumers[4] – in other words, the ZEC

---

[4] http://www.pjm.com/about-pjm/~/media/about-pjm/20151016-value-proposition.ashx.

payments result in the erosion of significant benefits that are not just theoretical, but actually quantified by PJM. Regardless of the short-run or long-run effect, Illinois – like Maryland in *Hughes* – has taken action to alter what the state views as unsatisfactory consequences of the prices set by the wholesale markets under FERC's exclusive jurisdiction.

50.     Artificially suppressed prices threaten the viability of more efficient existing generators, including Plaintiffs, and discourage investment in efficient new, flexible generators better suited to integrate weather-dependent, zero-carbon renewable generating resources like wind and solar. The suppressed prices also lower the market revenues received by wind and solar renewables that are the real long-term no-carbon solution, and so the consumer backed incentives paid under legitimate Renewable Energy Credit ("REC") programs will also have to increase. Accordingly, not only will the ZEC program ultimately lead to higher consumer costs over the long run, but it will also stifle the unquestionable environmental benefits derived from competitive electric markets.

51.     The Illinois ZEC program is easily distinguishable from the Renewable Energy Credit ("REC") programs many states have enacted. These programs vary significantly from state to state but, under a typical REC program, qualified renewable generators (such as solar, wind, and biomass) earn RECs for

**A.23**

each MWh of electricity they generate. LSEs are required to acquire a certain number of RECs each year or make an Alternative Compliance Payment.

52. RECs differ from ZECs in several important respects. RECs are created by *all* qualified renewable generators, without regard to economic need. The price of RECs is not fixed by the State and is not tethered in any way to wholesale electricity prices. Rather, RECs are competitively traded outside of the wholesale energy markets, so that their value varies based on supply and demand, including the competitive interactions among alternative qualified suppliers of renewable generation (based on the overall economics of their respective technologies, their specific generating units, and their own operational efficiencies).

53. In contrast, Illinois' ZEC program is different in every respect:

• ZECs are not available to all qualified renewable generators, but rather just to certain nuclear plants specifically selected through an IPA "procurement process" on the basis of economic need rather than the value of a particular attribute.

• The value of ZECs is fixed by the State rather than by competitive markets.

24

**A.24**

• The value of ZECs is expressly tied to the price of electricity in the FERC-

regulated wholesale markets, and the amount of the subsidies is adjusted as

wholesale prices fluctuate.

### FEJA's Illinois ZEC Program

54.     Among Illinois's six nuclear generating plants, only Clinton, a single-

reactor plant in Clinton, IL, and Quad Cities, a two-reactor plant in Cordova, IL,

are currently operating unprofitably.  Exelon, the owner of both of these plants, has

announced that the two plants lost $800 million in the last seven years.  Clinton

sells its output in the MISO wholesale markets and Quad Cities sells its production

in PJM wholesale markets.

55.     Quad Cities is so inefficient that its bid did not clear in the PJM

capacity auction for the 2019-2020 planning year and thus it will not receive

capacity revenue for that period.  Clinton's bid did clear MISO's 2016 one-year

forward capacity auction, but these capacity revenues were insufficient to avoid

continued losses.

56.     Both of these nuclear plants are Exempt Wholesale Generators

("EWGs") under the Public Utility Holding Company Act, 42 U.S.C. § 16451 *et*

*seq*.  An EWG is a person engaged "exclusively in the business of owning or

operating, or both owning and operating, all or part of one or more eligible

**A.25**

facilities and selling electric energy at wholesale." *Id.* § 79z–5a.  These nuclear facilities thus can only sell the energy they produce into the wholesale market.

57.     In 2016, after hundreds of millions of dollars in losses, Exelon announced it was "forced to retire" the Clinton and Quad Cities plants, as the expected revenues from the sale of capacity and energy into the MISO and PJM markets were insufficient to cover its costs of continued operation.  Citing its status as a large taxpayer and employer, Exelon said it would consider reversing its decision and keeping these two plants open only if the State enacted "adequate legislation" to provide billions of dollars in ratepayer-funded subsidies.

58.     In response to extensive lobbying by Exelon and local politicians, the Illinois General Assembly included the ZEC program in FEJA.  Although "environmental protection" was the legislature's asserted goal, the clear and actual purpose of FEJA was to save jobs and local tax revenues associated with these plants, as demonstrated by the very name of the law – Future Energy **Jobs** Act. FEJA is not environmental legislation; it is just a mechanism to provide out-of-market funding to Clinton and Quad Cities.

59.     Under FEJA, only nuclear plants specifically selected through an IPA "procurement process" are eligible to receive the ZEC subsidies.  20 ILCS 3855/1-75(d-5)(1)(C).  Although the law states that the IPA is to award ZEC contracts to the "winners" of the procurement process, with the winners to be determined on

26

the basis of "public interest criteria," *id*., the process is a sham, as Clinton and

Quad Cities have been pre-determined to be the "winners" of the ZEC contracts.

60.     FEJA directs the IPA to consider reports under House Resolution

1146.  One report under House Resolution 1146 titled "Potential Nuclear Power

Plant Closings" specifically identifies Exelon's Quad Cities and Clinton's nuclear

units.  The report concluded that the facilities needed higher prices to cover their

costs.  FEJA provides that "the selection of winning bids shall take into account the

incremental environmental benefits resulting from the procurement, such as any

existing environmental benefits that are preserved by the procurement . . . and

would cease to exist if the procurements were not held, including the preservation

of zero emission facilities."  20 ILCS 3855/1-75(d-5)(1)(C).  As "preservation of

zero emission facilities" is to be the key factor in the "public interest"

determination, all other facilities are effectively excluded, as no other Illinois

nuclear plant is in danger of closing.

61.     Indeed, when he signed the bill into law, Governor Rauner expressly

stated, "The Future Energy Jobs bill protects taxpayers, ratepayers, and *the good-*

*paying jobs at the Clinton and Quad Cities' plants*."[5]  Furthermore, Exelon itself

has boasted that FEJA "ensures the continued operations of Clinton and Quad

---

[5] http://www.exeloncorp.com/newsroom/governor-rauner-signing-of-future-energy-jobs-bill
(emphasis added).

Cities for at least 10 years."[6]  Exelon reversed its decision to close these two plants on the very day the governor signed the law, and within days it announced plans to fast track multiple capital projects at these plants.[7]  In an earnings call on February 8, 2017, Exelon stated that it had already recognized anticipated Illinois ZEC revenue in its financial statements.[8]  This plainly shows that Exelon's plants are the pre-determined winners of the so-called "competitive procurement process."

62.     The ZEC program excludes all other zero-carbon resources in Illinois and elsewhere, and thus no others will receive compensation for their zero-carbon attributes.  Once the ZEC subsidy is taken into account, the uneconomic nuclear resources (Clinton and Quad Cities) will receive a higher level of wholesale market compensation than other nuclear generators operating in Illinois, all of which are now profitable without subsidies.  Thus, FEJA simply serves to maintain the uneconomic capacity and energy from the Clinton and Quad Cities units in the FERC-regulated wholesale markets, notwithstanding the fact that wholesale market price signals are indicating that these units should be retired.

63.     The exact amount to be paid to Clinton and Quad Cities is to be determined by a complicated formula that is tethered to FERC-regulated wholsale prices in both the MISO and PJM energy and capacity markets.  For 2017, these

---

[6] http://www.exeloncorp.com/newsroom/fejb-econ-impact-rls.
[7] http://www.exeloncorp.com/newsroom/governor-rauner-signing-of-future-energy-jobs-bill.
[8] http://seekingalpha.com/article/4043975-exelon-exc-q4-2016-results-earnings-call-transcript.

two nuclear generators will receive an additional $16.50 for each MWh of electricity they produce and sell. The $16.50 price is said to be based on the "Social Cost of Carbon," as determined by a federal interagency working group. 20 ILCS 3855/1-75(d-5)(1)(B). Beginning in 2023, this price will increase by $1.00 each year. *Id*. Beginning in 2018, the price is also subject to a "Price Adjustment," which is determined by the amount "by which the market price index for the applicable delivery year exceeds the baseline market price index for the consecutive 12-month period ending May 31, 2016." *Id*. Both the "market price index" and the "baseline market price index" are based on the sum of specified PJM and MISO forecast energy and capacity prices. *Id*. The essence of the formula is that the ZEC payments will go down if FERC-regulated energy and capacity prices go down.

64.     The ZEC pricing formula is set forth in its entirety in Exhibit A. It can be summarized as shown in this table:



The ZEC program thus establishes a new state-created energy price "adder" granted only to the "winners" of the IPA procurement program. The adder will not occur unless the "winning" nuclear generators sell their energy into the wholesale markets, and thus the adder is directly tethered to the wholesale price of electricity.

65. The price-suppressive effects of the ZECs on the FERC-regulated wholesale markets also impermissibly discriminate against other non-carbon emitting technologies. Under FEJA's ZEC program, a small hydroelectric dam producing zero-emission energy will receive the FERC-determined energy price,

but would not qualify for ZECs. Other generators of renewable energy and out-of-state entities are similarly disadvantaged, substantially burdening interstate (as well as international) commerce.

66.     If the ZEC program goes into effect as planned in June 2017, Plaintiffs will incur many millions of dollars in damages, because the subsidies will enable the nuclear generators, who compete against Plaintiffs in interstate markets, to continue operating money losing facilities, and selling uneconomic capacity and energy into the FERC-regulated auctions, causing the auctions to return significantly lower prices. Plaintiffs will lose auctions they otherwise would have won, and they will receive less revenue from auctions they do win.

67.     The State of Illinois, the IPA, and the defendant IPA director are immune from damages liability. Accordingly, the harm to Plaintiffs from implementation of FEJA's unconstitutional ZEC program will be irreparable.

## CLAIMS FOR RELIEF

### COUNT I
### FIELD PREEMPTION – SUPREMACY CLAUSE

68.     Plaintiffs herein incorporate all previous allegations.

69.     Under the Supremacy Clause, if Congress enacts a federal law regulatory scheme and intends to fully occupy the field it has chosen to regulate, any state law in this field is "field preempted" and thus invalid, without regard for the impact of the state regulation upon the national interest.

31

70.     FEJA's ZEC program is field preempted.  Under the FPA, 16 U.S.C.

§ 824(b), FERC has exclusive jurisdiction over the sale of electric energy, the sale

of capacity at wholesale in interstate commerce, and wholesale electricity rates.

FERC also has exclusive jurisdiction over measures that affect, pertain to, or are

connected with wholesale electricity rates.  *Id.* §§ 824d(a), 824e(a).  Federal law

exclusively occupies the entire field of wholesale electricity sales.

71.     MISO and PJM's energy and capacity auctions are wholesale

interstate markets for the sale of electricity, and they fall within the field of

FERC's exclusive authority.  FEJA's ZEC program invades that field because it

directly affects the wholesale clearing price of electricity sales in the MISO and

PJM auctions.

72.     Specifically, the nuclear generators offer into the MISO and PJM

auctions. Under FERC-approved rules, all generators whose offers "clear" receive

the market clearing price, which is the wholesale market price.  The ZEC

requirement invades FERC's exclusive regulatory field by directly altering the

revenue to be paid to the nuclear generators.  The ZECs provide the nuclear plants

with substantial out-of-market payments for each MWh of electricity they produce,

thus effectively replacing the auction clearing price received by these plants with

the alternative, higher price preferred by the Illinois General Assembly.

**A.32**

73.    The FERC-determined price paid to competing generators in the energy market is also suppressed by the uneconomic retention of the nuclear units, which also frustrates FERC's market design, causing a concomitant lowering of the clearing price to be paid to plaintiffs and other competitors.

74.    Finally, the continued operation of the otherwise non-economic nuclear generators has a direct and significant price suppressive effect in the capacity market, frustrating FERC's goals of ensuring electric reliability through the capacity market.  But for the subsidy, these units would leave the market, temporarily decreasing the amount of supply in the market, and increasing prices until the market responded with the necessary level of investment in new generation, thereby finding a new equilibrium level.  The turnover of generating units is essential to delivering the benefits of competition to consumers as state of the art technologies replace less efficient, less flexible, more costly resources.

75.    FEJA's ZEC program is therefore field preempted, because (a) FERC has exclusive jurisdiction to set wholesale prices, yet the ZEC program guarantees the favored generators a higher price than the competitive market price set by FERC; and (b) the ZEC program interferes with FERC's exclusive jurisdiction over wholesale prices by directly affecting the behavior of participants in both energy and capacity auctions and the ultimate outcome of those auctions.

33

**A.33**

## COUNT II
## CONFLICT PREEMPTION – SUPREMACY CLAUSE

76.     Plaintiffs herein incorporate all previous allegations.

77.     Even in the absence of field preemption, any state law or regulation is "conflict preempted" and thus invalid if it conflicts with federal law, frustrates the purpose of a federal law, or is an obstacle to full implementation of federal law. A state measure may be conflict preempted even if its impact on federal law is only indirect or incidental.

78.     FEJA's ZEC program is conflict preempted by the FPA. FERC, the agency charged with implementing the FPA, has determined that market-based processes – approved and overseen by FERC – are the best way to bring more efficient, lower cost power to the Nation's electricity consumers. The auction market process creates an incentive for capacity providers to be efficient and cost effective in order to be selected. It creates price signals for new capacity to enter the market if it can supply capacity at prices below the clearing price. At the same time, the market provides price signals for existing suppliers to exit the market if they are unable to beat the clearing price.

79.     FEJA's ZEC program enables the nuclear generators to offer in the auction markets at a lower price, below actual costs, over a lengthy ten-year period of time. At the expense of industrial progress, the clearing price of the auctions will thus be artificially suppressed for an entire decade. The offers of some

34

generators will be rejected, both existing and new, even though (absent the nuclear generators' subsidized participation) they would have cleared the auction. The generators whose offers are accepted will be under-compensated, because the clearing price will be artificially lower than what a competitive market process – as established by FERC – would have produced, and lower than the actual cost to provide the capacity service.

80.     FEJA's ZEC program will disrupt market signals. The subsidized nuclear generators, even though uneconomic, will stay in operation; generators that are otherwise economic will exit the market because they are receiving an artificially suppressed price and thus lower revenues; and investors will be discouraged from financing and building new economic generators. Supply will then be reduced, and new investors will be deterred from entering a marketplace plagued by subsidized distortions.

81.     The ZEC program also interferes with FERC's decision to structure the wholesale markets for capacity and energy on market-based principles in order to encourage the exit of uneconomic generating capacity – when a generator's costs exceed its revenues – to encourage the entry, when appropriate, of more efficient generators. It is clear from FEJA's ZEC program that Illinois simply disagrees with FERC's determination that the markets should determine the fate of the uneconomic nuclear generators.

**A.35**

82.     FEJA's ZEC program will also affect interstate and international wholesale markets outside Illinois and the MISO and PJM.  Because the ZEC program will artificially suppress the MISO and PJM auction prices, generators will prefer, where possible, to sell in wholesale markets other than MISO and PJM. This shift will increase supply and reduce prices in those other markets, and thus the ZECs will have market-distorting ripple effects throughout the national market and beyond Illinois's borders.

83.     If Illinois truly believes that Clinton and Quad Cities require a subsidy to achieve environmental goals, it is entitled to petition FERC to adopt market rule changes or take other steps to increase market prices to levels sufficient to allow the nuclear generators to recover their costs.  Instead of following this course, the Illinois General Assembly has opted to disregard FERC's exclusive jurisdiction over wholesale electricity rates.

84.     FEJA's ZEC program therefore stands as a formidable obstacle to FERC's regulatory scheme, which depends upon fair competition and the functioning of competitive auction markets without interference from out-of-market subsidies to achieve just and reasonable rates.  Under the Supremacy Clause, Illinois may not supplant FERC's scheme with its own preferred approach.

## COUNT III
### DORMANT COMMERCE CLAUSE, UNDER 28 U.S.C. § 1983

85.     Plaintiffs herein incorporate all previous allegations.

**A.36**

86. The FEJA's ZEC program is invalid under the dormant Commerce Clause, U.S. Const. art. I, § 8. Under this provision, states cannot discriminate against interstate commerce nor can they unduly burden interstate commerce, even in the absence of federal legislation regulating the activity. Any state action that burdens interstate commerce is invalid if the burden is clearly excessive in relation to the putative local benefits. A state action is invalid if it does not regulate evenhandedly to effectuate a legitimate local public interest, or if its effects on interstate commerce are more than incidental.

87. Although states have the authority to regulate the retail sale of electricity within their own borders, the wholesale sale of electricity involves interstate commerce, which the state may not regulate. MISO and PJM's wholesale markets are interstate and international in nature, as they involve the sale and transmission of energy and capacity from generators located in other states and in Canada, and the purchase of such commodities by customers in other states.

88. FEJA's ZEC program was enacted for political reasons in an attempt to save jobs and property tax revenues at the subsidized generators. Illinois's attempts to preserve local industry from the rigors of interstate competition are prohibited by the Commerce Clause.

89. Although the reduction of carbon emissions is important, this can be achieved more effectively by means that would neither discriminate against

**A.37**

interstate or international commerce nor frustrate the progress competitive markets have been delivering in the form of environmental benefits.

90.     FEJA's ZEC program is directly discriminatory, as only favored Illinois nuclear plants will receive subsidies.  Although all nuclear facilities connected to MISO or PJM are purportedly eligible to apply for ZEC subsidies, the procurement criteria have been rigged so that only Clinton and Quad Cities may be selected as the "winning bidders."  Moreover, the program is not even-handed with respect to other technologies that could produce carbon-free electricity and with respect to out-of-state generation.  It therefore violates the Commerce Clause.

91.     Even if the ZEC program is not deemed discriminatory, it is still invalid under the Commerce Clause because it imposes market-distorting burdens on interstate and international commerce that far outweigh the purported local benefits.  As detailed above, the ZECs would cause more efficient interstate generators to leave the market and discourage the entry of new competitors.

92.     In fact, the purported local benefits are largely illusory. Artificially suppressed prices – achieved through ratepayer subsidies provided to uneconomic nuclear generating units – will ultimately lead to reduced supply and higher prices, as they will deter the development of newer, more efficient market entry needed to moderate higher prices. The ZEC program will hurt Illinois consumers and businesses and will cost jobs.

93.     Implementing the FEJA's ZEC program deprives plaintiffs of their

Commerce Clause "rights, privileges, or immunities" within the meaning of 28

U.S.C. § 1983.  Plaintiffs have been injured by these deprivations and are entitled

to redress under § 1983.  *Dennis v. Higgins*, 498 U.S. 439 (1991).

## **PRAYER FOR RELIEF**

In light of the foregoing, Plaintiffs seek:

A.     a declaration that the portions of FEJA establishing the ZEC nuclear

subsidies are invalid because they are preempted by federal law and violate the

Commerce Clause;

B.     a permanent injunction preventing Defendant from implementing

FEJA's ZEC program;

C.     reasonable attorneys' fees and costs, including pursuant to 28 U.S.C.

§ 1988; and

D.     all such other relief to which the Court may find Plaintiffs are entitled.

By:*/s/Leonard A. Gail*
        Leonard A. Gail

Jonathan S. Massey (*pro hac vice* pending)
MASSEY & GAIL, LLP
1325 G Street, NW
Suite 500
Washington, DC 20005
Telephone: (202) 652-4511
jmassey@masseygail.com

Jonathan D. Schiller (*pro hac vice* pending)
David A. Barrett (*pro hac vice* pending)
BOIES SCHILLER & FLEXNER, LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
jschiller@bsfllp.com
dbarrett@bsfllp.com

39

**A.39**

Leonard A. Gail
Suyash Agrawal
Paul J. Berks
MASSEY & GAIL, LLP
50 East Washington Street
Suite 400
Chicago, IL 60602
Telephone: (312) 283-1590
jmassey@masseygail.com
sagrawal@masseygail.com
pberks@masseygail.com

*Attorneys for Plaintiffs*

Stuart H. Singer (*pro hac vice* pending)
William T. Dzurilla
(*pro hac vice* pending)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone (954) 356-0011
ssinger@bsfllp.com
wdzurilla@bsfllp.com

Edward J. Normand (*pro hac vice* pending)
Jason C. Cyrulnik (*pro hac vice* pending)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
enormand@bsfllp.com
jcyrulnik@bsfllp.com

**A.40**

## EXHIBIT A

## ZEC Pricing Formula, 20 ILCS 3855/1-75(d-5)(1)(B)

(B) The price for each zero emission credit procured under this subsection (d-5) for each delivery year shall be in an amount that equals the Social Cost of Carbon, expressed on a price per megawatthour basis.  However, to ensure that the procurement remains affordable to retail customers in this State if electricity prices increase, the price in an applicable delivery year shall be reduced below the Social Cost of Carbon by the amount ("Price Adjustment") by which the market price index for the applicable delivery year exceeds the baseline market price index for the consecutive 12-month period ending May 31, 2016.  If the Price Adjustment is greater than or equal to the Social Cost of Carbon in an applicable delivery year, then no payments shall be due in that delivery year.  The components of this calculation are defined as follows:

(i) Social Cost of Carbon: The Social Cost of Carbon is $16.50 per megawatthour, which is based on the U.S. Interagency Working Group on Social Cost of Carbon's price in the August 2016 Technical Update using a 3% discount rate, adjusted for inflation for each year of the program. Beginning with the delivery year commencing June 1, 2023, the price per megawatthour shall increase by $1 per megawatthour, and continue to increase by an additional $1 per megawatthour each delivery year thereafter.

(ii) Baseline market price index: The baseline market price index for the consecutive 12-month period ending May 31, 2016 is $31.40 per megawatthour, which is based on the sum of (aa) the average day-ahead energy price across all hours of such 12-month period at the PJM Interconnection LLC Northern Illinois Hub, (bb) 50% multiplied by the Base Residual Auction, or its successor, capacity price for the rest of the RTO zone group determined by PJM Interconnection LLC, divided by 24 hours per day, and (cc) 50% multiplied by the Planning Resource Auction, or its successor, capacity price for Zone 4 determined by the Midcontinent Independent System Operator, Inc., divided by 24 hours per day.

(iii) Market price index: The market price index for a delivery year shall be the sum of projected energy prices and projected capacity prices determined as follows:

(aa) Projected energy prices: the projected energy prices for the applicable delivery year shall be calculated once for the year using the forward market price for the PJM Interconnection, LLC Northern Illinois Hub.  The forward market price shall be calculated as follows: the energy forward prices for each month of the applicable delivery year averaged for each trade date during the calendar year immediately preceding that delivery year to produce a single energy forward price for the delivery year.  The forward market price calculation shall use data published by the Intercontinental Exchange, or its successor.

(bb) Projected capacity prices:

(I) For the delivery years commencing June 1, 2017, June 1, 2018, and June 1, 2019, the projected capacity price shall be equal to the sum of (1) 50% multiplied by the Base Residual Auction, or its successor, price for the rest of the RTO zone group as determined by PJM Interconnection LLC, divided by 24 hours per day and (2) 50% multiplied by the resource auction price determined in the resource auction administered by the Midcontinent Independent System Operator, Inc., in which the largest percentage of load cleared for Local Resource Zone 4, divided by 24 hours per day, and where such price is determined by the Midcontinent Independent System Operator, Inc.

(II) For the delivery year commencing June 1, 2020, and each year thereafter, the projected capacity price shall be equal to the sum of (1) 50% multiplied by the Base Residual Auction, or its successor, price for the ComEd zone as determined by PJM Interconnection LLC, divided by 24 hours per day, and (2) 50% multiplied by the resource auction price determined in the resource auction administered by the Midcontinent Independent System Operator, Inc., in which the largest percentage of load cleared for Local Resource Zone 4, divided by 24 hours per day, and where such price is determined by the Midcontinent Independent System Operator, Inc.  For purposes of this subsection (d-5): "Rest of the RTO" and "ComEd Zone" shall have the meaning ascribed to them by PJM Interconnection, LLC.  "RTO" means regional transmission organization.

A-2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELECTRIC POWER SUPPLY | ) | |
| ASSOCIATION, DYNEGY INC., | ) | |
| EASTERN GENERATION, LLC, | ) | |
| NRG ENERGY, INC., and CALPINE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Plaintiffs | ) | Case No. 17-cv-01164 |
| | ) | |
| v. | ) | Judge |
| | ) | |
| ANTHONY M. STAR, in his official | ) | Magistrate |
| capacity as Director of the Illinois | ) | |
| Power Agency, and BRIEN J. | ) | |
| SHEAHAN,  JOHN R. ROSALES, | ) | |
| SADZI MARTHA OLIVA, MIGUEL | ) | |
| DEL VALLE, and SHERINA MAYE | ) | |
| EDWARDS, in their official capacities | ) | |
| as Commissioners of the Illinois | ) | |
| Commerce Commission, | ) | |
| | ) | |
| Defendants | ) | |

DECLARATION OF DAVID W. DERAMUS, PH.D.

**A.43**

# Table of Contents

I. Introduction and summary of conclusions ...................................................................................... 1

II. Overview of affected FERC-jurisdictional wholesale markets ...................................................... 4
    II.A. General structure and purpose of wholesale markets ....................................................... 4
    II.B. Energy vs. capacity markets ............................................................................................ 5
    II.C. PJM energy and capacity markets .................................................................................. 7
    II.D. MISO energy and capacity markets .............................................................................. 10

III. The ZEC price is "tethered" to wholesale markets and prices ................................................. 11
    III.A. ZEC program is predicated on participation in wholesale markets .............................. 11
    III.B. The ZEC price is calculated based on wholesale prices ............................................. 13
    III.C. ZECs are easily distinguishable from RECs ............................................................... 17

IV. The IL ZEC program will distort FERC-jurisdictional wholesale market prices and outcomes ...... 19
    IV.A. Illinois 2015 Report ..................................................................................................... 19
    IV.B. Analysis of the market impact of the Illinois ZEC program ......................................... 22
        IV.B.1. Impact of ZEC nuclear subsidy on energy markets ......................................... 22
        IV.B.2. Impact of ZEC nuclear subsidy on capacity markets ...................................... 26
    IV.C. The IL ZEC program will distort market bidding behavior .......................................... 28

V. The IL ZEC program will cause irreparable harm ..................................................................... 31
    V.A. ZEC program will harm other market participants by artificially suppressing market prices ......... 31
    V.B. ZEC program will cause market exit and reduce market entry by more efficient participants ......... 32
    V.C. ZEC program will harm ratepayers .............................................................................. 33
    V.D. ZEC program will harm ratepayers by overcompensating nuclear units relative to actual costs ......... 35

VI. The IL ZEC program provides undue in-state preferences ...................................................... 37
    VI.A. Statements and actions by Exelon .............................................................................. 37
    VI.B. The stated goals and findings of the FEJA .................................................................. 38
    VI.C. Specific provisions of the FEJA .................................................................................. 40
        VI.C.1. ZEC participation is limited to nuclear facilities ............................................. 40
        VI.C.2. ZEC participation is limited to nuclear facilities with insufficient market revenues .... 41
        VI.C.3. ZEC participation is effectively limited to uneconomic nuclear facilities in Illinois ...... 42
        VI.C.4. ZEC program design is uniquely applicable to Clinton and Quad Cities ......... 43
    VI.D. Legislative history of the FEJA ................................................................................... 44
    VI.E. Protectionist effects of the FEJA are exacerbated by exports ..................................... 45

Declaration of David W. DeRamus, Ph.D.

# I. Introduction and summary of conclusions

(1)     My name is David W. DeRamus. I am a Partner with the economic consulting firm of Bates White, LLC. I have held this position since 1999. During this time period, I have performed economic analyses related to a range of litigation, arbitration, and regulatory matters, many of which pertain to issues of competition in wholesale electricity markets. I have previously served as an economic expert in various proceedings before the Federal Energy Regulatory Commission ("FERC"), various state regulatory authorities, federal and state courts, and arbitration associations. In many of these proceedings, I have analyzed issues of market power, market manipulation, monopolization, price-fixing, mergers and acquisitions, and the design of wholesale electricity markets. I have worked on behalf of the U.S. Department of Justice, the Maryland Public Service Commission, public utilities, independent power producers, industrial and residential consumers of electricity, industry associations, and various other parties. Prior to joining Bates White, I was employed by the management consulting firm A.T. Kearney, the accounting firm KPMG Peat Marwick, and the Harvard Graduate School of Business Administration. I received a Ph.D. in Economics from the University of Massachusetts at Amherst.

(2)     I have been asked by Plaintiffs to evaluate and quantify the likely impact on wholesale electricity markets of the nuclear power plant subsidies associated with the Illinois Zero Emissions Credits (ZECs), resulting from the Illinois Future Energy Jobs Act (FEJA).[1] I have also been asked to assess whether the impact of the Illinois ZEC program on wholesale electricity markets is likely to cause irreparable harm to wholesale market participants and/or to consumers. Finally, I have been asked to evaluate whether the FEJA effectively limits participation in the Illinois ZEC program to uneconomic nuclear generating units located within Illinois – all of which are owned by Exelon[2] – and effectively excludes other non-emitting electricity resources outside Illinois from participating in the program.

(3)     If the ZEC program is allowed to take effect, it will have a major, long-term disruptive effect on U.S. wholesale electricity markets. The wholesale electricity markets that will be primarily affected by this program are those administered by PJM Interconnection, L.L.C. (PJM) and the Midcontinent Independent System Operator, Inc. (MISO). PJM is a regional transmission organization (RTO) operating across 13 states and the District of Columbia. MISO is an RTO operating across 15 states and the Canadian Province of Manitoba. Illinois is served in part by PJM (in and around Chicago) and in part by MISO. Because of the interconnected nature of electricity systems and markets, the

---

[1]     The FEJA amends the Illinois Power Agency Act (IPAA), 20 ILCS 3855, effective June 1, 2017.

[2]     Of the seven nuclear generating facilities in Illinois, Exelon owns 100% of six of these units and 75% of the Quad Cities facility. MidAmerican Energy owns the remaining 25% of the Quad Cities facility. MidAmerican, however, is fully compensated for the costs of its 25% share of Quad Cities, since its retail ratepayers take service from MidAmerican at cost-of-service rates. It does not appear that MidAmerican intends or would be eligible to participate in the ZEC program with its share of the Quad Cities facility. See: "Exelon Bill Won't Raise MidAmerican Rates," *Dispatch/Argus*, December 2, 2016, available at http://www.qconline.com/news/local/exelon-bill-won-t-raise-midamerican-rates/article_31c06e9f-f10c-5f3b-bb19-a7bcbba95562.html, accessed March 27, 2017.

**A.45**

Declaration of David W. DeRamus, Ph.D.

disruptive effects of the ZEC program will extend to neighboring wholesale markets in the Eastern Interconnection as well.

(4)     The volume of commerce affected by the PJM and MISO markets is substantial. If allowed to proceed, the Illinois ZEC program will provide one company, Exelon, with out-of-market subsidies of approximately $235 million annually on average for the next 10 years – although the costs of the program may be as high as $340 million annually in the near term. The ZEC subsidies will be paid to support two uneconomic nuclear generating facilities in Illinois: Exelon's Clinton and Quad Cities nuclear generating facilities.[3] The purpose and effect of these subsidies is to ensure that these two uneconomic Illinois nuclear generating facilities, with 2,900 MW of capacity, will continue to operate and participate in the PJM and MISO wholesale electricity markets for at least the next 10 years, notwithstanding Exelon's stated intention – prior to the passage of the FEJA – to shutter these plants in 2017 and 2018.

(5)     The Illinois ZEC program directly "tethers" the subsidies to the continued wholesale market participation and revenues earned by the selected nuclear generating units. This "tethering" occurs both from the *de facto* requirement that the nuclear units continue to participate in wholesale markets (for the 10-year duration of the program) in order to receive the ZEC subsidies; and from the specific formula specified in the FEJA. The ZEC formula establishes a "price collar" that substantially reduces the risks to Exelon of changes in wholesale market prices. This "price collar" will eliminate any deficiency in Exelon's wholesale market revenues relative to the selected units' costs (up to a cap of $16.50/MWh). The ZEC program is easily distinguishable from other state environmental programs: its purpose is to prevent the retirement of uneconomic units of a mature technology, not to stimulate new investment or the development of novel technologies; it relies on a non-market mechanism, restricting participation to a single owner of a single technology in a single state, who can demonstrate that its costs are greater than its expected wholesale market revenues (for the specific generating facilities at issue); and it will have widespread and long-term distortionary effects on wholesale markets.

(6)     The Illinois ZEC program will artificially suppress prices in the wholesale energy and capacity markets, both in the immediate future and over the long-term. While the impact of the ZEC program will be greatest on the wholesale prices where the Clinton and Quad Cities facilities are located, i.e., in the ComEd Zone in PJM and the Zone 4 (Illinois) region in MISO, the impacts will be spread across a large volume of wholesale market transactions throughout these regions. The ZEC program will suppress energy market revenues by approximately **$107 million annually** in the ComEd Zone of PJM, and by approximately **$244 million annually** across all of PJM. In MISO, the ZEC program will suppress energy market revenues by **$26 million annually** in the Illinois Zone 4 region, and by

---

[3]     The Clinton generation facility has one nuclear reactor, while the Quad Cities generation facility has two reactors. All of the ZEC payments for the Quad Cities facility are expected to be earned by Exelon for its 75% share of that facility.

**A.46**

Declaration of David W. DeRamus, Ph.D.

**$93 million annually** across the broader MISO Central Region. In the wholesale capacity markets, the ZEC program will suppress market revenues by between **$386 million and $529 million annually** in the ComEd Zone of PJM. In the MISO capacity market, the ZEC program will likely suppress market revenues by between **$117 million and $309 million annually**.

(7)     If allowed to proceed, the Illinois ZEC program will cause irreparable harm, resulting from:

        a.     the immediate and long-term artificial suppression of wholesale energy and capacity prices, which cannot be "undone" after the fact;

        b.     the retirement of other more cost-effective generating units, and the foregone investment and market entry by other participants (including by renewable and demand-side resources), resulting from market distortions caused by the ZEC program; and

        c.     the substantial direct costs of the ZEC subsidies borne by Illinois ratepayers, as well as the costs and inefficiencies ultimately borne by ratepayers across the entire region as a result of the long-term market distortions from the ZEC program.

(8)     If allowed to proceed, the Illinois ZEC program will also undermine the faith and confidence of market participants in the integrity and sustainability of the market mechanisms established by FERC and the RTOs. To the extent the ZEC program reflects buyer-side market power, i.e., the artificial suppression of wholesale market prices, the program will cause PJM and MISO market prices to be unjust and unreasonable. The retention of uneconomic generating units in the wholesale markets also would frustrate the explicit purpose of wholesale markets: in establishing capacity markets, FERC intended markets to provide appropriate price signals to encourage the exit of inefficient generation and the entry of more efficient market participants. By artificially suppressing prices across a number of states, the ZEC program will ultimately leading to the replacement of market competition with "competition for subsidies."[4]

(9)     I also conclude that the ZEC program was structured to ensure that only in-state resources would participate in the program. Immediately after the FEJA was passed, Exelon reversed its prior decision to retire the Quad Cities and Clinton nuclear facilities. This demonstrates that the outcome of the ZEC procurement process is a foregone conclusion, i.e., with Clinton and Quad Cities the predetermined "winners" of the future procurement. The requirements and guidance provided in the FEJA ensure that participation in the ZEC program will be restricted to in-state resources. The FEJA defines "Zero Emissions Facilities" to limit participation only to nuclear generating units, thereby excluding other zero emissions technologies, such as wind or solar. The FEJA further limits participation to nuclear facilities that would otherwise exit the market. The reference prices used to determine the amount of

---

[4]     *See* "PJM monitor rails against threat of 'contagious' subsidies," *Energy Wire*, March 13, 2017, available at: http://www.eenews.net/energywire/2017/03/13/stories/1060051340, accessed March 30, 2017.

**A.47**

Declaration of David W. DeRamus, Ph.D.

ZEC subsidies is based on wholesale prices in Illinois. The 10-year time horizon for the ZEC program corresponds to the end of the nuclear license for Exelon's Clinton facility. The volume of ZEC credits to be procured corresponds to Exelon's output from its Clinton and Quad Cities facilities. Other provisions of the FEJA provide guidance to ensure that only in-state uneconomic nuclear plants will be selected for the program. The legislative history of the FEJA further demonstrates that the ZEC program is intended to support only in-state nuclear generation. The protectionist result of these in-state preferences is exacerbated here, since Illinois is a net exporter of electricity to other states, and these exports are supported in significant part by the ZEC subsidies – provided solely to Illinois nuclear generating units owned by Exelon.

## II. Overview of affected FERC-jurisdictional wholesale markets

(10) Under the FPA, FERC has exclusive jurisdiction over the transmission of electric energy in interstate commerce and over the sale of electric energy at wholesale in interstate commerce.[5] A "wholesale" transaction is defined as the sale of electric energy for resale. The FERC has exclusive authority to regulate the wholesale market to ensure that wholesale rates are "just and reasonable."[6] Recent state efforts to subsidize new electric generation facilities have been barred when they were found to distort FERC-jurisdictional wholesale markets and rates.[7]

## II.A. General structure and purpose of wholesale markets

(11) To promote competition in wholesale electricity markets, FERC issued Order No. 2000, which encouraged utilities to join an independent system operator (ISO) or regional transmission organization (RTO). RTO/ISOs are independent, nonprofit organizations responsible for wholesale sales and purchases of electricity, grid reliability, and transmission planning and operation to provide efficient market outcomes.[8] Since trades of electricity in the wholesale market generally occur across multi-state boundaries, RTO/ISOs often are organized regionally, encompassing many states. Two-thirds of the electricity consumed in the U.S. is by consumers in an RTO/ISO.[9]

---

[5]   16 U.S.C. § 824(b)(1).

[6]   16 U.S.C. § 824(d). FERC's exclusive jurisdiction over wholesale rates also extends to the terms and conditions of wholesale transactions.

[7]   In *Hughes v. Talen Energy*, the Supreme Court found that the FPA pre-empted a state's ability to provide subsidies for a new power plant because it intruded on FERC's authority over interstate wholesale rates (*[b]y adjusting an interstate wholesale rate, Maryland's program invades FERC's regulatory turf.*" slip op., at 12.).

[8]   89 FERC ¶ 61,285. Available at https://www.ferc.gov/legal/maj-ord-reg/land-docs/RM99-2A.pdf

[9]   "The Value of Independent Regional Grid Operators," *The ISO/RTO Council*. Available at http://www.nyiso.com/public/webdocs/media_room/press_releases/2005/isortowhitepaper_final11112005.pdf

Declaration of David W. DeRamus, Ph.D.

(12)  RTO/ISOs use centrally operated, "organized" day-ahead and real time spot markets to balance supply and demand. They also send long-term price signals to balance the supply and demand of generation and transmission infrastructure investment. Some RTO/ISOs like PJM and MISO use capacity markets to supplement revenue deficiencies earned in spot markets, to ensure that adequate resources exist to meet reliable planning needs, and to provide appropriate market signals to encourage efficient market exit and entry of generation resources. In addition, RTO/ISOs plan grid operations and infrastructure investment to ensure efficient response to changes in market fundamentals and/or challenges, such as declining natural-gas prices, shifts in electricity demand, and/or the need to reliably interconnect increased amount of renewable energy resources to the grid.

(13)  RTO/ISO markets are designed to select supply and demand resources that provide electricity at the lowest cost without hampering grid reliability. The physical challenges of maintaining electric supply-demand balance at all times necessitate complex market mechanisms that require FERC approval. Numerous market-rule changes have been implemented in order to improve the efficiency and reliability of the competitive wholesale markets.[10] RTO/ISO markets are overseen by FERC and an independent market monitor (IMM) to ensure that they are structurally competitive, to prevent market manipulation, and to prevent the exercise of either buyer or seller market power.

(14)  The largest part of the state of Illinois (by area) belongs to the MISO RTO, while the remainder of the state, including Chicago and parts of northern Illinois, belongs to the PJM RTO. As described more fully below, PJM and MISO operate two distinct types of electricity markets, i.e., both energy and capacity markets, and the energy markets include both "day-ahead" and "real-time" services.[11]

## II.B. Energy vs. capacity markets

(15)  Energy and capacity markets price different aspects of delivering electric power to the grid. Energy is what is generated and consumed in the moment, and is typically measured in kilowatt-hours (kWh) or megawatt-hours (MWh). Capacity is a measure of the *capability* to generate electric energy, and is typically measured in kilowatts (kW) or megawatts (MW).

(16)  Centralized wholesale markets, such as those administered by PJM, MISO, and other RTO/ISOs, are designed to set a single price of energy at a point in time, typically every five minutes, and at various locations. The clearing price in energy markets is based on the cost of generating the last quantity of electricity needed to meet demand in the moment (and location), with generating resources selected to operate in increasing order of cost. The energy market is intended to secure generation to meet load efficiently (only using higher cost resources when necessary), and to create incentives for generators

---

[10]  These market changes include creation of capacity markets and compensation for demand-response resources.

[11]  PJM and MISO also operate ancillary services markets, but the effect of the Illinois ZEC program on these markets is relatively small compared to the effect on the energy and capacity markets.

Declaration of David W. DeRamus, Ph.D.

to minimize operating costs and increase plant availability. Energy markets set prices per unit of actual generation, generally expressed in dollars per megawatt hour ($/MWh).

(17)   The single-price nature of energy markets means that sources of energy with very low operating costs, such as wind turbines and nuclear power plants, often receive energy market revenue in excess of their immediate operating costs. The excess of the energy price over the cost of generation is a plant's net energy revenue.

(18)   Capacity markets have been introduced in most, but not all, centralized markets. Capacity markets establish a price for capacity based on the value it provides to the electric system. As noted above, capacity is the *capability* to produce electric energy. Because heat waves or cold snaps can push the demand for electricity very high for short periods – much higher than the average level over a typical year – significantly more capacity must be available than is needed for producing energy in most hours. Without sufficient capacity, there would be blackouts during peak demand periods. Hence, there may be significant value in a power plant's capacity, even if it is needed only very rarely to actually generate energy.

(19)   Capacity markets were introduced to account for the fact that some generating resources – particularly those with high operating costs that may only operate infrequently, when they themselves are setting the market clearing price – do not earn sufficient net revenue in the energy market to cover their fixed costs. Capacity markets were designed to allow for compensation in addition to net energy revenue so that generators are paid appropriately for the value they provide to the electric system. Capacity market prices in PJM and MISO are generally expressed in dollars per megawatt day ($/MW-day), although the base commitment period is annual.

(20)   The economic viability of a generator that sells into the wholesale markets depends on its total costs relative to the combined revenue it can receive in both the energy and capacity markets.[12] Plant costs include not only current generating costs, but also the on-going fixed costs that are required to keep the plant ready to operate when needed, and which may be avoidable only through plant retirement. Some power plants, like nuclear generators, have a low cost of generating energy, but high fixed costs. Other types of plants, such as simple cycle turbines burning natural gas or oil, have relatively high costs of generation, but low fixed costs. In both cases, competitive plants earn revenue to cover their costs in the same capacity and energy markets, but may earn a greater or smaller share of their revenues from the energy market relative to the capacity market.

(21)   The design of the wholesale markets, and particularly of the capacity markets, is intended to provide appropriate price signals to generators, developers, and investors, in order to induce economically efficient decisions to build needed, new generation, or to retire old, costly power plants. Because

---

[12]   Centralized wholesale markets also include markets for ancillary services – generation-related services needed to ensure electric system stability.

**A.50**

capacity markets set the price of incremental capacity, and because they provide compensation for the capability to generate, they are essential parts of the overall wholesale market mechanism. Disruption to efficient pricing in the capacity markets – such as that caused by the Illinois ZEC subsidy program – undermines the signals intended to guide efficient market entry and exit.

## II.C. PJM energy and capacity markets

(22)  PJM operates competitive wholesale electricity markets and manages the reliability of its transmission grid.[13] In managing the grid, PJM centrally dispatches generation and coordinates the movement of wholesale electricity in all or part of 13 states (Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia) and the District of Columbia. PJM's markets include energy (day-ahead and real-time) and capacity (Reliability Pricing Model or RPM) services.[14] As of December 31, 2016, PJM had installed generating capacity of 182,449 MW and 986 members, including market buyers, sellers, and traders of electricity in a region of more than 65 million people.

(23)  The PJM energy market procures electricity to meet consumers' demands both in real-time (five minutes) and on a day-ahead (one-day forward) basis. PJM uses locational marginal prices (LMPs) to price energy purchases and sales. LMPs are derived using a physical flow-based pricing methodology that includes local generation costs, transmission congestion, and the cost of transmission losses to move energy within the PJM service territory.[15] Accordingly, LMPs represent the marginal cost to serve the next MW of demand at a specific location, using the lowest production cost of all available generation, while observing all transmission constraints and operating limitations. To ensure the lowest production cost, PJM requires that generators bid the price and amount of generation at generator-specific locations (i.e., a generator "bus") and accepts bids from the lowest until the accepted amount meets the demand. The resulting market clearing price is the LMP and is paid to all accepted bidders in that specific location without regard to the original bid price. LMPs are calculated both in day-ahead and real-time auctions.

(24)  Figure 1 provides a map of 2016 energy prices in PJM, with different colors representing energy prices at different locations (i.e., different LMPs).[16] In 2016, the PJM-wide load-weighted average

---

[13]  PJM was founded in 1927 as a power pool of three utilities serving customers in Pennsylvania and New Jersey. In 1956, with the addition of two Maryland utilities, it became the Pennsylvania-New Jersey-Maryland Interconnection, or PJM. PJM became a fully functioning ISO in 1996 and, in 1997, it introduced markets with bid-based pricing and locational market pricing (LMP). PJM was designated an RTO in 2001.

[14]  PJM introduced the RPM capacity market effective June 1, 2007. PJM also operates ancillary services markets, including the regulation market, the synchronized reserve market, the day-ahead scheduling reserve (DASR) market.

[15]  An LMP is comprised of the system energy price (or system lambda), transmission congestion cost, and transmission losses cost.

[16]  Monitoring Analytics LLC, "State of the Market Report," March 9, 2017, vol. 2, p. 157

**A.51**

Declaration of David W. DeRamus, Ph.D.

real-time LMP was $29.23/MWh, which was exceptionally low relative to historical averages.[17] There were significant differences among the zones, however. The highest average price by zone in 2016 was $38.62/MWh for the BGE zone (around Baltimore, Maryland), reflecting the transmission constraints in that part of PJM. This means that a limited amount of lower-cost energy from elsewhere on the system could be delivered to the zone in some hours, with higher-cost local resources setting the LMP in such hours. Average energy prices in the ComEd zone in Northern Illinois, by contrast, were considerably lower at $27.66/MWh, reflecting both the relatively large amount of generation supply in that zone relative to local load requirements, as well as the PJM transmission network topology that may limit exports to other parts of PJM (or MISO).

**Figure 1: PJM real-time energy LMPs relative to system marginal price, 2016**



(25) Unlike other generators that rapidly change their output in response to fluctuating demand, nuclear generators are inflexible and generally run continuously at maximum output. Since the opportunity costs of not running a nuclear plant are exceptionally high, they generally bid as price-takers in the energy markets to ensure that they can continuously sell their energy, regardless of the clearing prices in the day-ahead and real-time energy market auctions. At times of high energy prices, nuclear plant owners earn very large margins, since fuel costs are far cheaper than for fossil fuel plants. However, the recent decline in natural gas prices, driven primarily by the abundance of cheap shale gas, has decreased energy prices, thereby dramatically reducing the profitability of many nuclear plants, as

---

[17] Id., p. 156, Table 3-66.

**A.52**

Declaration of David W. DeRamus, Ph.D.

well as other generation owners. Nonetheless, current low energy prices are the result of the operation of competitive markets, as the PJM IMM has found.

(26)     The PJM capacity market, called the Reliability Pricing Model (RPM), was first introduced in 2007. The RPM ensures long-term grid reliability by procuring an appropriate amount of capacity resources needed to meet forecasted energy demand three years in the future. By matching energy supply with future energy demand, the RPM creates long-term price signals to attract needed investments in generation infrastructure and to assure adequate power supplies in the region. In the PJM capacity market, a load serving entity (LSE) is required to have the resources to meet its customers' demand plus a reserve. LSEs can meet that requirement in four ways: (i) with generating capacity they own; (ii) with capacity they purchase from others under contract; (iii) through demand response, in which end-use customers reduce their usage in exchange for payment; or (iv) with capacity obtained through the RPM auctions.[18]

(27)     The amount of capacity that LSEs are required to purchase is determined through the RPM, which in turn is subject to FERC oversight. LSEs in PJM procure capacity three years before it is needed through a competitive auction administered according to FERC-approved rules. This results in locational pricing for capacity that varies to reflect limitations on the transmission system and accounts for the differing needs for capacity in various areas of PJM. The RPM uses an administratively determined and FERC-approved "downward sloping" demand curve, which is the energy demand formula used to set the locational capacity price paid to market participants.

(28)     Similar to the energy market, the RPM participants offer power supply resources into the market that either increase energy supply or reduce demand at a certain price and volume at specific locations, called Locational Delivery Areas (LDAs).[19] The PJM capacity market accepts the offer from the lowest bid price until the requisite amount for each capacity zone has been met. The last accepted offer in each capacity zone establishes the market-clearing price for that zone, and all accepted capacity resources in that zone are paid the respective market-clearing price regardless of the original offer price. Accepted capacity resources must deliver energy or reduce demand in the energy market, if warranted, especially during power system emergencies. Otherwise, they are subject to significant penalty payments.

---

[18]   The RPM conducts a series of auctions for a delivery year in the future. The majority of capacity is procured in the first auction for a particular delivery year, which is known as the Base Residual Auction (BRA). This auction is conducted three years in advance of a given delivery year. The RPM model works in conjunction with PJM's Regional Transmission Expansion Planning (RTEP) process to ensure the reliability of the PJM region for future years.

[19]   LDAs are established by their ability to move electricity in the event of an emergency. LDAs are determined annually through PJM's Regional Transmission Expansion Plan (RTEP) process. There are currently 27 LDAs in PJM.

**A.53**

Declaration of David W. DeRamus, Ph.D.

## II.D. MISO energy and capacity markets

(29)   MISO operates the transmission system and centrally dispatched energy and capacity markets in all or parts of 15 U.S. states and the Canadian province of Manitoba, extending from Michigan and Indiana to Montana, and from Canada to Louisiana and Mississippi. MISO began market operations in April 2005. In 2013, MISO expanded its geographic footprint and established the MISO South region, which includes Entergy's service territory in parts of Arkansas, Mississippi, Louisiana, and Texas.

(30)   The operation of MISO's energy market is similar to PJM's energy market, i.e., centrally dispatched day-ahead and real-time energy markets that procure energy in a least-cost manner through competitive auctions, in which all accepted generators in the auction are paid the location-specific market clearing price (the LMP) regardless of their original bid prices.

(31)   Figure 2 below shows MISO's day-ahead average annual LMPs at major trading hubs (in Illinois, Indiana, Michigan, and Minnesota) during 2001 – 2016. During this time period, the average day-ahead MISO LMPs were lowest in 2016, due to low natural gas prices and slow demand growth. For example, the average day-ahead LMP at the Illinois hub (where the Clinton nuclear station is located) was $26.66/MWh in 2016, which is about 16% below the 2011 price of $31.67/MWh, and 28% below the 2014 price of $37.03/MWh.[20]

**Figure 2: MISO day-ahead LMPs ($/MWh)**



---

[20]   The average real-time LMP at the Illinois hub was $26.42/MWh in 2016, compared to $29.92/MWh in 2011 and $34.65/MWh in 2014.

**A.54**

Declaration of David W. DeRamus, Ph.D.

(32)    MISO's capacity market is called the Resource Adequacy Requirement (RAR). LSEs in MISO can meet their capacity requirements (defined by the sum of the LSEs' projected demand and a reserve calculated by MISO and approved by FERC) by self-scheduling capacity resources or by acquiring capacity from annual Planning Resource Auctions (PRAs). PRAs are held annually for each of the 9 load zones within the MISO footprint.[21] Similar to PJM's RPM auction, MISO's PRA functions as a reverse auction, where the offer price of the last unit needed to meet resource requirements sets the clearing price, which is paid to all cleared resources.[22] Unlike PJM's RPM market, MISO's RAR purchases annual capacity obligations one month before the annual delivery period. By contrast, PJM purchases capacity three years in the future.

## III. The ZEC price is "tethered" to wholesale markets and prices

(33)    As discussed in more detail below, the ZEC program will fundamentally distort wholesale markets: it will lead to uneconomic units being artificially retained in the market, after market price signals already signaled that they should exit (and after Exelon announced that the affected units would exit); it will lead to exit, and prevent entry, by other more efficient market participants (including by non-emitting resources); and it will artificially suppress wholesale market prices. All of these wholesale market impacts indicate a strong "tethering" of the ZEC program to the wholesale market. There are, however, several other fundamental ways in which the ZEC program is "tethered" to the wholesale markets, reflected in the very design of the program. These linkages between the design of the program and wholesale markets demonstrate that "tethering" is not simply incidental to the program (i.e., because "everything is interconnected in electricity"), but is a reflection of its basic purpose.

## III.A. ZEC program is predicated on participation in wholesale markets

(34)    First, in order to receive a ZEC payment, there is an implicit – and unavoidable – requirement that a selected nuclear unit must participate in wholesale markets, given the way both the program and the regional markets are structured. The amount of the ZEC payment received by a participating nuclear unit is based on its actual output. Indeed, as a condition of eligibility, ZEC program applicants must commit to operate the specific units selected for the entire 10-year duration of the program.[23] For a nuclear unit, this effectively means a commitment to run at maximum feasible output, around the clock (subject to availability, maintenance and refueling outages, etc.), for 10 years.

---

[21]    Since the 2015/2016 PRA, a new LRZ 10 for Mississippi was established.

[22]    Load pays the Auction Clearing Price (ACP) for the Zone in which it is physically located; cleared capacity is paid the ACP for the Zone where it is physically located; and external resources are paid the price of the Zone where their firm transmission service crosses into MISO.

[23]    FEJA(d-5)(1)(A)(iv).

**A.55**

Declaration of David W. DeRamus, Ph.D.

(35)    The output of these units is sold in FERC-jurisdictional wholesale markets. Given the way in which the system operator (PJM or MISO) implements its centralized dispatch function, in order to produce electricity in PJM and MISO, a competitive generator has to participate in – and clear – wholesale energy markets. Even if a nuclear unit decides to "self-schedule" its output without clearing the day-ahead market, the system operator will ensure that the unit will clear in the real-time market (with the wholesale payments or charges to the unit owner adjusted accordingly). In PJM and MISO, there is simply no practical means for a selected nuclear unit to avoid bidding into, and ultimately clearing, the wholesale energy markets, if it is to receive any ZEC payments.

(36)    Similarly, the ZEC program also implicitly and unavoidably requires a selected nuclear unit to bid into the capacity market. By the rules established by the RTOs (and approved by FERC), all competitive generators in the PJM and MISO markets are required to participate in capacity markets, i.e., to submit a bid subject to PJM and MISO rules regarding permissible bid amounts, even if their bids do not clear the market.[24] Further, as further discussed below, the formula for the ZEC program provides strong incentives for a participating nuclear unit to submit bids in the capacity market at a level that will ensure that it clears the market (e.g., as a "price-taker"), since any increase in capacity market prices caused by bidding as a "price-setter" (rather than a price-taker) would be offset by a corresponding reduction in its ZEC payments. Thus, the ZEC program's specific design – in concert with the established rules and structure of the wholesale markets – has the same effect on a nuclear unit's participation in the wholesale markets as an explicit requirement that it do so.

(37)    Second, the entire ZEC program is predicated on the assumption that the selected nuclear units would have retired in the absence of the ZEC payment. Thus, absent the ZEC program, the units at issue would have ceased participating in the wholesale markets. Certain provisions of the FEJA (discussed further below) require that in order to be eligible to participate in the ZEC program, an applicant must show that its nuclear unit's costs are such that it would be forced to retire without the ZEC payments, i.e., that wholesale market revenues are insufficient to allow it to recover its costs. Indeed, the stated rationale of the ZEC program is the "preservation of zero emission facilities," i.e., the retention of nuclear units in the market that would have otherwise retired in the absence of the ZEC payments.[25] This basic eligibility requirement – to show a deficiency in wholesale market revenues relative to a unit's costs – provides a further tethering between the ZEC program and the wholesale market.

(38)    Third, the "tethering" of the ZEC program to the wholesale market is evident in the program's genesis. The ZEC program was adopted in response to the expected retirement of specific Illinois nuclear plants. These expected retirements were the result of low wholesale market prices, relative to these specific nuclear units' operating costs. These low wholesale market prices, in turn, were the

---

[24]    The capacity markets in PJM and MISO allow load-serving entities – principally vertically-integrated utilities with their own generation – to in effect opt out of the capacity market-clearing process. This option is not relevant to the Illinois nuclear units nor the vast majority of generators in Illinois.

[25]    20 ILCS 3855/1-75(d- 5)(1)(C)

Declaration of David W. DeRamus, Ph.D.

result of increased competition from lower-priced natural gas generation; market entry by new generation, including new renewable generation; and increased wholesale market participation by other participants, such as providers of demand response and energy efficiency resources. The retirement of uneconomic units – and entry by more efficient units – in response to wholesale market price signals is precisely the result that FERC intended with competitive electricity markets. The fact that the ZEC program was developed in response to a perceived deficiency in wholesale market outcomes provides a further "tethering" of the program to wholesale markets and prices.

## III.B. The ZEC price is calculated based on wholesale prices

(39)    The explicit "tethering" of the ZEC subsidy to wholesale prices is evident in the specific formula for the ZEC credit adopted by the FEJA. As shown in Figure 3, the amount of subsidy earned by a participating nuclear generator is designed to adjust as wholesale electricity prices fluctuate:[26]

1.    The FEJA stipulates that the Illinois ZEC price is to be based on the value of the "Social Cost of Carbon" (SCC), which it has set equal to $16.50/MWh in 2017. The SCC value specified in the FEJA is derived from a range of estimates published by a U.S. government interagency working group (recently withdrawn), which are expressed in terms of dollars per metric ton of CO2.[27] The FEJA has selected one of these SCC estimates, which it purports to convert to $16.50/MWh based on the carbon intensity of electricity generation in Illinois.[28] The FEJA holds the SCC value of $16.50/MWh constant for the first six years of the program, unlike the (withdrawn) SCC values reported by the U.S. government interagency working group, which increase annually. Beginning in 2023, the SCC value used to set the ZEC price will increase by $1/MWh, and continue to increase by an additional $1/MWh each delivery year thereafter.

2.    The FEJA states that the ZEC price in an applicable delivery year will be reduced below the SCC by the amount by which the "market price index" for the applicable delivery year exceeds the "baseline market price index" for the 12-month period ending May 31, 2016. If the resulting "Price Adjustment" is greater than or equal to the SCC in an applicable delivery year, then no payments are due in that year.

---

[26]   20 ILCS 3855/1-75(d- 5)(1)(B)(i)

[27]   The FEJA relies on estimates of the SCC reported by the U.S. federal government Interagency Working Group on Social Cost of Carbon (August 2016 Technical Update), using a 3% discount rate, adjusted for inflation for each applicable year. The Interagency Working Group does not report a single value for the SCC, but rather provides a wide range of values, using alternative discount rates of 2.5%, 3%, and 5%, as well as a "high impact" estimate (corresponding to the 95th percentile of estimates based on a 3% discount rate). On March 29, 2017, by Executive Order, the Interagency Working Group on Social Cost of Carbon was disbanded, and the published SCC estimates were withdrawn.

[28]   The FEJA does not specify exactly how the Interagency Working Group's SCC estimate of the costs per metric ton of CO2 was converted to $16.50/MWh, as used in the Illinois ZEC program. The Interagency Working Group's SCC estimates vary by year, and the FEJA does not specify which year's estimate was used. The Interagency Working Group's estimate of the SCC for 2016, using a 3% discount rate, is $38 per metric ton of CO2.

**A.57**

3.  The "market price index" is the sum of projected energy prices at the PJM Northern Illinois Hub, and the average of projected PJM and MISO capacity prices for the specific delivery zones in which Illinois is located. The "baseline market price index" is equal to $31.40/MWh, which was calculated based on the historical PJM day-ahead energy and average PJM/MISO capacity prices for these same Illinois delivery points (or zones) over the 12-month period ending May 31, 2016.

**Figure 3: Derivation of Illinois ZEC payment**



\* The SCC remains fixed for the first six years and then escalates at $1/MWh per year thereafter.

The amount of the ZEC payment received by a generator will thus fluctuate between $0 and $16.50/MWh, depending on future wholesale energy and capacity prices in Illinois. A participating nuclear generator (i.e., Exelon) will receive no ZEC payments in a given delivery year if projected energy and capacity prices in Illinois rise above $47.90/MWh for that year (= $31.40 baseline market index + $16.50 SCC). Within these two bookends, the ZEC payment varies in a formulaic way based on current and projected wholesale energy and capacity prices.

(40)  In effect, the ZEC price formula establishes a "price collar" (or "revenue collar") for subsidized nuclear units at $47.90/MWh, which largely eliminates their risks from changes in wholesale market prices. If total projected market prices are equal to $35/MWh, for example, a nuclear generator would expect to earn $35 + [($16.50 - ($35 - $31.40)] = $47.90/MWh. If the following year, projected market prices fell back to $32/MWh, the nuclear generator would expect to earn $32 + [$16.50 - ($32 - $31.40)] = $47.90/MWh, identical to what it expected to earn the prior year. Indeed, the ZEC price is sufficiently high to keep the generator's expected revenues constant at $47.90/MWh over a wide range of expected market prices, as shown in Figure 4 below. This constancy in the resulting prices received by the nuclear plant owner makes the Illinois ZEC price formula highly similar to the explicit state-mandated "contract for differences" that the Supreme Court considered unconstitutional in *Hughes v. Talen Energy*. The only difference here is that this constant "contract for difference" effect only applies when wholesale prices are in the range of $31.40 to $47.90/MWh – although wholesale prices in the ComEd zone for PJM, for example, have been in this range fairly persistently since 2009. However, even if wholesale prices fall below $31.40, the $16.50/MWh maximum ZEC payment still provides substantial downside price protection, even if this ZEC price cap does not keep the nuclear unit's total revenues constant.

**A.58**

**Figure 4: ZEC "price collar" for subsidized nuclear units vs. market compensation**



(41) The "price collar" of $47.90/MWh established by the Illinois ZEC program corresponds roughly to the average break-even costs (levelized) for nuclear generating units, at least as reported by Exelon for two of its "at risk" nuclear units in New York, which have average costs of $49.60/MWh.[29] Thus, the ZEC can be considered a type of "make-whole" price intended to make an uneconomic nuclear generating unit "whole" with regard to the differential between its purportedly deficient wholesale market revenues and its expected costs (subject to an important caveat regarding exactly what costs are being included, and how).

(42) Indeed, this demonstrates that not only are two of the three elements in the ZEC pricing formula directly "tethered" to wholesale prices (i.e., the "baseline market index" and "market price index"), but so is the third element, the SCC, albeit in a slightly round-about way. The Illinois ZEC program was initially designed such that the ZEC price would be set explicitly on the difference between a nuclear generating unit's costs and wholesale market revenues, as reflected in an April 3, 2016 draft summary of the proposed program.[30] It was only after the U.S. Supreme Court's *Hughes* decision on

---

[29]   *See* NY CES Order, p. 140, fn. 99. The two referenced Exelon units for this cost estimate are the recipients of similar ZEC subsidies established by the New York Public Service Commission. As discussed below, however, the actual break-even cost of the Illinois nuclear units is unclear and may be lower than this, as noted in the 2015 Illinois Report.

[30]   "The price at which winning zero emission resources will be compensated is calculated annually, and is the difference between (i) the weighted average of all zero emission resources' average annual zero emission resource cost for the

**A.59**

April 16, 2016 that the ZEC formula was changed to be based on the SCC, as reflected in the final version of the FEJA. The $16.50/MWh value of the SCC derived for the FEJA, when added to the prevailing wholesale market prices (as of May 2016), is (not coincidentally) relatively close to the asserted break-even (levelized) cost of "at risk" nuclear units. While the reliance on the SCC in the ZEC formula allows Illinois to couch the subsidy as a payment for an environmental attribute, the effect of the payment – and its intent – is to be a "make-whole" payment to cover the perceived deficiency in wholesale market revenues, relative to the operating costs, for the nuclear units at issue.

(43)     The ICC may argue that because the ZEC's "market index" uses forward market prices, not actual wholesale market prices, this somehow "untethers" the ZEC formula from the wholesale market. Such an argument would ignore the fact that the "baseline market index" in the ZEC formula (i.e., the $31.40/MWh) is based on actual, historical wholesale market prices (for 2016), not forecasts. But even as it pertains to the "market index" forecast price component, such an argument is unconvincing in economic terms.

(44)     The market index specified in the ZEC formula encompasses both energy and capacity prices. The energy component is based on "forward" prices, which are traded on various exchanges. These forward prices are determined based on actual market prices, supplemented by market expectations of future changes in prices. The shorter the "window" between the forecast and current time period, the closer the forecasts will tend to be to actual market prices, with forecasts ultimately converging to actual prices.[31] Capacity prices applied in the ZEC formula are not forecasts, but are actual prices, because they are determined in advance of the delivery year. The MISO capacity market establishes capacity prices and obligations as of April each year for a delivery year of June through May (extending into the following year). The PJM capacity market clears three years in advance of the delivery year for the main auction. PJM holds incremental auctions subsequent to the base auction, but final capacity prices paid by load are fixed several months prior to the start of the delivery year.

(45)     The ZEC program allows ZEC prices to change over time, with the price for each delivery year set close to the beginning of that year. Thus, as the forecasts applicable to each delivery year are updated based on actual prices as the ZEC pricing date approaches (supplemented with revised expectations of future prices), the resulting ZEC prices will be inherently – and very closely – "tethered" to actual market prices. As an economist, I understand the term "tethering" to mean that there is an important linkage, or a fundamental dependency, between the ZEC price and the wholesale market. Using this definition, the ZEC price would be fundamentally "tethered" to wholesale market prices, even if it only used forecast prices.

---

planning year and (ii) the zero emission resource's projected energy revenues and capacity revenues for the planning year." *See* "Summary of Zero Emission Standard (ZES) Legislation," confidential discussion draft of April 3, 2016, p. 2.

[31]     When forward contracts are settled by the exchanges, they are settled against actual prices. This further demonstrates the inherent linkages between forward prices and actual wholesale market prices.

**A.60**

Declaration of David W. DeRamus, Ph.D.

## III.C. ZECs are easily distinguishable from RECs

(46) The FEJA has crafted the ZEC program to provide some superficial similarities to state Renewable Energy Credit (REC) programs: it is couched as an environmental program, i.e., to preserve the "zero emissions" benefits of nuclear generation; it is to be implemented via a procurement process (the exact parameters of which have yet to be determined); and it describes the ZEC subsidy as a payment for an "environmental attribute." The Illinois ZEC program, however, is easily distinguishable from the REC programs established by many states, in a number of fundamental respects: in terms of the ZEC program's purpose of preventing the retirement of inefficient plants; its major direct and foreseeable negative effects on regional wholesale markets; its insulation of program participants from wholesale market risks; its frustration of FERC's regulatory objectives in establishing wholesale markets; its absence of a true market-based procurement process; and (as discussed further below) its predetermined outcome to only support specific in-state uneconomic nuclear units.

(47) RECs are designed to enable states to implement their Renewable Portfolio Standards (RPS) programs, in keeping with their environmental objectives. REC programs use market-based mechanisms, i.e., with actual price competition between alternative suppliers of renewable energy, to incentivize new entry and innovation at the least cost. In many programs, RECs can be traded (often on exchanges), thereby allowing utilities to meet their renewable obligations more cost-effectively. REC programs have been successful in encouraging early adoption of new technologies, thereby enabling subsequent cost reductions and efficiencies with increased scale and innovations. Even when some states establish specific REC "tiers," e.g., a "solar REC," alternative suppliers can compete on price to supply that REC to the market, often using different underlying technologies within that tier, and at different (competing) generation locations. REC programs do not limit eligibility to suppliers whose wholesale market revenues are less than their costs; nor do states use REC price formulas that change the value of RECs based on wholesale market prices.

(48) The Illinois ZEC program, by contrast, is aimed at preserving older, inefficient in-state nuclear generating units – and their attendant jobs – even though the nuclear units have long been in the market, with a long-established technology, and have operated profitably in prior years when wholesale prices were higher. When Exelon acquired its nuclear units, it did so with full awareness of the risks – and profit opportunities – it faced as a generation owner selling into competitive wholesale markets. Now that competitive wholesale market conditions are no longer conducive to these units' profitability, the ZEC program in effect would shift the regulatory paradigm: it would allow Exelon to fully recover (and potentially over-recover) its costs, up to certain limits; it would shield these units from market risk for the next 10 years; and it would allow Exelon to take advantage of "upside" opportunities if wholesale market prices rise sharply in future years.

(49) ZEC prices are also not market prices. The ZEC prices are not determined by competitive bidding by alternative suppliers for the "good" ostensibly being acquired (electricity generated with zero

**A.61**

Declaration of David W. DeRamus, Ph.D.

emissions). Indeed, ZEC program participants do not submit supply offers based on price, but rather they submit detailed cost information. While the FEJA does not precisely specify how the IPA is to select among alternative applicants to the program (in the unlikely event that any nuclear generator other than Exelon would submit an offer), its general guidance indicates that they are to be selected based on an administrative determination regarding the perceived deficiency in wholesale market revenues for a given nuclear generating unit, relative to its costs. ZECs are further distinguishable from RECs in other ways as well, as summarized in Table 1, below.

## Table 1: Comparison of RECs and ZECs

| | RECs | ZECs |
|---|---|---|
| **Origin** | Environmental protection: reduce emissions of $CO_2$ and other air pollutants by encouraging new entry | Save in-state jobs and tax revenues by keeping uneconomic nuclear plants in the market |
| **Eligibility** | Open to all qualified renewable energy resources, regardless of economic need; typically many participants | Limited to nuclear plants that would cease to operate without subsidies (in Illinois: one owner, Exelon) |
| **Mechanism** | Competitively traded in voluntary open markets | Selected through a state procurement process with criteria designed to pre-select in-state units |
| **Value** | Varies based on supply and demand in competitive auction markets, independent of FERC-regulated wholesale markets | Price formula specified by the state (with price caps), but "tethered" to FERC-jurisdictional wholesale electricity prices |
| **Tenor** | Short-term (annual or shorter) | Long-term (10 years or longer) |
| **Purpose** | Support nascent renewable energy technologies; encourage investment and innovation; target declining costs | Subsidize existing, older, uneconomic nuclear plants to retain in-state jobs; may also be directed at suppressing market prices |
| **Outcome** | Entry by new renewable energy resources; enhanced competitiveness of wholesale markets | Keeps uneconomic nuclear from retiring; distorts competition in the wholesale markets; allows exercise of buyer market power |
| **Wholesale market risks** | Renewable energy owners still exposed to market risks | Insulates selected uneconomic nuclear owner from market risks via "make-whole" payments |
| **Wholesale market price impact** | New entry by many participants, incentivized both by RECs and RPS requirements, reduces energy prices; impact on capacity market prices is small due to low capacity value of renewables | Significant suppression of energy and capacity prices due to size of nuclear units; "domino effect" puts further pressure on distressed assets in other states, incentivizing "competition for subsidies" |
| **Wholesale market bidding incentives** | REC programs do not change renewable resources' bidding incentives in wholesale markets | ZEC price formula changes recipients' bidding incentives due to "make-whole" payment structure |

(50)    The FEJA points to the "positive externalities" of nuclear units, e.g., their lack of $CO_2$ emissions, as a justification for the ZEC subsidies. Nuclear power, however, also has "negative externalities," such as the unresolved costs and risks of disposing spent nuclear fuel, or the risks of a catastrophic event. While nuclear facility owners (or ratepayers) bear some of these costs and risks, a significant portion is borne by the U.S. government (and ultimately taxpayers). Nuclear power also benefits from other subsidies, such as federal support for R&D, federal loan guarantees for new construction, and the implicit subsidies of construction cost overruns borne by ratepayers (prior to restructuring).[32]

(51)    Regardless of how much weight one places on each of these considerations, however, the "positive externalities" associated with a given nuclear facility are not sufficient justification to allow the ZEC program to fundamentally distort competitive wholesale markets. There are many non-distorting ways of "internalizing" the costs of $CO_2$ emissions (and other pollutants), such as imposing a carbon tax, or participating in regional cap-and-trade programs (such as the Regional Greenhouse Gas Initiative). Illinois also could have petitioned FERC, and applied to MISO and PJM, for a change in market rules to explicitly value the asserted attributes of these facilities; or for other measures that could enable the units to continue operating, e.g., to address the claimed reliability concerns noted in the FEJA. Instead, Illinois chose to unilaterally implement a program that will fundamentally undermine FERC's competitive wholesale market construct, and disrupt wholesale markets in many other states.

# IV. The IL ZEC program will distort FERC-jurisdictional wholesale market prices and outcomes

## IV.A. Illinois 2015 Report

(52)    Several prior studies have shown that using the ZECs to retain the Clinton and Quad Cities nuclear facilities in the market will result in a significant distortion of wholesale market prices and auction outcomes. These studies are couched in terms of measuring the impact of the retirement of these facilities on wholesale prices (i.e., the retirements were expected to increase wholesale prices). The reverse is simply a logical extension of these studies: if the uneconomic nuclear generating units would have retired as a result of market forces, but stayed in the market solely as a result of the ZEC "out of market" payments, the price impacts reported in these studies show the amount by which the ZEC program caused wholesale market prices to be artificially depressed.

---

[32]    The Clinton nuclear station was subject to billions of dollars in cost overruns by the time it was completed in 1987. "Nuke Plant by the Numbers," *The Southeast Missourian*, July 28, 1997. Available at: https://news.google.com/newspapers?nid=1893&dat=19970728&id=kH0pAAAAIBAJ&sjid=VNgEAAAAIBAJ&pg=3983,5430326&hl=en  Accessed March 30, 2017. These cost overruns were ultimately borne by Illinois ratepayers. Exelon acquired the plant (for a small fraction of its cost) in the Illinois transition to competitive markets.

**A.63**

Declaration of David W. DeRamus, Ph.D.

(53) In response to the Illinois General Assembly's House Resolution 1146, the Illinois Commerce Commission (ICC), the Illinois Power Agency (IPA), the Illinois Environmental Protection Agency (Illinois EPA), and the Department of Commerce and Economic Opportunity (DCEO) (collectively, the Illinois Agencies) issued a joint report dated January 5, 2015 titled "Potential Nuclear Power Plant Closings in Illinois" (the 2015 Report).[33] The 2015 Report addressed issues related to the early retirement of certain "at-risk" nuclear power plants in Illinois.[34] Clinton, Quad Cities, and Byron, all of which are owned by Exelon, were identified as Illinois nuclear units at risk of retirement. The 2015 Report was the basis for the FEJA and is referenced in the FEJA.

(54) The 2015 Report recognizes that the "problem" of at-risk nuclear units is due to the decline in wholesale market prices. These prices are a direct result of the competitive wholesale markets that were established, designed, approved, and overseen by FERC; administered by independent RTOs; subject to regular independent monitoring; and modified via well-established rule-making and governance procedures, involving a wide range of parties (ultimately subject to approval by FERC). The 2015 Report documents that the wholesale energy prices (LMPs) available to Exelon's Illinois nuclear plants have declined by approximately 38% since 2007, primarily because of the sharp drop in the price of natural gas, which powers the generating units that are often the marginal, i.e., price-setting, units in both PJM and MISO. Among Exelon's fleet of nuclear units, the energy market LMPs for Quad Cities and Clinton have been the lowest and second lowest (respectively) for the period 2007-2013, while the LMPs for Byron were the third lowest. The 2015 Report also concludes that the combined energy and capacity revenues available to Clinton and Quad Cities in Illinois are significantly lower than those available to Exelon's nuclear plants outside Illinois.

(55) As a result of the decline in wholesale prices, Exelon has warned for several years that Clinton, Quad Cities, and Byron were at risk for premature closing.[35] While the 2015 Report finds that the costs of Clinton and Quad Cities would have exceeded total revenues from energy and capacity market sales in all years during 2007-2013, it also cautions that because of the limited cost data available, it is not clear whether Exelon's Illinois plants earn sufficient revenues to cover their operating costs.[36]

(56) It is important to reiterate that the "problem" identified in the 2015 Report is that wholesale electricity prices fell to levels at which certain high-cost nuclear power plants in Illinois might no longer be

---

[33] The 2015 Report is available at
http://www.ilga.gov/reports/special/Report_Potential%20Nuclear%20Power%20Plant%20Closings%20in%20IL.pdf

[34] The ICC studied the impact of nuclear plant closures on transmission and electricity rates. The IPA examined how nuclear plant closures would affect reliability and the adequacy of generating capacity in the Midwest. The Illinois EPA studied how nuclear plant closures would affect the level and societal cost of greenhouse gas emissions, and the DCEO examined the impact of nuclear plant closures on jobs and economic activity in Illinois. The Report also identified potential ways of preventing the closure of the at-risk nuclear plants.

[35] *See* "Exelon Warns State It May Close 3 Nukes," *Crain's Chicago Business*, March 1, 2014. Available at: http://www.chicagobusiness.com/article/20140301/ISSUE01/303019987/exelon-warns-state-it-may-close-3-nukes Accessed March 30, 2017.

[36] 2015 Report, at p. 39.

**A.64**

Declaration of David W. DeRamus, Ph.D.

economic to operate. The Illinois ZEC program is ostensibly intended to correct the "problem," but it would do so by exacerbating its source, because the program would artificially suppress energy and capacity market prices. In doing so, the ZEC program would inflict harm on other generators spanning PJM, MISO, and other interconnected electric regions, effectively "exporting" the problem elsewhere and undermining the price signals that are critical to the successful, efficient operation of regional wholesale power markets in the longer term.

(57)   The 2015 Report includes assessments of energy market impacts in PJM and MISO. One of these assessments was conducted by Monitoring Analytics, the IMM for PJM. The IMM focused on the retirement of the Quad Cities and Byron nuclear plants, and estimated the impact on LMPs for the ComEd Zone on a "hot weather alert" day in June 2014. The study found that the unavailability of these two plants during these conditions would significantly increase LMPs in the ComEd zone. The IMM concluded that such results were to be expected, given the assumed removal of 4,000 MW of Illinois baseload generation. However, the IMM also provided the following caution:

> *The fact that energy market prices would increase does not support providing subsidies to these plants in order to forestall retirement*. Any decision to retire the plants would be based on the basic economics of the plants. […] Such a [basic economics] review would also have to account for the substantial increase in capacity market revenues that is expected to result from PJM's new capacity market design proposal. *If a well structured wholesale power market does not provide enough revenue to support one or both plants, then an appropriate conclusion would be that the clear market signal is to retire one or both plants*.[37]

(58)   The 2015 Report concluded with an evaluation of potential "market-based solutions" identified by the Agencies. In developing solutions, the Agencies acknowledged that Illinois is a part of the PJM and MISO markets, so that "the use, dispatch, and compensation for all generating plants located in Illinois is dependent on consumer decisions made in over 20 states and Canadian provinces."[38] Moreover, the Agencies also recognized that an Illinois "market-based solution" cannot conflict with FERC rules, stating that "a narrowly tailored solution that incentivizes electricity outputs from nuclear assets in Illinois could be considered a violation [of the FERC rules]."[39] The Illinois ZEC program fails to address these "core realities"[40] for a workable market-based solution.

(59)   In the remainder of this section, I evaluate the magnitude of the harm the Illinois ZEC program would impose in PJM and MISO, drawing on the results of the analyses presented in the 2015 Report.

---

[37]   "Nuclear Plant Retirement Impact Preliminary Analysis of High Load Day," Monitoring Analytics, October 30, 2014, at pp. 5-6.

[38]   2015 Report, at p.152.

[39]   Id., at p.153.

[40]   Id., at p.152.

Declaration of David W. DeRamus, Ph.D.

# IV.B. Analysis of the market impact of the Illinois ZEC program

(60) The near-term effect of keeping uneconomic nuclear capacity operating and selling into the wholesale power markets is unambiguous: it will suppress market energy and capacity prices. This is a simple function of how such markets work, the operating characteristics of the subsidized nuclear plants, and the incentives inherent in the Illinois ZEC program. Information from studies presented in the 2015 Report, along with available market data, allows me to calculate a conservative estimate of the likely impacts in PJM and MISO, as follows:

   a. Retaining Quad Cities alone in the PJM energy market (i.e., excluding the additional impact from retaining Clinton in MISO) will suppress energy prices across PJM, with a likely reduction in generator revenues of **$244 million annually**. Within the local ComEd Zone, the price suppressing effect is more pronounced. Based on generation volume in the zone, the reduction in revenue is likely to be approximately **$107 million annually**, or a little less than half the PJM aggregate impact.

   b. Retaining Quad Cities in the PJM capacity market will suppress clearing prices in the upcoming May 2017 auction for the 2020/21 delivery year, with a likely reduction in generator revenues of between **$386 million** and **$529 million** for the annual delivery period.

   c. Retaining Clinton alone in the MISO energy market (i.e., excluding the additional impact from retaining Quad Cities in PJM) will suppress energy prices across the MISO Central Region, and it is likely to reduce generator revenues by approximately **$93 million annually**. Within Zone 4 (Illinois), the price suppressing effect is likely to reduce generator revenue by approximately **$26 million**, or a little more than a quarter of the MISO Central aggregate impact.

   d. Retaining Clinton in the MISO capacity market will suppress clearing prices in the annual Planning Resource Auctions, with a likely reduction in capacity revenues for generators in Illinois of between **$117 million** and **$309 million** annually.

## IV.B.1. Impact of ZEC nuclear subsidy on energy markets

(61) As described above, the centralized wholesale energy markets administered by the RTOs produce clearing prices at each point in time – typically every five minutes – by selecting the volume of generating resources, in increasing order of cost, that is needed to meet demand. For a given moment (I will use an hour for ease of description), there is a stepwise supply curve, or "stack," that represents the supply offers in order from low to high. This is illustrated in Figure 5. Each resource type has a different range of generation costs, and the combined capacity available at a particular cost makes up

**A.66**

one step of the supply curve. Typically, renewable generation, such as wind or solar, has an energy cost near zero and establishes the first supply step on the lower left. The variable cost of generation by nuclear plants is very low, and typically it is the next resource type in order of variable cost (i.e., ignoring their relatively high fixed costs). The practical need to ensure that a nuclear generating unit continues to operate around the clock means that they are often offered into energy markets at a price of zero, but in any case, nuclear units would be selected to run in most hours on the basis of their low variable costs. In Illinois, nuclear units account for approximately 48 – 50% of annual energy generated; in the ComEd Zone of PJM, they account for 77% of annual energy generated.

**Figure 5: Illustrative wholesale energy market supply curve**



(62)    In increasing order of variable costs, the next resources would typically be large coal-fired generating units; followed by large, efficient gas-fired units; followed by smaller, less-efficient fossil fuel units; and finally at the top of the stack, small oil-fired units. The quantity of electrical load, or demand, on the system in a given hour determines the quantity of generation that must be procured (i.e., the distance to the right along the supply stack), and the highest-cost resource needed sets the clearing price for that hour. This is illustrated in Figure 6.

**A.67**

Declaration of David W. DeRamus, Ph.D.

**Figure 6: Determination of market clearing price**



(63)     The effect of the ZEC subsidy is to cause otherwise uneconomic nuclear plants to stay in the market rather than retire. Since nuclear plants are very low on the supply stack (i.e., they are far to the lower left in the figure), keeping these plants in the generating market increases the horizontal length of the nuclear capacity step, and so causes most of the supply curve to shift to the right. Because nuclear plants are large, in many hours this shift of the supply curve will mean that a higher-cost unit that otherwise would be needed to serve load and would clear the market is no longer needed. Another, lower-cost unit becomes the marginal resource, and the market clearing price is reduced. This effect of shifting the supply curve is illustrated in Figure 7.

**A.68**

Declaration of David W. DeRamus, Ph.D.

**Figure 7: Illustrative impact on energy supply curve and market clearing prices**



(64)  As discussed above, at the request of the ICC, PJM estimated the impact of various scenarios related to the retirement or retention of Illinois nuclear plants.[41] PJM estimated that the effect of Quad Cities alone retiring would be to increase the projected average energy price across the entire PJM footprint by between 0.8% and 1.1% in 2019, depending on additional scenario assumptions such as the prevailing natural gas price. Impacts would be felt across the system, and would be greater in the local ComEd zone, increasing energy prices there between 2.7% and 3.2% in 2019. These estimated impacts are based on the retirement of Quad Cities alone – i.e., they do not reflect the retirement of the nearby Clinton plant in MISO, which would also affect the energy markets in PJM.

(65)  In 2016, annual generation, including imports, clearing the PJM real-time energy market totaled approximately 835 million MWh. PJM's average energy clearing price for the year was a historic low of $29.23/MWh – about 20% lower than for the prior year, influenced predominantly by low natural gas prices. If energy prices were suppressed by 1% across PJM (a conservative estimate, since PJM's estimated price impacts do not include Clinton), expected annual generator revenue would fall by approximately $244 million (835 million MWh x $29.23/MWh x 1%). This estimate of the impact of the Illinois ZEC program on PJM energy prices is likely to be conservative, since it is based on a historically low reference price, and retaining Clinton will also have an impact on energy prices in PJM, even though it is located in MISO.

---

[41]  2015 Report, starting p. 55.

Declaration of David W. DeRamus, Ph.D.

(66)    The LMP impact of retaining Quad Cities is more pronounced in the ComEd Zone, where the plant is located. The PJM analysis presented in the 2015 Report estimates a price impact of retirement between 2.7% and 3.2% of the average annual energy price. Again, this estimate is conservative for the purposes of assessing ZEC program effects, because it excludes the additional expected impact associated with Clinton. A 3% impact on the ComEd Zone load-weighted real-time LMP in 2016 – which was $27.66, even lower that the historic low for PJM as a whole – can be translated into a dollar impact using the generation volume for the zone in 2016, which was 129 million MWh. The reduced generator revenue would be approximately $107 million (129 million MWh x $27.66 x 3%).

(67)    The impact of retaining Clinton in the MISO energy markets can also be estimated conservatively based on the results of PJM's analysis. PJM estimated energy market effects on the Ameren Illinois pricing zone, within MISO Local Resource Zone 4, which itself represents virtually all of Illinois outside of the ComEd/PJM portion.[42] Ameren constitutes more than 70% of Zone 4 load. The PJM analysis estimated an impact from the retirement of Clinton of between 1.2% and 2.7% of average energy prices. This impact excludes any effect from the contemporaneous retirement of Quad Cities.

(68)    A 2% reduction in average energy prices for MISO's Zone 4 can be translated into an aggregate dollar impact using the average real-time LMP for MISO's Illinois Hub, which was $26.52 in 2016, slightly lower than the comparable energy price in PJM's ComEd Zone for 2016. Annual customer load for Zone 4 is approximately 50 million MWh. Using this as a proxy for generation affected by LMPs, the price suppression impact would be $26 million (50 million MWh x $26.52 x 2%). This is likely highly conservative for several reasons: 1.) as previously noted, the energy price impact estimate is for Clinton alone, excluding any compounding effect from Quad Cities; 2.) 2016 energy prices were at historic lows; and 3.) the load proxy likely significantly understates Zone 4 generation. Regarding the last factor, Zone 4 currently has generation capability greater than local electricity demand, so generation generally exceeds load.[43]

(69)    As is the case in PJM, energy price impacts would extend in MISO well beyond Illinois. A 1% energy price effect over the MISO Central region, representing aggregate annual load of approximately 350 million MWh, translates to an aggregate price suppression of approximately $93 million annually (350 million MWh x $26.52 x 1%).

## IV.B.2. Impact of ZEC nuclear subsidy on capacity markets

(70)    Retaining the uneconomic Quad Cities and Clinton plants via ZEC subsidies will also suppress clearing prices in the PJM and MISO capacity markets. The economic principle that drives market

---

[42]    Small portions of northwestern Illinois are included in MISO Zones 1 and 3.

[43]    In addition, generation will always exceed load because some energy is lost in the process of being transmitted from the generator to the consumer.

**A.70**

suppression in the capacity market is essentially the same as for the energy market: an artificial increase in supply pushes down market clearing prices.

(71)   The next PJM capacity market auction occurs in the first half of May 2017. This will be the Base Residual Auction (BRA) for the 2020/21 delivery year. The PJM-wide demand curve applicable for the auction is shown in Figure 8. The aggregate resource requirement is 168,000 MW, but as discussed above, the demand curve ensures that capacity in excess of the requirement is priced and procured, consistent with PJM's estimate of incremental capacity value to the system.

**Figure 8:  PJM RTO capacity market demand curve – 2020/21 BRA**



(72)   Capacity prices in PJM have ranged in recent years between roughly $120/MW-day and $170/MW-day (weighting multiple auction results applicable to delivery years from 2015/16), indicating that the RTO as a whole has capacity significantly in excess of the resource requirement. Figure 8 shows the RTO-wide demand curve, which in surplus conditions (i.e., along the right-most part of the curve) prices incremental (or decremental) capacity at $0.026/MW. Like the energy market, the capacity market also accounts for constraints on moving power from one location to another. When such constraints are binding, as has occurred in the ComEd delivery area in recent auctions, capacity prices in the constrained-in region clear at higher levels. The clearing price for the ComEd region in the 2019/20 Base Residual Auction was $202.77/MW-day, compared to prices elsewhere in PJM of $100/MW-day and $120/MW-day.

(73)   The effect of retaining 1,790 MW[44] of Quad Cities capacity in the market, rather than allowing it to exit because of economic retirement, would suppress clearing prices by about $46/MW-day (1,790

---

[44]   1,790 MW reflects a 1.8% reduction of Quad Cities' installed capacity, which corresponds to the 'unforced capacity' value that would be applicable in the PJM capacity auction.

**A.71**

MW x $0.026/MW), if the market were unconstrained, i.e., if the RTO-wide demand curve were applicable. The impact on the ComEd area would likely be significantly greater. A scenario analysis performed by the PJM market monitor with respect to the 2019/20 capacity market results, which evaluated the effect on ComEd clearing prices of a change in the zonal transfer limit by 1,860 MW, comparable to the quantity of Quad Cities capacity, derived an impact of $63/MW-day.[45] The range of price impacts can be translated into a range of aggregate dollar impacts based on the volume of capacity clearing the market in the ComEd zone, which totaled approximately 23,000MW in the 2019/20 auction. The lower price suppression value of $46/MW-day corresponds to an annual capacity revenue reduction of $386 million (23,000MW x $46/MW-day x 365 days). The higher value of $63/MW-day corresponds to an annual capacity revenue reduction of $529 million (23,000MW x $63/MW-day x 365 days).

(74)   Capacity market effects in MISO can be estimated based on the available offer curves, i.e. the offer prices and volumes from prior auctions. In the most recent MISO Planning Resource Auction, for the 2016-17 delivery year, the capacity clearing price was $72/MW-day for Zones 2 through 7, spanning most of the Midwest region. The data show that the offer that set the clearing price was for a resource located in Illinois Zone 4. The data also show that only 7 MW further up the offer curve, the clearing price would have been $110.77/MW-day, and that a shift up the curve by 1,100 MW, corresponding to Clinton's capacity, would have pushed the clearing price to $174.61/MW-day. While it is not possible to determine from the data what volume of Clinton capacity cleared the capacity market, because resource-identifying information is not made available by MISO, the difference between the two alternative points on the offer curve provide reasonable bounds on the likely price suppression from retaining Clinton in the market rather than allowing it to retire. Based on the cleared capacity of 8,242 MW from Zone 4 only, these values translate into reduced capacity market revenue of between $117 million and $309 million annually (8,242 MW x ($111/MW-day - $72/MW-day) x 365 days = $117 million; and 8,242 MW x ($175/MW-day - $72/MW-day) x 365 days = $309 million).

## IV.C. The IL ZEC program will distort market bidding behavior

(75)   Given the results of the analysis above, it should be evident that the ZEC program will change the bidding behavior of many market participants – which reflects the fundamental "tethering" between the ZEC program and the wholesale markets. The most direct impact on bidding behavior is that the program will cause uneconomic nuclear generating plant owners to submit supply offers into wholesale markets in which they otherwise would have exited. In the absence of the ZEC program, Clinton (a 1,065 MW facility) would not bid into the MISO energy and capacity auctions for any delivery period after June 2017, for example, since it would have already retired. Similarly, while

---

[45]   Monitoring Analytics, "Analysis of the 2019/2020 RPM Base Residual Auction" (August 31, 2016), p. 81. Available at: http://www.monitoringanalytics.com/reports/Reports/2016/IMM_Analysis_of_the_20192020_RPM_BRA_20160831.pdf

**A.72**

Declaration of David W. DeRamus, Ph.D.

Quad Cities (a 1,819 MW facility) was not scheduled to retire until June 2018, the ZEC program will have an immediate impact on its bidding behavior as well, particularly in the capacity market: it would not bid into the PJM capacity markets in April/May 2017 (i.e., in the BRA for delivery years 2020/21) in the absence of the ZEC program.

(76)     The ZEC program will not only determine *whether* a nuclear unit will bid into the wholesale markets, it will also will likely affect *how* it does so, i.e., it will change the specific bid strategies that it employs. This change in bidding behavior is the result of the fundamental change in a unit's compensation created by the ZEC program (as analyzed above in the discussion of the "price collar"). A change in a market participant's "profit function" will almost necessarily cause a change in its bidding strategy. The affected nuclear units have a strong incentive to run continuously at maximum output, and the ZEC program makes them relatively immune to changes in wholesale prices across a wide range of market outcomes. Any incremental benefit they may obtain from bidding to increase wholesale prices – e.g., to reflect their going-forward costs in capacity markets, for example – will be offset by a corresponding reduction in the ZEC payment, to the extent that these price increases are incorporated into forecast prices.

(77)     PJM's different zonal capacity market prices vary significantly, both across the zones and over time, depending on the availability of local capacity resources and transmission constraints.[46] During 2007 – 2014, market clearing prices in the PJM ComEd zone varied between $16.46/MW-day in 2012 and $174.29/MW-day in 2010. This wide variability in capacity prices provides Exelon with the incentive to maximize its capacity revenues by strategically bidding its nuclear fleet in Illinois – and indeed, across all of PJM – on a portfolio basis. In other words, Exelon may be able to maximize its profits across its portfolio of generating units (nuclear and other units) by selectively bidding in different units at different prices, i.e., potentially sacrificing capacity revenues for some units by bidding above the expected clearing price, in order to secure higher capacity revenues for the remainder of its units from the resulting price increase (subject to the capacity market rules established by PJM and approved by FERC).

(78)     On May 29, 2014, Exelon announced that its Quad Cities, Byron, and Oyster Creek nuclear plants did not clear the PJM capacity auction for the delivery period 2017/2018.[47] Despite the fact that more than 4,000 MW of its Illinois nuclear fleet failed to clear PJM's base residual auction, Exelon said its PJM capacity revenues would increase by $150 million in 2017 relative to 2016.[48] Exelon's estimate was supported by other analysts. UBS Securities reported that Exelon "couldn't have played its hand any better," as Exelon would earn almost $150 million more in capacity revenue from 2017/18 than it

---

[46]   Transmission constraints are local capacity import capability limitations caused by transmission facility limitations, voltage limitations or stability limitations. The amount is determined by the capacity emergency transfer limit (CETL) and the capacity emergency transfer objective (CETO).

[47]   Exelon presentation at the Sanford C. Bernstein Strategic Decisions Conference on May 29, 2014.

[48]   Id.

Declaration of David W. DeRamus, Ph.D.

would have if all of its capacity had cleared (i.e., the additional supply would have reduced the clearing prices). UBS said Exelon's ideal strategy was to "withhold" 4,457 MW of its PJM fleet capacity from the PJM capacity markets. Failing to clear 4,457 MW of capacity reduced Exelon's daily revenue by $267,000 for those units (including Quad Cities), but it increased the capacity market clearing prices by $33/MW-day. With this higher clearing price, Exelon's remaining 20,543 MW fleet of generation capacity was able to earn $148 million more in revenue than if the entire portfolio had cleared at the lower price.[49, 50]

(79) The ZEC program will fundamentally change Exelon's incentives in how it bids the Quad Cities and Clinton facility into the capacity markets. Now, any increase in capacity prices will be offset by a future reduction in Illinois ZEC payments. This provides Exelon a significantly greater incentive to bid Quad Cities in as a price taker in future capacity auctions. Exelon's incentives to bid in as a price-taker in all capacity auctions is perhaps most evident for Clinton, since Clinton is Exelon's only nuclear unit in MISO. There, any increase in capacity prices that Clinton could hope to earn for that unit will be offset by a corresponding reduction in its ZEC payment. Thus, its incentive will now be to bid Clinton into the MISO capacity market as a price-taker – with a depressing effect on wholesale prices.

(80) The ZEC program will also change other participants' bidding behavior. If other generation or demand-side resources decide to exit or not enter the market as a result of the ZEC program, they would not be submitting offers in the wholesale markets when they otherwise would have done so. The ZEC also is likely to change the bidding strategies of many other participants who remain in the market. Many sellers develop their offers based on the offers that they expect other participants are likely to submit.[51] Other sellers will know that the uneconomic nuclear units will remain in the market as a result of the ZEC program, and will be able to assess the changes in these nuclear units' bidding incentives; and this information may be sufficiently important to cause these other sellers to change their offer strategies. The Illinois nuclear units at issue represent a sufficiently large amount of capacity that their retention in the market could well have a significant impact on other suppliers' offers.

---

[49] *See* "How Exelon Won by Losing," *RTO Insider*, June 3, 2014. Available at: https://www.rtoinsider.com/exelon-pjm-capacity-mkt/ Accessed March 30, 2017.

[50] Subsequently, Exelon's Quad Cities and Byron plants were bid into and cleared PJM's transitional capacity auction (for its new "Capacity Performance" capability standard) for the same 2017/18 delivery period, at an even higher clearing price. *See* https://www.rtoinsider.com/pjm-transition-auction-17524/

[51] There is an extensive economic literature on supplier bidding incentives in electricity markets that discusses this. *See e.g.*, Peter Cramton, "Competitive Bidding Behavior in Uniform-Price Auction Markets," *Proceedings of the Hawaii International Conference on System Sciences*, January 2004, available at: ftp://www.cramton.umd.edu/papers2000-2004/cramton-bidding-behavior-in-electricity-markets-hawaii.pdf

**A.74**

Declaration of David W. DeRamus, Ph.D.

# V. The IL ZEC program will cause irreparable harm

## V.A. ZEC program will harm other market participants by artificially suppressing market prices

(81)   If allowed to proceed, the Illinois ZEC program will cause immediate and long-term harm to wholesale market participants – other than to Exelon, the sole recipient of the subsidies. Exelon previously announced that Clinton would retire in June 2017, while Quad Cities would retire in 2018. Any continued participation by Clinton and Quad Cities in the wholesale markets after those dates will artificially – and significantly – suppress wholesale prices. Similarly, the continued participation by Clinton and Quad Cities in capacity markets after the planned retirement dates will also artificially suppress market prices. In contrast to energy markets, the capacity markets are forward markets, and some of the relevant capacity markets for delivery years after the previously announced retirement dates are already occurring even prior to the official start of the ZEC program. For example, the PJM capacity market auction for 2020/2021 occurs in April/May 2017, and as a result of the ZEC program, Quad Cities will now participate in that auction (and others). Similarly, the auction process for MISO capacity markets for 2017/2018 has already begun, and Clinton's participation in that auction will artificially suppress prices. As demonstrated by the analysis above, the artificial price suppression caused by the ZEC subsidies will result in a substantial reduction in wholesale market revenues.

(82)   The ZEC program will distort wholesale market prices immediately and in the long run. The program obligates uneconomic nuclear generating units to continue to generate, and thus to continue to bid into the wholesale markets, over the entire 10-year duration of the program. Furthermore, in PJM, the capacity markets are 3-year forward markets. Thus, the impact of the ZEC program on PJM capacity auctions held in 2017 will suppress wholesale prices paid to market participants three years hence – as well as in earlier periods, to the extent that the program causes nuclear units to change their bidding behavior in any interim capacity auctions.

(83)   The significant impact of the Illinois ZEC program on PJM and MISO energy and capacity auction prices cannot be "undone" after the fact. Once the wholesale markets clear, those prices are used to make financial settlements among the market participants; to make generation dispatch decisions (i.e., to determine which generating units are instructed to run in any given hour by the RTO); and, as examined below, to make decisions regarding whether to exit (i.e., retire) or enter the markets. Since the ZEC program will artificially suppress wholesale market prices outside of Illinois as well, this will aggravate the financial challenges faced by other plants in other states, including other nuclear

units. As the PJM market monitor notes, market competition is replaced by "competition for subsidies,"[52] as companies try to retain their own units in the market via out-of-market subsidies.

## V.B. ZEC program will cause market exit and reduce market entry by more efficient participants

(84)    The artificial price suppression caused by the ZEC program will frustrate FERC's central purpose in establishing competitive markets. FERC has encouraged RTOs to adopt capacity markets to provide the price signals necessary to encourage efficient market exit and entry. If a nuclear plant is unable to earn sufficient wholesale market revenues from energy and capacity markets to make it financially sustainable to remain in the market, the uneconomic plant should exit. As capacity prices (and energy prices) rise, new entry and/or increased investment by more efficient generation becomes more economic. This new entry and investment – including by new renewable generation, demand-side participants, and energy efficiency resources – in turn will moderate future price increases.

(85)    The ZEC program, by contrast, encourages uneconomic nuclear plants in Illinois to remain in the market, despite the wholesale markets signals that they should retire. The resulting suppression of capacity and energy prices then causes other, more economic plants to retire instead. In 2016, PJM's IMM concluded that 96 generating units in PJM with 14,500 MW of capacity in PJM are "at risk" of retirement,[53] in addition to the approximately 5,000 MW of capacity that is already expected to retire between 2017 and 2020.[54] While it is difficult to determine which of these generating facilities would stay in the market if the uneconomic nuclear units were allowed to retire, the suppression of wholesale market prices makes it far more likely that other marginal plants will be forced to retire (assuming they are not similarly supported with out-of-market subsidies by their states).

(86)    The ZEC program is also likely to reduce entry by new, more efficient market participants. Current low energy and capacity prices in PJM have reduced incentives to invest in new generation, especially in the western portion of PJM (PJM West region). In the PJM ComEd zone, total wholesale market revenues have been insufficient since 2007 to cover the costs of new combustion turbine or combined cycle natural gas units, or the costs of new wind and solar facilities.[55] Retaining uneconomic nuclear units in the market through ZEC subsidies will further exacerbate this situation.

(87)    The distortionary impact of the ZEC program on investment decisions is already beginning to occur. In response to the passage of the FEJA, Exelon has already begun to make substantial additional

---

[52]    *See* "PJM monitor rails against threat of 'contagious' subsidies," dated March 13, 2017. http://www.eenews.net/energywire/2017/03/13/stories/1060051340  last accessed March 30, 2017.

[53]    2016 State of the Market Report for PJM, Monitoring Analytics, LLC (March 9, 2017), Volume 2, page 43.

[54]    Id., page 58.

[55]    Id., pages 287-94.

**A.76**

investments in its Clinton and Quad Cities facilities – even though the ZEC procurement has not yet occurred. Exelon expects to be able to recover the cost of these investments from Illinois ratepayers from the ZEC subsidies (in combination with its wholesale market revenues). Since Exelon would not have made these investments absent the ZEC program and its associated revenue guarantees, the program has effectively shifted the risks of these investments from a wholesale market participant (Exelon) to Illinois ratepayers. Once these investments are made, they become a "sunk cost," and thus further change the cost-benefit calculations in Exelon's future decisions regarding the participation of these units in the wholesale markets, relative to the *status quo ante*.

(88)    The artificial price suppression caused by the ZEC program will also harm the competitive process of the wholesale markets. Suppressing market prices by paying out-of-market subsidies to uneconomic nuclear plants is a form of buyer market power. This buyer market power, provided by state intervention, reduces confidence in competitive wholesale markets, as well as in the established regulatory processes (subject to FERC oversight) that exist for parties to propose changes to those markets. Undermining confidence in markets and regulatory processes, in turn, reduces the willingness of actual or potential future market participants to participate in those markets – to the ultimate detriment of all electricity customers in the affected regions.

(89)    As should be evident from the discussion above, the ZEC program not only frustrates FERC's regulatory objectives and framework in establishing wholesale markets, but it also frustrates the environmental objectives that the FEJA purports to advance. The artificial suppression of wholesale prices caused by retaining uneconomic nuclear units discourages investments in renewable generation, or efficient gas-fired generation, which could displace higher emitting generating sources. It also discourages market participation by demand-side resources, such as demand response or energy efficiency resources. Indeed, after rising rapidly in PJM for the past several years, demand response resources declined in 2016, consistent with the decline in wholesale market prices.[56]

## V.C. ZEC program will harm ratepayers

(90)    The ZEC program will also ultimately harm ratepayers, most directly by imposing hundreds of millions of dollars in subsidy costs on Illinois ratepayers, starting on June 1, 2017. Most of the subsidies to Exelon will be paid by Illinois retail customers taking service from Exelon's affiliate, ComEd. The amount of subsidies that Illinois ratepayers will be required to provide Exelon is

---

[56]    In PJM, demand response participates in the energy market via the "economic program" and in the capacity market via the "emergency program." Most of the revenues earned by demand response resources in PJM are from the capacity market. In 2016, the revenue earned by demand response resources declined by 20%, reflecting a decline in PJM energy and capacity prices, as well as a lower volume of demand response resources.

**A.77**

Declaration of David W. DeRamus, Ph.D.

substantial. According to Exelon, the cost of the ZEC program to Illinois ratepayers will be approximately $235 million annually, on average over the 10 years of the program.[57]

(91)     It is unclear how Exelon derived its estimate, but it may understate the annual cost of the subsidies, particularly in the early years. Exelon's estimate of the 10-year average annual cost will depend on its projections of future wholesale prices. As shown above, future wholesale price changes have a large impact on the amount of the ZEC subsidy paid to Exelon. Particularly in the early years of the program, the "market price index" may not exceed the "baseline" index of $31.40 in some years, and thus the price of the ZEC subsidy would be $16.50/MWh. Exelon's output from Clinton and Quad Cities[58] is approximately equal to the ZEC purchase requirement of 16% of Illinois load, as specified in the FEJA. Multiplying $16.50/MWh by Exelon's historical output from Clinton and Quad Cities[59] equals a total annual subsidy payment of approximately $340 million.

(92)     The FEJA imposes a cap on the allowable percentage increase in Illinois retail rates attributable to the ZEC, and Exelon states that it accounts for these limits in its $235 million average annual cost estimate. If the retail rate cap is exceeded, the FEJA reduces the required ZEC purchase volumes, not the ZEC prices. It is difficult to determine the precise impact of these potential volume limits on the amount of subsidies paid to Exelon, since the adjustment provisions in the FEJA appear to allow subsidies to be "banked" across years; i.e., subsidies that exceed the rate cap in one year may be applied to another year in which the cap was not exceeded (e.g., if wholesale prices increase).[60] However, whether the direct cost of providing the subsidies is $235 million or $340 million annually, or something in between, the burden on Illinois ratepayers will be substantial and immediate.

(93)     An alternative way of evaluating the harm to Illinois ratepayers is to calculate the premium that they are effectively required to pay to subsidized nuclear units relative to wholesale prices earned by other market participants. Since ZEC payments are based on a participating unit's actual output, it is reasonable to compare the price of the ZEC to current energy prices of between $18/MWh and $25/MWh.[61] A ZEC price of $16.50/MWh (as allowed under the FEJA) for each MWh of energy that a subsidized nuclear unit sells into FERC-jurisdictional markets represents a premium paid by Illinois ratepayers of between 66% and 92% above current energy prices. The magnitude of this price

---

[57]   Exelon presentation at the Q4 2016 earnings conference call, dated February 8, 2017.

[58]   For this calculation, I only use the output corresponding to Exelon's 75% ownership share of Quad Cities.

[59]   This is based on Exelon's total output from Clinton (100%) and Quad Cities (75%) of 20,611,589 million MWh for 2014, the reference year often cited in the FEJA. The maximum output from these two units combined over 2012 – 2015 was 21,003,203 million MWh, which would correspond to ZEC subsidies of $346 million.

[60]   20 ILCS 3855/1- 75(d5)(2).

[61]   Average real-time energy prices in Illinois (ComEd in PJM and Illinois Hub in MISO) have trended around $25/MWh in 2017 through March. MISO prices have been in the range of $18/MWh -$20/MWh in March 2017, and as low as $12/MWh on a daily average basis.

**A.78**

Declaration of David W. DeRamus, Ph.D.

premium paid by Illinois ratepayers will change over the 10-year duration of the ZEC program, based on changes in wholesale capacity and energy prices.

(94)    The distortionary effect of the ZEC subsidies on markets will also harm ratepayers in all the affected wholesale markets. Proponents of ZEC programs often point to wholesale price suppression as a benefit to ratepayers. As it applies to the Illinois program, however, this argument ignores the fact that all of the subsidy costs will be borne by Illinois ratepayers, while the asserted "benefits" of wholesale price suppression are spread over all of PJM. Furthermore, while artificial price suppression through out-of-market subsidies may provide a short-term "benefit" to buyers of electricity (as does any exercise of buyer market power), it deprives ratepayers of the benefits of competitive wholesale markets in the medium- and long-term. Ratepayers benefit from efficient market exit and entry, as this provides investment, innovation, competitive prices, and lower costs over time. Since the ZEC program artificially distorts market exit and entry decisions, ratepayers in all the affected wholesale markets will ultimately bear the long-term cost of these distortions.

(95)    Furthermore, ratepayers can also participate indirectly in wholesale markets via demand response and energy efficiency programs (typically via "aggregators"). Demand response and energy efficiency resources are just as disadvantaged by distorted wholesale prices as owners of generation, since artificial price suppression provides more limited opportunities for such resources to participate in wholesale markets. Some Illinois customers also already purchase all, or a substantial portion, of their electricity through "green power" programs. Nonetheless, these customers will be required to pay the ZEC subsidies, even though they are already paying for the "environmental attributes" of their power through their retail choice programs. This "double-charging" for the environmental attributes of their electricity consumption is harmful to these customers and unduly discriminatory towards providers of such "green power."

## V.D. ZEC program will harm ratepayers by overcompensating nuclear units relative to actual costs

(96)    As discussed above, the "price collar" of $47.90/MWh established by the Illinois ZEC program effectively ensures that Exelon's Clinton and Quad Cities units will earn at least this amount of revenue, as long as wholesale energy and capacity prices are above $31.50/MWh. The use of the SCC to set this price collar was proposed after earlier legislative proposals had a more direct cost-based cap of $42/MWh, likely based on information from Exelon regarding the costs of Clinton and Quad Cities.[62] Thus, under earlier proposals, the subsidy to Exelon would have been equal to the difference between the plants' $42/MWh costs and their expected wholesale market revenues; while the final legislation determines the payment based on the difference between $47.90 and the plants' expected

---

[62]    SB 1585 (May 5, 2016), pp. 82 – 83.

**A.79**

Declaration of David W. DeRamus, Ph.D.

wholesale market revenues. This change provides a windfall subsidy to Exelon, and a corresponding "deadweight" loss to ratepayers, of $5.90/MWh above the purported cost of these units.

(97)  It is difficult to reconcile the amount of the ZEC subsidy with the cost of the nuclear units at issue based on publicly available information. The 2015 Illinois study reported a relatively wide range of different estimates for the costs of these units. EIA data, for example, show the costs of Clinton and Quad Cities in the range of $24 - $25/MWh,[63] while EPA data suggest costs in the range of $32 - $46/MWh.[64] While Exelon stopped publicly reporting its nuclear plant costs after 2014, it appears that they were approximately $27.51/MWh in 2014.[65] None of the available information suggests that the costs of the Clinton and Quad Cities facilities are as high as $47.90.[66] If the costs of the nuclear units are less than $47.90/MWh, it implies that a potentially large portion of the payment is unnecessary to achieve the stated objective of the program: namely, to retain the "environmental attributes" of the plants by retaining them in the market. Such excessive charges for the ZEC subsidy represent an additional harm to ratepayers.

(98)  Other changes were implemented in the final legislation as compared to earlier draft proposals, which could impact whether the ZEC subsidies are greater than Exelon's costs of the units over the life of the program. For example, the duration of the ZEC program was extended to 10 years and the $16.50/MWh SCC value was held constant until 2023, with increases of $1/MWh annually thereafter. Without access to detailed cost projections from Exelon (and projections of future efficiency improvements), it is difficult to assess the ratepayer impact of these changes, relative to the original proposal with the ZEC price based explicitly on Exelon's actual costs. The final legislation also set the maximum retail customer impact for the program at 1.65% of their 2009 retail rates (measured in terms of cents per kWh). As discussed above, it is difficult to assess the impact of these provisions on Exelon's ultimate cost recovery, but the rate cap may limit the extent to which the ZEC price of $16.50/MWh enables Exelon to earn the full amount of the implied premium of $5.90/MWh above its asserted costs of $42/MWh – or not.[67] Regardless of how market prices and Exelon's costs unfold in the future, however, the shift to $16.50/MWh for the ZEC price in the FEJA provides Exelon with a substantial premium above its stated costs of $42/MWh in the early years of the program – including

---

[63]  EIA 923 in 2015 real dollars.

[64]  2015 Report, at p. 31, in 2011 real dollars.

[65]  In its 2014 10-K, Exelon reported that its nuclear unit costs of production were $19.33/MWh, while NEI reported average U.S. nuclear plant capital costs of $8.18/MWh in 2014, for a total estimated costs of $27.51/MWh.

[66]  The costs of Exelon's New York nuclear units in New York may be in this range, as noted above.

[67]  For example, assume that forecast wholesale prices used for the market price index were to rise to $42/MWh by May 2018 (prior to the start of the 2018/2019 delivery year). The ZEC price would then fall to $5.90/MWh (since the market index would be higher than the baseline index by $42 – $31.40 = $10.60; and $16.50 – 10.60 = $5.90). Even if the rate cap binds on the full $5.90/MWh, *any* ZEC subsidy in this scenario would allow Exelon to recover in excess of its asserted costs of $42/MWh. The likelihood that the ZEC subsidy will overcompensate Exelon for its costs increases as wholesale prices increase, since the lower the ZEC price, the less likely the retail rate cap will be a binding constraint on the ZEC procurement volume.

**A.80**

the upcoming 2017/2018 delivery year – that should be sufficient to ensure *at least* full cost recovery, and potentially additional profits.

# VI. The IL ZEC program provides undue in-state preferences

(99)  It is my understanding that the dormant Commerce Clause (U.S. Const. art. I, Section 8) prohibits states from discriminating against or unduly burdening interstate commerce, and that Plaintiffs have alleged that the ZEC program violates the Commerce Clause. From an economic perspective, a prohibition against in-state preference is consistent with the objective of preventing state-level protectionism, which would otherwise inhibit efficient trade and commerce among the states. It is my understanding that the Supreme Court has taken a similar view: "Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of economic protectionism that the Commerce Clause prohibits."[68]

(100)  In evaluating whether the Illinois ZEC program provide undue in-state preferences, I have reviewed: a.) actions and statements by Exelon prior to and after the FEJA was passed; b.) statements by the Governor of Illinois; c.) the declarations and findings of the FEJA; d.) the 2015 Report (referenced above) on which the FEJA was based; e.) the specific provisions of the FEJA; and f.) the legislative history of the FEJA, including prior proposals. The requirements and guidance provided in the FEJA ensures that participation in the ZEC program will be restricted to in-state resources, consistent with the FEJA's stated purpose.

## VI.A. Statements and actions by Exelon

(101)  Exelon's actions demonstrate that it considers its Clinton and Quad Cities facilities to be the pre-determined recipients of ZECs under the Illinois program. This recognition by Exelon is particularly important, given that: it owns all of the nuclear generating facilities in Illinois, with the exception of MidAmerican Energy's 25% minority interest in Exelon's Quad Cities facility; it is (by far) the largest owner of nuclear generation in PJM; and it has an ownership interest in approximately 67% of the "distressed" nuclear generating capacity in all of PJM and MISO.[69]

(102)  On May 6, 2016, Exelon announced its intention to retire its Clinton and Quad Cities nuclear facilities "if adequate legislation is not passed during the spring Illinois legislative session."[70] A month later,

---

[68]  West Lynn Creamery, Inc. v. Healy, 512 U.S. 186 (1994).

[69]  This does not include Exelon's Byron nuclear generating facilities as an "at-risk" facility.

[70]  "Exelon Statement on Early Retirement of Clinton and Quad Cities Nuclear Facilities," press release by Exelon dated May 6, 2016. http://www.exeloncorp.com/newsroom/exelon-statement-on-early-retirement-of-clinton-and-quad-cities-nuclear-facilities last accessed March 30, 2017.

**A.81**

Declaration of David W. DeRamus, Ph.D.

Exelon announced it would shut down Clinton (in June 2017) and Quad Cities (in June 2018) due to "the lack of progress on Illinois energy legislation."[71] On December 1, 2016, in response to extensive lobbying by Exelon, the Illinois General Assembly included the ZEC program in FEJA in the final hours of its annual session.[72] A week later, on the same day the governor signed the legislation into law, Exelon reversed its decision to close these two plants and announced that Quad Cities and Clinton "are now planned to operate for at least another 10 years as a result of the legislation."[73] One week later, Exelon announced its plans to fast-track several capital projects at these plants, which had been previously cancelled or put on hold as Exelon was preparing for their retirement.[74] Exelon also promised to hire more than 400 permanent employees to assist with these capital projects.[75] Most recently, on a February 8, 2017 earnings call, Exelon included expected revenues from the Illinois ZEC program as a separate component of its gross margins.[76] Exelon estimates that the cost to Illinois customers for the ZEC program will be as high as $235 million per year for the duration of the 10-year program.[77] Exelon would not have taken these actions, made these accounting changes, and made these disclosures, if the results of the ZEC procurement process were not, in effect, predetermined by the FEJA, with Clinton and Quad Cities the only "zero emissions" facilities that were *de facto* eligible to receive the Illinois ZEC subsidies. These actions by Exelon at the end of 2016 and early 2017 do not reflect an assessment that Clinton and Quad Cities are likely to be selected in the June 2017 ZEC procurement; but that their selection is a certain result.

## VI.B. The stated goals and findings of the FEJA

(103)  Although environmental objectives are among the stated goals of the FEJA, the purpose of the ZEC program is also, if not primarily, to save local jobs, specifically those at the Clinton and Quad Cities facilities. The job promotion and protection purpose of the FEJA is evident in its very title: the "Future Energy Jobs Act." At the signing ceremony of FEJA, Governor Rauner stated, "[t]he Future Energy Jobs bill protects taxpayers, ratepayers, and the **good-paying jobs at the Clinton and Quad Cities' plants**."[78] It is difficult to understand the basis for this statement by the Governor in 2016,

---

[71]  "Exelon Announces Early Retirement of Clinton and Quad Cities Nuclear Plants," press release by Exelon dated June 2, 2016. http://www.exeloncorp.com/newsroom/clinton-and-quad-cities-retirement  last accessed March 30, 2017.

[72]  "Illinois governor signs energy bill to help Exelon nuclear plants," *Platts*, December 7, 2016. http://www.platts.com/latest-news/electric-power/washington/illinois-governor-signs-energy-bill-to-help-exelon-21280324  Accessed March 30, 2017.

[73]  "Governor Rauner Joins Hundreds of Community Members, Local Business Leaders, Environmental Groups and Nuclear Plant Employees for Signing of Future Energy Jobs Bill," press release by Exelon dated December 7, 2016. http://www.exeloncorp.com/newsroom/governor-rauner-signing-of-future-energy-jobs-bill  last accessed March 30, 2017.

[74]  "Future Energy Jobs Bill Already Delivering Job Growth, Economic Impact," press release by Exelon dated December 14, 2016. http://www.exeloncorp.com/newsroom/fejb-econ-impact-rls  last accessed March 30, 2017.

[75]  Id.

[76]  Exelon presentation at the Q4 2016 earnings conference call, dated February 8, 2017.

[77]  Id.

[78]  "Governor Rauner Joins Hundreds of Community Members, Local Business Leaders, Environmental Groups and

**A.82**

Declaration of David W. DeRamus, Ph.D.

prior to the criteria for the ZEC procurement process even being established, unless the selection of Clinton and Quad Cities for the ZEC program was a foregone conclusion by those charged with drafting, passing, and implementing the legislation. Immediately after the FEJA was passed, the Nuclear Energy Institute similarly stated that the FEJA would keep the Clinton and Quad Cities facilities from retiring and would preserve "4,200 direct jobs" at those two plants.[79]

(104)  In support of the ZEC program, the General Assembly made certain findings and declarations in the FEJA that specifically referenced the "premature closure of existing nuclear power plants in Illinois,"[80] noting that it had directed the ICC (and other Illinois agencies) to prepare the 2015 Report to identify ways of ensuring that the closure of at-risk Illinois "does not occur."[81] The fact that the General Assembly included these findings and declarations in the FEJA suggests that the purpose of the ZEC program is to prevent the closure of nuclear facilities in Illinois; that the FEJA was intended to avert the perceived "adverse consequences" of these Illinois plant closures on reliability and the regional economy, in addition to its stated environmental goals; and that the only way for the ZEC program to achieve these objectives is by *de facto* limiting eligibility for participation in the program to uneconomic nuclear units in Illinois.

(105)  The following passage in the 2015 Report indicates how the ICC and IPA are likely to implement the FEJA:

> **Illinois solution.**  In considering the market-based solutions included herein, the General Assembly should be cognizant that these solutions provide varying degrees of certainty for **ensuring that funds provided by Illinois consumers would be utilized primarily to support assets within Illinois**.  In assessing potential market-based solutions, the value of **keeping those funds expended and associated economic activity within the state** may be considered.[82]

Since the ICC and the IPA were among the primary authors of the 2015 Report, it is reasonable to infer that in implementing the Illinois ZEC program (as directed by the FEJA), they would take into consideration whether an applicant to the program would provide such an "Illinois solution" (assuming any nuclear generating facilities outside Illinois would even apply to the program).

---

Nuclear Plant Employees for Signing of Future Energy Jobs Bill," press release by Exelon dated December 7, 2016. http://www.exeloncorp.com/newsroom/governor-rauner-signing-of-future-energy-jobs-bill  last accessed March 30, 2017.

[79]   "Illinois Joins New York in Recognizing Value of Nuclear Plants," press release by the Nuclear Energy Institute dated December 1, 2016. https://www.nei.org/News-Media/Media-Room/News-Releases/Illinois-Joins-New-York-in-Recognizing-Value-of-Nu, accessed March 24, 2017. "Legislators in Illinois today passed the Future Energy Jobs Bill, a measure that will **ensure the continued operation of the Clinton and Quad Cities nuclear power plants** in that state." As the COO of NEI states in the same article, "The Future Energy Jobs Bill, now headed to the governor's desk, preserves more than $1.2 billion in annual economic activity across Illinois, including **4,200 direct jobs at Clinton and Quad Cities** and thousands more jobs that the plants support." (Emphasis added.)

[80]   FEJA, Section 1.5 "Zero emission standard legislative findings," (5). (Emphasis added.)

[81]   Id., (7). (Emphasis added.) *See also*, Id., (4) – (8).

[82]   2015 Report, p. 154. (Emphasis added.)

**A.83**

# VI.C. Specific provisions of the FEJA

## VI.C.1. ZEC participation is limited to nuclear facilities

(106)  There are several specific provisions of the FEJA indicating that the ZEC program is intended to be limited to in-state nuclear units. First, as defined by the FEJA, the term "Zero Emission Facility" is a misnomer. If the purpose of the program is to limit greenhouse gases and/or other emissions, a zero emission facility would be reasonably defined to apply to a generating facility that emits no $CO_2$ or other air pollutants. The FEJA, by contrast, defines a "Zero Emission Facility" as "a facility that: (1) is fueled by **nuclear power**; and (2) is interconnected with PJM Interconnection, LLC or the Midcontinent Independent System Operator, Inc., or their successors."[83]

(107)  As a result of requirement (1), solar, wind, or hydroelectric generating facilities are not eligible to participate in the ZEC program, even though they emit no $CO_2$ or other pollutants. Nor are demand response or energy efficiency aggregators eligible to compete with nuclear units to reduce emissions from electric generation through the ZEC program, even though they may be able to do so more cost effectively. The FEJA uses the language of "emissions reduction" as evidence of its ostensible objective, but the unavoidable implication of the definitions used in the FEJA is that its purpose is to support the retention of nuclear generation.

(108)  As a result of requirement (2), only nuclear facilities interconnected with PJM or MISO are eligible. In theory, this suggests that other nuclear facilities outside Illinois should be eligible to participate in the program. As shown in Figure 9, below, there are a large number of nuclear facilities in PJM and MISO. If the primary purpose of the program is to reduce emissions, however, particularly of $CO_2$, there is no reason for the program to be limited to PJM or MISO facilities. Illinois residents are just as affected by $CO_2$ emissions in New York, Florida, or China, as they are by $CO_2$ emissions in Illinois. A given reduction in $CO_2$ emissions is equally beneficial to Illinois residents, regardless of where the $CO_2$ reduction occurs. The consequences of $CO_2$ emissions are not local, but global in nature.

---

[83]  FEJA, Section 1-10. Definitions. (Emphasis added.)

Declaration of David W. DeRamus, Ph.D.

**Figure 9: Nuclear facilities in PJM, MISO, and neighboring control areas**



### VI.C.2. ZEC participation is limited to nuclear facilities with insufficient market revenues

(109)    The language in the FEJA indicates that eligibility to participate in the ZEC program is limited to nuclear facilities that would otherwise exit the market in the absence of the ZEC program. As noted above, the FEJA states that the purpose of the ZEC program is to allow for the "**preservation of [existing] zero emission facilities.**" Accordingly, the FEJA states in the ZEC procurement process, "the selection of winning bids shall take into account… any existing environmental benefits that are **preserved** by the procurements … and would **cease to exist** if the procurements were not held, including the **preservation of zero emission facilities**."[84]

(110)    The FEJA also requires that ZEC applicants submit detailed cost data.[85] The only reason to require submission of such information is if participation is limited to loss-making nuclear units. The ZEC payments are not based on a plant's costs, nor will applicants submit an offer bid (i.e., with a price at which it is willing to sell ZECs). Instead, the ZEC payment is based solely on the (estimated) SCC value – which the FEJA derives from Illinois' specific electric generation profile – and wholesale

---

84    FEJA, (d-5)(1)(C) (Emphasis added.)
85    FEJA, (d-5)(1)(A)(iii).

A.85

price benchmarks. As discussed above, other portions of the FEJA reference the need to retain nuclear generating units that would otherwise exit the market (and specifically, units in Illinois).[86]

(111) I note, however, that if the FEJA limits participation in the ZEC program to uneconomic nuclear units, the record does not demonstrate that Quad Cities and Clinton meet that criterion. As the 2015 Report (the basis for the FEJA) stated, "Because of the limited cost data available, it is not entirely clear whether or not Exelon's Illinois plants earn sufficient revenues to cover their operating costs."[87]

### VI.C.3. ZEC participation is effectively limited to uneconomic nuclear facilities in Illinois

(112) The specific language of the FEJA cited above indicates that the program is intended to apply only to in-state resources. Other provisions of the FEJA further underscore that the ZEC program will be used to support only *uneconomic* nuclear facilities in Illinois, and not the many other nuclear units in the state. Thus, unlike other environmental programs (such as RECs), the ZEC program cannot be appropriately characterized as a payment for a zero-carbon attribute, but rather as a subsidy for inefficient plants. First, ZEC prices will be based on wholesale prices in Illinois. As noted above, eligibility to participate in the ZEC program is explicitly limited to nuclear units in PJM or MISO. The ZEC prices, however, are not based on PJM or MISO average wholesale prices, for example, but instead are based on: (a) energy prices at the PJM Northern Illinois Hub; (b) the PJM capacity price for the "rest of RTO zone group" and (starting in 2020) the "ComEd zone," both of which pertain to wholesale market prices in Illinois; and (c) the MISO capacity price for Zone 4, which also pertains to Illinois. The use of these locational wholesale market prices to determine compensation for the selected units provides strong incentives for participation by in-state resources, strong disincentives for participation by out-of-state resources (who are exposed to different wholesale prices), and a strong signal to potential participants that the program is intended to support Illinois resources.

(113) The statute also directs the IPA to use a "public interest" standard in selecting among program applicants – assuming (improbably) that any nuclear generating unit owner in PJM or MISO other than Exelon would apply to the program, and assuming (also improbably) that Exelon would apply for its non-Illinois plants to be considered. While it is unclear exactly what this "public interest" standard requires, the remainder of the guidance provided by the FEJA (cited above) strongly suggests that it refers to the public interest in Illinois, including the preservation of economic activity (i.e., jobs) associated with the at-risk Illinois nuclear plants. As noted above, in the 2015 Report, the ICC also stated that it would be appropriate to ensure that Illinois ratepayer funds were used only to

---

[86] FEJA, (d-5)(1)(C). "[W]inning bids shall be selected based on public interest criteria that include, but are not limited to, minimizing carbon dioxide emissions that result from electricity consumed in Illinois and … would cease to exist if the procurements were not held, including the preservation of zero emission facilities."

[87] 2015 Report, at p. 39.

**A.86**

support the retention of in-state at-risk nuclear units and to support in-state "economic activity."[88] It is thus reasonable to infer that in conducting the ZEC procurement, the ICC and the IPA would consider that ZEC subsidies paid by Illinois ratepayers could only be used to support in-state resources, under the "public interest" criterion of the FEJA.

### VI.C.4. ZEC program design is uniquely applicable to Clinton and Quad Cities

(114)    Two other elements of the ZEC program appear to be directed not just at in-state Illinois resources, but at Exelon's Clinton and Quad Cities facilities specifically. First, the FEJA has specified a 10-year time horizon for the duration of the ZEC program. Not coincidentally, the current nuclear operating license for the Clinton facility ends in September, 2026: 9 years and 3 months from the start of the program (although after the FEJA was passed, Exelon announced that it would seek to extend Clinton's operating license).[89] Furthermore, as noted above, Exelon had put on hold several major capital expenditures for the Clinton and Quad Cities facilities, which it restarted immediately after the legislation passed. A 10-year duration for the ZEC program would also be consistent with the objective of enabling these specific investments – but only if these specific Illinois generating units were the sole intended recipients of the ZEC subsidies.

(115)    Second, the volume of the ZEC requirement corresponds to Exelon's combined output from its Clinton and Quad Cities nuclear units. The FEJA requires that the IPA procure an amount of ZECs approximately equal to 16% of the electricity delivered by utilities to Illinois' retail customers in 2014.[90] This corresponds to approximately 22 million MWh of electricity (a more precise estimate would require identifying Illinois utilities with less than 100,000 customers on whose behalf the IPA does not procure power and energy).[91] In 2014, Exelon's output from its Clinton and Quad Cities facilities was 20.6 million MWh of electricity; in 2012, its output was 21 million MWh.[92] Exelon's maximum feasible output from these two facilities is approximately 21.4 million MWh (at operating capacity). One could hypothesize that this close correspondence between the ZEC volume requirements and Exelon's output from Clinton and Quad Cities would be equally close for any two nuclear plants; but Clinton is (unusually) a one-unit nuclear station, and Exelon has a 75% share of Quad Cities. Thus, it is difficult to ascribe this result to anything other than a legislative intent to ensure that the outcome of the ZEC procurement would be to support only in-state nuclear units, and

---

[88]    Id., at p. 154.

[89]    Exelon 2015 Form 10-K.

[90]    FEJA, (d-5)(1).

[91]    Illinois total retail load in 2014 was 141,540,287 MWh. The ZEC volumes do not apply to Illinois utilities with less than 100,000 customers on whose behalf the IPA does not procure power and energy. I estimate that this accounts for at least 2% of Illinois load, based on the load served by MidAmerican Energy. 16% x 98% x 141.5 million = 22 million MWh.

[92]    As referenced above, Exelon's output from Quad Cities relates only to its 75% ownership share. It is my understanding that MidAmerican Energy's 25% share of this facility does not intend to participate in the ZEC program and would be ineligible, since it recovers its costs from its retail customers (subject to cost-of-service retail rates).

**A.87**

specifically Exelon's Clinton and Quad Cities facilities – and to exclude out-of-state units, even if they are nuclear units.[93]

## VI.D. Legislative history of the FEJA

(116)   The legislative history of the FEJA also demonstrates that the ZEC program is intended to support only in-state nuclear generation. Earlier versions of the bill, drafted with significant input from Exelon, also indicate that the purpose of the legislation was to keep open Clinton and Quad Cities specifically. On May 5, 2016, ComEd (Exelon's retail affiliate) and Exelon issued a proposal (the "Next Generation Energy Plan") with many elements, including ZECs, that ultimately are reflected in the FEJA:

> ComEd and Exelon have released a new bill they say reconciles the state's competing interests… The bill includes **supports for the two Exelon nuclear plants** that the company has maintained are in danger of closing if left to market forces. It calls for an independent review of the plants' financial prospects, and if "**available market revenues are insufficient, the plants will be eligible for compensation for their zero emissions attributes**," as described by Joe Dominguez, Executive Vice President of Governmental and Regulatory Affairs and Public Policy for Exelon… The new proposal is based on a plan crafted for New York's nuclear plants, Dominguez said, and as the legislation is written **only Exelon's Quad Cities and Clinton nuclear plants would be eligible** for aid. [94]

(117)   Exelon made similar statements about its proposal in a press release, titled, "Next Generation Energy Plan to **Protect and Create Jobs**, Deliver Clean Energy and Jumpstart Solar Development, Nearly Double Energy Efficiency, Provide for $1B in Low-Income Assistance, and **Secure Future of Illinois' Nuclear Plants**:"

> An exciting new part of this bill is an innovative **Zero Emission Standard** that will create a level playing field for all clean energy sources to compete… "The program introduced in today's bill **only compensates financially challenged plants after a full and complete review of costs** by the experts at the Illinois Commerce Commission and the Illinois Power Agency," said Joe Dominguez, executive vice president, Governmental and Regulatory Affairs and Public Policy, Exelon. "**The Zero Emission Standard will preserve Illinois' at-risk nuclear energy facilities, which serve as economic engines for the state and communities in which they operate**, maintain the reliability of the grid, and avoid substantial amounts of carbon emissions."[95]

---

[93]   EPSA has a member that owns a nuclear facility in Pennsylvania. Based on the analysis above, this nuclear facility would be precluded from participating in the Illinois ZEC program.

[94]   "Surprise Energy Bill Turns Up Heat on Nuclear, Solar Debates," May 5, 2016, *Midwest Energy News*. http://midwestenergynews.com/2016/05/05/surprise-illinois-energy-bill-turns-up-heat-on-nuclear-solar-debates/, accessed March 24, 2017.

[95]   Exelon press release, "Next Generation Energy Plan to Protect and Create Jobs, Deliver Clean Energy and Jumpstart Solar Development, Nearly Double Energy Efficiency, Provide for $1B in Low-Income Assistance, and Secure Future of Illinois' Nuclear Plants," May 5, 2016, available at: http://www.exeloncorp.com/newsroom/next-generation-energy-

**A.88**

Declaration of David W. DeRamus, Ph.D.

(118)   I have reviewed other drafts of the legislation, such as Illinois SB 1585 and its proposed amendments, and several provisions are explicit as to the purpose of the ZEC program. Illinois SB 1585 proposed that the ZEC be calculated as the difference between a unit's costs and its projected wholesale market revenues for a given planning year.[96] SB 1585 fixed the "average annual zero emission resource cost" at $42/MWh for the first four years of the program (with adjustment provisions thereafter). Much of the language of the FEJA mirrors the language in SB 1585 (with the notable exception of the use of the SCC value in the FEJA in place of costs in determining the amount of the subsidy). Based on Exelon's involvement in the legislative process behind FEJA and the lack of more definitive publicly available information on Exelon's nuclear unit costs, it is reasonable to assume that the $42/MWh referenced in SB 1585 represents Exelon's asserted costs of its Clinton and Quad Cities units (or potentially, all of its Illinois units). This further demonstrates that the purpose of the ZEC legislation was to support Exelon's Clinton and Quad Cities facilities.

(119)   In addition, in a proposed amendment to SB 1585 dated May 27, 2016, a provision was included that would have relieved a utility from an obligation to purchase ZECs, unless at least one ZEC was procured from a facility directly interconnected to same zone "balancing authority or zone" as the purchasing utility.[97] Given that no at-risk nuclear unit could participate in the market with only one ZEC, this provision would effectively require the IPA to purchase ZECs from in-state resources.

## VI.E. Protectionist effects of the FEJA are exacerbated by exports

(120)   Undue in-state preferences are a form of economic protectionism that is detrimental to interstate commerce. As with other forms of protectionism, undue in-state preferences are detrimental to the welfare of in-state citizens, due to the higher prices they are ultimately forced to pay; and to the welfare of out-of-state citizens, due to their foregone opportunities to sell their goods and services in other states.

(121)   The protectionist result of the Illinois ZEC program is exacerbated by the fact that Illinois is a significant net exporter of electricity to other states. Illinois has a large amount of baseload capacity (including from nuclear units) relative to its load. Recently, for example, Exelon announced that its Byron nuclear facility in Illinois (located in PJM) would export power to other states in the Midwest, including Michigan, Indiana, and Wisconsin.[98] While Illinois imports power in certain peak periods, e.g., on hot summer days in Chicago, on average over the course of a year, it is a net exporter to other states. Between 2009 and 2015, Illinois exported more than 53 million MWh on average, or

---

plan, accessed March 24, 2017.

[96]   SB 1585 (May 5, 2016), pp. 82 – 83.

[97]   Proposed Amendment to SB 1585, May 27, 2016, Section G.

[98]   "Exelon seeks right to export power from big Illinois nuke," *Crain's Chicago Business*, March 24, 2017. Available at: http://www.chicagobusiness.com/article/20170324/ISSUE01/170329896/exelon-seeks-right-to-export-power-from-big-illinois-nuke; accessed March 29, 2017.

**A.89**

Declaration of David W. DeRamus, Ph.D.

approximately 27% of total Illinois net generation. Thus, by retaining uneconomic nuclear units in the markets as a result of the ZEC program, the Illinois subsidies will help support its electric power exports (supplied out of its portfolio of resources) to other states. Illinois exports ultimately benefit from Illinois subsidies in ways that competing generation in other states (or in Illinois) do not. As a consequence, the Illinois in-state subsidies have a distortionary effect on interstate commerce, in addition to the impacts discussed above.

**A.90**

Declaration of David W. DeRamus, Ph.D.

I declare under penalty of perjury under the laws of the United States that the foregoing facts are true and correct to the best of my knowledge.

_____          March 31, 2017
David W. DeRamus, Ph.D.                              Date

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Electric Power Supply Association, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-01164 |
| | ) | Judge Manish S. Shah |
| Anthony M. Star, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF OF PJM INTERCONNECTION, L.L.C.**
**AS AMICUS CURIAE IN OPPOSITION TO MOTIONS TO DISMISS**

Paul M. Flynn (*pro hac vice*)
Andrew T. Swers (*pro hac vice*)
WRIGHT & TALISMAN, P.C.
1200 G Street, N.W.
Suite 600
Washington, D.C. 20005
(202) 393-1200
flynn@wrightlaw.com
swers@wrightlaw.com

Richard G. Douglass
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
(312) 419-6900
rdouglass@novackmacey.com

Vincent P. Duane (*pro hac vice*)
Senior Vice President and
   General Counsel
Law, Compliance & External Relations
PJM Interconnection, L.L.C.
2750 Monroe Blvd.
Audubon, PA 19403
(610) 666-4367
Vincent.Duane@pjm.com

*Attorneys for PJM Interconnection, L.L.C.*

A.92

PJM Interconnection, L.L.C. ("PJM") respectfully submits this brief *amicus curiae* in opposition to the Motions to Dismiss filed by Defendants Anthony M. Star, in his official capacity as Director of the Illinois Power Agency, and Brien J. Sheahan, John R. Rosales, Sadzi Martha Oliva, Miguel Del Valle, and Sherina Maye Edwards, in their official capacities as Commissioners of the Illinois Commerce Commission ("ICC") (collectively, the "State Defendants") and Intervenor Exelon Generation Company, LLC ("Exelon").

## SUMMARY OF *AMICUS CURIAE* POSITION

PJM submits this brief because the Zero Emission Credit ("ZEC") program established pursuant to the Illinois Future Energy Jobs Act, SB 2814, Public Act 099-0906, 99th Gen. Assemb. (Ill. 2016) ("FEJA") will substantially harm the wholesale electricity markets that PJM operates, as well as the investors, competitive energy providers, and (ultimately) consumers that rely on PJM's markets to provide adequate and reliable electricity at the lowest efficient price. Moreover, the ZEC program will frustrate Congress' intent to promote competition in wholesale electricity markets and, in particular, thwart Congress' assignment to the Federal Energy Regulatory Commission ("FERC") of responsibility to set just and reasonable wholesale electricity rates under the Federal Power Act. For these reasons, as explained in detail below, PJM respectfully requests that the Court deny the Motions to Dismiss.

## BACKGROUND OF PJM'S MARKETS

PJM is a Regional Transmission Organization ("RTO"), as approved by FERC in 2002. *PJM Interconnection, L.L.C.*, 101 FERC ¶ 61,345 (2002). RTOs are created by FERC regulation to independently operate the electric transmission network and administer wholesale electricity markets. *Regional Transmission Organizations*, Order No. 2000, 1996–2000 FERC Stats. & Regs., Regs. Preambles ¶ 31,089 (1999). The PJM region has grown since 2002 to encompass

**A.93**

all or part of thirteen states in the Mid-Atlantic and Midwest, as well as the District of Columbia. PJM's territory covers northern Illinois, including the Chicago area. A separate RTO, the Midcontinent Independent System Operator, Inc. ("MISO") is responsible for the transmission system and wholesale markets in the rest of Illinois.

States within PJM's territory—like Illinois—are not members of PJM. But utility companies—such as Exelon affiliate Commonwealth Edison Co. ("ComEd")—can join PJM and, in so doing, agree to subject their assets, which may include transmission facilities and generating stations, to PJM's operational rules and markets. Relevant here, twenty years ago, the Illinois General Assembly directed Illinois utilities to form or join Independent System Operators (the predecessors to RTOs), in light of the independence and expected efficiency these interstate markets and operations could bring to the state and its citizens. Electric Service Customer Choice and Rate Relief Law of 1997, 220 Ill. Comp. Stat. 5/16-126 (2017). *See also* Transcript of Technical Conference at 43:3–7, *PJM Technical Conference with States and Market Participants*, (Aug. 28, 2003) (ICC Commissioner Wright stating, "[s]ince 1997, it's been the [ICC]'s policy goal to see that our public utilities join an RTO in order to bring efficient access to trading partners and less costly links for power to all market participants in Illinois.") (attached as Exh. A).

PJM operates in many states, including Illinois, that have legislatively chosen to deregulate or "unbundle" utility operations within their state. While these decisions vary by state,[1] they either require the formerly-integrated utilities to sell their generation to third parties,

---

[1] Differences in state unbundling have led to different market design choices by PJM and MISO. MISO has not established a resource adequacy approach reliant on competitive, unsubsidized offers from merchant generation because most states in MISO have not deregulated, and thus retain responsibility to ensure sufficient generation is in place to serve their citizens. Accordingly, FERC is focusing only on PJM and the RTOs in New York and New England (and not MISO) in a technical

**A.94**

or place ownership and operation of their generation into financially separate "merchant" affiliates, which compete with other generation owners in wholesale energy markets. An important rationale driving states to deregulate, including Illinois, *infra* at 5 (quoting Illinois legislative history), is the advantage in having merchant investors (as opposed to utility ratepayers) underwrite the investment and assume the attendant risks of developing and operating power plants in an industry facing technological change, uncertain demand growth, and volatile fuel prices.

Not every state in PJM has deregulated in the same manner as Illinois. Several retain traditional, so-called "integrated" utility companies responsible for generation, transmission, distribution, and sale of electricity. This model is distinct from the regime adopted by Illinois in a manner crucially important to this litigation: unlike Illinois, traditionally regulated states do not rely on PJM's markets to ensure that sufficient generation and other resources are installed and available to satisfy federal standards governing "resource adequacy." (a concept described more fully immediately below). Rather, these states retain responsibility, with their integrated utilities, to meet resource adequacy requirements through traditional state rate regulatory mechanisms.

## ARGUMENT

**A.    Illinois' Restructuring of its Electric Industry Ceded to the Wholesale Market Economic Determination of the Generation Resources on Which Illinois Would Rely to Meet Demand.**

At its most basic level, the question before the Court is: Who is responsible for managing "resource adequacy" in Illinois—*i.e.*, ensuring that sufficient generation is available in

---

conference next month on "an open question of how the competitive wholesale markets, particularly in states or regions that restructured their retail electricity service, can select resources of interest to state policy makers while preserving the benefits of regional markets and economic resource selection." *State Policies & Wholesale Markets Operated by ISO New England Inc., New York Independent System Operator, Inc., and PJM Interconnection, L.L.C.*, Notice of Technical Conference, Docket No. AD17-11, at 1 (Mar. 3, 2017) (attached as Exh. B).

**A.95**

Illinois when needed to meet future demand. A state that retains a traditional regulatory construct for its public utilities manages the resource adequacy challenge through utility commission proceedings that approve resource plans submitted by the utilities. These plans identify the construction of new power plants, the retirement of old plants, and the mix of fuel types on which the utility, its customers and its regulator agree. Thus, under the traditional, integrated model, it is state regulators that retain authority to address resource adequacy.

However, once a state elects to restructure or unbundle the generation function of the utility and place that function in a competitive wholesale environment, the state effectively cedes authority over the economic determination of which generators will be committed to meet resource adequacy. In deregulated states like Illinois, generation entry and exit decisions are determined by supply and demand in competitive markets.

In particular, notwithstanding any generation permitting, siting, or procurement[2] authority retained by a restructured state (like Illinois), "if [the state] wish[es] to use a new generation resource to satisfy [its] capacity obligations required under the [PJM wholesale capacity market], [then] the resource must clear the [PJM] [a]uction . . . . [and] if the state['s] preferred generation resources fail to clear the auction . . . the states cannot use (those) resources to offset their capacity obligations in [the wholesale market]." *N. J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 97 (3rd Cir. 2014) ("*NJBPU*"). If the preferred resource does not clear the wholesale capacity auction and the state nevertheless compels its construction, then the state "'will appropriately

---

[2]   Ten years after the 1997 restructuring, Illinois established Defendant Illinois Power Agency as an independent body to oversee the competitive procurement of electricity to meet the needs of the Illinois utilities' residential and small commercial customers that chose (by default) to continue buying power supply from the utilities. Illinois Power Agency Act, Public Act 95-0481. Generators or power supply contracts secured through IPA's processes, however, will not count towards PJM's determination of the wholesale capacity needed to meet the needs of those customers unless those resources clear in PJM's capacity market (as explained in the text, *infra*).

**A.96**

bear the cost of [those] decision[s],' including possibly having to pay twice for capacity." *Id.* (quoting *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009)).

Thus, rather than relying on an administratively dictated "integrated resource plan," as a restructured state, Illinois relies on the PJM-operated interstate wholesale markets to meet the resource adequacy objective in the most cost efficient manner. *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331, at P 8 (2006); *see also* Request for Rehearing of the Illinois Commerce Commission, Docket No. ER13-535-000, at 11 (May 28, 2013) (ICC explains Illinois is "a retail access state with no ICC jurisdiction over generation facilities in Illinois;" as distinct from "traditionally regulated states," *id.* at 10, in which "the legislature or state commission could direct a state-jurisdictional utility to place [a preferred generation plant] into the state-approved integrated resource plan." *Id.*).

The Illinois General Assembly expressly considered the anticipated "[i]mproved efficiencies in the use of industry assets and personnel" gained by relying on the market—instead of regulators—in its 1997 restructuring legislation. Nancy Brockway et al., *Principles Applicable to the Electric Industry Reform Legislation*, The Governor's Advisory Committee for Electric Utility Regulatory Reform, 11-12 (Apr. 28, 1997) (attached as Exh. C). By "substituting competitive market pricing for regulated pricing of electricity in the wholesale and retail markets" the restructured markets could "send[ ] . . more efficien[t] price signals to operators and builders of electricity generators and to users of electricity;" and could "shift[ ] the locus of risk bearing for the use of existing generating assets and personnel [and constructing new generating assets] from captive users (where much of it has rested in the current system of economic regulation) onto shareholders of unregulated generating companies." *Id.* Similarly, the ICC advised the legislature at that time that it "supports a swift transition to a competitive electric

5

industry in which prices are decided by market forces, not by government." *Report to the Senate President Analysis of Electric Restructuring with Particular Emphasis on Senate Bill 55*, Illinois Commerce Commission, Executive Summary at ii (Aug. 15, 1997) (attached as Exh. D).

Notably, the legislators who voted to approve deregulation appreciated fully that: "[o]nce industry restructuring has progressed to the stage where distribution companies, generating companies and transmission companies are deemed separate business[es] and the FERC has deemed the wholesale market prices to be just and reasonable, the State will have no more voice in the price that generating companies charge for unbundled electricity than they do over the price that oil refineries charge for gasoline." *Id.* at 18.

To enable and promote competition, PJM's markets are single-clearing price auctions. *PJM Interconnection*, 117 FERC ¶ 61,331, at P 141. This means sellers can receive a higher price for electricity than their actual offers. This is because, based on economic rationale evaluated and accepted by FERC, RTOs (including PJM) centrally clear the total amount of generation needed to meet demand, starting with the lowest offer and proceeding upward until the demand is met, and pay all generators that clear the price represented by the offer of the last (or marginal) generator needed to serve demand. This marginal offer sets the single-clearing price paid to all generators. *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1293 (2016); *PJM Interconnection*, 117 FERC ¶ 61,331, at P 141. As Intervenor Exelon has explained, this single-clearing price structure "provides the appropriate price signals for market participants to determine when to invest in generation [and] whether to retire plants or re-invest in them" because "lower-cost resources are able to achieve a higher producer margin than higher cost resources, and are more likely to clear in the market," which "inherently produces competitive pressure on producers to achieve lower costs and higher efficiency, which ultimately reduces

**A.98**

costs for consumers." *See* Comments and Partial Protest of Exelon Corporation, Docket No. ER15-623-000, at 53 (Jan. 20, 2015) (attached as Exh. E).

The prices set by these markets therefore signal: (a) when obsolete or non-economic plants can and should be retired; (b) when new more efficient technologies should enter the markets; and (c) when existing plants remain necessary and economic. *Hughes*, 136 S. Ct. at 1293.

PJM's wholesale markets are agnostic as to resource and fuel types, so they do not favor one technology over another. This structure is completely consistent with—as Exelon itself put it—FERC's "strong preference for competitive markets, in which resources that provide the same product receive the same compensation, without regard to generation fuel type, vintage, cost structure, or any other attribute of a particular generator." *See* Exh. E at 52. These markets will clear the lowest cost resources needed to meet resource adequacy. Consequently, they will not provide revenues sufficient to retain what the market regards as an uneconomic plant (nuclear or otherwise), in spite of the environmental value, employment, or other social or political value a state may see in the plant.[3]

B. **Subsidies Distort PJM's Wholesale Markets**

Generators that receive subsidies to prevent them from retiring in response to the price signals coming from the PJM market represent uneconomic generation whose continued participation distorts PJM's market outcomes by suppressing prices. Subsidies allow high-cost generators to offer at artificial, i.e., below-cost, prices in order to guarantee that they will clear the auctions, confident that whatever they receive by way of PJM's single-clearing price auction

---

[3]   This is not to say these additional features are unimportant public policy matters. Rather, as noted, *infra*, at 14-15, Illinois had alternate avenues to recognize this value in a manner which would not have the effect of changing wholesale prices set through FERC tariffs.

will be supplemented by the subsidy. This drives down the clearing prices, which crowds out potential new merchant competition that relies only on market revenues to support investment. *See, e.g.*, *NJBPU*, 744 F.3d at 100 (relying on FERC's expressed concern that the "prospect of thousands of megawatts of new generation, developed under arrangements that would explicitly subsidize the resources regardless of Auction price, potentially being offered into the [PJM] [m]arket at a zero bid brought into focus the distortive effect . . . that the state exemption could have on market prices for all capacity.") Lower clearing prices also starve otherwise economic existing generation, beginning a vicious cycle that requires these plants also to look for out-of-market subsidies, further depressing clearing prices and undermining the market price.

FERC, PJM, and various PJM members (including Exelon) have previously recognized the potential harms described above. Exelon, for example, has explained that "the payment of out-of-market subsidies to a select group of producers destabilizes market dynamics in a manner that ends up being self fulfilling and discourages new entry." Exh. E at 54 (footnotes omitted). Such "discriminatory subsidies depress market price signals for other resources that rely on competitive prices to remain in or enter the market, thereby encouraging early retirement of resources dependent upon those price signals, and discouraging new entry." *Id.* The result is to "saddle[ ] consumers with a set of higher-cost resources than could have been procured through the competitive market." *Id.* Indeed, concerns over these types of harms have led to successful action in federal courts to stop similar state programs. *See PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467 (4th Cir. 2014); *PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241 (3rd Cir. 2014).

Such state programs to, in effect, pick the winners in the wholesale market, are contrary to Congress's intent, as reflected in such statutes as the Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776 (1992), and the Energy Policy Act of 2005, Pub. L. No. 109-58, 119

Stat. 594 (2005), "to promote greater competition in bulk power markets by encouraging new generation entrants." *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 1991–1996 FERC Stats. & Regs., Regs. Preambles ¶ 31,036, at 31,644 (1996). *See also Wholesale Competition in Regions with Organized Electric Markets*, Order No. 719, 125 FERC ¶ 61,071, at P 1 (Oct. 17, 2008) ("National policy has been, and continues to be, to foster competition in wholesale electric power markets. This policy was embraced in the Energy Policy Act of 2005").

## C.    The ZEC Program Is a Targeted Intervention That Causes Particular Harm

Of course, the Illinois program is hardly the only industry subsidy that impacts and frustrates theoretically perfect PJM market outcomes. For example, federal tax subsidies offer great advantage to wind generation and have distorted economic outcomes in PJM's markets. This effect has been particularly felt in PJM's western region, impacting Illinois and Exelon's nuclear operations. These and other federal programs (including several benefiting nuclear owners) are authorized by the U.S. Congress and, as a result, are not subject to the constitutional pre-emption and commerce clause arguments raised in this case. State programs also exist to promote emerging technologies, including carbon-free renewable generation, that work to incent otherwise uneconomic investments and also distort PJM market outcomes. Also, programs that provide tax rebates for efficiency artificially lower demand, while renewable energy credits and regulations directing utilities to procure a certain percentage of preferred resources artificially increase supply. These programs, which are not before the Court, cause a similar type of harm to PJM's markets as the Illinois ZEC program. However, the Court should be cognizant of factual differences that potentially distinguish the Illinois program from generic programs supporting

9

renewable energy technologies.[4]  These potential distinctions, recognized in *Hughes*, at 136 S. Ct. at 1299, are fact-specific and thus not appropriately addressed in the context of a Motion to Dismiss.  Rather, all parties should have the opportunity to demonstrate facts concerning the distinction drawn in *Hughes*, as applied to the Illinois ZEC legislation through further proceedings rather than being summarily addressed in a Motion to Dismiss.

D.     **Potential ZEC Recipients Are Required to Participate in PJM's Markets**

In fact, how the ZEC program operates depends on prices realized by the nuclear plants as they participate in the interstate electricity markets.  The plants in Illinois are *required* to participate in the wholesale auction markets run by PJM.  PJM's members, including Exelon, are subject to the rules found in the PJM Open Access Transmission Tariff (excerpts attached as Exh. F) as approved by FERC.  The Tariff, Exh. F at Attachment DD, section 6.6(a), requires every generation plant located in the PJM Region to offer its capacity into the PJM capacity auction.[5]

Further, according to the Tariff, once a generator's capacity offer clears, then it also is required to make offers in the energy market every day.  *See* Exh. F at Attachment K, Appendix section 1.10.1A(d).  In other words, participation in PJM markets is effectively mandatory; subsidized plants therefore cannot simply sit outside the market to avoid having their participation depress prices.  As a result, nuclear plants located in the PJM footprint are *required*,

---

[4]   The key legal distinction that separates existing state subsidies that promote emerging technologies is that the determination, award, and subsequent level of the ZEC payments under the Illinois program are targeted to supplementing wholesale market revenues just enough to maintain in service the particular plants that will receive the subsidies.  More generic subsidies, which are both determined and awarded in a manner entirely separate from the wholesale market, do not share those characteristics of the ZEC payments.

[5]   This "must offer" requirement was designed to prevent withholding of resources—a possible exercise of market power driving prices higher for the unit owner's generation fleet.

**A.102**

by FERC-approved tariff rule, to offer into the market and thus are integral to the setting of wholesale market prices.[6]

Not only are the nuclear plants required to offer into the wholesale market, they *must clear* that market in order to receive a capacity designation and attendant wholesale revenues. The ZEC payments are expressly intended to make up the difference between these revenues and the total amount certain uneconomic nuclear plants need to continue operating and generating zero emission power. 20 Ill. Comp. Stat. 3855/1-75(d-5)(1)(C). By design then, the ZEC payments, standing alone, provide insufficient revenue to support the plant. To continue operating, and thus receive ZEC payments, the nuclear plant must offer below its real costs to ensure it clears the wholesale auction. The ZEC program therefore both enables and incents below-cost offers that distort the competitive wholesale market.

**E.      The ZEC Program Is Preempted Under *Hughes***

Illinois' choice to rely on the PJM wholesale market to decide what plants are needed for resource adequacy has clear implications on Illinois' effort now to ensure that certain generators remain in service and continue to sell power in the wholesale market for the benefit of Illinois consumers. PJM does not contend that Illinois is without options to further its objective. However, those options cannot include a state effort to supplement wholesale electricity market revenues that the state finds to be inadequate for specified generators. Nor do those options include effectively changing which resources clear in the wholesale market and the clearing price determined by that wholesale market. Such state actions are preempted, as the Supreme Court

---

[6]      PJM is exploring ways to create exceptions that would remove subsidized resources from the price formation process and thus accommodate state subsidies in a manner that might be acceptable to FERC and PJM's stakeholders. At present, however, the ZEC program before this Court should be viewed in the context of the existing federal rules; and a design component of these rules presently compels participation by all plants seeking a capacity designation from PJM, including subsidized plants.

**A.103**

made clear in *Hughes*. The state action here is sufficiently similar to the state action that *Hughes* found pre-empted that, at a minimum, the Complaint should survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Indeed, here, as in *Hughes*:

- The state award of ZECs requires a finding that the desired generation resource will not be financially viable (i.e., will not continue to provide zero emission power) if it relies only on PJM wholesale market revenues;

- The relevant states (Illinois and Maryland) both adopted retail choice, restructured their utilities, and chose to rely on the competitive wholesale market to determine the resources that would be relied upon to meet reliability needs;

- The state will review the desired generation resource's costs, and the award of the payments to a specific generator will depend on whether they are sufficient to ensure the generator will enter (or remain) in service;

- The subsidy payments adjust in certain circumstances depending on the level of wholesale prices; and

- The distribution utilities will make the payments to the desired generation resource, and collect the cost of those payments from retail customers.

*See Hughes*, 136 S. Ct. at 1294-95; 20 Ill. Comp. Stat. 3855/1-75(d-5)(1)(A)(iii) (demonstration of costs necessary to continue operating), (d-5)(1)(A)(iv)(commitment to continue operating), (d-5)(1)(B)(ZEC payment reduction based on wholesale price index increase), (d-5)(1)(C) (selection of winning bids shall take into account preservation of zero emissions facilities that would cease to exist if the ZEC procurements were not held). Thus, at a minimum, *Hughes* requires close factual examination of the ZEC program because it is so closely interconnected with wholesale rates and affects wholesale market results. Such close examination cannot meaningfully occur within the context of a motion to dismiss.

Movants attempt to distinguish *Hughes* primarily on the grounds that the state in *Hughes* only awarded the "contract for difference" payments if the selected generator offered its capacity into the PJM capacity market, whereas the ZEC law supposedly does not. *See, e.g.*, Exelon Memo. Supp. Mot. to Dismiss at 14-15. But the condition that the plant offer into PJM's market as imposed in Maryland is not needed in the ZEC program because, as noted above, the Illinois nuclear generators located in the PJM Region are *already* required by the FERC-approved Tariff to offer their capacity into the PJM capacity market. The ICC has long known of, and supported, this PJM Tariff requirement. *See, e.g.*, Request for Rehearing of the Illinois Commerce Commission, FERC Docket No. ER15-623-000, at 7 (July 8, 2015) (attached as Exh. G) (ICC arguing that a particular price cap "*combined with a must-offer requirement from existing resources*, has been an essential element protecting PJM's capacity construct from the exercise of market power.") (emphasis added). Maryland, in the program addressed in *Hughes*, had to condition state financial support on a requirement that the proposed new generator offer and clear in PJM's market because PJM's "must-offer" rule does not apply to new resources. But that rule *does apply* to existing resources, like the nuclear plants that the ZEC program aims to keep in service, obviating any need for an explicit condition requiring the nuclear plants to offer into the PJM market. Still, the ZEC program is clear that the nuclear plants must remain in service to continue receiving the ZEC payments—which creates the same incentive seen in *Hughes* for the state-supported plant to offer at a below-cost price, and thereby distort the price paid to *all* sellers and charged to buyers.

Here, as in *Hughes*, 136 S. Ct. at 1296, the proponents of the challenged subsidy argue that the program does not seek to change the wholesale rate, and that the objectives it seeks to advance are permissible and distinct from the objectives of the federal wholesale market. And,

13

**A.105**

candidly, PJM accepts that the dividing line between the federal sphere and permissible state action is not clear-cut. But the Court in *Hughes* nonetheless found that, considering the state program's target and structure, it was still "tethered" to the wholesale market and constituted an over-reach into the exclusive federal domain of that wholesale market. The proposed ZEC payments here, in their structure, effect, and apparent purpose, appear to be economically equivalent to the contract for differences at issue in *Hughes* and should be treated the same. As noted, for example, while the ZEC payment begins at a fixed level based on the social cost of carbon, *whether to award the ZEC* expressly involves consideration of the nuclear generators' costs, and must take into account whether, without the ZEC payments, the plant would no longer provide zero emission power—*i.e.,* cease operations. Moreover, the ZEC payments are designed to adjust—*i.e.,* go down—to the extent wholesale market compensation goes up, thus directly tying the amount of the ZECs to the wholesale energy price. Adding to the concern, the ZEC payments at issue here also are expected to be quite substantial, targeted to only one or two plants, and to continue for ten years, resulting in a large and prolonged market distortion. These factors heighten the degree to which the program will intrude into and change both the pricing and resource-clearing results of PJM's wholesale markets.

Notably, Illinois has other permissible avenues, if it wishes to value carbon-free generation at Illinois nuclear plants. Illinois could, for example, price the negative externality in question here—carbon. Emitting units would internalize this cost in their PJM market offers, thus changing the competitiveness of nuclear plants relative to fossil generation. Plainly, a program of this sort is more efficient on a national or regional basis. But models for this sort of approach already exist. Indeed, the Regional Greenhouse Gas Initiative (which includes two other PJM states) is designed to cap and reduce (through emissions allowances) carbon dioxide

emissions in the power sector. *Program Design*, Regional Greenhouse Gas Initiative, http://www.rggi.org/design (last visited Apr. 24, 2017). Putting a price on carbon is wholly compatible with the operation of competitive wholesale electricity markets and the economic commitment and dispatch approach used by these markets to clear competing generation.

Additionally, PJM has market rules that offer Illinois the opportunity to work with Exelon and its affiliate, ComEd, to relieve PJM of resource adequacy responsibility, and the ability to pick and choose plants to meet resource adequacy needs for ComEd's customers. *See* Exh. F, Reliability Assurance Agreement Among Load Serving Entities in the PJM Region, Schedule 8.1.A. More dramatically, Illinois could return to traditional regulation for the whole state. These options carry consequences and complications that might unduly burden and cost Illinois consumers. But so long as PJM remains tasked with meeting resource adequacy in Illinois, the state cannot intervene to prop up a small portion of the need and expect PJM's markets to effectively cover all the rest.

## CONCLUSION

WHEREFORE, for the foregoing reasons, PJM, solely as *amicus curiae*, respectfully requests that the Court deny the State Defendants' and Exelon's Motions to Dismiss and award PJM such other and further relief as is appropriate, if any.

Respectfully submitted,

PJM INTERCONNECTION, L.L.C.

By:  /s/ Paul M. Flynn
          One Of Its Attorneys

15

**A.107**

### CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Paul M. Flynn*
Paul M. Flynn (*pro hac vice*)
Wright & Talisman, P.C.
1200 G Street, N.W.
Suite 600
Washington, D.C.  20005
(202) 393-1200
flynn@wrightlaw.com

**Attorney for
PJM Interconnection, L.L.C.**

**A.108**

Case No. 1:17-cv-01164
BRIEF OF PJM INTERCONNECTION, L.L.C.
AS AMICUS CURIAE IN OPPOSITION
TO MOTIONS TO DISMISS

April 24, 2017

# EXHIBIT F

PJM Interconnection, L.L.C.,Intra-PJM Tariffs
Filing Category:          Normal                          Filing Date:              07/13/2011
FERC Docket:              ER11-04040-000                  FERC Action:              Accept
FERC Order:               Delegated Letter Order          Order Date:
          09/08/2011
Effective Date:           07/14/2011                      Status:                   Effective
RAA SCHEDULE 8.1.A, RAA SCHEDULE 8.1.A-The Fixed Resource Requirement ("FRR") AI, 1.0.0

**The Fixed Resource Requirement ("FRR") Alternative**

A.    The Fixed Resource Requirement ("FRR") Alternative provides an alternative means, under the terms and conditions of this Schedule, for an eligible Load-Serving Entity to satisfy its obligation hereunder to commit Unforced Capacity to ensure reliable service to loads in the PJM Region.

**A.110**

PJM Interconnection, L.L.C.,Intra-PJM Tariffs
Filing Category:          Normal                       Filing Date:          04/28/2016
FERC Docket:           ER16-01520-000              FERC Action:        Accept
FERC Order:             155 FERC 61,303               Order Date:          06/23/2016
Effective Date:           06/27/2016                    Status:              Effective
OATT ATT DD.6, OATT ATTACHMENT DD.6. MARKET POWER MITIGATION, 13.0.0

## 6.6      Offer Requirement for Capacity Resources

(a)      To avoid application of subsection (h), all of the installed capacity of all Existing Generation Capacity Resources located in the PJM Region shall be offered by the Capacity Market Seller that owns or controls all or part of such resource (which may include submission as Self-Supply) in all RPM Auctions for each Delivery Year, less any amount determined by the Office of the Interconnection to be eligible for an exception to this RPM must-offer requirement, where installed capacity is determined as of the date on which bidding commences for each RPM Auction pursuant to Section 5.6.6 of Attachment DD of the Tariff.   The Unforced Capacity of such resources is determined using the EFORd value that is submitted by the Capacity Market Seller in its Sell Offer, which shall not exceed the maximum EFORd for that resource as defined in Section 6.6(b).   If a resource should be included on the list of Existing Generation Capacity Resources subject to the RPM must-offer requirement that is maintained by the Market Monitoring Unit pursuant to Section II.C.1 of Attachment M - Appendix of the Tariff, but is omitted therefrom whether by mistake of the Market Monitoring Unit or failure of the Capacity Market Seller that owns or controls all or part of such resource to provide information about the resource to the Market Monitoring Unit, this shall not excuse such resource from the RPM must-offer requirement.

PJM Interconnection, L.L.C.,Intra-PJM Tariffs
Filing Category:          Normal                                    Filing Date:              02/10/2017
FERC Docket:              ER17-00957-000                            FERC Action:              Accept
FERC Order:               Delegated Letter Order                    Order Date:
          04/06/2017
Effective Date:           04/11/2017                                Status:                   Effective
OATT ATT K APPX Sec 1.10, OATT Attachment K Appendix Sec 1.10 - Scheduling, 27.0.1

**1.10.1A Day-ahead Energy Market Scheduling.**

The following actions shall occur not later than 10:30 a.m. on the day before the Operating Day for which transactions are being scheduled, or such other deadline as may be specified by the Office of the Interconnection in order to comply with the practical requirements and the economic and efficiency objectives of the scheduling process specified in this Schedule.

(a)    Each Market Participant may submit to the Office of the Interconnection specifications of the amount and location of its customer loads and/or energy purchases to be included in the Day-ahead Energy Market for each hour of the next Operating Day, such specifications to comply with the requirements set forth in the PJM Manuals.   Each Market Buyer shall inform the Office of the Interconnection of the prices, if any, at which it desires not to include its load in the Day-ahead Energy Market rather than pay the Day-ahead Price.   PRD Providers that have committed Price Responsive Demand in accordance with the Reliability Assurance Agreement shall submit to the Office of the Interconnection, in accordance with procedures specified in the PJM Manuals, any desired updates to their previously submitted PRD Curves, provided that such updates are consistent with their Price Responsive Demand commitments, and provided further that PRD Providers that are not Load Serving Entities for the Price Responsive Demand at issue may only submit PRD Curves for the Real-time Energy Market.   Price Responsive Demand that has been committed in accordance with the Reliability Assurance Agreement shall be presumed available for the next Operating Day in accordance with the most recently submitted PRD Curve unless the PRD Curve is updated to indicate otherwise.   PRD Providers may also submit PRD Curves for any Price Responsive Demand that is not committed in accordance with the Reliability Assurance Agreement; provided that PRD Providers that are not Load Serving Entities for the Price Responsive Demand at issue may only submit PRD Curves for the Real-time Energy Market.   All PRD Curves shall be on a PRD Substation basis, and shall specify the maximum time period required to implement load reductions.

(b)    Each Generating Market Buyer shall submit to the Office of the Interconnection: (i) hourly schedules for resource increments, including hydropower units, self-scheduled by the Market Buyer to meet its Equivalent Load; and (ii) the Dispatch Rate at which each such self-scheduled resource will disconnect or reduce output, or confirmation of the Market Buyer's intent not to reduce output.

(c)    All Market Participants shall submit to the Office of the Interconnection schedules for any energy exports, energy imports, and wheel through transactions involving use of generation or Transmission Facilities as specified below, and shall inform the Office of the Interconnection if the transaction is to be scheduled in the Day-ahead Energy Market.   Any Market Participant that elects to schedule an export, import or wheel through transaction in the

**A.112**

Day-ahead Energy Market may specify the price (such price not to exceed the maximum price that may be specified in the PJM Manuals), if any, at which the export, import or wheel through transaction will be wholly or partially curtailed. The foregoing price specification shall apply to the applicable interface pricing point. Any Market Participant that elects not to schedule its export, import or wheel through transaction in the Day-ahead Energy Market shall inform the Office of the Interconnection if the parties to the transaction are not willing to incur Transmission Congestion and Loss Charges in the Real-time Energy Market in order to complete any such scheduled transaction. Scheduling of such transactions shall be conducted in accordance with the specifications in the PJM Manuals and the following requirements:

       i)     Market Participants shall submit schedules for all energy purchases for delivery within the PJM Region, whether from resources inside or outside the PJM Region;

       ii)     Market Participants shall submit schedules for exports for delivery outside the PJM Region from resources within the PJM Region that are not Dynamic Transfers to such entities pursuant to Section 1.12; and

       iii)     In addition to the foregoing schedules for exports, imports and wheel through transactions, Market Participants shall submit confirmations of each scheduled transaction from each other party to the transaction in addition to the party submitting the schedule, or the adjacent Control Area.

(c-1)    A Market Participant may elect to submit in the Day-ahead Energy Market a form of Virtual Transaction that combines an offer to sell energy at a source, with a bid to buy the same megawatt quantity of energy at a sink where such transaction specifies the maximum difference between the Locational Marginal Prices at the source and sink. The Office of Interconnection will schedule these transactions only to the extent this difference in Locational Marginal Prices is within the maximum amount specified by the Market Participant. A Virtual Transaction of this type is referred to as an "Up-to Congestion Transaction." Such Up-to Congestion Transactions may be wholly or partially scheduled depending on the price difference between the source and sink locations in the Day-ahead Energy Market. The maximum difference between the source and sink prices that a participant may specify shall be limited to +/- $50/MWh. The foregoing price specification shall apply to the price difference between the specified source and sink in the day-ahead scheduling process only. An accepted Up-to Congestion Transaction results in scheduled injection at a specified source and scheduled withdrawal of the same megawatt quantity at a specified sink in the Day-ahead Energy Market. The source-sink paths on which an Up-to Congestion Transaction may be submitted are limited to those paths posted on the PJM internet site and determined by the Office of the Interconnection using the following criteria:

Step 1: Start with the historic set of eligible nodes that were available as sources and sinks for interchange transactions on the PJM OASIS.

Step 2: Remove from the list of nodes described in Step 1 all load buses below 69 kV.

**A.113**

Step 3: Remove from the resulting set of nodes from Step 2 all generator buses at which no generators of 100 megawatts or more are connected.

Step 4: Remove from the results of Step 3 all electrically equivalent nodes.

(d)     Market Sellers wishing to sell into the Day-ahead Energy Market shall submit offers for the supply of energy (including energy from hydropower units), demand reductions, Regulation, Operating Reserves or other services for the following Operating Day.   Offers shall be submitted to the Office of the Interconnection in the form specified by the Office of the Interconnection and shall contain the information specified in the Office of the Interconnection's Offer Data specification, this Section 1.10.1A(d), Schedule 2 of the Operating Agreement, and the PJM Manuals, as applicable.   Market Sellers owning or controlling the output of a Generation Capacity Resource that was committed in an FRR Capacity Plan, self-supplied, offered and cleared in a Base Residual Auction or Incremental Auction, or designated as replacement capacity, as specified in Attachment DD of the PJM Tariff, and that has not been rendered unavailable by a Generator Planned Outage, a Generator Maintenance Outage, or a Generator Forced Outage are subject to a Day-ahead Energy Market must-offer requirement and a Real-time Energy Market must-offer requirement and pursuant thereto shall submit offers for the available capacity of such Generation Capacity Resource, including any portion that is self-scheduled by the Generating Market Buyer.   Such offers shall be based on the ICAP equivalent of the Market Seller's cleared UCAP capacity commitment, provided, however, where the underlying resource is a Capacity Storage Resource or an Intermittent Resource, the Market Seller shall satisfy the Day-ahead Energy Market must-offer requirement and the Real-time Energy Market must-offer requirement by either self-scheduling or offering the unit as a dispatchable resource, in accordance with the PJM Manuals, where the hourly self-scheduled values for such Capacity Storage Resources and Intermittent Resources may vary hour to hour from the capacity commitment.   Any offer not designated as a Maximum Emergency offer shall be considered available for scheduling and dispatch under both Emergency and non-Emergency conditions.   Offers may only be designated as Maximum Emergency offers to the extent that the Generation Capacity Resource falls into at least one of the following categories:

i)   Environmental limits.   If the resource has a limit on its run hours imposed by a federal, state, or other governmental agency that will significantly limit its availability, on either a temporary or long-term basis.   This includes a resource that is limited to operating only during declared PJM capacity emergencies by a governmental authority.

ii)   Fuel limits.   If physical events beyond the control of the resource owner result in the temporary interruption of fuel supply and there is limited on-site fuel storage. A fuel supplier's exercise of a contractual right to interrupt supply or delivery under an interruptible service agreement shall not qualify as an event beyond the control of the resource owner.

iii)   Temporary emergency conditions at the unit.   If temporary emergency physical conditions at the resource significantly limit its availability.

iv)   Temporary megawatt additions.   If a resource can provide additional

**A.114**

megawatts on a temporary basis by oil topping, boiler over-pressure, or similar techniques, and such megawatts are not ordinarily otherwise available.

The submission of offers for resource increments that have not cleared in a Base Residual Auction or an Incremental Auction, were not committed in an FRR Capacity Plan, and were not designated as replacement capacity under Attachment DD of the PJM Tariff shall be optional, but any such offers must contain the information specified in the Office of the Interconnection's Offer Data specification, this Section 1.10.1A(d), Schedule 2 of the Operating Agreement, and the PJM Manuals, as applicable.   Energy offered from generation resources that have not cleared a Base Residual Auction or an Incremental Auction, were not committed in an FRR Capacity Plan, and were not designated as replacement capacity under Attachment DD of the PJM Tariff shall not be supplied from resources that are included in or otherwise committed to supply the Operating Reserves of a Control Area outside the PJM Region.

The foregoing offers:

i)      Shall specify the Generation Capacity Resource or Demand Resource and energy or demand reduction amount, respectively, for each hour in the offer period, and the minimum run time for generation resources and minimum down time for Demand Resources;

ii)     Shall specify the amounts and prices for the entire Operating Day for each resource component offered by the Market Seller to the Office of the Interconnection;

iii)    If based on energy from a specific generation resource, may specify start-up and no-load fees equal to the specification of such fees for such resource on file with the Office of the Interconnection, if based on reductions in demand from a Demand Resource may specify shutdown costs;

iv)     Shall set forth any special conditions upon which the Market Seller proposes to supply a resource increment, including any curtailment rate specified in a bilateral contract for the output of the resource, or any cancellation fees;

v)      May include a schedule of offers for prices and operating data contingent on acceptance by the deadline specified in this Schedule, with a second schedule applicable if accepted after the foregoing deadline;

vi)     Shall constitute an offer to submit the resource increment to the Office of the Interconnection for scheduling and dispatch in accordance with the terms of the offer, which offer shall remain open through the Operating Day for which the offer is submitted;

vii)    Shall be final as to the price or prices at which the Market Seller proposes to supply energy or other services to the PJM Interchange Energy Market, such price or prices being guaranteed by the Market Seller for the period extending through the end of the following Operating Day;

viii)    Shall not exceed an energy offer price of $1,000/megawatt-hour for all generation resources, except (1) when a Market Seller's cost-based offer is above $1,000/megawatt-hour and less than or equal to $2,000/megawatt-hour, then its market-based offer must be less than or equal to the cost-based offer; and (2) when a Market Seller's cost-based offer is greater than $2,000/megawatt-hour, then its market-based offer must be less than or equal to $2,000/megawatt-hour;

ix)    Shall not exceed an energy offer price of $1,000/megawatt-hour, plus the applicable Reserve Penalty Factor for the Primary Reserve Requirement, minus $1.00, for all Economic Load Response Resources;

x)    Shall not exceed an offer price as follows for Emergency Load Response and Pre-Emergency Load Response participants with:

a)    a 30 minute lead time, pursuant to Section A.2 of Attachment DD-1 of the Tariff and the parallel provision of Schedule 6 of the RAA, $1,000/megawatt-hour, plus the applicable Reserve Penalty Factor for the Primary Reserve Requirement, minus $1.00;

b)    an approved 60 minute lead time, pursuant to Section A.2 of Attachment DD-1 of the Tariff and the parallel provision of Schedule 6 of the RAA, $1,000/megawatt-hour, plus [the applicable Reserve Penalty Factor for the Primary Reserve Requirement divided by 2]; and

c)    an approved 120 minute lead time, pursuant to Section A.2 of Attachment DD-1 of the Tariff and the parallel provisions of Schedule 6 of the RAA, $1,100/megawatt-hour.

(xi) Shall not exceed an energy offer price of $0.00/MWh for pumped storage hydropower units scheduled by the Office of the Interconnection pursuant to the hydro optimization tool in the Day-ahead Energy Market.

(e)    A Market Seller that wishes to make a resource available to sell Regulation service shall submit an offer for Regulation that shall specify the megawatt of Regulation being offered, which must equal or exceed 0.1 megawatts, the Regulation Zone for which such regulation is offered, the price of the capability offer in dollars per MW, the price of the performance offer in Dollars per change in MW, and such other information specified by the Office of the Interconnection as may be necessary to evaluate the offer and the resource's opportunity costs.   The total of the performance offer multiplied by the historical average mileage used in the market clearing plus the capability offer shall not exceed $100 per MWh in the case of Regulation offered for all Regulation Zones.   In addition to any market-based offer for Regulation, the Market Seller also shall submit a cost-based offer.   A cost-based offer must be in the form specified in the PJM Manuals and consist of the following components as well as any other components specified in the PJM Manuals:

**A.116**

    i.  The costs (in $/MW) of the fuel cost increase due to the steady-state heat rate increase resulting from operating the unit at lower megawatt output incurred from the provision of Regulation shall apply to the capability offer;

    ii.  The cost increase (in $/ΔMW) in costs associated with movement of the regulation resource incurred from the provision of Regulation shall apply to the performance offer; and

    iii.  An adder of up to $12.00 per megawatt of Regulation provided applied to the capability offer.

Qualified Regulation capability must satisfy the measurement and verification tests specified in the PJM Manuals.

  (f)  Each Market Seller owning or controlling the output of a Generation Capacity Resource committed to service of PJM loads under the Reliability Pricing Model or Fixed Resource Requirement Alternative shall submit a forecast of the availability of each such Generation Capacity Resource for the next seven days.   A Market Seller (i) may submit a non-binding forecast of the price at which it expects to offer a generation resource increment to the Office of the Interconnection over the next seven days, and (ii) shall submit a binding offer for energy, along with start-up and no-load fees, if any, for the next seven days or part thereof, for any generation resource with minimum notification or start-up requirement greater than 24 hours.   Such resources committed by the Office of the Interconnection will not receive Operating Reserve Credits nor otherwise be made whole for its hours of operation for the duration of any portion of such commitment that exceeds the maximum start-up and notification times for such resources during Hot Weather Alerts and Cold Weather Alerts, consistent with Sections 3.2.3 and 6.6 hereof.

  (g)  Each   offer by a Market Seller of a Generation Capacity Resource shall remain in effect for subsequent Operating Days until superseded or canceled.

  (h)  The Office of the Interconnection shall post the total hourly loads scheduled in the Day-ahead Energy Market, as well as, its estimate of the combined hourly load of the Market Buyers for the next four days, and peak load forecasts for an additional three days.

  (i)  Except for Economic Load Response Participants, all Market Participants may submit Virtual Transactions that apply to the Day-ahead Energy Market only.   Such Virtual Transactions must comply with the requirements set forth in the PJM Manuals and must specify amount, location and price, if any, at which the Market Participant desires to purchase or sell energy in the Day-ahead Energy Market.   The Office of the Interconnection may require that a market participant shall not submit in excess of a defined number of bid/offer segments in the Day-ahead Energy Market, as specified in the PJM Manuals, when the Office of the Interconnection determines that such limit is required to avoid or mitigate significant system performance problems related to bid/offer volume. Notice of the need to impose such limit shall be provided prior to 10:00 a.m. EPT on the day that the Day-ahead Energy Market will clear. For purposes of this provision, a bid/offer segment is each pairing of price and megawatt

quantity submitted as part of an Increment Offer or Decrement Bid. For purposes of applying this provision to an Up-to Congestion Transaction, a bid/offer segment shall refer to the pairing of a source and sink designation, as well as price and megawatt quantity, that comprise each Up-to Congestion Transaction.

(j)     A Market Seller that wishes to make a generation resource or Demand Resource available to sell Synchronized Reserve shall submit an offer for Synchronized Reserve that shall specify the megawatts of Synchronized Reserve being offered, which must equal or exceed 0.1 megawatts, the price of the offer in dollars per megawatt hour, and such other information specified by the Office of the Interconnection as may be necessary to evaluate the offer and the energy used by the generation resource to provide the Synchronized Reserve and the generation resource's unit specific opportunity costs. The price of the offer shall not exceed the variable operating and maintenance costs for providing Synchronized Reserve plus seven dollars and fifty cents.

(k)     An Economic Load Response Participant that wishes to participate in the Day-ahead Energy Market by reducing demand shall submit an offer to reduce demand to the Office of the Interconnection. The offer must equal or exceed 0.1 megawatts, and the offer shall specify: (i) the amount of the offered curtailment in minimum increments of .1 megawatts: (ii) the Day-ahead Locational Marginal Price above which the end-use customer will reduce load, subject to section 1.10.1A(d)(ix); and (iii) at the Economic Load Response Participant's option, start-up costs associated with reducing load, including direct labor and equipment costs, opportunity costs, and/or a minimum of number of contiguous hours for which the load reduction must be committed. Economic Load Response Participants submitting offers to reduce demand in the Day-ahead Energy Market may establish an incremental offer curve, provided that such offer curve shall be limited to ten price pairs (in MWs).

(l)     Market Sellers owning or controlling the output of a Demand Resource that was committed in an FRR Capacity Plan, or that was self-supplied or that offered and cleared in a Base Residual Auction or Incremental Auction, may submit demand reduction bids for the available load reduction capability of the Demand Resource. The submission of demand reduction bids for Demand Resource increments that were not committed in an FRR Capacity Plan, or that have not cleared in a Base Residual Auction or Incremental Auction, shall be optional, but any such bids must contain the information required to be included in such bids, as specified in the PJM Economic Load Response Program. A Demand Resource that was committed in an FRR Capacity Plan, or that was self-supplied or offered and cleared in a Base Residual Auction or Incremental Auction, may submit a demand reduction bid in the Day-ahead Energy Market as specified in the Economic Load Response Program; provided, however, that in the event of an Emergency PJM shall require Demand Resources to reduce load, notwithstanding that the Zonal LMP at the time such Emergency is declared is below the price identified in the demand reduction bid.

(m)     Market Sellers providing Day-ahead Scheduling Reserves Resources shall submit in the Day-ahead Scheduling Reserves Market: 1) a price offer in dollars per megawatt hour; and 2) such other information specified by the Office of the Interconnection as may be necessary to determine any relevant opportunity costs for the resource(s). The foregoing notwithstanding,

**A.118**

to qualify to submit Day-ahead Scheduling Reserves pursuant to this section, the Day-ahead Scheduling Reserves Resources shall submit energy offers in the Day-ahead Energy Market including start-up and shut-down costs for generation resource and Demand Resources, respectively, and all generation resources that are capable of providing Day-ahead Scheduling Reserves that a particular resource can provide that service. The MW quantity of Day-ahead Scheduling Reserves that a particular resource can provide in a given hour will be determined based on the energy Offer Data submitted in the Day-ahead Energy Market, as detailed in the PJM Manuals.

**1.10.1B Demand Bid Scheduling and Screening**

(a)     The Office of the Interconnection shall apply Demand Bid Screening to all Demand Bids submitted in the Day-ahead Energy Market for each Load Serving Entity, separately by Zone. Using Demand Bid Screening, the Office of the Interconnection will automatically reject a Load Serving Entity's Demand Bids in any future Operating Day for which the Load Serving Entity submits bids if the total megawatt volume of such bids would exceed the Load Serving Entity's Demand Bid Limit for any hour in such Operating Day, unless the Office of the Interconnection permits an exception pursuant to subsection (d) below.

(b)     On a daily basis, PJM will update and post each Load Serving Entity's Demand Bid Limit in each applicable Zone. Such Demand Bid Limit will apply to all Demand Bids submitted by that Load Serving Entity for each future Operating Day for which it submits bids. The Demand Bid Limit is calculated using the following equation:

Demand Bid Limit =  greater of (Zonal Peak Demand Reference Point * 1.3), or (Zonal Peak Demand Reference Point + 10MW)

Where:
1.  Zonal Peak Demand Reference Point = for each Zone: the product of (a) LSE Recent Load Share, multiplied by (b) Peak Daily Load Forecast.
2.  LSE Recent Load Share is the Load Serving Entity's highest share of Network Load in each Zone for any hour over the most recently available seven Operating Days for which PJM has data.
3.  Peak Daily Load Forecast is PJM's highest available peak load forecast for each applicable Zone that is calculated on a daily basis.

(c)     A Load Serving Entity whose Demand Bids are rejected as a result of Demand Bid Screening may change its Demand Bids to reduce its total megawatt volume to a level that does not exceed its Demand Bid Limit, and may resubmit them subject to the applicable rules related to bid submission outlined in Tariff, Operating Agreement and PJM Manuals.

(d)     PJM may allow a Load Serving Entity to submit bids in excess of its Demand Bid Limit when circumstances exist that will cause, or are reasonably expected to cause, a Load Serving Entity's actual load to exceed its Demand Bid Limit on a given Operating Day. Examples of such circumstances include, but are not limited to, changes in load commitments due to state sponsored auctions, mergers and acquisitions between PJM Members, and sales and

**A.119**

divestitures between PJM Members. A Load Serving Entity may submit a written exception request to the Office of Interconnection for a higher Demand Bid Limit for an affected Operating Day. Such request must include a detailed explanation of the circumstances at issue and supporting documentation that justify the Load Serving Entity's expectation that its actual load will exceed its Demand Bid Limit.

## 1.10.2 Pool-scheduled Resources.

Pool-scheduled resources are those resources for which Market Participants submitted offers to sell energy in the Day-ahead Energy Market and offers to reduce demand in the Day-ahead Energy Market, which the Office of the Interconnection scheduled in the Day-ahead Energy Market as well as generators committed by the Office of the Interconnection subsequent to the Day-ahead Energy Market. Such resources shall be committed to provide energy in the real-time dispatch unless the schedules for such units are revised pursuant to Sections 1.10.9 or 1.11. Pool-scheduled resources shall be governed by the following principles and procedures.

(a)     Pool-scheduled resources shall be selected by the Office of the Interconnection on the basis of the prices offered for energy and demand reductions and related services, whether the resource is expected to be needed to maintain system reliability during the Operating Day, start-up, no-load and cancellation fees, and the specified operating characteristics, offered by Market Sellers to the Office of the Interconnection by the offer deadline specified in Section 1.10.1A. Hydropower units can only be pool-scheduled if they are pumped storage units and scheduled by the Office of the Interconnection pursuant to the hydro optimization tool in the Day-ahead Energy Market.

(b)     A resource that is scheduled by a Market Participant to support a bilateral sale, or that is self-scheduled by a Generating Market Buyer, shall not be selected by the Office of the Interconnection as a pool-scheduled resource except in an Emergency.

(c)     Market Sellers offering energy from hydropower or other facilities with fuel or environmental limitations may submit data to the Office of the Interconnection that is sufficient to enable the Office of the Interconnection to determine the available operating hours of such facilities.

(d)     The Market Seller of a resource selected as a pool-scheduled resource shall receive payments or credits for energy, demand reductions or related services, or for start-up and no-load fees, from the Office of the Interconnection on behalf of the Market Buyers in accordance with Section 3 of this Schedule 1. Alternatively, the Market Seller shall receive, in lieu of start-up and no-load fees, its actual costs incurred, if any, up to a cap of the resource's start-up cost, if the Office of the Interconnection cancels its selection of the resource as a pool-scheduled resource and so notifies the Market Seller before the resource is synchronized.

(e)     Market Participants shall make available their pool-scheduled resources to the Office of the Interconnection for coordinated operation to supply the Operating Reserves needs of the applicable Control Zone.

**A.120**

(f)     Economic Load Response Participants offering to reduce demand shall specify: (i) the amount of the offered curtailment, which offer must equal or exceed 0.1 megawatts, in minimum increments of .1 megawatts; (ii) the real-time Locational Marginal Price above which the end-use customer will reduce load; and (iii) at the Economic Load Response Participant's option, shut-down costs associated with reducing load, including direct labor and equipment costs, opportunity costs, and/or a minimum number of contiguous hours for which the load reduction must be committed.   Economic Load Response Participants submitting offers to reduce demand in the Real-time Energy Market may establish an incremental offer curve, provided that such offer curve shall be limited to ten price pairs (in MWs).   Economic Load Response Participants offering to reduce demand shall also indicate the hours that the demand reduction is not available.

### 1.10.3  Self-scheduled Resources.

Self-scheduled resources shall be governed by the following principles and procedures.

(a)     Each Generating Market Buyer shall use all reasonable efforts, consistent with Good Utility Practice, not to self-schedule resources in excess of its Equivalent Load.

(b)     The offered prices of resources that are self-scheduled, or otherwise not following the dispatch orders of the Office of the Interconnection, shall not be considered by the Office of the Interconnection in determining Locational Marginal Prices.

(c)     Market Participants shall make available their self-scheduled resources to the Office of the Interconnection for coordinated operation to supply the Operating Reserves needs of the applicable Control Zone, by submitting an offer as to such resources.

(d)     A Market Participant self-scheduling a resource in the Day-ahead Energy Market that does not deliver the energy in the Real-time Energy Market, shall replace the energy not delivered with energy from the Real-time Energy Market and shall pay for such energy at the applicable Real-time Price.

(e) Hydropower units, excluding pumped storage units, may only be self-scheduled.

### 1.10.4  Capacity Resources.

(a)     A Generation Capacity Resource committed to service of PJM loads under the Reliability Pricing Model or Fixed Resource Requirement Alternative that is selected as a pool-scheduled resource shall be made available for scheduling and dispatch at the direction of the Office of the Interconnection.   Such a Generation Capacity Resource that does not deliver energy as scheduled shall be deemed to have experienced a Generator Forced Outage to the extent of such energy not delivered.   A Market Participant offering such Generation Capacity Resource in the Day-ahead Energy Market shall replace the energy not delivered with energy from the Real-time Energy Market and shall pay for such energy at the applicable Real-time Price.

**A.121**

(b)     Energy from a Generation Capacity Resource committed to service of PJM loads under the Reliability Pricing Model or Fixed Resource Requirement Alternative that has not been scheduled in the Day-ahead Energy Market may be sold on a bilateral basis by the Market Seller, may be self-scheduled, or may be offered for dispatch during the Operating Day in accordance with the procedures specified in this Schedule.   Such a Generation Capacity Resource that has not been scheduled in the Day-ahead Energy Market and that has been sold on a bilateral basis must be made available upon request to the Office of the Interconnection for scheduling and dispatch during the Operating Day if the Office of the Interconnection declares a Maximum Generation Emergency.   Any such resource so scheduled and dispatched shall receive the applicable Real-time Price for energy delivered.

(c)     A resource that has been self-scheduled shall not receive payments or credits for start-up or no-load fees.

**1.10.5  External Resources.**

(a)     External Resources may submit offers to the PJM Interchange Energy Market, in accordance with the day-ahead and real-time scheduling processes specified above.   An External Resource selected as a pool-scheduled resource shall be made available for scheduling and dispatch at the direction of the Office of the Interconnection, and except as specified below shall be compensated on the same basis as other pool-scheduled resources.   External Resources that are not capable of Dynamic Transfer shall, if selected by the Office of the Interconnection on the basis of the Market Seller's Offer Data, be block loaded on an hourly scheduled basis.   Market Sellers shall offer External Resources to the PJM Interchange Energy Market on either a resource-specific or an aggregated resource basis.   A Market Participant whose pool-scheduled resource does not deliver the energy scheduled in the Day-ahead Energy Market shall replace such energy not delivered as scheduled in the Day-ahead Energy Market with energy from the PJM Real-time Energy Market and shall pay for such energy at the applicable Real-time Price.

(b)     Offers for External Resources from an aggregation of two or more generating units shall so indicate, and shall specify, in accordance with the Offer Data requirements specified by the Office of the Interconnection:   (i) energy prices; (ii) hours of energy availability; (iii) a minimum dispatch level; (iv) a maximum dispatch level; and (v) unless such information has previously been made available to the Office of the Interconnection, sufficient information, as specified in the PJM Manuals, to enable the Office of the Interconnection to model the flow into the PJM Region of any energy from the External Resources scheduled in accordance with the Offer Data.

(c)     Offers for External Resources on a resource-specific basis shall specify the resource being offered, along with the information specified in the Offer Data as applicable.

**1.10.6  External Market Buyers.**

(a)     Deliveries to an External Market Buyer not subject to Dynamic Transfer by the Office of the Interconnection shall be delivered on a block loaded basis to the   bus or buses at the electrical boundaries of the PJM Region, or in such area with respect to an External Market

Buyer's load within such area not served by Network Service, at which the energy is delivered to or for the External Market Buyer. External Market Buyers shall be charged (which charge may be positive or negative) at either the Day-ahead Prices or Real-time Prices, whichever is applicable, for energy at the foregoing bus or buses.

(b) An External Market Buyer's hourly schedules for energy purchased from the PJM Interchange Energy Market shall conform to the ramping and other applicable requirements of the interconnection agreement between the PJM Region and the Control Area to which, whether as an intermediate or final point of delivery, the purchased energy will initially be delivered.

(c) The Office of the Interconnection shall curtail deliveries to an External Market Buyer if necessary to maintain appropriate reserve levels for a Control Zone as defined in the PJM Manuals, or to avoid shedding load in such Control Zone.

## 1.10.6A   Transmission Loading Relief Customers.

(a) An entity that desires to elect to pay Transmission Congestion Charges in order to continue its energy schedules during an Operating Day over contract paths outside the PJM Region in the event that PJM initiates Transmission Loading Relief that otherwise would cause PJM to request security coordinators to curtail such Member's energy schedules shall:

(i) enter its election on OASIS by 10:30 a.m. of the day before the Operating Day, in accordance with procedures established by PJM, which election shall be applicable for the entire Operating Day; and

(ii) if PJM initiates Transmission Loading Relief, provide to PJM, at such time and in accordance with procedures established by PJM, the hourly integrated energy schedules that impacted the PJM Region (as indicated from the NERC Interchange Distribution Calculator) during the Transmission Loading Relief.

(b) If an entity has made the election specified in Section (a), then PJM shall not request security coordinators to curtail such entity's energy transactions, except as may be necessary to respond to Emergencies.

(c) In order to make elections under this Section 1.10.6A, an entity must (i) have met the creditworthiness standards established by the Office of the Interconnection or provided a letter of credit or other form of security acceptable to the Office of the Interconnection, and (ii) have executed either the Agreement, a Service Agreement under the PJM Tariff, or other agreement committing to pay all Transmission Congestion Charges incurred under this Section.

## 1.10.7   Bilateral Transactions.

Bilateral transactions as to which the parties have notified the Office of the Interconnection by the deadline specified in Section 1.10.1A that they elect not to be included in the Day-ahead Energy Market and that they are not willing to incur Transmission Congestion Charges in the Real-time Energy Market shall be curtailed by the Office of the Interconnection as necessary to

reduce or alleviate transmission congestion.   Bilateral transactions that were not included in the Day-ahead Energy Market and that are willing to incur congestion charges and bilateral transactions that were accepted in the Day-ahead Energy Market shall continue to be implemented during periods of congestion, except as may be necessary to respond to Emergencies.

**1.10.8  Office of the Interconnection Responsibilities.**

(a)     The Office of the Interconnection shall use its best efforts to determine (i) the least-cost means of satisfying the projected hourly requirements for energy, Operating Reserves, and other ancillary services of the Market Buyers, including the reliability requirements of the PJM Region, of the Day-ahead Energy Market, and (ii) the least-cost means of satisfying the Operating Reserve and other ancillary service requirements for any portion of the load forecast of the Office of the Interconnection for the Operating Day in excess of that scheduled in the Day-ahead Energy Market.   In making these determinations, the Office of the Interconnection shall take into account:   (i) the Office of the Interconnection's forecasts of PJM Interchange Energy Market and PJM Region energy requirements, giving due consideration to the energy requirement forecasts and purchase requests submitted by Market Buyers and PRD Curves properly submitted by Load Serving Entities for the Price Responsive Demand loads they serve; (ii) the offers submitted by Market Sellers; (iii) the availability of limited energy resources; (iv) the capacity, location, and other relevant characteristics of self-scheduled resources; (v) the objectives of each Control Zone for Operating Reserves, as specified in the PJM Manuals; (vi) the requirements of each Regulation Zone for Regulation and other ancillary services, as specified in the PJM Manuals; (vii) the benefits of avoiding or minimizing transmission constraint control operations, as specified in the PJM Manuals; and (viii) such other factors as the Office of the Interconnection reasonably concludes are relevant to the foregoing determination, including, without limitation, transmission constraints on external coordinated flowgates to the extent provided by section 1.7.6.   The Office of the Interconnection shall develop a Day-ahead Energy Market based on the foregoing determination, and shall determine the Day-ahead Prices resulting from such schedule.   The Office of the Interconnection shall report the planned schedule for a hydropower resource to the operator of that resource as necessary for plant safety and security, and legal limitations on pond elevations.

(b)     By 1:30 p.m., or as soon as practicable thereafter, of the day before each Operating Day, or such other   deadline as may be specified by the Office of the Interconnection in the PJM Manuals, the Office of the Interconnection shall:   (i) post the aggregate Day-ahead Energy Market results; (ii) post the Day-ahead Prices; and (iii) inform the Market Sellers, Market Buyers, and Economic Load Response Participants of their scheduled injections, withdrawals, and demand reductions respectively.   The foregoing notwithstanding, the deadlines set forth in this subsection shall not apply if the Office of the Interconnection is unable to obtain Market Participant bid/offer data due to extraordinary circumstances.   For purposes of this subsection, extraordinary circumstances shall mean a technical malfunction that limits, prohibits or otherwise interferes with the ability of the Office of the Interconnection to obtain Market Participant bid/offer data prior to 11:59 p.m. on the day before the affected Operating Day. Extraordinary circumstances do not include a Market Participant's inability to submit bid/offer data to the Office of the Interconnection.   If the Office of the Interconnection is unable to clear

the Day-ahead Energy Market prior to 11:59 p.m. on the day before the affected Operating Day as a result of such extraordinary circumstances, the Office of the Interconnection shall notify Members as soon as practicable.

(c)     Following posting of the information specified in Section 1.10.8(b), and absent extraordinary circumstances preventing the clearing of the Day-ahead Energy Market, the Office of the Interconnection shall revise its schedule of generation resources to reflect updated projections of load, conditions affecting electric system operations in the PJM Region, the availability of and constraints on limited energy and other resources, transmission constraints, and other relevant factors.

(d)     Market Buyers shall pay PJMSettlement and Market Sellers shall be paid by PJMSettlement for the quantities of energy scheduled in the Day-ahead Energy Market at the Day-ahead Prices when the Day-ahead Price is positive.   Market Buyers shall be paid by PJMSettlement and Market Sellers shall pay PJMSettlement for the quantities of energy scheduled in the Day-ahead Energy Market at the Day-ahead Prices when the Day-ahead Price is negative.   Economic Load Response Participants shall be paid for scheduled demand reductions pursuant to Section 3.3A of this Schedule.   Notwithstanding the foregoing, if the Office of the Interconnection is unable to clear the Day-ahead Energy Market prior to 11:59 p.m. on the day before the affected Operating Day due to extraordinary circumstances as described in subsection (b) above, no settlements shall be made for the Day-ahead Energy Market, no scheduled megawatt quantities shall be established, and no Day-ahead Prices shall be established for that Operating Day.   Rather, for purposes of settlements for such Operating Day, the Office of the Interconnection shall utilize a scheduled megawatt quantity and price of zero and all settlements, including Financial Transmission Right Target Allocations, will be based on the real-time quantities and prices as determined pursuant to Sections 2.4 and 2.5 hereof.

(e)     If the Office of the Interconnection discovers an error in prices and/or cleared quantities in the Day-ahead Energy Market, Real-time Energy Market, Ancillary Services Markets or Day Ahead Scheduling Reserve Market after it has posted the results for these markets on its Web site, the Office of the Interconnection shall notify Market Participants of the error as soon as possible after it is found, but in no event later than 12:00 p.m. of the second business day following the Operating Day for the Ancillary Services Markets and Real-time Energy Market, and no later than 5:00 p.m. of the second business day following the initial publication of the results for the Day-ahead Scheduling Reserve Market and Day-ahead Energy Market.

After this initial notification, if the Office of the Interconnection determines it is necessary to post modified results, it shall provide notification of its intent to do so, together with all available supporting documentation, by no later than 5:00 p.m. of the fifth business day following the Operating Day for the Ancillary Services Markets and Real-time Energy Market, and no later than 5:00 p.m. of the fifth business day following the initial publication of the results in the Day-ahead Scheduling Reserve Market and the Day-ahead Energy Market.   Thereafter, the Office of the Interconnection must post on its Web site the corrected results by no later than 5:00 p.m. of the tenth calendar day following the Operating Day for the Ancillary Services Markets, Day-ahead Energy Market and Real-time Energy Market, and no later than 5:00 p.m. of the tenth

**A.125**

calendar day following the initial publication of the results in the Day-ahead Scheduling Reserve Market. Should any of the above deadlines pass without the associated action on the part of the Office of the Interconnection, the originally posted results will be considered final. Notwithstanding the foregoing, the deadlines set forth above shall not apply if the referenced market results are under publicly noticed review by the FERC.

(f)     Consistent with Section 18.17.1 of the PJM Operating Agreement, and notwithstanding anything to the contrary in the Operating Agreement or in the PJM Tariff, to allow the tracking of Market Participants' non-aggregated bids and offers over time as required by FERC Order No. 719, the Office of the Interconnection shall post on its Web site the non-aggregated bid data and Offer Data submitted by Market Participants (for participation in the PJM Interchange Energy Market) approximately four months after the bid or offer was submitted to the Office of the Interconnection.

**1.10.9  Hourly Scheduling.**

(a)     Following the initial posting by the Office of the Interconnection of the Locational Marginal Prices resulting from the Day-ahead Energy Market, and subject to the right of the Office of the Interconnection to schedule and dispatch pool-scheduled resources and to direct that schedules be changed in an Emergency, and absent extraordinary circumstances preventing the clearing of the Day-ahead Energy Market, a generation rebidding period shall exist.   Typically the rebidding period shall be from the time the Office of the Interconnection posts the results of the Day-ahead Energy Market until 2:15 p.m. on the day before each Operating Day.   However, should the clearing of the Day-ahead Energy Market be significantly delayed, the Office of the Interconnection may establish a revised rebidding period.   During the rebidding period, Market Participants may submit revisions to generation Offer Data for any generation resource that was not selected as a pool-scheduled resource in the Day-ahead Energy Market.   Adjustments to the Day-ahead Energy Market shall be settled at the applicable Real-time Prices, and shall not affect the obligation to pay or receive payment for the quantities of energy scheduled in the Day-ahead Energy Market at the applicable Day-ahead Prices.

(b)     A Market Participant may adjust the schedule of a resource under its dispatch control on an hour-to-hour basis beginning at 10:00 p.m. of the day before each Operating Day, provided that the Office of the Interconnection is notified not later than 60 minutes prior to the hour in which the adjustment is to take effect, as follows:

i)     A Generating Market Buyer may self-schedule any of its resource increments, including hydropower resources, not previously designated as self-scheduled and not selected as a pool-scheduled resource in the Day-ahead Energy Market;

ii)     A Market Participant may request the scheduling of a non-firm bilateral transaction; or

iii)     A Market Participant may request the scheduling of deliveries or receipts of Spot Market Energy; or

iv)     A Generating Market Buyer may remove from service a resource increment, including a hydropower resource, that it had previously designated as self-scheduled, provided that the Office of the Interconnection shall have the option to schedule energy from any such resource increment that is a Capacity Resource at the price offered in the scheduling process, with no obligation to pay any start-up fee.

(c)     With respect to a pool-scheduled resource that is included in the Day-ahead Energy Market, a Market Seller may not change or otherwise modify its offer to sell energy.

(d)     An External Market Buyer may refuse delivery of some or all of the energy it requested to purchase in the Day-ahead Energy Market by notifying the Office of the Interconnection of the adjustment in deliveries not later than 60 minutes prior to the hour in which the adjustment is to take effect, but any such adjustment shall not affect the obligation of the External Market Buyer to pay for energy scheduled on its behalf in the Day-ahead Energy Market at the applicable Day-ahead Prices.

(e)     The Office of the Interconnection shall provide External Market Buyers and External Market Sellers and parties to bilateral transactions with any revisions to their schedules resulting from the rebidding period by 6:30 p.m. on the day before each Operating Day.   The Office of the Interconnection may also commit additional resources after such time as system conditions require.   For each hour in the Operating Day, as soon as practicable after the deadlines specified in the foregoing subsection of this Section 1.10, the Office of the Interconnection shall provide External Market Buyers and External Market Sellers and parties to bilateral transactions with any revisions to their schedules for the hour.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

VILLAGE OF OLD MILL CREEK,
FERRITE INTERNATIONAL COMPANY,
GOT IT MAID, INC., NAFISCA ZOTOS,
ROBERT DILLON, RICHARD OWENS,
And ROBIN HAWKINS, both individually and
d/b/a ROBIN'S NEST,

No. 17-cv-1163

     Plaintiffs,

     v.

ANTHONY STAR, in his official capacity
As Director of the Illinois Power Agency,

     Defendant.

## COMPLAINT

Plaintiffs Village of Old Mill Creek, Ferrite International Company, Got it Maid, Inc.,

Nafisca Zotos, Robert Dillon, Richard S. Owens, and Robin Hawkins, both individually and

d/b/a Robin's Nest, complain against Defendant Anthony Star, in his official capacity as

Director of the Illinois Power Agency, as follows:

## NATURE OF THE CASE

1.    This case arises from unlawful Illinois legislation that invades the exclusive

jurisdiction of the Federal Energy Regulatory Commission ("FERC") over "the sale of electric

energy at wholesale in interstate commerce" pursuant to the Federal Power Act. 16 U.S.C.

A.128

824(b)(1). The unlawful legislation is contained in subsection (d-5) Zero emission standard of Illinois Public Act 99-0906 ("P.A. 99-0906"), which was enacted on December 7, 2016.[1]

2.     By invading the exclusive jurisdiction of the Federal Energy Regulatory Commission, P.A. 99-0906 violates the U.S. Constitution's Supremacy Clause (Article VI, Section 2), and the 14th Amendment (Equal Protection Clause). By discriminating against and burdening interstate commerce, P.A. 99-0906 also violates the dormant Commerce Clause of the U.S. Constitution (Article I, Section 8).

3.     FERC has determined that competitive market forces best set wholesale prices for electricity supply and thus has approved the use of auction-based markets and competitive bilateral contracts for wholesale electric energy and capacity within the PJM Interconnection, LLC ("PJM") regional transmission organization ("RTO"), which includes northern Illinois, and the Midcontinent Independent System Operator ("MISO"), which includes central and southern Illinois. *See, e.g.*, FERC Orders 888 and 889.

4.     Through P.A. 99-0906, Illinois seeks to change the results of the effectively competitive wholesale electricity market by requiring the Illinois Power Agency to procure zero emission credits ("ZECs") from certain nuclear-fueled generating plants under ten-year contracts for each of Commonwealth Edison Company ("ComEd"), the electric utility for northern Illinois, and Ameren Illinois Company ("Ameren Illinois"), the electric utility for central and southern Illinois. 20 ILCS 3855/1-10; 20 ILCS 3855/1-75(d-5)(1); and 220 ILCS 5/16-111.5(*l*).

---

[1] Illinois P.A. 99-0906 is available at http://www.ilga.gov/legislation/99/HB/09900HB65761v.htm. P.A. 99-0906 amends both the Illinois Public Utilities Act (220 ILCS 5/1-101 *et seq.*) and the Illinois Power Agency Act. (20 ILCS 3855/1 *et seq.*) Although P.A. 99-0906 has many other provisions, this case concerns only subsection (d – 5) Zero emission standard. Subsection (d-5) Zero emission standard of P.A. 99-0906 is attached hereto as Exhibit A. Plaintiffs are not challenging any other provisions of P.A. 99-0906. Section 97 of P.A. 99-0906 provides that the provisions of the act are severable under Section 1.31 of the Illinois Statute on Statutes. P.A. 99-0906, Section 97; 5 ILCS 70/1.31.

**A.129**

5.     Zero emission credit is defined as "a tradable credit that represents the environmental attributes of one megawatt hour of energy from a zero emissions facility, which is defined as a facility fueled by nuclear power interconnected with PJM or MISO or their successors. 20 ILCS 3855/1-10, Definitions.

6.     P.A. 99-0906 provides that the ten-year ZEC purchase contracts must require each of ComEd and Ameren Illinois to procure contracts with zero emission facilities that are reasonably capable of generating ZECs in an amount approximately equal to 16% of the actual amount of megawatt hours ("MWh") of electricity delivered by the utility to Illinois retail customers during calendar year 2014[2] for each of ten delivery years.[3] 20 ILCS 3855/1-75(d-5)(1) Retail customers include all residential, commercial, industrial, and governmental customers of each utility. P.A. 99-0906 requires that the contracts provide that the quantity of ZECs procured from a zero emission facility shall be all the ZECs produced by the facility in each delivery year. 20 ILCS 3855/1-75(d-5)(1).

7.     P.A. 99-0906 is designed so that the Illinois-based Quad Cities and Clinton nuclear plants, which are owned by Exelon Generation Company ("Exelon Generation"), will sell all of the ZECs to ComEd and Ameren Illinois. Exelon Corporation ("Exelon Corp.") owns both Exelon Generation and the electric public utility ComEd.

8.     P.A. 99-0906 establishes the initial ZEC price at $16.50 per MWh. P.A. 99-0906 further provides that this ZEC price will be increased by $1 per MWh for each of delivery years 7-10. But P.A. 99-0906 also provides that the ZEC price must be reduced for each delivery year

---

[2] For calendar year 2014, ComEd delivered 88,580,643 MWh, and Ameren Illinois delivered 36,897,391 MWh to Illinois retail customers. Illinois Commerce Commission, Report on Comparison of Electric Sales Statistics for Calendar Years 2015 and 2014 (May 2016), available at https://www.icc.illinois.gov/publicutility/salesstatistics.aspx?type=e .

[3] Under P.A. 99-0906, delivery years are defined as June 1 of a given year through May 31 of the following year. 20 ILCS 3855/1-10, Definitions.

by the amount, if any, by which the projected market index price for the delivery year exceeds a baseline market electricity price index of $31.40 per MWh. 20 ILCS 3855/1-75(d-5)(1)(B)(i).

9.     P.A. 99-0906 provides that each Illinois electric utility required to purchase ZECs is entitled to pass through the costs of the ZECs to consumers through "automatic adjustment" tariffs. 20 ILCS 3855/1-75(d-5)(6). Therefore, the electric utility is merely a conduit for charges imposed on consumers.

10.     P.A. 99-0906 is narrowly tailored so that Exelon Corp. is the sole beneficiary of the ZEC payments. Unless enjoined or eliminated, P.A. 99-0906's ZEC purchase requirement will result in the transfer from consumers to Exelon Corp. of as much as $3.3 billion over the 10-year contract term.[4]

11.     A typical residential customer using 1 MWh (1,000 kWh) per month would pay an additional $2.64 per month beginning June 1, 2017 based on the initial ZEC price.[5]

12.     A manufacturing company using 10,000 MWh per month would pay an additional $26,400 per month beginning June 1, 2017 based on the initial ZEC price.[6]

13.     If this Court allows P.A. 99-0906's ZEC purchase requirement to go into effect for the delivery year beginning June 1, 2017, as required under P.A. 99-0906, the State of Illinois will profoundly disrupt competitive wholesale electricity markets in PJM and MISO and transgress FERC's exclusive jurisdiction over wholesale electricity pricing.

14.     At the baseline market price set forth in P.A. 99-0906 of $31.40 per MWh, electricity generators who can't issue and sell ZECs to Illinois utilities would receive the $31.40 for every MWh of electricity they sell in the wholesale market. But Exelon's Quad Cities and Clinton nuclear

---

[4] Calculated as 125,475,034 MWh per year x $16.50 per MWh x 16% x 10 (years).
[5] Calculated as 1 MWh x $16.50 per MWh x 16%.
[6] Calculated as 10,000 MWh x $16.50 per MWh x 16%.

**A.131**

plants would receive $47.90 per MWh based on the baseline market price and initial ZEC price of $16.50 per MWh – a more than 50 percent premium over their wholesale market competitors as a result of the ZEC purchase requirements.

15.     P.A. 99-0906 requires that all ComEd and Ameren Illinois retail customers will pay the extra ZEC charges as part of their delivery service (i.e., "wires") charges beginning June 1, 2017, regardless of whether they purchase electricity supply from their local electric utility (i.e., ComEd or Ameren Illinois). 200 ILCS 5/16-108(k). Therefore, even the thousands of ComEd and Ameren Illinois customers who use the utility's wires only to deliver electricity supply purchased from a competitive supplier will be forced to pay for the Quad Cities and Clinton nuclear plant subsidies to Exelon Generation. This results in an electricity consumer paying a subsidy for Exelon Generation's Quad Cities and Clinton nuclear plants even when a competitive supplier is supplying 100% of that consumer's electricity from wholesale producers other than the nuclear plants.

16.     P.A. 99-0906, a state law, purports to modify the results of wholesale electricity markets, which are under FERC's exclusive jurisdiction pursuant to the Federal Power Act. 16 U.S.C. 824(b)(1). The ZEC price is specifically tethered to the wholesale electricity market price because the statutorily established ZEC price is reduced for each delivery year to the extent that the projected market price index for that delivery year exceeds the statutorily established baseline market price of $31.40 per MWh. 220 ILCS 3855 11(d-5)(1)(B)(ii) and (iii). As a result, certain Illinois-based nuclear generators would get a guaranteed higher amount for their electricity than their competitors, regardless of wholesale market prices.

17.     P.A. 99-0906 provides for revenues (from ZECs) to certain Illinois nuclear plants in addition to the revenues obtained by these nuclear plants from the wholesale electricity markets. The ZECs solely benefit a specific producer of nuclear energy in Illinois, to the disadvantage of

**A.132**

out-of-state electricity producers who compete in the wholesale market and electricity consumers who purchase (or are eligible to purchase) electricity supply provided by competitive electricity suppliers from the out-of-state producers.

18.     P.A. 99-0906 violates the Supremacy Clause of the U.S. Constitution (Article VI, Section 2) because it regulates an area in which federal law has preempted the field.  P.A. 99-0906 also violates the Supremacy Clause because it conflicts with federal law and frustrates the purpose of a federal law. *Hughes v. Talen Energy Marketing, LLC*, 136 at S. Ct. 1288, 1298-99 (2016). The Illinois legislation in question also is invalid under the dormant Commerce Clause of the U.S. Constitution (Article I, Section 8). Illinois has failed to regulate evenhandedly to effectuate a legitimate local public interest, and the effects of its regulation on interstate commerce are more than incidental. *State of Missouri ex rel. Barrett v Kansas Natural Gas Co*., 265 U.S. 298, 306-307 (1924). Also, by favoring certain Illinois nuclear generators over other wholesale electricity producers and thereby imposing certain costs on Illinois electricity consumers that are not imposed on electricity consumers located elsewhere in PJM or MISO, P.A. 99-0906 violates the equal protection clause of the 14th Amendment of the U.S. Constitution. For all of these reasons, the Court should enter appropriate declaratory and injunctive relief.

## **PARTIES**

19.     Plaintiff Village of Old Mill Creek is a municipality located in Lake County, Illinois. Village of Old Mill Creek is a delivery services customer of ComEd.

20.     Plaintiff Ferrite International Company is a manufacturing company located at 39105 Magnetics Blvd., Wadsworth, Illinois. Ferrite International Company is a delivery services customer of ComEd.

**A.133**

21.     Plaintiff Got It Maid, Inc. is an Illinois business corporation located at 1421 Old Deerfield Road, Highland Park, Illinois. Got it Maid, Inc. is a delivery services customer of ComEd.

22.     Plaintiff Nafisca Zotos is an individual whose address is 118 Lawton Road, Riverside, Illinois. Nafisca Zotos is a delivery services customer of ComEd.

23.     Plaintiff Robert Dillon is an individual whose address is 760 Marion Avenue, Highland Park, Illinois. Robert Dillon is a delivery services customer of ComEd.

24.     Plaintiff Richard Owens is an individual whose address is 6172 Brown Trail, Harvel, Illinois. Richard Owens is a delivery services customer of Ameren Illinois.

25.     Plaintiff Robin Hawkins is an individual whose address is 4341 South Ellis Avenue, Chicago, Illinois. She also is owner and operator of Robin's Nest, a sole proprietorship and childcare provider licensed by the State of Illinois with a place of business at the same address. Ms. Hawkins is a delivery services customer of ComEd.

26.     Defendant Anthony Star is Director of the Illinois Power Agency and is sued only in his official capacity.

**A.134**

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this case, under 28 U.S.C. 1331, because the claims arise under federal law, specifically the Federal Power Act, 16 U.S.C. 824 *et seq.*, the Supremacy Clause and Commerce Clause of the U.S. Constitution, Amendment XIV of the U.S. Constitution, and 42 U.S.C. 1983.

28.     This Court has authority to grant the requested declaratory relief under 28 U.S.C. 2201 and Federal Rule of Civil Procedure 57, and authority to grant the requested injunctive relief under 28 U.S.C. 1651(a) and 2202, and Federal Rule of Civil Procedure 65.

29.     This Court has jurisdiction to order prospective relief in the form of a declaratory judgment and/or an injunction against Defendant Anthony Star in his official capacity as Director of the Illinois Power Agency. *Ex parte Young,* 209 U.S. 123, 129 (1908).

30.     Venue is properly in this district, pursuant to 28 U.S.C. 1391, because Defendant, as the Director of the Illinois Power Agency, has a major office in this district.

## FACTS

### Exclusive Federal Jurisdiction Over the Wholesale Electricity Market

32.     Under the Federal Power Act, FERC has exclusive regulatory authority, to the exclusion of state and local governments, over "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. 824(b)(1); *see also id. §* 824(d) (defining a "wholesale" sale as a sale of electric energy to a buyer "for resale" to another buyer).

33.     The scope of interstate regulation has grown over the years, as technological developments made it increasingly possible to transmit electricity over long distances. Local

**A.135**

delivery networks gave way to the modern "grid" network, with electricity constantly moving in interstate commerce throughout the United States.

34.     FERC is exclusively empowered to regulate the interstate wholesale market to ensure, *inter alia,* that rates are "just and reasonable." 16 U.S.C. 824d(a).

## The FERC Regulatory Regime

35.     Instead of directly setting wholesale rates, FERC has opted to utilize competitive market-based auctions that are administered to establish the "just and reasonable rates" the Federal Power Act requires. FERC also allows bilateral wholesale contracts at negotiated prices for electricity supply. FERC has explained that it relies on competitive market processes "to bring more efficient, lower cost power to the Nation's electricity consumers." *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.,* FERC Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996).

36.     FERC authorizes and regulates regional transmission organizations ("RTOs") and independent system operators ("ISOs") to oversee the interstate auctions that are part of competitive market processes. For purposes of supplying electricity to the northern Illinois region, wholesale electricity is bought and sold via auctions conducted by an RTO called PJM. For electricity supply to the central and southern Illinois regions, wholesale electricity is bought and sold via auctions conducted by an ISO known as MISO.

37.     PJM and MISO operate two distinct types of wholesale auctions: energy and capacity (among others, which are not relevant to this Complaint).[7] The electricity suppliers in the wholesale auctions of PJM and MISO include generators located inside and outside of Illinois.

---

[7] The capacity auctions are for the purchase and sale of options to buy electricity.

**A.136**

The PJM and MISO auctions are considered interstate wholesale markets, and FERC regulates them. Bilateral wholesale transactions also occur between wholesale electricity suppliers and wholesale purchasers such as the utility ComEd (in northern Illinois), the utility Ameren Illinois (in central and southern Illinois), and other wholesale buyers of electricity.

## Wholesale Energy Markets

38.     With respect to the energy market, PJM and MISO must dispatch (that is, turn on and regulate the output level of) sufficient generation resources to meet the actual amount of electricity used by consumers — or "load" in energy parlance — at any given moment. Unlike most other commodities that can be bought and sold in markets, electricity cannot be economically stored in appreciable quantities. If the amount of generation on the system falls short of demand levels, PJM and MISO take a series of FERC-mandated steps to limit the negative consequences, starting with voltage reductions or "brownouts" and ending, in more severe cases, with load shedding or "rotating blackouts" to restore system balance. If these measures to reduce load to meet available supply are not successful, uncontrolled widespread blackouts may result.

39.     PJM and MISO aim to prevent supply/demand mismatches by running sophisticated day-ahead and real-time energy markets that take into account physical limitations on the transmission lines, generator availability, predicted energy usage, and many other factors.

40.     In the day-ahead energy market, generators bid the price at which they are willing to generate a particular quantity of electricity for next-day delivery. In the real-time energy markets, the PJM or MISO price increases or decreases in real time, signaling the need for participating generators to produce more or less electricity as real-time conditions change.

**A.137**

41. The economic theory behind the energy markets is straightforward: PJM and MISO accept offers from generators, beginning with the lowest-priced and moving up until all electricity demand is satisfied. The price of the final bid that satisfies all demand for a given location is known as the "market clearing price" or "locational based marginal price." This price is paid to all successful supply-side bidders in that location, including those who offered to sell at a lower price. Subject to insuring system reliability, markets deploy the most efficient and cheapest generators first, and additional quantity is provided by less efficient generators that cost more to run. The wholesale price of electricity in both the day-ahead and real-time energy markets can rise very steeply at times of peak demand.

42. Unlike other types of electricity generators, which can be turned on and off, or adjusted quickly to produce more or less energy, as conditions warrant, nuclear generators are typically dispatched in the day-ahead market and run continuously at maximum output.

## **Wholesale Capacity Markets**

43. In order to ensure that PJM and MISO have the electricity-producing resources (the generating capacity) needed to operate the grid reliably, PJM and MISO also operate capacity auctions. PJM and MISO establish the amount of electricity-generation capacity that Illinois utilities and competitive retail electricity suppliers are required to have in order to meet customer demand under peak conditions. Illinois utilities and competitive retail electricity suppliers can meet their capacity obligations either through the PJM and MISO administered auction markets for capacity which FERC has established, or through bilateral contracts with generation owners (or with generation that they own).

**A.138**

44. In contrast to the day-ahead and real-time energy auctions, where *electricity itself* is bought and sold, capacity auctions are for the purchase and sale of *options* to produce electricity. PJM and MISO, as buyers of capacity-market options, receive the right, at their sole discretion, to call upon the seller of the option (a power generator or demand response provider) to produce a specified amount of energy if and when needed. While the buyer of an option — in this case, PJM or MISO — need not exercise its option to require the seller to produce energy, the capacity market ensures that the grid will have the *ability* to furnish the amount of energy needed by consumers at any given moment in time.

45. The amounts of capacity that ComEd is required to purchase in the PJM capacity markets and Ameren Illinois is required to purchase in the MISO capacity markets are determined through a rigorous reliability planning processes conducted by PJM and MISO, respectively, and overseen by FERC. Under FERC oversight, PJM and MISO each first determine the required amount of capacity, and then administer FERC-approved capacity auctions.

### Total Energy and Capacity Market Compensation to Electricity Generators

46. The total compensation an electricity generator receives in the wholesale market is the sum of its energy-market and capacity-market revenues (as well as ancillary services market revenues, which account for only a small part of a generator's total revenue).

### How the ZEC Purchase Requirement of P.A. 99-0906 Distorts the Wholesale Electricity Market

47. Under the ZEC purchase requirement of P.A. 99-0906, certain Illinois-based nuclear generators will receive higher prices per MWh of electricity than the wholesale prices established pursuant to FERC-approved market rules. The electricity delivery service customers

A.139

of the utilities ComEd and Ameren Illinois, including customers who do not even purchase electricity supply from the applicable utility, will be required to fund the difference between the wholesale electricity prices authorized by FERC and the higher prices established by the State of Illinois. These state-determined "revised" prices contradict FERC's determination that competitive wholesale prices are the just and reasonable rates for resources participating in the wholesale electricity market. Implementation of the ZEC purchase requirement will distort the functioning of the FERC-regulated energy and capacity markets in PJM, MISO, and nationwide.

48.     P.A. 99-0906, the legislation signed by Illinois Governor Bruce Rauner on December 7, 2016, enacted a zero emission standard requiring the Illinois Power Agency to procure contracts for electric utilities which serve at least 100,000 customers (i.e., ComEd and Ameren Illinois) for purchases of ZECs from nuclear fueled generating plants interconnected with PJM or MISO that are reasonably capable of generating ZECs for each delivery year (i.e., June 1 – May 31) in an amount approximately equal to 16% of the amount of MWhs of electricity delivered by the electric utility in calendar year 2014.[8]

49.     P.A. 99-0906 requires that the duration of the ZEC contracts be from June 1, 2017 through May 31, 2027 and that the contracts provide that the quantity of ZECs procured from a nuclear generating facility shall be all of the ZECs generated by the facility in each delivery year. 20 ILCS 3855/1-75(d-5)(1).

50.     P.A. 99-0906 provides that the price for each ZEC shall initially be $16.50 per MWh, which, according to the state law, is based on the U.S. Interagency Working Group on Social Cost of Carbon's price in the August 2016 Technical Update using a 3% discount rate,

---

[8] For utilities that serve fewer than 100,000 customers the IPA must procure contracts with nuclear generating plants interconnected with PJM or MISO that are reasonably capable of generating cost-effective ZECs for each delivery year in an amount approximately equal to 16% of the portion of electricity to be procured by the Illinois Power Agency for the utility. 20 ILCS 3855/1-75(d-5)(1).

**A.140**

adjusted for inflation due to the ten-year contract duration. 220 ILCS 3855/1-75(d-5)(1)(B)(i). Beginning with the delivery year commencing June 1, 2023, the ZEC price also increases by $1 per MWh and continues to increase an additional $1 per MWh annually in the delivery years commencing June 1, 2024, June 1, 2025, and June 1, 2026. *Id.*

51.     P.A. 99-0906 further provides that the price of ZECs for each delivery year shall be reduced by the amount by which the projected wholesale market price index for the delivery year exceeds a baseline wholesale market price index, which P.A. 99-0906 sets at $31.40 per MWh. 20 ILCS 3855/1-75(d-5)(1)(B)(ii).  The wholesale market price index for the applicable delivery year is the sum of projected wholesale energy prices and projected wholesale capacity prices for the delivery year. 220 ILCS 3855/1-75(d-5)(1)(B)(i).

52.     Under P.A. 99-0906, the electric utilities ComEd and Ameren Illinois will each charge all of their retail customers through their delivery service charges, including those customers who purchase electricity supply from competitive suppliers rather than the electric utility, for the cost of the ZECs sold to the electric utility under its contract with the provider of the ZECs. 20 ILCS 3855/1-75(d-5)(2); 220 ILCS 5/16-108(k). Furthermore, the state law authorizes the utility to recover these costs from all of its retail customers through an "automatic adjustment clause tariff."[9] 20 ILCS 3855/1-75(d-5)(6); 220 ILCS 5/16-108(k).

53.     P.A. 99-0906 is specifically designed so that Exelon Generation's Quad Cities and Clinton nuclear plants will sell all of the ZECs to ComEd and Ameren Illinois. Exelon Generation

---

[9] The ZEC purchase requirement cannot cause a net increase due to the cost of the ZECs in a delivery year for eligible retail customers, defined as retail customers purchasing electricity supply and delivery from the utility under fixed priced bundled service tariffs (other than retail customers whose service is declared competitive under Section 16-113 of the Public Utilities Act), of 1.65% or more of the amount per kWh paid for electric service by eligible retail customers during the twelve months ending May 31, 2009. To the extent that ZEC payments are reduced in a particular delivery year to avoid such an increase, the foregone ZEC payments are made up in any subsequent delivery year in which they can be made without violating the 1.65% cap for eligible retail customers. 20 ILCS 3855/1-75(d-5)(2).

**A.141**

is an Exempt Wholesale Generator ("EWG") under the Public Utility Holding Company Act. 42 U.S.C. 16451 *et seq.* An EWG is a person engaged "exclusively in the business of owning or operating, or both owning and operating, all or part of one or more eligible facilities and selling electric energy at wholesale." *Id.* Exelon Generation's nuclear facilities can only produce electricity to sell in wholesale markets.

54.     Exelon Generation sells electric energy and capacity from the Quad Cities and Clinton nuclear plants to the utilities ComEd and Ameren Illinois pursuant to wholesale bilateral transactions procured by the Illinois Power Agency. 20 ILCS 3855/1-75. Exelon Generation also sells electric energy and capacity from these nuclear plants in the wholesale auctions conducted by PJM and MISO.

55.     The Quad Cities and Clinton nuclear plants were owned by electric utilities prior to the Illinois Customer Choice and Rate Relief Law of 1997. 220 ILCS 5/16-101 *et seq.* This law allowed the utilities to divest the plants to non-utilities. 220 ILCS 5/16-111(g). After the nuclear plants were divested to non-utilities and entered the wholesale markets, prices charged by the plants were subject to FERC rather than State of Illinois jurisdiction. The Illinois Customer Choice and Rate Relief Law of 1997 also allowed competitive suppliers to sell electricity to Illinois retail customers and required the utilities to deliver the competitive electricity to these customers on a non-discriminatory basis. 220 ILCS 5/16-115, 5/16-118. This Illinois law specifically found that: "All consumers must benefit in an equitable and timely fashion from the lower costs for electricity that result from retail and wholesale competition…." 220 ILCS 5/16-101A(e).

56.     The ZEC purchase requirement of P.A. 99-0906 establishes a new state-created electricity price "adder" that will inure only to Exelon Generation's Illinois-based Quad Cities and Clinton nuclear plants.

**A.142**

57.     The amount of the adder is directly tied to electricity prices in the FERC-regulated PJM and MISO wholesale markets. That is, the price of the ZEC will be reduced by the amount the projected wholesale market electricity price index for the applicable delivery year exceeds the baseline wholesale electricity market price index of $31.40 per MWh. In other words, if wholesale electricity prices increase, the ZEC subsidies directly decrease. For example, if the projected electricity market price index for delivery year 2 is $38.40 per MWh, the ZEC price for that year will be $9.50 per MWh. But if the projected electricity market price index for delivery year 3 is $39.40 per MWh, the ZEC price for that year will be $8.50 per MWh.

58.     The ZEC purchase requirement mechanism is analogous to the contract for differences ("CFD") mechanism adopted by Maryland and found unconstitutional by the U.S. Supreme Court in April 2016. *Hughes v Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016). In *Hughes*, the CFD mechanism ordered by the Maryland Public Service Commission annually changed the amount that an electric utility had to pay to a generator over the life of a twenty-year contract based on the clearing price in PJM's capacity auction. Each year the generator would receive the amount for capacity it received from participating in the PJM capacity auction and whatever additional subsidy was necessary from the utility for the generator to receive a specific amount for capacity each year.[10] Likewise, the ZEC pricing mechanism in P.A. 99-0906 is tied to an electricity market index which annually revises the amount of the ZEC price so it is exactly the amount necessary to provide a "sufficient" subsidy to Clinton and Quad Cities.

59.     In *Hughes*, the U.S. Supreme Court stated that FERC has jurisdiction to approve the PJM capacity auction as the sole rate-setting mechanism for capacity, and FERC's approval of

---

[10] In *Hughes*, to the extent the PJM capacity clearing price was higher than the price guaranteed in the CFD in a particular year, the price difference between the clearing price and contract price would be paid by the generator to the utility and the savings passed through to the utility's customers. 136 S. Ct. at 1295.

**A.143**

that mechanism means that the clearing price in the PJM capacity auction is *per se* just and reasonable. 136 S. Ct. at 1297. The U.S. Supreme Court found that "by adjusting an interstate wholesale rate, Maryland's [CFD] program invade[d] FERC's regulatory turf." 136 U.S. at 1297. Like Maryland's CFD program, the Illinois ZEC program under P.A. 99-0906 is invalid because it is aimed directly at prices in the wholesale electricity market, a market over which FERC holds plenary power.

60.     In *Hughes*, the U.S. Supreme Court's holding was that it rejected "Maryland's program only because it disregards an interstate wholesale rate required by FERC." 136 S. Ct. at 1299. In enacting P.A. 99-0906, the State of Illinois has disregarded the wholesale rates for capacity and energy established by the competitive market under FERC jurisdiction. This approach violates the Federal Power Act. 16 U.S.C. 824(b)(1). It does not matter whether the State believed that the generators were not receiving sufficient revenues from the wholesale market, as in the instant case and *Hughes*, or that a State believed the wholesale rate was too low, as the States of Mississippi and North Carolina did in *Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354(1988),* and *Nantahala Power & Light v. Thornburg,* 476 U.S. 953 (1986), respectively. A state simply cannot transgress the federal government's authority over wholesale rates.

61.     State laws are preempted when "they deny full effect to the rates set by FERC, even though [they do] not seek to tamper with the actual terms of an interstate transaction." *PPL Energyplus, LLC v. Nazarian*, 753 F. 3d 467, 476 (2014). The Federal Power Act '"leaves no room either for direct state regulation of the prices' or for regulation that 'would indirectly achieve the same result.'" *FERC v. Electric Power Association* 136 S.Ct. 760, 780, quoting *Northern Natural Gas Co. v. State Corporation Comm*. of Kansas 372 U.S. 84, 91 (1963).

**A.144**

62.     All of the utilities' retail customers, including customers that do not purchase electricity supply from them, must pay for the ZEC subsidies as part of the utilities' delivery services charges pursuant to automatic adjustment tariffs. 220 ILCS 5/16-108(k). Even customers of competitive suppliers providing 100 percent carbon emission-free wind and/or solar renewable energy to them as a premium service are required to pay for the utilities' cost of purchasing ZECs from Exelon Generation's Quad Cities and Clinton nuclear plants.

63.     The ZEC purchase requirement of P.A. 99-0906 bastardizes the competitive wholesale electricity market and thereby harms Illinois electricity consumers who currently purchase or are eligible to purchase electricity provided by competitive retail suppliers from interstate wholesale sources. Accordingly, the ZEC purchase requirement violates the dormant Commerce Clause of the U.S. Constitution.

64.     Under the 14th Amendment to the Constitution, electricity consumers are entitled to the equal protection of the laws of the United States, among which is the Federal Power Act. 16 U.S.C 791a, *et seq.; Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 890 n.9 (1985). The 14th Amendment to the United States Constitution provides, in relevant part, as follows: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws.*" U.S. Constitution, Amendment XIV (emphasis added).

65.     As discussed above, under the Federal Power Act FERC regulates wholesale electricity markets in PJM and MISO. In addition to northern Illinois, the PJM regional transmission organization footprint covers parts or all of twelve other states and the District of

**A.145**

Columbia.[11] Likewise, in addition to central and southern Illinois, the MISO independent system operator footprint covers all or parts of fourteen other states.[12] By favoring certain Illinois-based nuclear generators over other electricity producers and thereby imposing on Illinois consumers wholesale electricity costs not imposed on electricity consumers of the several other states in the PJM and MISO footprints, P.A. 99-0906 denies to Plaintiffs the equal protection of federal laws governing the wholesale electricity markets in violation of the 14th Amendment to the U.S. Constitution.

66.     Implementation of the unconstitutional ZEC purchase requirement will cause irreparable harm to Plaintiffs because the State of Illinois and Defendant Anthony Star, in his official capacity as Director of the Illinois Power Agency, is immune from damages liability.

## CLAIMS FOR RELIEF

## COUNT I

## FIELD PREEMPTION — SUPREMACY CLAUSE

67.     Plaintiffs herein incorporate all previous allegations.

68.     Under the Supremacy Clause, if Congress enacts a federal regulatory scheme and intends to fully occupy the field it has chosen to regulate, any state law in this field is "field preempted" and thus invalid.

---

[11] Delaware, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia.

[12] Arkansas, Indiana, Iowa, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, North Dakota, South Dakota, Wisconsin and Texas. MISO also includes the Province of Manitoba, Canada.

**A.146**

69. Under the Federal Power Act, 16 U.S.C. 824(b), FERC has exclusive jurisdiction over the sale of electric energy and the sale of capacity at wholesale in interstate commerce. Federal law exclusively occupies the entire field of wholesale electricity sales.

70. Sales of electricity from generators to electric utilities within PJM and MISO are wholesale sales of electricity, and therefore fall within the field of FERC's exclusive authority. The ZEC purchase requirement is field preempted because FERC has exclusive jurisdiction over wholesale prices, yet the ZEC program guarantees favored generators higher prices than the competitive wholesale market prices authorized by FERC.

71. Plaintiffs will be injured if the ZEC purchase requirement goes ino effect and therefore are entitled to declaratory and injunctive relief.

## COUNT II

## **CONFLICT PREEMPTION — SUPREMACY CLAUSE**

72. Plaintiffs herein incorporate all previous allegations.

73. Even in the absence of field preemption, any state law or regulation is "conflict preempted" and thus invalid if it conflicts with federal law or frustrates the purpose of a federal law.

74. The ZEC purchase requirement of P.A. 99-0906 is conflict preempted by the Federal Power Act. 16 U.S.C. 824. FERC, the agency charged with implementing the Federal Power Act, has determined that market-based processes — approved and overseen by FERC — are the best way to bring more efficient, lower cost power to the nation's electricity consumers.

A.147

75.     The ZEC purchase requirement requires Illinois utilities to charge all of their retail customers, including customers that do not purchase electricity supply from the utilities, for the costs of purchasing ZECs from favored nuclear generators.

76.     The ZEC purchase requirement makes a mockery of the competitive wholesale electricity market under FERC jurisdiction and violates federal law.

77.     The Illinois law directly contravenes FERC's determination that competitive markets should reasonably determine the wholesale price for electricity within PJM and MISO. This contravention violates Section 824 of the Federal Power Act. 16 U.S.C. 824.

78.     If Illinois truly believes that nuclear generators should get higher payments for their electricity, it is entitled to petition FERC to adopt market rule changes designed to accomplish this goal. At Exelon Generation's urging, PJM did this in 2014 when it asked FERC to approve a change to PJM's capacity auction which required that generators meet certain capacity performance standards. *PJM Interconnection, LLC,* 151 FERC Par. 61,208 (June 9, 2015) and 155 FERC Par. 61,157 (May 10, 2016) (Order on Rehearing and Compliance).  After FERC approved this approach, Exelon Generation's nuclear generators obtained much higher capacity payments through PJM's capacity auction.[13] Instead of following this course of petitioning FERC for changes designed to result in higher wholesale electricity prices, Illinois has opted to disregard FERC's exclusive jurisdiction over wholesale electricity rates.

79.     The ZEC purchase requirement stands as an obstacle to FERC's regulatory scheme, which depends upon fair competition and the functioning of competitive markets without

---

[13] See http://www.pjm.com/~/media/markets-ops/rpm/rpm-auction-info/2018-2019-base-residual-auction-report.ashx. Compare the clearing price for the first annual base capacity performance auction of $215/MW-day for the delivery year June 2018-May 2019 applicable to northern Illinois with the annual base capacity auction clearing price of $120/MW-day applicable to northern Illinois for the prior delivery year (June 2017-May 2018).

**A.148**

interference from out-of-market subsidies. Under the Supremacy Clause, the State of Illinois may not supplant FERC's scheme with its own preferred approach.

80.     Plaintiffs will be injured if the ZEC purchase requirement goes into effect and therefore are entitled to declaratory and injunctive relief.

## COUNT III

## DORMANT COMMERCE CLAUSE, UNDER 42 U.S.C. 1983

81.     Plaintiffs herein incorporate all previous allegations.

82.     The ZEC purchase requirement of P.A. 99-0906 is invalid under the dormant Commerce Clause of the U.S. Constitution, Article I, Section 8. Under this provision of the U.S. Constitution, states cannot discriminate against interstate commerce nor can they unduly burden interstate commerce, even in the absence of federal legislation regulating the activity. Any state action that burdens interstate commerce is invalid if it does not regulate evenhandedly to effectuate a legitimate local public interest and its effects on interstate commerce are more than incidental. *E.g., State of Missouri ex rel. Barrett v Kansas Natural Gas Co.*, 265 U.S. 298, 306-07 (1924).

83.     Although states have the right to regulate retail sales of electricity within their own borders, the wholesale sale of electricity involves interstate commerce, which a state may not regulate. PJM's and MISO's wholesale markets are interstate and international in nature, as they involve the sale and transmission of energy and capacity from generators located in other states and Canada.

84.     The ZEC purchase requirement directly discriminates against electricity suppliers that buy and sell electricity in the interstate wholesale market.

**A.149**

85. The ZEC purchase requirement is directly discriminatory, as only certain Illinois nuclear facilities will be selling ZECs to the utilities ComEd and Ameren Illinois. The program is not even-handed with respect to out-of-state generation and its effects on interstate commerce are more than incidental. It therefore violates the Commerce Clause.

86. The ZEC purchase requirement harms Illinois consumers that purchase or are eligible to purchase electricity supply from competitive retail suppliers who purchase electricity from interstate wholesale suppliers.

87. Defendant's actions in enacting and implementing the ZEC purchase requirement deprive Plaintiffs of their Commerce Clause "rights, privileges, or immunities" within the meaning of the Commerce Clause. Plaintiffs have been injured by these deprivations and are entitled to redress under 42 U.S.C. 1983. *Dennis v. Higgins,* 498 U.S. 439 (1991).

## COUNT IV

### 14th AMENDMENT, EQUAL PROTECTION, UNDER 42 U.S.C. 1983

88. Plaintiffs herein incorporate all previous allegations.

89. Plaintiffs are persons entitled to the equal protection of the laws of the United States. Among those laws is the Federal Power Act, 16 U.S.C 791a, *et seq*., pursuant to which FERC, an agency of the United States Government, has authorized and regulates wholesale electricity markets in both PJM and MISO.

90. P.A. 99-0906 will impose on all retail customers of the electric utilities ComEd and Ameren Illinois certain costs of ZEC purchases from Exelon Generation's Quad Cities and Clinton nuclear plants that are not imposed on electricity consumers in other states within PJM and MISO.

A.150

91.     The imposition of ZEC charges would be actions taken under color of state law, i.e. P.A. 99-0906.

92.     Enactment of P.A. 99-0906 denied to Plaintiffs the equal protection of the laws in violation of the 14th Amendment to the U.S. Constitution.

93.     Implementation and enforcement of P.A. 99-0906 will deny to Plaintiffs the equal protection of the laws in violation of the 14th Amendment to the U.S. Constitution.

94.     Plaintiffs have been injured by these deprivations of their rights to equal protection of the laws and are entitled to redress under 42 U.S.C. 1983. *Dennis v. Higgins*, 498 U.S. 439 (1991).

## PRAYER FOR RELIEF

In light of the foregoing, Plaintiffs seek:

A.      a declaration that subsection (d-5) of Illinois Public Act 99-0906 is invalid because it is preempted by federal law and unconstitutional;

B.      a permanent injunction prohibiting Defendant Illinois Power Agency Director Anthony Star from implementing subsection (d-5) of Illinois Public Act 99-0906;

C.      reasonable attorneys' fees and costs (42 U.S.C. 1988); and

**A.151**

D.     all such other relief to which they may be entitled.


Dated: February 14, 2017

                                        Respectfully submitted,


                                        /s/ Patrick N. Giordano
                                        _____
Paul G. Neilan                            Patrick N. Giordano
LAW OFFICES OF PAUL G. NEILAN,            GIORDANO & ASSOCIATES, LTD.
P.C.                                      1710 Wesley Avenue
1954 First Street #390                    Evanston, Illinois 60201
Highland Park, Illinois 60035             Telephone: 847-905-0703
pgneilan@energy.law.pro                   patrickgiordano@dereglaw.com
Telephone: 847-266-0464                   Direct: 847-905-05

**A.152**

A.153

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS


VILLAGE OF OLD MILL CREEK,
FERRITE INTERNATIONAL COMPANY,
GOT IT MAID, INC., NAFISCA ZOTOS,
ROBERT DILLON, RICHARD OWENS,
And ROBIN HAWKINS, both individually and
d/b/a ROBIN'S NEST,

                                          No. 17-cv-1163

     Plaintiffs,

     v.

ANTHONY STAR, in his official capacity
As Director of the Illinois Power Agency,

     Defendant.


**<u>EXHIBIT A TO COMPLAINT</u>**

Section (d-5) of P.A. 99-0906

**A.154**

PUBLIC UTILITIES – ENERGY – ZERO EMISSION, 2016 Ill. Legis. Serv. P.A. 99-906...

Case: 1:17-cv-01163 Document #: 1-1 Filed: 02/14/17 Page 2 of 8 PageID #:28

(E) Amounts paid to third parties unrelated to the owner or owners of the initial clean coal facility to prepare the core plant construction cost quote, including the front end engineering and design study, and the operating and maintenance cost quote will be reimbursed through Coal Development Bonds.

(5) Re–powering and retrofitting coal-fired power plants previously owned by Illinois utilities to qualify as clean coal facilities. During the 2009 procurement planning process and thereafter, the Agency and the Commission shall consider sourcing agreements covering electricity generated by power plants that were previously owned by Illinois utilities and that have been or will be converted into clean coal facilities, as defined by Section 1–10 of this Act. Pursuant to such procurement planning process, the owners of such facilities may propose to the Agency sourcing agreements with utilities and alternative retail electric suppliers required to comply with subsection (d) of this Section and item (5) of subsection (d) of Section 16–115 of the Public Utilities Act, covering electricity generated by such facilities. In the case of sourcing agreements that are power purchase agreements, the contract price for electricity sales shall be established on a cost of service basis. In the case of sourcing agreements that are contracts for differences, the contract price from which the reference price is subtracted shall be established on a cost of service basis. The Agency and the Commission may approve any such utility sourcing agreements that do not exceed cost-based benchmarks developed by the procurement administrator, in consultation with the Commission staff, Agency staff and the procurement monitor, subject to Commission review and approval. The Commission shall have authority to inspect all books and records associated with these clean coal facilities during the term of any such contract.

(6) Costs incurred under this subsection (d) or pursuant to a contract entered into under this subsection (d) shall be deemed prudently incurred and reasonable in amount and the electric utility shall be entitled to full cost recovery pursuant to the tariffs filed with the Commission.

**(d–5) Zero emission standard.**

**(1) Beginning with the delivery year commencing on June 1, 2017, the Agency shall, for electric utilities that serve at least 100,000 retail customers in this State, procure contracts with zero emission facilities that are reasonably capable of generating cost-effective zero emission credits in an amount approximately equal to 16% of the actual amount of electricity delivered by each electric utility to retail customers in the State during calendar year 2014. For an electric utility serving fewer than 100,000 retail customers in this State that requested, under Section 16–111.5 of the Public Utilities Act, that the Agency procure power and energy for all or a portion of the utility's Illinois load for the delivery year commencing June 1, 2016, the Agency shall procure contracts with zero emission facilities that are reasonably capable of generating cost-effective zero emission credits in an amount approximately equal to 16% of the portion of power and energy to be procured by the Agency for the utility. The duration of the contracts procured under this subsection (d–5) shall be for a term of 10 years ending May 31, 2027. The quantity of zero emission credits to be procured under the contracts shall be all of the zero emission credits generated by the zero emission facility in each delivery year; however, if the zero emission facility is owned by more than one entity, then the quantity of zero emission credits to be procured under the contracts shall be the amount of zero emission credits that are generated from the portion of the zero emission facility that is owned by the winning supplier.**

**The 16% value identified in this paragraph (1) is the average of the percentage targets in subparagraph (B) of paragraph (1) of subsection (c) of Section 1–75 of this Act for the 5 delivery years beginning June 1, 2017.**

**The procurement process shall be subject to the following provisions:**

**(A) Those zero emission facilities that intend to participate in the procurement shall submit to the Agency the following eligibility information for each zero emission facility on or before the date established by the Agency:**

**(i) the in-service date and remaining useful life of the zero emission facility;**

(ii) the amount of power generated annually for each of the years 2005 through 2015, and the projected zero emission credits to be generated over the remaining useful life of the zero emission facility, which shall be used to determine the capability of each facility;

(iii) the annual zero emission facility cost projections, expressed on a per megawatthour basis, over the next 6 delivery years, which shall include the following: operation and maintenance expenses; fully allocated overhead costs, which shall be allocated using the methodology developed by the Institute for Nuclear Power Operations; fuel expenditures; non–fuel capital expenditures; spent fuel expenditures; a return on working capital; the cost of operational and market risks that could be avoided by ceasing operation; and any other costs necessary for continued operations, provided that "necessary" means, for purposes of this item (iii), that the costs could reasonably be avoided only by ceasing operations of the zero emission facility; and

(iv) a commitment to continue operating, for the duration of the contract or contracts executed under the procurement held under this subsection (d–5), the zero emission facility that produces the zero emission credits to be procured in the procurement.

The information described in item (iii) of this subparagraph (A) may be submitted on a confidential basis and shall be treated and maintained by the Agency, the procurement administrator, and the Commission as confidential and proprietary and exempt from disclosure under subparagraphs (a) and (g) of paragraph (1) of Section 7 of the Freedom of Information Act. The Office of Attorney General shall have access to, and maintain the confidentiality of, such information pursuant to Section 6.5 of the Attorney General Act.

(B) The price for each zero emission credit procured under this subsection (d–5) for each delivery year shall be in an amount that equals the Social Cost of Carbon, expressed on a price per megawatthour basis. However, to ensure that the procurement remains affordable to retail customers in this State if electricity prices increase, the price in an applicable delivery year shall be reduced below the Social Cost of Carbon by the amount ("Price Adjustment") by which the market price index for the applicable delivery year exceeds the baseline market price index for the consecutive 12–month period ending May 31, 2016. If the Price Adjustment is greater than or equal to the Social Cost of Carbon in an applicable delivery year, then no payments shall be due in that delivery year. The components of this calculation are defined as follows:

(i) Social Cost of Carbon: The Social Cost of Carbon is $16.50 per megawatthour, which is based on the U.S. Interagency Working Group on Social Cost of Carbon's price in the August 2016 Technical Update using a 3% discount rate, adjusted for inflation for each year of the program. Beginning with the delivery year commencing June 1, 2023, the price per megawatthour shall increase by $1 per megawatthour, and continue to increase by an additional $1 per megawatthour each delivery year thereafter.

(ii) Baseline market price index: The baseline market price index for the consecutive 12–month period ending May 31, 2016 is $31.40 per megawatthour, which is based on the sum of (aa) the average day-ahead energy price across all hours of such 12–month period at the PJM Interconnection LLC Northern Illinois Hub, (bb) 50% multiplied by the Base Residual Auction, or its successor, capacity price for the rest of the RTO zone group determined by PJM Interconnection LLC, divided by 24 hours per day, and (cc) 50% multiplied by the Planning Resource Auction, or its successor, capacity price for Zone 4 determined by the Midcontinent Independent System Operator, Inc., divided by 24 hours per day.

(iii) Market price index: The market price index for a delivery year shall be the sum of projected energy prices and projected capacity prices determined as follows:

(aa) Projected energy prices: the projected energy prices for the applicable delivery year shall be calculated once for the year using the forward market price for the PJM Interconnection, LLC Northern Illinois Hub. The forward market price shall be calculated as follows: the energy forward

PUBLIC UTILITIES—ENERGY—ZERO EMISSION, 2016 Ill. Legis. Serv. P.A. 99-906...

Case: 1:17-cv-01163 Document #: 1-1 Filed: 02/14/17 Page 4 of 8 PageID #:30

prices for each month of the applicable delivery year averaged for each trade date during the calendar year immediately preceding that delivery year to produce a single energy forward price for the delivery year. The forward market price calculation shall use data published by the Intercontinental Exchange, or its successor.

**(bb) Projected capacity prices:**

> **(I)** For the delivery years commencing June 1, 2017, June 1, 2018, and June 1, 2019, the projected capacity price shall be equal to the sum of (1) 50% multiplied by the Base Residual Auction, or its successor, price for the rest of the RTO zone group as determined by PJM Interconnection LLC, divided by 24 hours per day and, (2) 50% multiplied by the resource auction price determined in the resource auction administered by the Midcontinent Independent System Operator, Inc., in which the largest percentage of load cleared for Local Resource Zone 4, divided by 24 hours per day, and where such price is determined by the Midcontinent Independent System Operator, Inc.

> **(II)** For the delivery year commencing June 1, 2020, and each year thereafter, the projected capacity price shall be equal to the sum of (1) 50% multiplied by the Base Residual Auction, or its successor, price for the ComEd zone as determined by PJM Interconnection LLC, divided by 24 hours per day, and (2) 50% multiplied by the resource auction price determined in the resource auction administered by the Midcontinent Independent System Operator, Inc., in which the largest percentage of load cleared for Local Resource Zone 4, divided by 24 hours per day, and where such price is determined by the Midcontinent Independent System Operator, Inc.

For purposes of this subsection (d–5):

> "Rest of the RTO" and "ComEd Zone" shall have the meaning ascribed to them by PJM Interconnection, LLC.

> "RTO" means regional transmission organization.

**(C)** No later than 45 days after the effective date of this amendatory Act of the 99th General Assembly, the Agency shall publish its proposed zero emission standard procurement plan. The plan shall be consistent with the provisions of this paragraph (1) and shall provide that winning bids shall be selected based on public interest criteria that include, but are not limited to, minimizing carbon dioxide emissions that result from electricity consumed in Illinois and minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of this State. In particular, the selection of winning bids shall take into account the incremental environmental benefits resulting from the procurement, such as any existing environmental benefits that are preserved by the procurements held under this amendatory Act of the 99th General Assembly and would cease to exist if the procurements were not held, including the preservation of zero emission facilities. The plan shall also describe in detail how each public interest factor shall be considered and weighted in the bid selection process to ensure that the public interest criteria are applied to the procurement and given full effect.

For purposes of developing the plan, the Agency shall consider any reports issued by a State agency, board, or commission under House Resolution 1146 of the 98th General Assembly and paragraph (4) of subsection (d) of Section 1–75 of this Act, as well as publicly available analyses and studies performed by or for regional transmission organizations that serve the State and their independent market monitors.

Upon publishing of the zero emission standard procurement plan, copies of the plan shall be posted and made publicly available on the Agency's website. All interested parties shall have 10 days following the date of posting to provide

comment to the Agency on the plan. All comments shall be posted to the Agency's website. Following the end of the comment period, but no more than 60 days later than the effective date of this amendatory Act of the 99th General Assembly, the Agency shall revise the plan as necessary based on the comments received and file its zero emission standard procurement plan with the Commission.

If the Commission determines that the plan will result in the procurement of cost-effective zero emission credits, then the Commission shall, after notice and hearing, but no later than 45 days after the Agency filed the plan, approve the plan or approve with modification. For purposes of this subsection (d–5), "cost effective" means the projected costs of procuring zero emission credits from zero emission facilities do not cause the limit stated in paragraph (2) of this subsection to be exceeded.

(C–5) As part of the Commission's review and acceptance or rejection of the procurement results, the Commission shall, in its public notice of successful bidders:

    (i) identify how the winning bids satisfy the public interest criteria described in subparagraph (C) of this paragraph (1) of minimizing carbon dioxide emissions that result from electricity consumed in Illinois and minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of this State;

    (ii) specifically address how the selection of winning bids takes into account the incremental environmental benefits resulting from the procurement, including any existing environmental benefits that are preserved by the procurements held under this amendatory Act of the 99th General Assembly and would have ceased to exist if the procurements had not been held, such as the preservation of zero emission facilities;

    (iii) quantify the environmental benefit of preserving the resources identified in item (ii) of this subparagraph (C–5), including the following:

        (aa) the value of avoided greenhouse gas emissions measured as the product of the zero emission facilities' output over the contract term multiplied by the U.S. Environmental Protection Agency eGrid subregion carbon dioxide emission rate and the U.S. Interagency Working Group on Social Cost of Carbon's price in the August 2016 Technical Update using a 3% discount rate, adjusted for inflation for each delivery year; and

        (bb) the costs of replacement with other zero carbon dioxide resources, including wind and photovoltaic, based upon the simple average of the following:

            (I) the price, or if there is more than one price, the average of the prices, paid for renewable energy credits from new utility-scale wind projects in the procurement events specified in item (i) of subparagraph (G) of paragraph (1) of subsection (c) of Section 1–75 of this Act; and

            (II) the price, or if there is more than one price, the average of the prices, paid for renewable energy credits from new utility-scale solar projects and brownfield site photovoltaic projects in the procurement events specified in item (ii) of subparagraph (G) of paragraph (1) of subsection (c) of Section 1–75 of this Act and, after January 1, 2015, renewable energy credits from photovoltaic distributed generation projects in procurement events held under subsection (c) of Section 1–75 of this Act.

Each utility shall enter into binding contractual arrangements with the winning suppliers.

    The procurement described in this subsection (d–5), including, but not limited to, the execution of all contracts procured, shall be completed no later than May 10, 2017. Based on the effective date of this amendatory Act of the 99th General Assembly, the Agency and Commission may, as appropriate, modify the various dates and timelines under

this subparagraph and subparagraphs (C) and (D) of this paragraph (1). The procurement and plan approval processes required by this subsection (d–5) shall be conducted in conjunction with the procurement and plan approval processes required by subsection (c) of this Section and Section 16–111.5 of the Public Utilities Act, to the extent practicable. Notwithstanding whether a procurement event is conducted under Section 16–111.5 of the Public Utilities Act, the Agency shall immediately initiate a procurement process on the effective date of this amendatory Act of the 99th General Assembly.

(D) Following the procurement event described in this paragraph (1) and consistent with subparagraph (B) of this paragraph (1), the Agency shall calculate the payments to be made under each contract for the next delivery year based on the market price index for that delivery year. The Agency shall publish the payment calculations no later than May 25, 2017 and every May 25 thereafter.

(E) Notwithstanding the requirements of this subsection (d–5), the contracts executed under this subsection (d–5) shall provide that the zero emission facility may, as applicable, suspend or terminate performance under the contracts in the following instances:

(i) A zero emission facility shall be excused from its performance under the contract for any cause beyond the control of the resource, including, but not restricted to, acts of God, flood, drought, earthquake, storm, fire, lightning, epidemic, war, riot, civil disturbance or disobedience, labor dispute, labor or material shortage, sabotage, acts of public enemy, explosions, orders, regulations or restrictions imposed by governmental, military, or lawfully established civilian authorities, which, in any of the foregoing cases, by exercise of commercially reasonable efforts the zero emission facility could not reasonably have been expected to avoid, and which, by the exercise of commercially reasonable efforts, it has been unable to overcome. In such event, the zero emission facility shall be excused from performance for the duration of the event, including, but not limited to, delivery of zero emission credits, and no payment shall be due to the zero emission facility during the duration of the event.

(ii) A zero emission facility shall be permitted to terminate the contract if legislation is enacted into law by the General Assembly that imposes or authorizes a new tax, special assessment, or fee on the generation of electricity, the ownership or leasehold of a generating unit, or the privilege or occupation of such generation, ownership, or leasehold of generation units by a zero emission facility. However, the provisions of this item (ii) do not apply to any generally applicable tax, special assessment or fee, or requirements imposed by federal law.

(iii) A zero emission facility shall be permitted to terminate the contract in the event that the resource requires capital expenditures in excess of $40,000,000 that were neither known nor reasonably foreseeable at the time it executed the contract and that a prudent owner or operator of such resource would not undertake.

(iv) A zero emission facility shall be permitted to terminate the contract in the event the Nuclear Regulatory Commission terminates the resource's license.

(F) If the zero emission facility elects to terminate a contract under this subparagraph (E, of this paragraph (1), then the Commission shall reopen the docket in which the Commission approved the zero emission standard procurement plan under subparagraph (C) of this paragraph (1) and, after notice and hearing, enter an order acknowledging the contract termination election if such termination is consistent with the provisions of this subsection (d–5).

(2) For purposes of this subsection (d–5), the amount paid per kilowatthour means the total amount paid for electric service expressed on a per kilowatthour basis. For purposes of this subsection (d–5), the total amount paid for electric service includes, without limitation, amounts paid for supply, transmission, distribution, surcharges, and add-on taxes.

Notwithstanding the requirements of this subsection (d–5), the contracts executed under this subsection (d–5) shall provide that the total of zero emission credits procured under a procurement plan shall be subject to the limitations of this paragraph (2). For each delivery year, the contractual volume receiving payments in such year shall be reduced for all retail customers

based on the amount necessary to limit the net increase that delivery year to the costs of those credits included in the amounts paid by eligible retail customers in connection with electric service to no more than 1.65% of the amount paid per kilowatthour by eligible retail customers during the year ending May 31, 2009. The result of this computation shall apply to and reduce the procurement for all retail customers, and all those customers shall pay the same single, uniform cents per kilowatthour charge under subsection (k) of Section 16–108 of the Public Utilities Act. To arrive at a maximum dollar amount of zero emission credits to be paid for the particular delivery year, the resulting per kilowatthour amount shall be applied to the actual amount of kilowatthours of electricity delivered by the electric utility in the delivery year immediately prior to the procurement, to all retail customers in its service territory. Unpaid contractual volume for any delivery year shall be paid in any subsequent delivery year in which such payments can be made without exceeding the amount specified in this paragraph (2). The calculations required by this paragraph (2) shall be made only once for each procurement plan year. Once the determination as to the amount of zero emission credits to be paid is made based on the calculations set forth in this paragraph (2), no subsequent rate impact determinations shall be made and no adjustments to those contract amounts shall be allowed. All costs incurred under those contracts and in implementing this subsection (d–5) shall be recovered by the electric utility as provided in this Section.

No later than June 30, 2019, the Commission shall review the limitation on the amount of zero emission credits procured under this subsection (d–5) and report to the General Assembly its findings as to whether that limitation unduly constrains the procurement of cost-effective zero emission credits.

(3) Six years after the execution of a contract under this subsection (d–5), the Agency shall determine whether the actual zero emission credit payments received by the supplier over the 6–year period exceed the Average ZEC Payment. In addition, at the end of the term of a contract executed under this subsection (d–5), or at the time, if any, a zero emission facility's contract is terminated under subparagraph (E) of paragraph (1) of this subsection (d–5), then the Agency shall determine whether the actual zero emission credit payments received by the supplier over the term of the contract exceed the Average ZEC Payment, after taking into account any amounts previously credited back to the utility under this paragraph (3). If the Agency determines that the actual zero emission credit payments received by the supplier over the relevant period exceed the Average ZEC Payment, then the supplier shall credit the difference back to the utility. The amount of the credit shall be remitted to the applicable electric utility no later than 120 days after the Agency's determination, which the utility shall reflect as a credit on its retail customer bills as soon as practicable; however, the credit remitted to the utility shall not exceed the total amount of payments received by the facility under its contract.

For purposes of this Section, the Average ZEC Payment shall be calculated by multiplying the quantity of zero emission credits delivered under the contract times the average contract price. The average contract price shall be determined by subtracting the amount calculated under subparagraph (B) of this paragraph (3) from the amount calculated under subparagraph (A) of this paragraph (3), as follows:

(A) The average of the Social Cost of Carbon, as defined in subparagraph (B) of paragraph (1) of this subsection (d–5), during the term of the contract.

(B) The average of the market price indices, as defined in subparagraph (B) of paragraph (1) of this subsection (d–5), during the term of the contract, minus the baseline market price index, as defined in subparagraph (B) of paragraph (1) of this subsection (d–5).

If the subtraction yields a negative number, then the Average ZEC Payment shall be zero.

(4) Cost–effective zero emission credits procured from zero emission facilities shall satisfy the applicable definitions set forth in Section 1–10 of this Act.

(5) The electric utility shall retire all zero emission credits used to comply with the requirements of this subsection (d–5).

**(6) Electric utilities shall be entitled to recover all of the costs associated with the procurement of zero emission credits through an automatic adjustment clause tariff in accordance with subsection (k) and (m) of Section 16–108 of the Public Utilities Act, and the contracts executed under this subsection (d–5) shall provide that the utilities' payment obligations under such contracts shall be reduced if an adjustment is required under subsection (m) of Section 16–108 of the Public Utilities Act.**

**(7) This subsection (d–5) shall become inoperative on January 1, 2028.**

(e) The draft procurement plans are subject to public comment, as required by Section 16–111.5 of the Public Utilities Act.

(f) The Agency shall submit the final procurement plan to the Commission. The Agency shall revise a procurement plan if the Commission determines that it does not meet the standards set forth in Section 16–111.5 of the Public Utilities Act.

(g) The Agency shall assess fees to each affected utility to recover the costs incurred in preparation of the annual procurement plan for the utility.

(h) The Agency shall assess fees to each bidder to recover the costs incurred in connection with a competitive procurement process.

**(i) A renewable energy credit, carbon emission credit, or zero emission credit can only be used once to comply with a single portfolio or other standard as set forth in subsection (c), subsection (d), or subsection (d–5) of this Section, respectively. A renewable energy credit, carbon emission credit, or zero emission credit cannot be used to satisfy the requirements of more than one standard. If more than one type of credit is issued for the same megawatt hour of energy, only one credit can be used to satisfy the requirements of a single standard. After such use, the credit must be retired together with any other credits issued for the same megawatt hour of energy.**

(Source: P.A. 98–463, eff. 8–16–13; 99–536, eff. 7–8–16.)

Section 10. The Illinois Procurement Code is amended by changing Section 20–10 as follows:

<< IL ST CH 30 § 500/20–10 >>

**[S.H.A. 30 ILCS 500/20–10]** (30 ILCS 500/20–10)

(Text of Section from P.A. 96–159, 96–588, 97–96, 97–895, and 98–1076)

§ 20–10. Competitive sealed bidding; reverse auction.

(a) Conditions for use. All contracts shall be awarded by competitive sealed bidding except as otherwise provided in Section 20–5.

(b) Invitation for bids. An invitation for bids shall be issued and shall include a purchase description and the material contractual terms and conditions applicable to the procurement.

(c) Public notice. Public notice of the invitation for bids shall be published in the Illinois Procurement Bulletin at least 14 calendar days before the date set in the invitation for the opening of bids.

(d) Bid opening. Bids shall be opened publicly in the presence of one or more witnesses at the time and place designated in the invitation for bids. The name of each bidder, the amount of each bid, and other relevant information as may be

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VILLAGE OF OLD MILL CREEK,<br>FERRITE INTERNATIONAL COMPANY,<br>GOT IT MAID, INC., NAFISCA ZOTOS,<br>ROBERT DILLON, RICHARD OWENS,<br>And ROBIN HAWKINS, both individually and<br>d/b/a ROBIN'S NEST, | )<br>)<br>)<br>)<br>)<br>) | |
| | ) | Case No. 1:17-cv-01163 |
| Plaintiffs, | ) | |
| | ) | District Judge Thomas M. Durkin |
| v. | ) | |
| | ) | |
| ANTHONY M. STAR, in his official capacity as | ) | |
| Director of the Illinois Power Agency, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JEANNE JONES**

1.      My name is Jeanne Jones.  I currently serve as the Vice President, Finance, Exelon Nuclear, at Exelon Corporation.  I have personal knowledge of the interests of Intervenor Exelon Generation Co., LLC ("Exelon") in this litigation.

2.      Exelon is the indirect owner (in whole or in part) of a number of plants that generate nuclear power and are interconnected with PJM Interconnection, LLC, or the Midcontinent Independent System Operator, Inc.  These include: the Clinton Power Station, the Quad Cities Nuclear Power Station, Braidwood Generating Station, Byron Generating Station, Calvert Cliffs Nuclear Power Plant, Dresden Generating Station, LaSalle County Generating Station, Limerick Generating Station, Oyster Creek Generating Station, Peach Bottom Atomic Power Station, and Three Mile Island Generating Station.

3.      Exelon is in turn directly owned by Exelon Corporation.

1

**A.162**

4.      Exelon has a strong interest in the ZEC Program.  Absent their participation in the ZEC Program, certain nuclear plants, including Clinton and Quad Cities, will lose money in the near term.  Absent their participation in the ZEC Program, Exelon would opt to close these plants.  However, if these plants are selected into the ZEC Program, the ZEC Program would facilitate their continued operation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 15, 2017

*Jeanne Jones*

2

**A.163**

## **AFFIDAVIT OF ROGER W. TURNER**

I, Roger W. Turner, being first duly sworn on oath, certify that the statements set forth in this instrument are true and correct, state that I am the Executive Vice President of GEV Corp. ("GEV"), an energy consulting company located in Illinois, and that this Affidavit is made in connection with the case of *Village of Old Mill Creek et al. v. Star, 17-cv-1163*, in the United States District Court for the Northern District of Illinois, Eastern Division, and further state that:

### ZEC CHARGE ESTIMATES

1. Subsection (d-5) Zero Emission Standard of Illinois Public Act 99-0906 ("The ZEC Procurement Law") requires the Illinois Power Agency to procure contracts for zero emission credits ("ZECs") for utilities with at least 100,000 customers in an amount approximately equal to 16% of the actual amount of electricity delivered by each such electric utility to retail customers in the State of Illinois during calendar year 2014. (20 ILCS 3855/1-75(d-5)(1)). Zero emission credit is defined as "a tradable credit that represents the environmental attributes of one megawatt hour of energy from a zero emissions facility which is defined in the ZEC Procurement Law as a facility fueled by nuclear power interconnected with PJM or MISO or their successors." ( ILCS 3855/1-10, Definitions.)

2. The Illinois Commerce Commission ("ICC") issued a *Report on Comparison of Electric Sales Statistics, 2014-2015* in May 2016 (the "ICC Report"). The ICC Report is available at: https://www.icc.illinois.gov/publicutility/salesstatistics.aspx

3. Based on the data in the ICC Report, (a) the 2014 electricity deliveries to retail customers of Commonwealth Edison Company ("ComEd") were 88,580,643 megawatt-hours ("MWh"), and (b) the 2014 electricity deliveries to retail customers of Ameren Illinois Company ("Ameren Illinois") were 36,897,391 MWh.

4. Taking 16% of the total electricity deliveries to retail customers in MWhs for ComEd and Ameren Illinois in calendar year 2014, multiplying that quantity by a $16.50 per MWh ZEC price, and dividing by the total number of MWhs in 2014 yields $2.64 per MWh, as shown in the table below:

1

|  |  |  |  | 2014 Electricity Sales |
|  |  |  |  | (in MWhs) |
| Commonwealth Edison Company |  |  |  | 88,580,643 |
| Ameren Illinois Company |  |  |  | 36,897,391 |
|  |  | Total |  | 125,478,034 |
|  |  | 16% |  | 20,076,485 |
|  |  |  |  |  |
| ZEC Price |  | $16.50 per MWh | $ | 331,262,010 |

$331,262,010
divided by   125,478,034  MWh
equals       $        2.64  per MWh

5. Over the ten year ZEC purchase requirement period of the ZEC Procurement Law total
   ZEC charges to Illinois consumers are estimated to be $3.3 billion based on a ZEC
   price of $16.50 per MWh.

## CAPACITY PERFORMANCE PRODUCT

6. In 2015 FERC allowed PJM to begin including a capacity performance product in its
   capacity auctions.

7. The capacity performance product resulted in substantially higher capacity payments to
   generating plants such as nuclear plants which met the capacity performance standard.

8. The capacity performance product resulted in the Quad Cities plant and other Exelon
   nuclear plants in Illinois receiving substantial additional capacity payments in 2016 and
   2017 from the utility ComEd and competitive electricity suppliers which were passed
   onto Illinois electricity consumers.

Further Affiant sayeth not.

Dated: March 31, 2017

NOTARY
PUBLIC

Notary Public

[SEAL]
Donald J. Blackett
Barrister & Solicitor
Notary Public
Commissioner for Oaths
Province of Alberta

Roger W. Turner

2

**A.165**

## AFFIDAVIT OF SCOTT FRASER

I, Scott Fraser, being first duly sworn on oath, certify that the statements set forth in this instrument are true and correct, except as to any matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true, state that I am the Chief Financial Officer of Ferrite International Company ("Ferrite"), that this Affidavit is made in connection with the case of Village of Old Mill Creek et al. v. Star, 17-cv-1163, in the United States District Court for the Northern District of Illinois, Eastern Division, and further state that:

1. Ferrite is a manufacturing company located in Wadsworth, Lake County, Illinois, and its Commonwealth Edison Company ("ComEd") account number is 0270626009 (the "Account").

2. Ferrite's average monthly usage over the last 24 billing periods is 325.90 megawatt-hours ("MWh").

3. Based on the Account's usage data and a ZEC charge amount of $2.64/MWh, I estimate that Ferrite would pay an additional $860 per month and a total of $103,244 over the 10-year period for which the ZEC charges will apply.

Further Affiant sayeth not.

Dated: March 31, 2017

Scott Fraser

Notary Public

[SEAL]

ANGELITA KEVITT
OFFICIAL SEAL
NOTARY PUBLIC
STATE OF ILLINOIS
MY COMMISSION EXPIRES
FEBRUARY 17, 2020

1

**A.166**



OFFICE OF THE GOVERNOR

# NEWS

Print Release

Close Window

**FOR IMMEDIATE RELEASE**
December 7, 2016

### Governor Signs Legislation to Protect Jobs, Ratepayers and Taxpayers

*Future Energy Jobs bill also supports renewable energy, energy efficiency, and invests in low-income communities*

PORT BYRON – Governor Bruce Rauner today signed Senate Bill 2814, the Future Energy Jobs bill, at a ceremony at Riverdale High School in Port Byron. The bipartisan legislation ensures the Quad Cities and Clinton power facilities remain open for another 10 years, saving thousands of good-paying jobs, while protecting working families, seniors, and thousands of other high-quality, good-paying jobs throughout the state by capping residential and business energy rates.

"When this legislation was originally drafted, it was a Christmas tree loaded with special interest goodies that would have skyrocketed energy costs on families and businesses across the state," said Governor Rauner. "So we needed to find a balance, because I was unwilling to gamble with these communities, gamble with thousands of good paying jobs and gamble with our energy diversity. While this legislation isn't perfect, it allows us to protect jobs, ratepayers and taxpayers."

Before Governor Rauner's involvement, the legislature was poised to pass a massive bill with demand rates that could have skyrocketed energy bills for consumers. Governor Rauner laid out a pathway for a deal with his statement of principles which outlined any energy agreement should preserve jobs while protecting ratepayers and taxpayers.

"Thank you to those who negotiated in good faith to help make this bill a reality, and most importantly, thank you to the people of the Quad Cities and Clinton for your persistence, your patience, and hard work," Governor Rauner added.

Senate Bill 2814 ensures the Clinton and Quad Cities power facilities remain open for another 10 years. It contains a guaranteed cap that energy prices cannot increase more than 25 cents on the average residential home, and cannot increase more than 1.3 percent on commercial and industrial users over the next ten years. Rates are projected to decrease for the first several years due to the utilities being able to amortize energy efficiency. It also promotes unprecedented wind and solar expansion and preserves zero-emission generation, maintaining Illinois' status in leading the nation in zero-carbon generation.

"I want to commend Sen. Anderson, as well as every local community leader, who worked diligently to educate both public and policy makers in the Capitol about the important contribution this facility makes to the local electrical supply grid, the regional economy and the state as a whole," said Senate Republican Leader Christine Radogno (R-Lemont).

"A joint study conducted by the Illinois Commerce Commission, the Illinois Power Agency, the Illinois Environmental Protection Agency and the Illinois Department of Commerce and Economic Opportunity found that allowing several nuclear plants to prematurely close would cause our electric rates to increase by as much as 26% during stress events while grid reliability and capacity would significantly decrease. Closing the plants would also cost Illinois approximately 7,800 jobs and $1.8 billion in economic activity," said House

A.167

Republican Leader Jim Durkin (R-Burr Ridge). "At the end of the day, had we failed to take action Illinois and Illinois consumers would suffer, and our electric rates would get dramatically out of hand."

"Getting this bill passed, and saving jobs in the 36th Senate District has been one of my top priorities since taking office almost two years ago. This legislation saves our area from losing more than 800 direct jobs, 1,200 indirect jobs, and the largest property taxpayer in Rock Island County" said State Sen. Neil Anderson (R-Rock Island). "It has been a long and difficult process to pass this legislation, but I'm happy to be able to say we have been successful thanks to negotiations between stakeholders, the General Assembly, and the Governor's Office."

"This historic legislation will protect the state's primary source of clean energy while saving thousands of good jobs at our plants and providing millions of dollars in low-income assistance as well as job training in communities that need it most," said Chris Crane, president and CEO of Exelon. "We appreciate the leadership of Governor Rauner and legislative leaders for their roles in positioning Illinois to be a national leader in clean energy, job growth and economic development."

"ICC Staff, including policy analysts, accountants, economists, attorneys and engineers spent a great deal of time analyzing this bill," said Brien Sheahan, Chairman of the Illinois Commerce Commission. "Our analysis shows the bill not only provides true caps to protect and limit customer rate impacts, but also includes several methods by which the ICC can enforce these caps. We are confident in our ability to oversee the charge this legislation creates for our agency."

"This is a big win for consumers," said Dave Kolata, Executive Director of the Citizens Utility Board (CUB). "It's Economics 101 – reducing demand for electricity also reduces the price. Illinois already enjoys some of the lowest rates in the nation because of energy efficiency, and this bill will drive further savings to homeowners." According to a CUB analysis, residential consumers will enjoy at least $4 billion in lower electric bills over the lifetime of the law, which also imposes a cap limiting bill increases to no more than 25-35 cents a month while savings from efficiency ramp up.

"With this legislation, Illinois will now be able to compete head-to-head with any other state in the nation in the race to build a renewable energy economy-- and win," said Lesley McCain, director of the Illinois Solar Energy Association (ISEA). "This bill will mean more jobs for solar installers, more savings for solar customers and environmental benefits for all of us who gain when cleaner sources of energy are used."

"With this legislation, Illinois will now be able to compete head-to-head for clean energy jobs with any other state in the nation -- and win," said Jennifer Walling, Executive Director of the Illinois Environmental Council (IEC), who added "The Future Energy Jobs bill fixes and improves the broken Renewable Portfolio Standard (RPS), leading to $12 to $15 billion in private investment and the development of at least 3,000 megawatts of new solar and 1,300 MWs of wind energy— enough to power nearly 1 million homes."

Video of the event will be posted here.

**A.168**



**Printed from ChicagoBusiness.com**

# Why Rauner should veto Exelon's bailout

By: Dave Lundy December 05, 2016

Springfield proved the cynics right last week. Rather than moving heaven and earth to pass a budget, come up with a pension fix or help decimated social services organizations, the General Assembly and governor engaged in an act of what could best be described as "faith-based lawmaking." What was more important that all those other priorities? Bailing out two failing nuclear plants owned by Exelon, a Fortune 100 company that made more than $2 billion in profit last year.

The 500-plus page "Future Energy Jobs Bill" violates every principle of good government. In the last 24 hours of the fall veto session, lawmakers amended the measure seven times with amendments ranging from one page to 60. The bill the Legislature passed without even seeing its final form will probably be around 550 pages—about as hefty as the entire Illinois Public Utilities Act. Illinois ratepayers won't be able to fully analyze what was done to every person, business, hospital and school in the state until a final version is assembled for Gov. Bruce Rauner to sign. This was Springfield at its very worst.

As bad as the process was, **what's in the bill** is even worse. That's why an extraordinarily diverse coalition of consumer advocates like Illinois Attorney General Lisa Madigan and AARP, business groups like the Illinois Manufacturers' Association and Illinois Chamber of Commerce, and an array of other organizations including the Building Owners and Managers Association of Chicago, NAACP and National Federation of Independent Businesses worked together in an effort to stop it. (Crain's Chicago Business also thinks the rare display of bipartisanship was wasted at a great cost to Illinois.)

*Related:*

• *Editorial: Nothing brings pols together like a bailout*

• *Biz opposition grows as Exelon trims bailout bill again*

• *Opinion: This energy bill has had a messy birth. But it might just deliver.*

So what's in the bill? A bailout that provides $2.35 billion to Exelon to keep two nuclear power plants open that can no longer compete in the marketplace. Illinois generates 41 percent more power than we use and as we become more efficient—demand is declining at about 1 percent a year—that excess supply is growing. With so much supply and electricity prices falling, ratepayers have been the big winners.

But that's the risk of the competitive market Exelon championed for the past 25 years. When prices were high, shareholders won. As recently as 2014, Exelon CEO Chris Crane said, "We're saying we don't want to be subsidized and no one should be subsidized in the competitive markets, so there are a few that may not make it." With energy prices lower because of cheap natural gas, consumers are winning and company executives don't like it. So Exelon abandoned its competitive principles and ran to the Legislature to seek a government-mandated subsidy at the expense of every consumer and business in the state.

Also in the bill is a drastic change in policy to allow ComEd to earn almost 10 percent guaranteed annual profits on energy efficiency spending. Currently, we invest hundreds of millions each year on a variety of programs and ratepayers pay for these investments as they're made on a cash basis. To date these programs have been partially successful, with ComEd achieving about 35 percent of promised efficiency gains. Improving the programs would be a good step forward, but it can be achieved not by rewarding utility failures with billions in guaranteed profits, but through market-oriented solutions that pay for success.

**A.169**

**JOBS KILLER**

With a price tag of more than $10 billion by Exelon's own testimony, the bill, despite its name, is a jobs killer. According to an analysis of the legislation using the industry standard economic modeling tool IMPLAN, this legislation will kill 44,000 jobs, destroy $14.7 billion in economic activity and cost $429 million in lost state and local tax revenue. In fact, this legislation will cost the city of Chicago, Chicago Public Schools and CTA a combined total of more than $10 million each year.

While proponents of the bill tout "rate caps," sadly these caps are a sham, gamed by Exelon using technical language to mask artificially high baselines against which caps will be measured. For commercial and industrial customers, the gaming of the rate caps will cost them more than $100 million per year.

For residential ratepayers, the gap between rhetoric and reality is extreme. Exelon has said their bills will go up by no more than 25 cents a month, but that's an average of all residential customers, not individual homeowners. An independent analysis by Illinois' leading energy expert, the Power Bureau, finds the bill will cost the average residential ratepayer an additional $4.54 a month for ComEd customers and $2.01 a month for Ameren customers in downstate Illinois.

Although he negotiated the final version of the bill, Rauner still has a chance to stand up for business and consumer ratepayers. It's time to honor his anti-corporate bailout rhetoric and veto this massive rate hike for everyone. We urge him to do so without delay.

*Dave Lundy is director of the **Best Coalition**, a diverse group of consumer, business and energy interests.*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VILLAGE OF OLD MILL CREEK, *et al.*,

                    Plaintiffs,

           v.

ANTHONY M. STAR,

                    Defendant.

No. 17 CV 1163

Judge Manish S. Shah

Magistrate Judge Susan E. Cox

PLAINTIFFS' SUBMISSION OF SUPPLEMENTAL
MATERIAL IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Patrick N. Giordano
GIORDANO & ASSOCIATES, LTD.
1710 Wesley Avenue
Evanston, Illinois
patrickgiordano@dereglaw.com
Telephone: 847-905-0703

Paul G. Neilan
LAW OFFICES OF PAUL G. NEILAN, P.C.
1954 First Street #390
Highland Park, Illinois 60035
pgneilan@energy.law.pro
Telephone: 847-266-0464

Dated: May 12, 2017

*Attorneys for Plaintiffs*

**A.171**

As supplemental material in support of Plaintiffs' pending motion for preliminary injunction, Plaintiffs respectfully submit the attached proposed tariff modification recently filed by Commonwealth Edison Company ("ComEd") with the Illinois Commerce Commission. The automatic adjustment tariff will allow ComEd to bill all retail customers a ZEC charge of 0.195 cents per kWh beginning June 1, 2017.

Dated:  May 12, 2017                          Respectfully submitted,


By:  _/s/ *Patrick N. Giordano*
        Patrick N. Giordano


Patrick N. Giordano
GIORDANO & ASSOCIATES, LTD.
1710 Wesley Avenue
Evanston, Illinois
patrickgiordano@dereglaw.com
Telephone: 847-905-0703


Paul G. Neilan
LAW OFFICES OF PAUL G. NEILAN, P.C.
1954 First Street #390
Highland Park, Illinois 60035
pgneilan@energy.law.pro
Telephone: 847-266-0464


*Attorneys for Plaintiffs*

**A.172**

## <u>CERTIFICATE OF SERVICE</u>

     I certify that on May 12, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users.

By: <u>/s/ Paul G. Neilan</u>
Paul G. Neilan

**A.173**

**ComEd** ®

An Exelon Company

Commonwealth Edison Company    www.exeloncorp.com
Energy Delivery
Three Lincoln Centre
Oakbrook Terrace, IL 60181-4260
Tel. 630-437-2000

## VIA OVERNIGHT DELIVERY

April 14, 2017

Ms. Elizabeth Rolando
Chief Clerk
Illinois Commerce Commission
527 E. Capitol Avenue
Springfield, IL 62701

Subject: General Terms and Conditions, Rider ZEA, and Informational Sheet No. 37

Dear Ms. Rolando:

Enclosed for filing with the Illinois Commerce Commission (ICC) on April 17, 2017, are the following tariff sheets:

COMMONWEALTH EDISON COMPANY
ELECTRICITY
ILL. C. C. No. 10

General Terms and Conditions:

| | | |
|---|---|---|
| 2nd Revised Sheet No. 128 | canceling | 1st Revised Sheet No. 128 |
| 3rd Revised Sheet No. 129 | canceling | 2nd Revised Sheet No. 129 |
| 1st Revised Sheet No. 129.1 | canceling | Original Sheet No. 129.1 |

Rider ZEA – Zero Emission Adjustment (Rider ZEA):

| | | |
|---|---|---|
| 3rd Revised Sheet No. 236 | canceling | 2nd Revised Sheet No. 236 |
| 2nd Revised Sheet No. 236.1 | canceling | 1st Revised Sheet No. 236.1 |
| 2nd Revised Sheet No. 236.2 | canceling | 1st Revised Sheet No. 236.2 |
| 2nd Revised Sheet No. 236.3 | canceling | 1st Revised Sheet No. 236.3 |
| 2nd Revised Sheet No. 236.4 | canceling | 1st Revised Sheet No. 236.4 |
| 2nd Revised Sheet No. 236.5 | canceling | 1st Revised Sheet No. 236.5 |
| 2nd Revised Sheet No. 236.6 | canceling | 1st Revised Sheet No. 236.6 |

Informational Sheet No. 37:

                                      Original Informational Sheet No. 37

**A.174**

Ms. Rolando           -2-           April 14, 2017
<u>General Terms and Conditions,</u>
<u>Rider ZEA, and Informational Sheet No. 37</u>

With this filing, Commonwealth Edison Company (Company) proposes a new tariff, Rider ZEA – Zero Emission Adjustment (Rider ZEA) and Informational Sheet No. 37, as a supplement to Rider ZEA. The Company also proposes revisions to include a definition of "exempt group" customers, effectuating the provisions of Subsection 8-103B(l) of the Act. The Company is proposing to have these revisions become effective on June 1, 2017.

The informational sheet identifies that the Zero Emission Adjustment and the Zero Emission Adjustment Reduction are not applicable prior to June 2017 for all retail customers. This informational sheet also identifies that a Zero Emission Adjustment of 0.195 ¢/kWh has been determined for application beginning in the June 2017 monthly billing period and extending through the May 2018 monthly billing period for (a) retail customers to which the exempt group, as defined in these revisions to General Terms and Conditions, is applicable, (b) all other residential retail customers, and (c) all other nonresidential retail customers. Finally, the informational sheet identifies the Zero Emission Adjustment Reduction is 0.000 ¢/kWh for retail customers to which the exempt group is applicable for the period beginning with the June 2017 monthly billing period and extending through the May 2018 monthly billing period.

Also enclosed are copies of this transmittal letter, along with the Supplemental Statement, the tariff sheets, and informational sheet (marked DUPLICATE) to which it relates, addressed to Ms. Theresa Ebrey (Accountant: Accounting Department, Financial Analysis Division), Mr. Steve Knepler (Supervisor: Accounting Department, Financial Analysis Division), Ms. Joy Nicdao-Cuyugan (Director: Financial Analysis Division), Ms. Bonita Pearce (Accountant: Accounting Department, Financial Analysis Division), Mr. Scott Struck (Manager: Rates Department, Financial Analysis Division), Mr. Scott Tolsdorf (Accountant: Accounting Department, Financial Analysis Division), and Dr. James Zolnierek (Bureau Chief), all of the Bureau of Public Utilities of the ICC Staff.  Electronic copies of this transmittal letter and its associated Supplemental Statement, tariff sheets and informational sheet are being provided to Mr. Torsten Clausen (Director: Policy Division) at <u>tclausen@icc.illinois.gov</u> and Mr. Sam McClerren (Tariff Analyst: Rates Department, Financial Analysis Division, Bureau of Public Utilities) at <u>smcclerr@icc.illinois.gov</u>, also of the ICC Staff.

Work papers supporting the determination of the applicable Zero Emission Adjustment charges and the applicable Zero Emission Adjustment Reduction credits are being sent electronically to Ms. Ebrey at <u>tebrey@icc.illinois.gov</u>, Mr. Knepler at <u>sknepler@icc.illinois.gov</u>, Mr. Struck at <u>sstruck@icc.illinois.gov</u>, and Mr. Tolsdorf as <u>stolsdorf@icc.illinois.gov</u>.

REC'D 04/17/2017 03:43 PM ICC/CCO

Two extra copies of this transmittal letter, along with the Supplemental Statement, tariff sheets, and the informational sheet to which it relates, are provided.  One set of such copies is provided for your convenience in acknowledging receipt of this letter and enclosures and is to be returned to Commonwealth Edison Company in the self-addressed stamped envelope provided.

Sincerely,

Martin G. Fruehe
Manager Retail Rates
(630) 437-2063

Enclosures

cc: T. Ebrey
S. Knepler
J. Nicdao-Cuyugan
B. Pearce
S. Struck
S. Tolsdorf
J. Zolnierek

**A.176**

Commonwealth Edison Company
April 14, 2017

## SUPPLEMENTAL STATEMENT
## ELECTRICITY
## ILL. C. C. No. 10

**General Terms and Conditions:**

| | | |
|---|---|---|
| 2nd Revised Sheet No. 128 | canceling | 1st Revised Sheet No. 128 |
| 3rd Revised Sheet No. 129 | canceling | 2nd Revised Sheet No. 129 |
| 1st Revised Sheet No. 129.1 | canceling | Original Sheet No. 192.1 |

**Rider ZEA – Zero Emission Adjustment (Rider ZEA):**

| | | |
|---|---|---|
| 3rd Revised Sheet No. 236 | canceling | 2nd Revised Sheet No. 236 |
| 2nd Revised Sheet No. 236.1 | canceling | 1st Revised Sheet No. 236.1 |
| 2nd Revised Sheet No. 236.2 | canceling | 1st Revised Sheet No. 236.2 |
| 2nd Revised Sheet No. 236.3 | canceling | 1st Revised Sheet No. 236.3 |
| 2nd Revised Sheet No. 236.4 | canceling | 1st Revised Sheet No. 236.4 |
| 2nd Revised Sheet No. 236.5 | canceling | 1st Revised Sheet No. 236.5 |
| 2nd Revised Sheet No. 236.6 | canceling | 1st Revised Sheet No. 236.6 |

**Informational Sheet No. 37:**

Original Informational Sheet No. 37

### Filed with the Illinois Commerce Commission on April 17, 2017

With this filing, Commonwealth Edison Company (Company) submits a new tariff Rider ZEA – Zero Emission Adjustment (Rider ZEA) and Informational Sheet No. 37, as a supplement to Rider ZEA. This proposed Rider ZEA and the related Informational Sheet No. 37 effectuate provisions of subsection 16-108(k) of the Public Utility Act (PUA) that allow for the recovery of costs associated with the procurement of zero emission credits to meet the requirements of subsection 1-75(d-5) of the Illinois Power Agency Act.

Rider ZEA provides for the mechanism by which the Company proposes to recover costs associated with the procurement of zero emission credits as well as the applicability

**A.177**

Supplemental Statement                                    Commonwealth Edison Company
Rider ZEA, GTC, and                                                      April 14, 2017
Informational Sheet No. 37

of the adjustment to each kilowatt-hour delivered to each retail customer. The Company

also proposes making periodic informational filings updating the zero emission adjustment,

as needed. Additionally, the Company proposes an annual review and reconciliation of

Rider ZEA beginning in 2018.

The informational sheet identifies that the Zero Emission Adjustment and the Zero

Emission  Adjustment Reduction are not applicable prior to June 2017 for all retail

customers. The informational sheet also identifies that the applicable Zero Emission

Adjustment is 0.195 ¢/kWh for (a) retail customers to which the exempt group, as defined

in these revisions to General Terms and Conditions, is applicable, (b) all other residential

retail customers, and (c) all other nonresidential retail customers for the period beginning

with the June 2017 monthly billing period and extending through the May 2018 monthly

billing period. Finally, the informational sheet identifies that the Zero Emission Adjustment

Reduction is 0.000 ¢/kWh for retail customers to which the exempt group is applicable for

the period beginning with the June 2017 monthly billing period and extending through the

May 2018 monthly billing period.

The Company also proposes revisions to include a definition of "exempt group"

customers, effectuating the provisions of Subsection 8-103B(l) of the Act.

With the filing of this Supplemental Statement, the tariff sheets, and informational

sheet to which it relates, the Company will post a Public Notice of this filing in its office at

Three Lincoln Centre in Oakbrook Terrace, Illinois 60181-4260, and will place copies of the

proposed tariff sheets, informational sheet, and this Supplemental Statement in the Public

File in such office and on its internet website:

-2-

**A.178**

Supplemental Statement
Rider ZEA, GTC, and
Informational Sheet No. 37

Commonwealth Edison Company
April 14, 2017

proposed tariff sheets, informational sheet, and this Supplemental Statement in the Public

File in such office and on its internet website:

https://www.comed.com/MyAccount/MyBillUsage/Pages/ProposedRevisions.aspx

For interested parties who do not have access to the internet, arrangements to view the

copies of the proposed tariff sheets, informational sheet, and this Supplemental Statement

at the Three Lincoln Centre office can be made by contacting a Company representative in

Retail Rates at (630) 576-6750 during regular business hours.

Commonwealth Edison Company, therefore, requests that the Illinois Commerce

Commission accept the proposed Rider ZEA and Informational Sheet No. 37 and the

proposed revisions to the Company's General Terms and Conditions by allowing

the aforementioned tariff sheets and informational sheet to pass to file and become

effective on June 1, 2017.

**COMMONWEALTH EDISON COMPANY**

Martin G. Fruehe
Manager Retail Rates

Attachments

-3-

REC'D 04/17/2017 03:43 PM ICC/CCO

ILL. C. C. No. 10

**Commonwealth**         **ELECTRICITY**
**Edison Company**                                    **Original Informational Sheet No. 37**

### ZERO EMISSION ADJUSTMENTS

#### Supplement to Rider ZEA (1)

| | Prior to the<br>June 2017 Monthly Billing Period |
|---|---|
| Zero Emission (ZE) Adjustment Applicability (2) | |
| Retail Customers to Which the Exempt Group is Applicable (3) | Not Applicable |
| All Other Residential Retail Customers | Not Applicable |
| All Other Nonresidential Retail Customers | Not Applicable |

| | Prior to the<br>June 2017 Monthly Billing Period |
|---|---|
| ZE Adjustment Reduction Applicability (4) | |
| Retail Customers to Which the Exempt Group is Applicable (3) | Not Applicable |

| | ZE Adjustment<br>Applicable Beginning with the<br>June 2017 Monthly Billing Period<br>and Extending Through the<br>May 2018 Monthly Billing Period (5) |
|---|---|
| ZE Adjustment Applicability (2) | |
| Retail Customers to Which the Exempt Group is Applicable (3) | 0.195 ¢/kWh |
| All Other Residential Retail Customers | 0.195 ¢/kWh |
| All Other Nonresidential Retail Customers | 0.195 ¢/kWh |

| | ZE Adjustment Reduction<br>Applicable Beginning with the<br>June 2017 Monthly Billing Period<br>and Extending Through the<br>May 2018 Monthly Billing Period (5) |
|---|---|
| ZE Adjustment Reduction Applicability (4) | |
| Retail Customers to Which the Exempt Group is Applicable (3) | 0.000 ¢/kWh |

NOTES:
(1) This informational sheet is supplemental to Rider ZEA – Zero Emission Adjustment (Rider ZEA).
(2) The ZE Adjustment is designated on retail customer bills as the Zero Emission Standard.
(3) Exempt Group is as defined in the Definitions part of the General Terms and Conditions of the Company's Schedule of Rates.
(4) The Zero Emission Standard Reduction is designated on retail customer bills for which the exempt group is applicable as the Zero Emission Standard Adjustment.
(5) An X.XXX value is a charge, while an (X.XXX) value is a credit.

**Filed with the Illinois Commerce Commission on**         **Date Effective: June 1, 2017**
**April 17, 2017. Issued pursuant to**         **Issued by A. R. Pramaggiore, President and CEO**
**Public Act 99-0906, which is effective as of**         **Post Office Box 805379**
**June 1, 2017.**         **Chicago, Illinois 60680-5379**

**A.180**

REC'D 04/17/2017 03:43 PM ICC/CCO

Commonwealth
Edison Company

ELECTRICITY

ILL. C. C. No. 10
2nd Revised Sheet No. 128
(Canceling 1st Revised Sheet No. 128)

GENERAL TERMS AND CONDITIONS

(Continued from Sheet No. 127)

DEFINITIONS (CONTINUED)

**ComEd Zone**
ComEd Zone means the PJM defined load zone for the Company.

**Company**
Company means Commonwealth Edison Company.

**CPT**
CPT means Central Prevailing Time, which is Central Standard Time or Central Daylight Savings Time, as applicable.

**Customer Supply Groups**
Customer supply groups mean the designations for retail customers located in the Company's service territory so that retail customers can be categorized for the purposes of computing charges for the procurement of electric power and energy and applying such charges to retail customers.

**DASR**
DASR means Direct Access Service Request. A DASR is an electronic communication by which the Company is informed of a retail customer's election to switch its provider of electric power and energy supply service or its provider of metering service.

**Delivery Classes**
Delivery classes mean the designations for retail customers located in the Company's service territory so that retail customers can be categorized for the purposes of computing charges for the delivery of electric service and applying such charges to retail customers.

**Effective Switch Date**
Effective Switch Date means the date that a retail customer's election of a different provider of metering service becomes effective, as described in the Switching Metering Service Providers section of the Switching and Termination part of Rate MSPS - Metering Service Provider Service (Rate MSPS).

**End of Business**
End of business means 5:00 P.M. CPT.

\* **Exempt Group**
Exempt Group means the designation applicable to retail customers using electric power and energy located at a single premises that each established a thirty (30) minute demand that exceeded 10,000 kilowatts (kW) during at least one month in the twelve (12) consecutive monthly billing periods immediately proceeding the start of the currently effective energy efficiency plan approved by the Illinois Commerce Commission for the Company in accordance with Section 8-103 or Section 8-103B of the Act, as applicable.

(Continued on Sheet No. 129)

**Filed with the Illinois Commerce Commission on April 17, 2017. Issued pursuant to Public Act 99-0906, which is effective as of June 1, 2017.**
**Asterisk (*) indicates change.**

**Date Effective: June 1, 2017**
**Issued by A. R. Pramaggiore, President and CEO**
**Post Office Box 805379**
**Chicago, Illinois 60680-5379**

**A.181**

REC'D 04/17/2017 03:43 PM ICC/CCO

**Commonwealth**
**Edison Company**

**ELECTRICITY**

ILL. C. C. No. 10
3rd Revised Sheet No. 129
(Canceling 2nd Revised Sheet No. 129)

## GENERAL TERMS AND CONDITIONS

(Continued from Sheet No. 128)

### DEFINITIONS (CONTINUED)

**Existing Underground Distribution System**
Existing underground distribution system means the Company's distribution facilities characterized by the use of cable in a conduit and manhole system and transformers installed in vaults, and the absence of poles and overhead wires. An existing underground distribution system is used to serve high load density areas such as the central business district of the City of Chicago. Distribution facilities located in certain areas in the Company's service territory that utilize direct buried cables connected to overhead distribution facilities are not considered to be part of an existing underground distribution system.

**Existing Overhead Distribution System**
Existing overhead distribution system means all Company distribution facilities that are not part of an existing underground distribution system, and include distribution facilities located in certain areas in the Company's service territory that utilize direct buried cables connected to overhead distribution facilities.

**FERC**
FERC means Federal Energy Regulatory Commission or any successor federal agency, commission, or department.

**GAA**
GAA means General Account Agent.

**General Terms and Conditions**
General Terms and Conditions mean these General Terms and Conditions included in the Company's Schedule of Rates on file with the ICC.

**ICC**
ICC means Illinois Commerce Commission or any successor state agency, commission, or department.

**IPA**
IPA means Illinois Power Agency or any successor state agency, commission, or department.

**kW**
kW means kilowatt. A kW is a unit measurement of the demand for electricity or rate at which electricity is used.

**kWh**
kWh means kilowatt-hour. A kWh is a unit measurement of the amount of electricity used.

**Lighting Retail Customer**
Lighting retail customer means a retail customer in the lighting sector as described in the Sectors section of the Retail Customer Categorizations part of these General Terms and Conditions.

(Continued on Sheet No. 129.1)

**Filed with the Illinois Commerce Commission on April 17, 2017. Issued pursuant to Public Act 99-0906, which is effective as of June 1, 2017.**

**Date Effective: June 1, 2017**
**Issued by A. R. Pramaggiore, President and CEO**
Post Office Box 805379
Chicago, Illinois 60680-5379

REC'D 04/17/2017 03:43 PM ICC/CCO

Commonwealth
Edison Company

ELECTRICITY

ILL. C. C. No. 10
1st Revised Sheet No. 129.1
(Canceling Original Sheet No. 129.1)

## GENERAL TERMS AND CONDITIONS

(Continued from Sheet No. 129)

## DEFINITIONS (CONTINUED)

**Meter Exchange Date**
Meter Exchange Date means the date of a meter's removal from or installation at a retail customer's premises to implement a switch in providers of metering service.

**Metering Service**
Metering Service means the sixteen (16) processes described in the Metering Services section of the Nature of Service part of Rate MSPS.

**MKD**
MKD means Maximum Kilowatts Delivered. A retail customer's MKD for a monthly billing period is the highest thirty (30) minute demand for electric power and energy established by the retail customer and delivered by the Company during such monthly billing period during the periods from 9:00 A.M. until 6:00 P.M. on Monday through Friday, except on days designated as holidays by the North American Electric Reliability Corporation (NERC).

**Monthly Billing Cycle**
With respect to any retail customer (a) to which the AMI Metering subsection of the Standard Metering section of the Metering part of these General Terms and Conditions is not applicable or (b) (i) to which such AMI Metering subsection is applicable and (ii) for which non AMI metering is provided, the monthly billing cycle means the monthly periods associated with a set of monthly meter reading dates. The Company arranges the accounts of its retail customers into one of twenty-one (21) separate meter reading groups it utilizes to read electric meters on a monthly basis.

With respect to any retail customer (a) to which such AMI Metering subsection is applicable and (b) for which an AMI metering installation is provided, the monthly billing cycle means the monthly periods associated with a set of monthly meter usage data acquisition dates to compile meter usage data for regularly scheduled electric service billing purposes. The Company arranges the accounts of its retail customers into one of twenty-one (21) separate meter usage data acquisition groups it utilizes to compile electric meter usage data for monthly billing purposes.

**Monthly Billing Period**
Monthly billing period means the period of approximately thirty (30) days during which the Company provides electric service to a retail customer and at the end of which the Company compiles the meter usage data for the electric service provided to the retail customer and assesses charges for such electric service. The start and end of a retail customer's monthly billing period are determined by the date that the data from the electric meter(s) at the retail customer's premises is (are) read or compiled for regularly scheduled electric service billing purposes.

(Continued on Sheet No. 130)

**Filed with the Illinois Commerce Commission on April 17, 2017. Issued pursuant to Public Act 99-0906, which is effective as of June 1, 2017.**

**Date Effective:  June 1, 2017**
**Issued by A. R. Pramaggiore, President and CEO**
**Post Office Box 805379**
**Chicago, Illinois  60680-5379**

REC'D 04/17/2017  03:43 PM ICC/CCO

**A.183**

ILL. C. C. No. 10
3rd Revised Sheet No. 236
(Canceling 2nd Revised Sheet No. 236)

**Commonwealth
Edison Company**

**ELECTRICITY**

\*

**RIDER ZEA
ZERO EMISSION ADJUSTMENT**

**Applicable to Rates BES, BESH, and RDS**

**APPLICABILITY.**
This rider is applicable to all retail customers.

**PURPOSE.**
The purpose of this rider is to effectuate provisions in subsection 16-108(k) of the Public Utilities Act (Act) to allow the Company to recover all the costs it incurs associated with the procurement of zero emission credits to meet the requirements of subsection 1-75(d-5) of the Illinois Power Agency (IPA) Act.

**DEFINITIONS.**
Generally, definitions of terms used in this rider are provided in the Definitions part of the General Terms and Conditions of the Company's Schedule of Rates. The following definitions are for use in this rider:

**Delivery Year**
Delivery year means the annual period beginning June 1 in one calendar year and extending through May 31 in the next calendar year.

**ZE Contracts**
ZE contracts mean the ten (10) year contractual agreements under which zero emission credits are procured for the Company by the IPA with zero emission facilities in accordance with subsection 1-75(d-5) of the IPA Act.

**DETERMINATION OF THE ZERO EMISSION ADJUSTMENT.**
Beginning with the June 2017 monthly billing period, the Zero Emission (ZE) Adjustment is equal to 0.195 cents per kilowatt-hour (¢/kWh).

Beginning in calendar year 2018, for the monthly billing periods beginning with the June monthly billing period in calendar year X and extending through the May monthly billing period in calendar year X+1 associated with the delivery year starting in calendar year X, after the IPA determines the payments the Company must make to zero emission facilities in accordance with applicable ZE contracts and publishes the associated payment calculations in accordance with the provisions of subsection 1-75(d-5)(1)(D) of the IPA Act, the Company must determine the ZE Adjustment, in ¢/kWh rounded to the thousandths of a cent, in accordance with the following equation:

$$\text{ZE Adjustment} = \left[ \frac{C}{U} + \frac{OA}{OU} + \frac{BA}{BU} \right] \times \frac{100¢}{\$1}$$

(Continued on Sheet No. 236.1)

**Filed with the Illinois Commerce Commission on April 17, 2017. Issued pursuant to Public Act 99-0906, which is effective as of June 1, 2017.
Asterisk (\*) indicates change.**

Date Effective: June 1, 2017
Issued by A. R. Pramaggiore, President and CEO
Post Office Box 805379
Chicago, Illinois 60680-5379

**A.184**

REC'D 04/17/2017 03:43 PM ICC-CCO

| | |
|---|---|
| Commonwealth | ILL. C. C. No. 10 |
| Edison Company | 2nd Revised Sheet No. 236.1 |
| | (Canceling 1st Revised Sheet No. 236.1) |

ELECTRICITY

\* 
**RIDER ZEA**
**ZERO EMISSION ADJUSTMENT**

(Continued from Sheet No. 236)

**DETERMINATION OF THE ZERO EMISSION ADJUSTMENT (CONTINUED).**
Where:

C = Costs, in dollars ($), equal to the sum of the expenditures the Company expects to incur associated with the procurement of zero emission credits during the months corresponding to the monthly billing periods during which the ZE Adjustment is applicable. Such expenditures include, but are not limited to payments that the Company must make to zero emission facilities during the delivery year beginning in calendar year X in accordance with applicable ZE Contracts and reasonable costs the Company expects to incur as part of the zero emission procurement processes and to implement and comply with plans and processes approved by the Illinois Commerce Commission (ICC) to effectuate subsection 1-75(d-5) of the IPA Act.

U = Usage, in kWh, equal to the electricity forecasted to be delivered to retail customers during the monthly billing periods during which the ZE Adjustment is applicable.

OA = Ordered Amount, in $, equal to any adjustment (a) directed by the ICC or (b) determined by the Company that is to be refunded to or collected from retail customers to correct for errors associated with the computation of a previously applied ZE Adjustment. Such amount includes interest at the rate established by the ICC in accordance with 83 Illinois Administrative Code Section 280.40(g)(1). Such interest is calculated for the period of time beginning on the first day of the effective period during which such ZE Adjustment was applied and extending through the day prior to the start of the effective period in which the OA is applied. OA may be subject to amortization and incorporated into the determination of multiple ZE Adjustments.

OU = Ordered Usage, in kWh, equal to the electricity forecasted to be delivered to retail customers during the monthly billing periods during which the OA is ordered to be applicable.

BA = Balancing Amount, in $, equal to zero dollars ($0.00) for ZE Adjustments applicable during June, July, and August monthly billing periods, otherwise equal to an amount determined in accordance with the following equation:

$$BA = \left( AC + BA_p + OA_p - CR - R \right) \times \left( 1 + i \right)$$

(Continued on Sheet No. 236.2)

Filed with the Illinois Commerce Commission on April 17, 2017. Issued pursuant to Public Act 99-0906, which is effective as of June 1, 2017.
Asterisk (\*) indicates change.

Date Effective: June 1, 2017
Issued by A. R. Pramaggiore, President and CEO
Post Office Box 805379
Chicago, Illinois 60680-5379

**A.185**

ILL. C. C. No. 10
2nd Revised Sheet No. 236.2
(Canceling 1st Revised Sheet No. 236.2)

Commonwealth
Edison Company

ELECTRICITY

*

**RIDER ZEA
ZERO EMISSION ADJUSTMENT**

(Continued from Sheet No. 236.1)

**DETERMINATION OF THE ZERO EMISSION ADJUSTMENT (CONTINUED).**

Where:

AC = Actual Costs, in $, equal to the total expenditures the Company incurred during the delivery year that began in calendar year X-1 that were associated with the procurement of zero emission credits, including but not limited to payments made to zero emission facilities for the procurement of zero emission credits and reasonable costs the Company incurred as part of the zero emission procurement processes and to implement and comply with plans and processes approved by the ICC to effectuate subsection 1-75(d-5) of the IPA Act. Notwithstanding the previous provisions of this definition, for a BA determined in calendar year, X, to the extent that actual costs for delivery years prior to the delivery year that began in calendar year X-1 were not able to be recovered due to the inability to set the ZE Adjustment greater than its maximum allowed value identified in this Determination of the Zero Emission Adjustment section, such unrecovered actual costs are included in the AC.

$BA_p$ = Prior Balancing Amount, in $, equal to the BA used to determine the ZE Adjustment(s) applicable beginning with the September monthly billing period in calendar year X-1 and extending through the May monthly billing period in calendar year X.

$OA_p$ = Prior Ordered Amount, in $, equal to the OA or portion of the OA, as applicable, used to determine the ZE Adjustment(s) applicable during monthly billing periods corresponding to months in the delivery year that began in calendar year X-1.

CR = Cost Recoveries, in $, equal to the revenues billed due to the application of ZE Adjustment(s) during the period beginning with the June monthly billing period in calendar year X-1 and extending through the May monthly billing period in calendar year X.

R = Reimbursement, in $, equal to the total amount received by the Company from zero emission facilities during the delivery year that began in calendar year X-1 for payments made by the Company to such zero emission facilities to procure zero emission credits that exceeded the applicable average zero emission credit payments as described in subsection 1-75(d-5) of the IPA Act.

i = Interest, in decimal format, equal to the applicable interest rate established by the ICC in accordance with 83 Illinois Administrative Code Section 280.40(g)(1).

(Continued on Sheet No. 236.3)

Filed with the Illinois Commerce Commission on April 17, 2017. Issued pursuant to Public Act 99-0906, which is effective as of June 1, 2017.
Asterisk (*) indicates change.

Date Effective: June 1, 2017
Issued by A. R. Pramaggiore, President and CEO
Post Office Box 805379
Chicago, Illinois 60680-5379

**A.186**

**Commonwealth**
**Edison Company**

ELECTRICITY

ILL. C. C. No. 10
**2nd Revised Sheet No. 236.3**
**(Canceling 1st Revised Sheet No. 236.3)**

*

**RIDER ZEA**
**ZERO EMISSION ADJUSTMENT**

(Continued from Sheet No. 236.2)

**DETERMINATION OF THE ZERO EMISSION ADJUSTMENT (CONTINUED).**

BU            =      Balance Usage, in kWh, equal to the electricity forecasted to be delivered to retail
                     customers during the monthly billing period during which the BA is applicable.

Notwithstanding the previous provisions of this Determination of the Zero Emission Adjustment section, the annual weighted average of ZE Adjustments may not be greater than 0.195 cents per kilowatt-hour (¢/kWh), with such average value determined based on the (a) annual period beginning with a June monthly billing period and extending through the following May monthly billing period and (b) weighting of kWh delivered.

Generally, ZE Adjustments are determined in May each calendar year following the publication of applicable zero emission credit payment calculations by the IPA, as approved by the ICC, as applicable, for application during the monthly billing periods corresponding to the months in the delivery year starting in calendar year X. Updates to such ZE Adjustments are subsequently determined in August of such calendar year to incorporate the BA, as applicable. In addition, a ZE Adjustment may be revised to incorporate a correction in an OA as determined by the Company or in accordance with an ICC Order issued in a proceeding as described in the Annual Review and Reconciliation section of this rider directing the Company to include an OA. Moreover, the ZE Adjustment may be revised by the Company in accordance with this Determination of the Zero Emission Adjustment section if the Company determines such revised ZE Adjustment results in a better match between the Company's applicable expected costs and its recovery of those costs.

Beginning in 2018, each year on or before April 30, the Company must also determine if the ZE Adjustment determined in accordance with the aforementioned equation in this Determination of the Zero Emission Adjustment section must be reduced for application to kWhs delivered by the Company to retail customers to which the Exempt Group, as defined in the Definitions part of the General Terms and Conditions of the Company's Schedule of Rates, is applicable in order to limit the annual estimated average net increase in electric service costs for the prior calendar year due to future energy investment costs, as determined in accordance with subsection 16-108(m)(2) of the Act, to no more than 0.07774 ¢/kWh. The Company must provide the results of such determination to the ICC no later than May 1 in such year.

(Continued on Sheet No. 236.4)

**Filed with the Illinois Commerce Commission on**
**April 17, 2017. Issued pursuant to**
**Public Act 99-0906, which is effective as of**
**June 1, 2017.**
**Asterisk (*) indicates change.**

**Date Effective: June 1, 2017**
**Issued by A. R. Pramaggiore, President and CEO**
**Post Office Box 805379**
**Chicago, Illinois 60680-5379**

**A.187**

ILL. C. C. No. 10
Commonwealth ELECTRICITY 2nd Revised Sheet No. 236.4
Edison Company (Canceling 1st Revised Sheet No. 236.4)

\* **RIDER ZEA**
**ZERO EMISSION ADJUSTMENT**

(Continued from Sheet No. 236.3)

## APPLICATION OF THE ZERO EMISSION ADJUSTMENT.

The ZE Adjustment is applicable to each kWh delivered to each retail customer during the monthly billing period during which the ZE Adjustment is effective. The amount resulting from such application of the ZE Adjustment must be shown as a separate line item on each electric service bill for each such retail customer, as applicable. Such line item is designated as the Zero Emission Standard.

## APPLICATION OF THE ZERO EMISSION ADJUSTMENT REDUCTION.

Notwithstanding the aforementioned provisions of this Application of the Zero Emission Adjustment Reduction section, each year the Company determines the ZE Adjustment determined in accordance with the equation in the Determination of the Zero Emission Adjustment section of this rider must be reduced for application to kWhs delivered by the Company to retail customers to which the Exempt Group, as defined in the Definitions part of the General Terms and Conditions of the Company's Schedule of Rates, is applicable in order to limit the annual estimated average net increase in electric service costs for the prior calendar year due to future energy investment costs, as determined in accordance with subsection 16-108(m)(2) of the Act, to no more than 0.07774 ¢/kWh, such reduction must be shown as a separate line item on each electric service bill for each such retail customer in the Exempt Group, as applicable. Such line item is designated as the Zero Emission Standard Adjustment.

## INFORMATIONAL FILINGS.

Beginning in 2018, in each calendar year, X, the values of ZE Adjustments determined in accordance with the provisions of Determination of the Zero Emission Adjustment section of this rider for application beginning with the June monthly billing period in year X must be submitted by the Company to the ICC in an informational filing no later than five (5) business days after the IPA determines the payments the Company must make to zero emission facilities during the delivery year beginning in calendar year X in accordance with applicable ZE Contracts and publishes the associated payment calculations, as approved by the ICC. Notwithstanding the previous provisions of this paragraph, such informational filing must be submitted no later than May 29 in any such calendar year.

ZE Adjustment values determined in accordance with the provisions of the Determination of the Zero Emission Adjustment section of this rider that incorporate nonzero BAs for application beginning with a September monthly billing period must be submitted by the Company to the ICC in an informational filing no later than August 20 preceding such September monthly billing cycle.

As necessary, the Company must file a revised ZE Adjustment with the ICC for informational purposes either (a) concurrently with the Company's filing made in compliance with the ICC's Order entered in accordance with the provisions of the Annual Updates section of Rate DSPP – Delivery Service Pricing and Performance (Rate DSPP) or (b) no later than December 20 in the event that no proceeding is initiated in accordance with the provisions of such Annual Updates section. Such revised ZE Adjustment is to be applicable beginning with the immediately following January monthly billing period.

(Continued on Sheet No. 236.5)

Filed with the Illinois Commerce Commission on          Date Effective:  June 1, 2017
April 17, 2017.  Issued pursuant to          Issued by A. R. Pramaggiore, President and CEO
Public Act 99-0906, which is effective as of          Post Office Box 805379
June 1, 2017.          Chicago, Illinois  60680-5379
Asterisk (\*) indicates change.

**A.188**

REC'D 04/17/2017 03:43 PM ICC/CCO

Commonwealth
Edison Company

ELECTRICITY

ILL. C. C. No. 10
2nd Revised Sheet No. 236.5
(Canceling 1st Revised Sheet No. 236.5)

\*

RIDER ZEA
ZERO EMISSION ADJUSTMENT

(Continued from Sheet No. 236.4)

**INFORMATIONAL FILINGS (CONTINUED).**
For a situation in which the Company revises a ZE Adjustment to provide for a better match between the Company's applicable expected costs and its recovery of those costs or to incorporate a corrective value in an OA, or the ICC, at the conclusion of a reconciliation proceeding described in the Annual Review and Reconciliation section of this rider, orders or changes an OA to be included in the determination of a ZE Adjustment value, the resultant revised ZE Adjustment value must be submitted by the Company to the ICC in an informational filing no later than the twentieth day of the month prior to the monthly billing cycle during which such revised ZE Adjustment value becomes applicable.

Any submission of a ZE Adjustment after the applicable deadline identified in this Informational Filings section but prior to the start of the period during which such ZE Adjustment is to be applicable is acceptable only if such submission corrects an error or errors from a timely submitted ZE Adjustment for such period. Any other such submission made after such applicable deadline is acceptable only if such submission is made in accordance with the special permission provisions of Section 9-201(a) of the Act.

Each time the Company files a ZE Adjustment value with the ICC for informational purposes, such filing must be accompanied by work papers supporting the determination of such ZE Adjustment, as applicable.

**ANNUAL REVIEW AND RECONCILIATION.**
Beginning in 2018, in each year X the Company must conduct an audit of its costs and the recoveries associated with such costs for the delivery year beginning June 1 in year X-1 during which period the Company procured zero emission credits. Such audit must be conducted within four (4) months after the end of such delivery year and must examine whether (a) the ZE Adjustment is properly billed to customers, (b) costs recovered through this rider are properly reflected in the calculation of the ZE Adjustment, (c) costs recovered through this rider are recorded in the appropriate accounts, (d) accounting controls are effectively preventing the double recovery of costs through this rider, and (e) costs recovered through this rider are properly reflected in the annual reconciliation pursuant to this Annual Review and Reconciliation section of this rider. The Company must prepare a report that summarizes the results of such audit. Such report must be submitted to the ICC in an informational filing, with copies of such report provided to the Director of the ICC Staff's Financial Analysis Division, and the Director of the ICC Staff's Office of Retail Market Development, and e-mailed to AccountingMgr@icc.illinois.gov no later than the October 1 of the calendar year in which such audit is conducted. Such report must be verified by an officer of the Company.

(Continued on Sheet No. 236.6)

Filed with the Illinois Commerce Commission on
April 17, 2017. Issued pursuant to
Public Act 99-0906, which is effective as of
June 1, 2017.
Asterisk (*) indicates change.

Date Effective: June 1, 2017
Issued by A. R. Pramaggiore, President and CEO
Post Office Box 805379
Chicago, Illinois 60680-5379

**A.189**

REC'D 04/17/2017 03.43 PM ICC/CCO

ILL. C. C. No. 10
2nd Revised Sheet No. 236.6
(Canceling 1st Revised Sheet No. 236.6)

**Commonwealth
Edison Company**

**ELECTRICITY**

\*

**RIDER ZEA
ZERO EMISSION ADJUSTMENT**

(Continued from Sheet No. 236.5)

**ANNUAL REVIEW AND RECONCILIATION (CONTINUED).**
In addition, the Company must file a petition with the ICC that requests the ICC to initiate a zero emission adjustment reconciliation proceeding. Such petition must be filed within thirty (30) calendar days after the Company submits to the ICC the report described in this Annual Review and Reconciliation section. At the conclusion of such proceeding, the ICC determines the amount and timing of an OA, if any, to include in the determination of subsequent ZE Adjustments determined in accordance with the provisions of the Determination of the Zero Emission Adjustment section of this rider in order to correct for errors in ZE Adjustments applied during the June through May monthly billing periods addressed in the proceeding. Any such OA is determined to the extent that any such error has not been already reflected in an applicable BA or OA determined by the Company. After any such OA is determined by the ICC, the Company must reflect such OA in the determination of ZE Adjustments in accordance with an order entered by the ICC that provides the terms under which the OA is to be reflected in the determination of ZE Adjustments.

**MISCELLANEOUS GENERAL PROVISIONS.**
Revenue associated with the application of ZE Adjustments must be recorded separately by the Company.

The Company's Schedule of Rates, of which this rider is a part, includes General Terms and Conditions and other tariffs. Service hereunder is subject to the General Terms and Conditions and such other tariffs, as applicable.

**Filed with the Illinois Commerce Commission on April 17, 2017. Issued pursuant to Public Act 99-0906, which is effective as of June 1, 2017.
Asterisk (\*) indicates change.**

**Date Effective: June 1, 2017
Issued by A. R. Pramaggiore, President and CEO
Post Office Box 805379
Chicago, Illinois 60680-5379**

**A.190**

REC'D 04/17/2017 03:43 PM ICC/CCO

# ComEd®
An Exelon Company

Page 1 of 3

## Account Number 0270626009

Name FERRITE INT
Service Location 39105 N MAGNETICS BLVD
WADSWORTH
Phone Number 847-249-4900

Issue Date June 13, 2017

### Bill Summary

| | |
|---|---|
| Previous Balance | $21,026.71 |
| Total Payments | $0.00 |
| **Amount Due on June 28, 2017** | **$45,922.62** |

**Visit ComEd.com**

**Customer Service / Power Outage**

**English**
1.877.4COMED1 (1.877.426.6331)

**Español**
1.800.95.LUCES (1.800.955.8237)

**Hearing/Speech Impaired**
1.800.572.5789 (TTY)

**Your Usage Profile**
13-Month Usage (Total kWh)



387340

193670

0
J J A S O N D J F M A M J

**Electric Usage**

| Month | kWh |
|---|---|
| Jun-16 | 334600 |
| Jul-16 | 311622 |
| Aug-16 | 324208 |
| Sep-16 | 314308 |
| Oct-16 | 311076 |
| Nov-16 | 314855 |
| Dec-16 | 363642 |
| Jan-17 | 307702 |
| Feb-17 | 387334 |
| Mar-17 | 284601 |
| Apr-17 | 324069 |
| May-17 | 331775 |
| Jun-17 | 367015 |

| Month Billed | Average Daily kWh | Temp |
|---|---|---|
| Last Year | 10456.3 | 66 |
| Last Month | 11440.5 | 53 |
| Current Month | 11469.2 | 66 |

### Meter Information

| Read Dates | Meter Number | Load Type | Reading Type | Previous | Meter Reading Present | Difference | Multiplier X | Usage |
|---|---|---|---|---|---|---|---|---|
| 6/7-6/12 | 230179511 | General Service | Total kWh | Actual | Actual | | | 74 |
| 6/7-6/12 | 230179511 | General Service | On Pk kW | Actual | Actual | | | 2.10 |
| 6/7-6/12 | 230211726 | General Service | Total kWh | Actual | Actual | | | 32137 |
| 6/7-6/12 | 230211726 | General Service | On Pk kW | Actual | Actual | | | 540.16 |
| 6/7-6/12 | 230211729 | General Service | Total kWh | Actual | Actual | | | 22330 |
| 6/7-6/12 | 230211729 | General Service | On Pk kW | Actual | Actual | | | 283.80 |
| 5/11-6/7 | 230231963 | General Service | Total kWh | Actual | Actual | | | 173951 |
| 5/11-6/7 | 230231963 | General Service | On Pk kW | Actual | Actual | | | 547.60 |
| 5/11-6/7 | 230231965 | General Service | Total kWh | Actual | Actual | | | 137986 |
| 5/11-6/7 | 230231965 | General Service | On Pk kW | Actual | Actual | | | 423.84 |
| 5/11-6/7 | 230278542 | General Service | Total kWh | Actual | Actual | | | 537 |
| 5/11-6/7 | 230278542 | General Service | On Pk kW | Actual | Actual | | | 2.79 |

**Service from 5/11/2017 to 6/12/2017 - 32 Days**　　　　**Commercial Hourly - 1000 kW to 10MW**

### Electricity Supply Services　　　　$15,275.88

| | | | |
|---|---|---|---|
| Electricity Supply Charge | 367,015 kWh | | 11,057.22 |
| Transmission Services Charge | 367,015 kWh X | 0.00844 | 3,097.61 |
| Capacity Charge | 543.67 kW X | 4.69477 | 2,552.41 |

For Electric Supply Choices visit
pluginillinois.org

(continued on next page)

---

Return only this portion with your check made payable to ComEd. Please write your account number on your check.

# ComEd.
An Exelon Company



0109282 01 AV 0.370 **AUTO T5 0 1117 60083-039999 -C02-B1-P09291-I1 45 C

**FERRITE INT**
PO BOX 399
WADSWORTH, IL 60083-0399



**To pay by phone call 1-800-588-9477.**
**A convenience fee will apply.**

Account Number
**0270626009**

Payment Amount

Please pay this
amount by 6/28/2017　　　　$45,922.62

COMED
PO BOX 6112
CAROL STREAM, IL 60197-6112



0270626009000000000071790000001

A.191

| | | | | |
|---|---|---|---|---|
| Purchased Electricity Adjustment | | | | -1,835.08 |
| Misc Procurement Component Chg | 367,015 kWh | X | 0.00110 | 403.72 |

| **Delivery Services - ComEd** | | | | **$6,999.87** |
|---|---|---|---|---|
| Customer Charge | | | | 494.86 |
| Standard Metering Charge | | | | 30.80 |
| Distribution Facilities Charge | 826.06 kW | X | 7.00000 | 5,782.42 |
| IL Electricity Distribution Charge | 367,015 kWh | X | 0.00116 | 425.74 |
| Meter Lease | | | | 3.30 |
| Nonstandard Facilities Charge | | | | 262.75 |

| **Taxes and Other** | | | | **$2,304.76** |
|---|---|---|---|---|
| Environmental Cost Recovery Adj | 367,015 kWh | X | 0.00026 | 95.42 |
| Renewable Portfolio Standard | 367,015 kWh | X | 0.00094 | 344.99 |
| Zero Emission Standard | 367,015 kWh | X | 0.00195 | 715.68 |
| Franchise Cost | $6,994.57 | X | 0.63500% | 44.42 |
| State Tax | | | | 1,104.25 |

| **Total Current Charges** | | | | **$24,580.51** |
|---|---|---|---|---|

| **Miscellaneous** | | | | **$21,342.11** |
|---|---|---|---|---|
| Charges from previous bill | | | | 20,707.99 |
| Current late payment charge (s) - electric | | | | 315.40 |
| Previous late payment charge (s) - electric | | | | 318.72 |

| **Total Amount Due** | | | | **$45,922.62** |
|---|---|---|---|---|

(continued on next page)

12% total recycled fiber

CME906R 03/10

When you provide a check as payment, you authorize us to use information from your check either to make a one-time electronic fund transfer from your account or to process the payment as a check transaction.

A.192

20 ILCS 3855/1-75

3855/1-75. Planning and Procurement Bureau

Effective: June 1, 2017

(d-5) Zero emission standard.

(1) Beginning with the delivery year commencing on June 1, 2017, the Agency shall, for electric utilities that serve at least 100,000 retail customers in this State, procure contracts with zero emission facilities that are reasonably capable of generating cost-effective zero emission credits in an amount approximately equal to 16% of the actual amount of electricity delivered by each electric utility to retail customers in the State during calendar year 2014. For an electric utility serving fewer than 100,000 retail customers in this State that requested, under Section 16-111.5 of the Public Utilities Act, that the Agency procure power and energy for all or a portion of the utility's Illinois load for the delivery year commencing June 1, 2016, the Agency shall procure contracts with zero emission facilities that are reasonably capable of generating cost-effective zero emission credits in an amount approximately equal to 16% of the portion of power and energy to be procured by the Agency for the utility. The duration of the contracts procured under this subsection (d-5) shall be for a term of 10 years ending May 31, 2027. The quantity of zero emission credits to be procured under the contracts shall be all of the zero emission credits generated by the zero emission facility in each delivery year; however, if the zero emission facility is owned by more than one entity, then the quantity of zero emission credits to be procured under the contracts shall be the amount of zero emission credits that are generated from the portion of the zero emission facility that is owned by the winning supplier.

The 16% value identified in this paragraph (1) is the average of the percentage targets in subparagraph (B) of paragraph (1) of subsection (c) of Section 1-75 of this Act for the 5 delivery years beginning June 1, 2017.

The procurement process shall be subject to the following provisions:

(A) Those zero emission facilities that intend to participate in the procurement shall submit to the Agency the following eligibility information for each zero emission facility on or before the date established by the Agency:

(i) the in-service date and remaining useful life of the zero emission facility;

(ii) the amount of power generated annually for each of the years 2005 through 2015, and the projected zero emission credits to be generated over the remaining useful life of the zero emission facility, which shall be used to determine the capability of each facility;

**A.193**

(iii) the annual zero emission facility cost projections, expressed on a per megawatthour basis, over the next 6 delivery years, which shall include the following: operation and maintenance expenses; fully allocated overhead costs, which shall be allocated using the methodology developed by the Institute for Nuclear Power Operations; fuel expenditures; non-fuel capital expenditures; spent fuel expenditures; a return on working capital; the cost of operational and market risks that could be avoided by ceasing operation; and any other costs necessary for continued operations, provided that "necessary" means, for purposes of this item (iii), that the costs could reasonably be avoided only by ceasing operations of the zero emission facility; and

(iv) a commitment to continue operating, for the duration of the contract or contracts executed under the procurement held under this subsection (d-5), the zero emission facility that produces the zero emission credits to be procured in the procurement.

The information described in item (iii) of this subparagraph (A) may be submitted on a confidential basis and shall be treated and maintained by the Agency, the procurement administrator, and the Commission as confidential and proprietary and exempt from disclosure under subparagraphs (a) and (g) of paragraph (1) of Section 7 of the Freedom of Information Act. The Office of Attorney General shall have access to, and maintain the confidentiality of, such information pursuant to Section 6.5 of the Attorney General Act.

(B) The price for each zero emission credit procured under this subsection (d-5) for each delivery year shall be in an amount that equals the Social Cost of Carbon, expressed on a price per megawatthour basis. However, to ensure that the procurement remains affordable to retail customers in this State if electricity prices increase, the price in an applicable delivery year shall be reduced below the Social Cost of Carbon by the amount ("Price Adjustment") by which the market price index for the applicable delivery year exceeds the baseline market price index for the consecutive 12-month period ending May 31, 2016. If the Price Adjustment is greater than or equal to the Social Cost of Carbon in an applicable delivery year, then no payments shall be due in that delivery year. The components of this calculation are defined as follows:

(i) Social Cost of Carbon: The Social Cost of Carbon is $16.50 per megawatthour, which is based on the U.S. Interagency Working Group on Social Cost of Carbon's price in the August 2016 Technical Update using a 3% discount rate, adjusted for inflation for each year of the program. Beginning with the delivery year commencing June 1, 2023, the price per megawatthour shall increase by $1 per megawatthour, and continue to increase by an additional $1 per megawatthour each delivery year thereafter.

**A.194**

(ii) Baseline market price index: The baseline market price index for the consecutive 12-month period ending May 31, 2016 is $31.40 per megawatthour, which is based on the sum of (aa) the average day-ahead energy price across all hours of such 12-month period at the PJM Interconnection LLC Northern Illinois Hub, (bb) 50% multiplied by the Base Residual Auction, or its successor, capacity price for the rest of the RTO zone group determined by PJM Interconnection LLC, divided by 24 hours per day, and (cc) 50% multiplied by the Planning Resource Auction, or its successor, capacity price for Zone 4 determined by the Midcontinent Independent System Operator, Inc., divided by 24 hours per day.

(iii) Market price index: The market price index for a delivery year shall be the sum of projected energy prices and projected capacity prices determined as follows:

(aa) Projected energy prices: the projected energy prices for the applicable delivery year shall be calculated once for the year using the forward market price for the PJM Interconnection, LLC Northern Illinois Hub. The forward market price shall be calculated as follows: the energy forward prices for each month of the applicable delivery year averaged for each trade date during the calendar year immediately preceding that delivery year to produce a single energy forward price for the delivery year. The forward market price calculation shall use data published by the Intercontinental Exchange, or its successor.

(bb) Projected capacity prices:

(I) For the delivery years commencing June 1, 2017, June 1, 2018, and June 1, 2019, the projected capacity price shall be equal to the sum of (1) 50% multiplied by the Base Residual Auction, or its successor, price for the rest of the RTO zone group as determined by PJM Interconnection LLC, divided by 24 hours per day and, (2) 50% multiplied by the resource auction price determined in the resource auction administered by the Midcontinent Independent System Operator, Inc., in which the largest percentage of load cleared for Local Resource Zone 4, divided by 24 hours per day, and where such price is determined by the Midcontinent Independent System Operator, Inc.

(II) For the delivery year commencing June 1, 2020, and each year thereafter, the projected capacity price shall be equal to the sum of (1) 50% multiplied by the Base Residual Auction, or its successor, price for the ComEd zone as determined by PJM Interconnection LLC, divided by 24 hours per day, and (2) 50% multiplied by the resource auction price determined in the resource auction administered by the Midcontinent Independent System Operator, Inc., in which the largest percentage of load cleared for Local Resource Zone 4, divided by 24 hours per day, and where such price is determined by the Midcontinent Independent System Operator, Inc.

For purposes of this subsection (d-5):

"Rest of the RTO" and "ComEd Zone" shall have the meaning ascribed to them by PJM Interconnection, LLC.

"RTO" means regional transmission organization.

(C) No later than 45 days after the effective date of this amendatory Act of the 99th General Assembly, the Agency shall publish its proposed zero emission standard procurement plan. The plan shall be consistent with the provisions of this paragraph (1) and shall provide that winning bids shall be selected based on public interest criteria that include, but are not limited to, minimizing carbon dioxide emissions that result from electricity consumed in Illinois and minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of this State. In particular, the selection of winning bids shall take into account the incremental environmental benefits resulting from the procurement, such as any existing environmental benefits that are preserved by the procurements held under this amendatory Act of the 99th General Assembly and would cease to exist if the procurements were not held, including the preservation of zero emission facilities. The plan shall also describe in detail how each public interest factor shall be considered and weighted in the bid selection process to ensure that the public interest criteria are applied to the procurement and given full effect.

For purposes of developing the plan, the Agency shall consider any reports issued by a State agency, board, or commission under House Resolution 1146 of the 98th General Assembly and paragraph (4) of subsection (d) of Section 1-75 of this Act, as well as publicly available analyses and studies performed by or for regional transmission organizations that serve the State and their independent market monitors.

Upon publishing of the zero emission standard procurement plan, copies of the plan shall be posted and made publicly available on the Agency's website. All interested parties shall have 10 days following the date of posting to provide comment to the Agency on the plan. All comments shall be posted to the Agency's website. Following the end of the comment period, but no more than 60 days later than the effective date of this amendatory Act of the 99th General Assembly, the Agency shall revise the plan as necessary based on the comments received and file its zero emission standard procurement plan with the Commission.

If the Commission determines that the plan will result in the procurement of cost-effective zero emission credits, then the Commission shall, after notice and hearing, but no later than 45 days after the Agency filed the plan, approve the plan or approve with modification. For purposes of this subsection (d-5), "cost effective" means the projected costs of procuring zero emission credits from zero emission facilities do not cause the limit stated in paragraph (2) of this subsection to be exceeded.

(C-5) As part of the Commission's review and acceptance or rejection of the

procurement results, the Commission shall, in its public notice of successful bidders:

(i) identify how the winning bids satisfy the public interest criteria described in subparagraph (C) of this paragraph (1) of minimizing carbon dioxide emissions that result from electricity consumed in Illinois and minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of this State;

(ii) specifically address how the selection of winning bids takes into account the incremental environmental benefits resulting from the procurement, including any existing environmental benefits that are preserved by the procurements held under this amendatory Act of the 99th General Assembly and would have ceased to exist if the procurements had not been held, such as the preservation of zero emission facilities;

(iii) quantify the environmental benefit of preserving the resources identified in item (ii) of this subparagraph (C-5), including the following:

(aa) the value of avoided greenhouse gas emissions measured as the product of the zero emission facilities' output over the contract term multiplied by the U.S. Environmental Protection Agency eGrid subregion carbon dioxide emission rate and the U.S. Interagency Working Group on Social Cost of Carbon's price in the August 2016 Technical Update using a 3% discount rate, adjusted for inflation for each delivery year; and

(bb) the costs of replacement with other zero carbon dioxide resources, including wind and photovoltaic, based upon the simple average of the following:

(I) the price, or if there is more than one price, the average of the prices, paid for renewable energy credits from new utility-scale wind projects in the procurement events specified in item (i) of subparagraph (G) of paragraph (1) of subsection (c) of Section 1-75 of this Act; and

(II) the price, or if there is more than one price, the average of the prices, paid for renewable energy credits from new utility-scale solar projects and brownfield site photovoltaic projects in the procurement events specified in item (ii) of subparagraph (G) of paragraph (1) of subsection (c) of Section 1-75 of this Act and, after January 1, 2015, renewable energy credits from photovoltaic distributed generation projects in procurement events held under subsection (c) of Section 1-75 of this Act.

Each utility shall enter into binding contractual arrangements with the winning suppliers.

The procurement described in this subsection (d-5), including, but not limited to, the

**A.197**

execution of all contracts procured, shall be completed no later than May 10, 2017. Based on the effective date of this amendatory Act of the 99th General Assembly, the Agency and Commission may, as appropriate, modify the various dates and timelines under this subparagraph and subparagraphs (C) and (D) of this paragraph (1). The procurement and plan approval processes required by this subsection (d-5) shall be conducted in conjunction with the procurement and plan approval processes required by subsection (c) of this Section and Section 16-111.5 of the Public Utilities Act, to the extent practicable. Notwithstanding whether a procurement event is conducted under Section 16-111.5 of the Public Utilities Act, the Agency shall immediately initiate a procurement process on the effective date of this amendatory Act of the 99th General Assembly.

(D) Following the procurement event described in this paragraph (1) and consistent with subparagraph (B) of this paragraph (1), the Agency shall calculate the payments to be made under each contract for the next delivery year based on the market price index for that delivery year. The Agency shall publish the payment calculations no later than May 25, 2017 and every May 25 thereafter.

(E) Notwithstanding the requirements of this subsection (d-5), the contracts executed under this subsection (d-5) shall provide that the zero emission facility may, as applicable, suspend or terminate performance under the contracts in the following instances:

(i) A zero emission facility shall be excused from its performance under the contract for any cause beyond the control of the resource, including, but not restricted to, acts of God, flood, drought, earthquake, storm, fire, lightning, epidemic, war, riot, civil disturbance or disobedience, labor dispute, labor or material shortage, sabotage, acts of public enemy, explosions, orders, regulations or restrictions imposed by governmental, military, or lawfully established civilian authorities, which, in any of the foregoing cases, by exercise of commercially reasonable efforts the zero emission facility could not reasonably have been expected to avoid, and which, by the exercise of commercially reasonable efforts, it has been unable to overcome. In such event, the zero emission facility shall be excused from performance for the duration of the event, including, but not limited to, delivery of zero emission credits, and no payment shall be due to the zero emission facility during the duration of the event.

(ii) A zero emission facility shall be permitted to terminate the contract if legislation is enacted into law by the General Assembly that imposes or authorizes a new tax, special assessment, or fee on the generation of electricity, the ownership or leasehold of a generating unit, or the privilege or occupation of such generation, ownership, or leasehold of generation units by a zero emission facility. However, the provisions of this item (ii) do not apply to any generally applicable tax, special assessment or fee, or requirements imposed by federal law.

(iii) A zero emission facility shall be permitted to terminate the contract in the event

A.198

that the resource requires capital expenditures in excess of $40,000,000 that were neither known nor reasonably foreseeable at the time it executed the contract and that a prudent owner or operator of such resource would not undertake.

(iv) A zero emission facility shall be permitted to terminate the contract in the event the Nuclear Regulatory Commission terminates the resource's license.

(F) If the zero emission facility elects to terminate a contract under this subparagraph (E, of this paragraph (1), then the Commission shall reopen the docket in which the Commission approved the zero emission standard procurement plan under subparagraph (C) of this paragraph (1) and, after notice and hearing, enter an order acknowledging the contract termination election if such termination is consistent with the provisions of this subsection (d-5).

(2) For purposes of this subsection (d-5), the amount paid per kilowatthour means the total amount paid for electric service expressed on a per kilowatthour basis. For purposes of this subsection (d-5), the total amount paid for electric service includes, without limitation, amounts paid for supply, transmission, distribution, surcharges, and add-on taxes.

Notwithstanding the requirements of this subsection (d-5), the contracts executed under this subsection (d-5) shall provide that the total of zero emission credits procured under a procurement plan shall be subject to the limitations of this paragraph (2). For each delivery year, the contractual volume receiving payments in such year shall be reduced for all retail customers based on the amount necessary to limit the net increase that delivery year to the costs of those credits included in the amounts paid by eligible retail customers in connection with electric service to no more than 1.65% of the amount paid per kilowatthour by eligible retail customers during the year ending May 31, 2009. The result of this computation shall apply to and reduce the procurement for all retail customers, and all those customers shall pay the same single, uniform cents per kilowatthour charge under subsection (k) of Section 16-108 of the Public Utilities Act. To arrive at a maximum dollar amount of zero emission credits to be paid for the particular delivery year, the resulting per kilowatthour amount shall be applied to the actual amount of kilowatthours of electricity delivered by the electric utility in the delivery year immediately prior to the procurement, to all retail customers in its service territory. Unpaid contractual volume for any delivery year shall be paid in any subsequent delivery year in which such payments can be made without exceeding the amount specified in this paragraph (2). The calculations required by this paragraph (2) shall be made only once for each procurement plan year. Once the determination as to the amount of zero emission credits to be paid is made based on the calculations set forth in this paragraph (2), no subsequent rate impact determinations shall be made and no adjustments to those contract amounts shall be allowed. All costs incurred under those contracts and in implementing this subsection (d-5) shall be recovered by the electric utility as provided in this Section.

No later than June 30, 2019, the Commission shall review the limitation on the amount of zero emission credits procured under this subsection (d-5) and report to the General Assembly its findings as to whether that limitation unduly constrains the procurement of cost-effective zero emission credits.

(3) Six years after the execution of a contract under this subsection (d-5), the Agency shall determine whether the actual zero emission credit payments received by the supplier over the 6-year period exceed the Average ZEC Payment. In addition, at the end of the term of a contract executed under this subsection (d-5), or at the time, if any, a zero emission facility's contract is terminated under subparagraph (E) of paragraph (1) of this subsection (d-5), then the Agency shall determine whether the actual zero emission credit payments received by the supplier over the term of the contract exceed the Average ZEC Payment, after taking into account any amounts previously credited back to the utility under this paragraph (3). If the Agency determines that the actual zero emission credit payments received by the supplier over the relevant period exceed the Average ZEC Payment, then the supplier shall credit the difference back to the utility. The amount of the credit shall be remitted to the applicable electric utility no later than 120 days after the Agency's determination, which the utility shall reflect as a credit on its retail customer bills as soon as practicable; however, the credit remitted to the utility shall not exceed the total amount of payments received by the facility under its contract.

For purposes of this Section, the Average ZEC Payment shall be calculated by multiplying the quantity of zero emission credits delivered under the contract times the average contract price. The average contract price shall be determined by subtracting the amount calculated under subparagraph (B) of this paragraph (3) from the amount calculated under subparagraph (A) of this paragraph (3), as follows:

(A) The average of the Social Cost of Carbon, as defined in subparagraph (B) of paragraph (1) of this subsection (d-5), during the term of the contract.

(B) The average of the market price indices, as defined in subparagraph (B) of paragraph (1) of this subsection (d-5), during the term of the contract, minus the baseline market price index, as defined in subparagraph (B) of paragraph (1) of this subsection (d-5).

If the subtraction yields a negative number, then the Average ZEC Payment shall be zero.

(4) Cost-effective zero emission credits procured from zero emission facilities shall satisfy the applicable definitions set forth in Section 1-10 of this Act.

(5) The electric utility shall retire all zero emission credits used to comply with the requirements of this subsection (d-5).

**A.200**

(6) Electric utilities shall be entitled to recover all of the costs associated with the procurement of zero emission credits through an automatic adjustment clause tariff in accordance with subsection (k) and (m) of Section 16-108 of the Public Utilities Act, and the contracts executed under this subsection (d-5) shall provide that the utilities' payment obligations under such contracts shall be reduced if an adjustment is required under subsection (m) of Section 16-108 of the Public Utilities Act.

(7) This subsection (d-5) shall become inoperative on January 1, 2028.

(e) The draft procurement plans are subject to public comment, as required by Section 16-111.5 of the Public Utilities Act.

(f) The Agency shall submit the final procurement plan to the Commission. The Agency shall revise a procurement plan if the Commission determines that it does not meet the standards set forth in Section 16-111.5 of the Public Utilities Act.

(g) The Agency shall assess fees to each affected utility to recover the costs incurred in preparation of the annual procurement plan for the utility.

(h) The Agency shall assess fees to each bidder to recover the costs incurred in connection with a competitive procurement process.

(i) A renewable energy credit, carbon emission credit, or zero emission credit can only be used once to comply with a single portfolio or other standard as set forth in subsection (c), subsection (d), or subsection (d-5) of this Section, respectively. A renewable energy credit, carbon emission credit, or zero emission credit cannot be used to satisfy the requirements of more than one standard. If more than one type of credit is issued for the same megawatt hour of energy, only one credit can be used to satisfy the requirements of a single standard. After such use, the credit must be retired together with any other credits issued for the same megawatt hour of energy.

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

**A.201**

16 U.S.C.A. § 824

§ 824. Declaration of policy; application of subchapter

Effective: December 4, 2015

## (a) Federal regulation of transmission and sale of electric energy

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

## (b) Use or sale of electric energy in interstate commerce

**(1)** The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

**(2)** Notwithstanding subsection (f) of this section, the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

## (c) Electric energy in interstate commerce

A.202

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

(d) "Sale of electric energy at wholesale" defined

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

(e) "Public utility" defined

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f)[1], 824i, 824j, 824j-1, 824k, 824o, 824o-1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

**(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt**

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

**(g) Books and records**

**(1)** Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of--

**(A)** an electric utility company subject to its regulatory authority under State law,

**(B)** any exempt wholesale generator selling energy at wholesale to such electric utility, and

**(C)** any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

**A.203**

**(2)** Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

**(3)** Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

**(4)** Nothing in this section shall--

**(A)** preempt applicable State law concerning the provision of records and other information; or

**(B)** in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

**(5)** As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C.A. § 16451 et seq.].

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

**A.204**

16 U.S.C.A. § 824d

§ 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

**(a) Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**A.205**

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

**(1)** Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine--

**(A)** whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

**(B)** whether any such clause reflects any costs other than costs which are--

**(i)** subject to periodic fluctuations and

**(ii)** not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

**(2)** Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

**(3)** The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to--

    **(A)** modify the terms and provisions of any automatic adjustment clause, or

    **(B)** cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

**(4)** As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

---

**End of Document**
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

**A.207**

16 U.S.C.A. § 824e

§ 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

Effective: August 8, 2005

## (a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

## (b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any

**A.208**

proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided,* That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided,* That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C.A. § 79 et seq.].

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

**(1)** In this subsection:

   **(A)** The term "short-term sale" means an agreement for the sale of electric energy at

wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

**(B)** The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

**(2)** If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

**(3)** This section shall not apply to--

**(A)** any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

**(B)** an electric cooperative.

**(4)(A)** The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

**(B)** The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

**(C)** In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

**A.210**

16 U.S.C.A. § 825p

§ 825p. Jurisdiction of offenses; enforcement of liabilities and duties

The District Courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder. Any criminal proceeding shall be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder may be brought in any such district or in the district wherein the defendant is an inhabitant, and process in such cases may be served wherever the defendant may be found. Judgments and decrees so rendered shall be subject to review as provided in sections 1254, 1291, and 1292 of Title 28. No costs shall be assessed against the Commission in any judicial proceeding by or against the Commission under this chapter.

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

**A.211**

West's Smith-Hurd Illinois Compiled Statutes Annotated
    Chapter 220. Utilities (Refs & Annos)
        Act 5. Public Utilities Act (Refs & Annos)
            Article XVI. Electric Service Customer Choice and Rate Relief Law of 1997 (Refs & Annos)

220 ILCS 5/16-101A

5/16-101A. Legislative findings

Effective: June 1, 2009
Currentness

§ 16-101A. Legislative findings.

(a) The citizens and businesses of the State of Illinois have been well-served by a comprehensive electrical utility system which has provided safe, reliable, and affordable service. The electrical utility system in the State of Illinois has historically been subject to State and federal regulation, aimed at assuring the citizens and businesses of the State of safe, reliable, and affordable service, while at the same time assuring the utility system of a return on its investment.

(b) Competitive forces are affecting the market for electricity as a result of recent federal regulatory and statutory changes and the activities of other states. Competition in the electric services market may create opportunities for new products and services for customers and lower costs for users of electricity. Long-standing regulatory relationships need to be altered to accommodate the competition that could fundamentally alter the structure of the electric services market.

(c) With the advent of increasing competition in this industry, the State has a continued interest in assuring that the safety, reliability, and affordability of electrical power is not sacrificed to competitive pressures, and to that end, intends to implement safeguards to assure that the industry continues to operate the electrical system in a manner that will serve the public's interest. Under the existing regulatory framework, the industry has been encouraged to undertake certain investments in its physical plant and personnel to enhance its efficient operation, the cost of which it has been permitted to pass on to consumers. The State has an interest in providing the existing utilities a reasonable opportunity to obtain a return on certain investments on which they depended in undertaking those commitments in the first instance while, at the same time, not permitting new entrants into the industry to take unreasonable advantage of the investments made by the formerly regulated industry.

(d) A competitive wholesale and retail market must benefit all Illinois citizens. The Illinois Commerce Commission should act to promote the development of an effectively competitive electricity market that operates efficiently and is equitable to all consumers. Consumer protections must be in place to ensure that all customers continue to receive safe, reliable, affordable, and environmentally safe electric service.

(e) All consumers must benefit in an equitable and timely fashion from the lower costs for electricity that result from retail and wholesale competition and receive sufficient information to make informed choices among suppliers and services. The use of renewable resources and energy efficiency resources should be encouraged in competitive markets.

(f) The efficiency of electric markets depends both upon the competitiveness of supply and upon the price-responsiveness of the demand for service. Therefore, to ensure the lowest total cost of service and to enhance the reliability of service, all classes of the electricity customers of electric utilities should have access to and be able to voluntarily use real-time pricing and other price-response and demand-response mechanisms.

(g) Including cost-effective renewable resources and demand-response resources in a diverse electricity supply portfolio will reduce long-term direct and indirect costs to consumers by decreasing environmental impacts and by avoiding or delaying the need for new generation, transmission, and distribution infrastructure. It serves the public interest to allow electric utilities to recover costs for reasonably and prudently incurred expenses for electricity generated by renewable resources and demand-response resources.

(h) Including electricity generated by clean coal facilities, as defined under Section 1-10 of the Illinois Power Agency Act [1], in a diverse electricity procurement portfolio will reduce the need to purchase, directly or indirectly, carbon dioxide emission credits and will decrease environmental impacts. It serves the public interest to allow electric utilities to recover costs for reasonably and prudently incurred expenses for sourcing electricity generated by clean coal facilities.

**Credits**

Laws 1921, p. 702, Art. XVI, § 16-101A, added by P.A. 90-561, Art. I, § 5, eff. Dec. 16, 1997. Amended by P.A. 94-977, § 5, eff. June 30, 2006; P.A. 95-481, Art. 5, § 5-935, eff. Aug. 28, 2007; P.A. 95-1027, § 1-10, eff. June 1, 2009.

Footnotes

[1]    20 ILCS 3855/1-10.

220 I.L.C.S. 5/16-101A, IL ST CH 220 § 5/16-101A

Current through P.A. 100-118 of the 2017 Reg. Sess.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

West's Smith-Hurd Illinois Compiled Statutes Annotated
   Chapter 220. Utilities (Refs & Annos)
      Act 5. Public Utilities Act (Refs & Annos)
         Article XVI. Electric Service Customer Choice and Rate Relief Law of 1997 (Refs & Annos)

220 ILCS 5/16-111

5/16-111. Rates and restructuring transactions during mandatory
transition period; restructuring and other transactions

Effective: August 21, 2008
Currentness

§ 16-111. Rates and restructuring transactions during mandatory transition period; restructuring and other transactions.

(a) During the mandatory transition period, notwithstanding any provision of Article IX of this Act, and except as provided in subsections (b) and (f) of this Section, the Commission shall not (i) initiate, authorize or order any change by way of increase (other than in connection with a request for rate increase which was filed after September 1, 1997 but prior to October 15, 1997, by an electric utility serving less than 12,500 customers in this State), (ii) initiate or, unless requested by the electric utility, authorize or order any change by way of decrease, restructuring or unbundling (except as provided in Section 16-109A), in the rates of any electric utility that were in effect on October 1, 1996, or (iii) in any order approving any application for a merger pursuant to Section 7-204 that was pending as of May 16, 1997, impose any condition requiring any filing for an increase, decrease, or change in, or other review of, an electric utility's rates or enforce any such condition of any such order; provided, however, that this subsection shall not prohibit the Commission from:

(1) approving the application of an electric utility to implement an alternative to rate of return regulation or a regulatory mechanism that rewards or penalizes the electric utility through adjustment of rates based on utility performance, pursuant to Section 9-244;

(2) authorizing an electric utility to eliminate its fuel adjustment clause and adjust its base rate tariffs in accordance with subsection (b), (d), or (f) of Section 9-220 of this Act, to fix its fuel adjustment factor in accordance with subsection (c) of Section 9-220 of this Act, or to eliminate its fuel adjustment clause in accordance with subsection (e) of Section 9-220 of this Act;

(3) ordering into effect tariffs for delivery services and transition charges in accordance with Sections 16-104 and 16-108, for real-time pricing in accordance with Section 16-107, or the options required by Section 16-110 and subsection (n) of 16-112, allowing a billing experiment in accordance with Section 16-106, or modifying delivery services tariffs in accordance with Section 16-109; or

(4) ordering or allowing into effect any tariff to recover charges pursuant to Sections 9-201.5, 9-220.1, 9-221, 9-222 (except as provided in Section 9-222.1), 16-108, and 16-114 of this Act, Section 5-5 of the Electricity Infrastructure Maintenance Fee Law, [1] Section 6-5 of the Renewable Energy, Energy Efficiency, and Coal Resources Development Law of 1997, [2] and Section 13 of the Energy Assistance Act. [3]

After December 31, 2004, the provisions of this subsection (a) shall not apply to an electric utility whose average residential retail rate was less than or equal to 90% of the average residential retail rate for the "Midwest Utilities", as that term is defined in subsection (b) of this Section, based on data reported on Form 1 to the Federal Energy Regulatory Commission for calendar year 1995, and which served between 150,000 and 250,000 retail customers in this State on January 1, 1995 unless the electric utility or its holding company has been acquired by or merged with an affiliate of another electric utility subsequent to January 1, 2002. This exemption shall be limited to this subsection (a) and shall not extend to any other provisions of this Act.

(b) Notwithstanding the provisions of subsection (a), each Illinois electric utility serving more than 12,500 customers in Illinois shall file tariffs (i) reducing, effective August 1, 1998, each component of its base rates to residential retail customers by 15% from the base rates in effect immediately prior to January 1, 1998 and (ii) if the public utility provides electric service to (A) more than 500,000 customers but less than 1,000,000 customers in this State on January 1, 1999, reducing, effective May 1, 2002, each component of its base rates to residential retail customers by an additional 5% from the base rates in effect immediately prior to January 1, 1998, or (B) at least 1,000,000 customers in this State on January 1, 1999, reducing, effective October 1, 2001, each component of its base rates to residential retail customers by an additional 5% from the base rates in effect immediately prior to January 1, 1998. Provided, however, that (A) if an electric utility's average residential retail rate is less than or equal to the average residential retail rate for a group of Midwest Utilities (consisting of all investor-owned electric utilities with annual system peaks in excess of 1000 megawatts in the States of Illinois, Indiana, Iowa, Kentucky, Michigan, Missouri, Ohio, and Wisconsin), based on data reported on Form 1 to the Federal Energy Regulatory Commission for calendar year 1995, then it shall only be required to file tariffs (i) reducing, effective August 1, 1998, each component of its base rates to residential retail customers by 5% from the base rates in effect immediately prior to January 1, 1998, (ii) reducing, effective October 1, 2000, each component of its base rates to residential retail customers by the lesser of 5% of the base rates in effect immediately prior to January 1, 1998 or the percentage by which the electric utility's average residential retail rate exceeds the average residential retail rate of the Midwest Utilities, based on data reported on Form 1 to the Federal Energy Regulatory Commission for calendar year 1999, and (iii) reducing, effective October 1, 2002, each component of its base rates to residential retail customers by an additional amount equal to the lesser of 5% of the base rates in effect immediately prior to January 1, 1998 or the percentage by which the electric utility's average residential retail rate exceeds the average residential retail rate of the Midwest Utilities, based on data reported on Form 1 to the Federal Energy Regulatory Commission for calendar year 2001; and (B) if the average residential retail rate of an electric utility serving between 150,000 and 250,000 retail customers in this State on January 1, 1995 is less than or equal to 90% of the average residential retail rate for the Midwest Utilities, based on data reported on Form 1 to the Federal Energy Regulatory Commission for calendar year 1995, then it shall only be required to file tariffs (i) reducing, effective August 1, 1998, each component of its base rates to residential retail customers by 2% from the base rates in effect immediately prior to January 1, 1998; (ii) reducing, effective October 1, 2000, each component of its base rates to residential retail customers by 2% from the base rate in effect immediately prior to January 1, 1998; and (iii) reducing, effective October 1, 2002, each component of its base rates to residential retail customers by 1% from the base rates in effect immediately prior to January 1, 1998. Provided, further, that any electric utility for which a decrease in base rates has been or is placed into effect between October 1, 1996 and the dates specified in the preceding sentences of this subsection, other than pursuant to the requirements of this subsection, shall be entitled to reduce the amount of any reduction or reductions in its base rates required by this subsection by the amount of such other decrease. The tariffs required under this subsection shall be filed 45 days in advance of the effective date. Notwithstanding anything to the contrary in Section 9-220 of this Act, no restatement of base rates in conjunction with the elimination of a fuel adjustment clause under that Section shall result in a lesser decrease in base rates than customers would otherwise receive under this subsection had the electric utility's fuel adjustment clause not been eliminated.

(c) Any utility reducing its base rates by 15% on August 1, 1998 pursuant to subsection (b) shall include the following statement on its bills for residential customers from August 1 through December 31, 1998: "Effective August 1, 1998,

your rates have been reduced by 15% by the Electric Service Customer Choice and Rate Relief Law of 1997 passed by the Illinois General Assembly.". Any utility reducing its base rates by 5% on August 1, 1998, pursuant to subsection (b) shall include the following statement on its bills for residential customers from August 1 through December 31, 1998: "Effective August 1, 1998, your rates have been reduced by 5% by the Electric Service Customer Choice and Rate Relief Law of 1997 passed by the Illinois General Assembly.".

Any utility reducing its base rates by 2% on August 1, 1998 pursuant to subsection (b) shall include the following statement on its bills for residential customers from August 1 through December 31, 1998: "Effective August 1, 1998, your rates have been reduced by 2% by the Electric Service Customer Choice and Rate Relief Law of 1997 passed by the Illinois General Assembly.".

(d) (Blank.)

(e) (Blank.)

(f) During the mandatory transition period, an electric utility may file revised tariffs reducing the price of any tariffed service offered by the electric utility for all customers taking that tariffed service, which shall be effective 7 days after filing.

(g) Until all classes of tariffed services are declared competitive, an electric utility may, without obtaining any approval of the Commission other than that provided for in this subsection and notwithstanding any other provision of this Act or any rule or regulation of the Commission that would require such approval:

(1) implement a reorganization, other than a merger of 2 or more public utilities as defined in Section 3-105 or their holding companies;

(2) retire generating plants from service;

(3) sell, assign, lease or otherwise transfer assets to an affiliated or unaffiliated entity and as part of such transaction enter into service agreements, power purchase agreements, or other agreements with the transferee; provided, however, that the prices, terms and conditions of any power purchase agreement must be approved or allowed into effect by the Federal Energy Regulatory Commission; or

(4) use any accelerated cost recovery method including accelerated depreciation, accelerated amortization or other capital recovery methods, or record reductions to the original cost of its assets.

In order to implement a reorganization, retire generating plants from service, or sell, assign, lease or otherwise transfer assets pursuant to this Section, the electric utility shall comply with subsections (c) and (d) of Section 16-128, if applicable, and subsection (k) of this Section, if applicable, and provide the Commission with at least 30 days notice of the proposed reorganization or transaction, which notice shall include the following information:

(i) a complete statement of the entries that the electric utility will make on its books and records of account to implement the proposed reorganization or transaction together with a certification from an independent certified

public accountant that such entries are in accord with generally accepted accounting principles and, if the Commission has previously approved guidelines for cost allocations between the utility and its affiliates, a certification from the chief accounting officer of the utility that such entries are in accord with those cost allocation guidelines;

(ii) a description of how the electric utility will use proceeds of any sale, assignment, lease or transfer to retire debt or otherwise reduce or recover the costs of services provided by such electric utility;

(iii) a list of all federal approvals or approvals required from departments and agencies of this State, other than the Commission, that the electric utility has or will obtain before implementing the reorganization or transaction;

(iv) an irrevocable commitment by the electric utility that it will not, as a result of the transaction, impose any stranded cost charges that it might otherwise be allowed to charge retail customers under federal law or increase the transition charges that it is otherwise entitled to collect under this Article XVI;

(v) if the electric utility proposes to sell, assign, lease or otherwise transfer a generating plant that brings the amount of net dependable generating capacity transferred pursuant to this subsection to an amount equal to or greater than 15% of the electric utility's net dependable capacity as of the effective date of this amendatory Act of 1997, and enters into a power purchase agreement with the entity to which such generating plant is sold, assigned, leased, or otherwise transferred, the electric utility also agrees, if its fuel adjustment clause has not already been eliminated, to eliminate its fuel adjustment clause in accordance with subsection (b) of Section 9-220 for a period of time equal to the length of any such power purchase agreement or successor agreement, or until January 1, 2005, whichever is longer; if the capacity of the generating plant so transferred and related power purchase agreement does not result in the elimination of the fuel adjustment clause under this subsection, and the fuel adjustment clause has not already been eliminated, the electric utility shall agree that the costs associated with the transferred plant that are included in the calculation of the rate per kilowatt-hour to be applied pursuant to the electric utility's fuel adjustment clause during such period shall not exceed the per kilowatt-hour cost associated with such generating plant included in the electric utility's fuel adjustment clause during the full calendar year preceding the transfer, with such limit to be adjusted each year thereafter by the Gross Domestic Product Implicit Price Deflator; and

(vi) in addition, if the electric utility proposes to sell, assign, or lease, (A) either (1) an amount of generating plant that brings the amount of net dependable generating capacity transferred pursuant to this subsection to an amount equal to or greater than 15% of its net dependable capacity on the effective date of this amendatory Act of 1997, or (2) one or more generating plants with a total net dependable capacity of 1100 megawatts, or (B) transmission and distribution facilities that either (1) bring the amount of transmission and distribution facilities transferred pursuant to this subsection to an amount equal to or greater than 15% of the electric utility's total depreciated original cost investment in such facilities, or (2) represent an investment of $25,000,000 in terms of total depreciated original cost, the electric utility shall provide, in addition to the information listed in subparagraphs (i) through (v), the following information: (A) a description of how the electric utility will meet its service obligations under this Act in a safe and reliable manner and (B) the electric utility's projected earned rate of return on common equity for each year from the date of the notice through December 31, 2006 both with and without the proposed transaction. If the Commission has not issued an order initiating a hearing on the proposed transaction within 30 days after the date the electric utility's notice is filed, the transaction shall be deemed approved. The Commission may, after notice and hearing, prohibit the proposed transaction if it makes either or both of the following findings: (1) that the proposed transaction will render the electric utility unable to provide its tariffed services in a safe and reliable manner, or (2) that there is a strong likelihood that consummation of the proposed transaction will result in the electric utility being entitled to request an increase in its base rates. Any hearing initiated by the Commission into the proposed transaction shall

be completed, and the Commission's final order approving or prohibiting the proposed transaction shall be entered, within 90 days after the date the electric utility's notice was filed. Provided, however, that a sale, assignment, or lease of transmission facilities to an independent system operator that meets the requirements of Section 16-126 shall not be subject to Commission approval under this Section.

In any proceeding conducted by the Commission pursuant to this subparagraph (vi), intervention shall be limited to parties with a direct interest in the transaction which is the subject of the hearing and any statutory consumer protection agency as defined in subsection (d) of Section 9-102.1. Notwithstanding the provisions of Section 10-113 of this Act, any application seeking rehearing of an order issued under this subparagraph (vi), whether filed by the electric utility or by an intervening party, shall be filed within 10 days after service of the order.

The Commission shall not in any subsequent proceeding or otherwise, review such a reorganization or other transaction authorized by this Section, but shall retain the authority to allocate costs as stated in Section 16-111(i). An entity to which an electric utility sells, assigns, leases or transfers assets pursuant to this subsection (g) shall not, as a result of the transactions specified in this subsection (g), be deemed a public utility as defined in Section 3-105. Nothing in this subsection (g) shall change any requirement under the jurisdiction of the Illinois Department of Nuclear Safety including, but not limited to, the payment of fees. Nothing in this subsection (g) shall exempt a utility from obtaining a certificate pursuant to Section 8-406 of this Act for the construction of a new electric generating facility. Nothing in this subsection (g) is intended to exempt the transactions hereunder from the operation of the federal or State antitrust laws. Nothing in this subsection (g) shall require an electric utility to use the procedures specified in this subsection for any of the transactions specified herein. Any other procedure available under this Act may, at the electric utility's election, be used for any such transaction.

(h) During the mandatory transition period, the Commission shall not establish or use any rates of depreciation, which for purposes of this subsection shall include amortization, for any electric utility other than those established pursuant to subsection (c) of Section 5-104 of this Act or utilized pursuant to subsection (g) of this Section. Provided, however, that in any proceeding to review an electric utility's rates for tariffed services pursuant to Section 9-201, 9-202, 9-250 or 16-111(d) of this Act, the Commission may establish new rates of depreciation for the electric utility in the same manner provided in subsection (d) of Section 5-104 of this Act. An electric utility implementing an accelerated cost recovery method including accelerated depreciation, accelerated amortization or other capital recovery methods, or recording reductions to the original cost of its assets, pursuant to subsection (g) of this Section, shall file a statement with the Commission describing the accelerated cost recovery method to be implemented or the reduction in the original cost of its assets to be recorded. Upon the filing of such statement, the accelerated cost recovery method or the reduction in the original cost of assets shall be deemed to be approved by the Commission as though an order had been entered by the Commission.

(i) Subsequent to the mandatory transition period, the Commission, in any proceeding to establish rates and charges for tariffed services offered by an electric utility, shall consider only (1) the then current or projected revenues, costs, investments and cost of capital directly or indirectly associated with the provision of such tariffed services; (2) collection of transition charges in accordance with Sections 16-102 and 16-108 of this Act; (3) recovery of any employee transition costs as described in Section 16-128 which the electric utility is continuing to incur, including recovery of any unamortized portion of such costs previously incurred or committed, with such costs to be equitably allocated among bundled services, delivery services, and contracts with alternative retail electric suppliers; and (4) recovery of the costs associated with the electric utility's compliance with decommissioning funding requirements; and shall not consider any other revenues, costs, investments or cost of capital of either the electric utility or of any affiliate of the electric utility that are not associated with the provision of tariffed services. In setting rates for tariffed services, the Commission shall equitably allocate joint and common costs and investments between the electric utility's competitive and tariffed services. In determining the justness and reasonableness of the electric power and energy component of an electric utility's rates for tariffed services

subsequent to the mandatory transition period and prior to the time that the provision of such electric power and energy is declared competitive, the Commission shall consider the extent to which the electric utility's tariffed rates for such component for each customer class exceed the market value determined pursuant to Section 16-112, and, if the electric power and energy component of such tariffed rate exceeds the market value by more than 10% for any customer class, may establish such electric power and energy component at a rate equal to the market value plus 10%.

(j) During the mandatory transition period, an electric utility may elect to transfer to a non-operating income account under the Commission's Uniform System of Accounts either or both of (i) an amount of unamortized investment tax credit that is in addition to the ratable amount which is credited to the electric utility's operating income account for the year in accordance with Section 46(f)(2) of the federal Internal Revenue Code of 1986, [4] as in effect prior to P.L. 101-508, or (ii) "excess tax reserves", as that term is defined in Section 203(e)(2)(A) of the federal Tax Reform Act of 1986, [5] provided that (A) the amount transferred may not exceed the amount of the electric utility's assets that were created pursuant to Statement of Financial Accounting Standards No. 71 which the electric utility has written off during the mandatory transition period, and (B) the transfer shall not be effective until approved by the Internal Revenue Service. An electric utility electing to make such a transfer shall file a statement with the Commission stating the amount and timing of the transfer for which it intends to request approval of the Internal Revenue Service, along with a copy of its proposed request to the Internal Revenue Service for a ruling. The Commission shall issue an order within 14 days after the electric utility's filing approving, subject to receipt of approval from the Internal Revenue Service, the proposed transfer.

(k) If an electric utility is selling or transferring to a single buyer 5 or more generating plants located in this State with a total net dependable capacity of 5000 megawatts or more pursuant to subsection (g) of this Section and has obtained a sale price or consideration that exceeds 200% of the book value of such plants, the electric utility must provide to the Governor, the President of the Illinois Senate, the Minority Leader of the Illinois Senate, the Speaker of the Illinois House of Representatives, and the Minority Leader of the Illinois House of Representatives no later than 15 days after filing its notice under subsection (g) of this Section or 5 days after the date on which this subsection (k) becomes law, whichever is later, a written commitment in which such electric utility agrees to expend $2 billion outside the corporate limits of any municipality with 1,000,000 or more inhabitants within such electric utility's service area, over a 6-year period beginning with the calendar year in which the notice is filed, on projects, programs, and improvements within its service area relating to transmission and distribution including, without limitation, infrastructure expansion, repair and replacement, capital investments, operations and maintenance, and vegetation management.

(l) Notwithstanding any other provision of this Act or any rule, regulation, or prior order of the Commission, a public utility providing electric and gas service may do any one or more of the following: transfer assets to, reorganize with, or merge with one or more public utilities under common holding company ownership or control in the manner prescribed in subsection (g) of this Section. No merger transaction costs, such as fees paid to attorneys, investment bankers, and other consultants, incurred in connection with a merger pursuant to this subsection (l) shall be recoverable in any subsequent rate proceeding. Approval of a merger pursuant to this subsection (l) shall not constitute approval of, or otherwise require, rate recovery of other costs incurred in connection with, or to implement the merger, such as the cost of restructuring, combining, or integrating debt, assets, or systems. Such other costs may be recovered only to the extent that the surviving utility can demonstrate that the cost savings produced by such restructuring, combination, or integration exceed the associated costs. Nothing in this subsection (l) shall impair the terms or conditions of employment or the collective bargaining rights of any employees of the utilities that are transferring assets, reorganizing, or merging.

(m) If an electric utility that on December 31, 2005 provided electric service to at least 100,000 customers in Illinois transfers assets, reorganizes, or merges under this Section, then the same provisions apply that applied during the mandatory transition period under Section 16-128.

**Credits**

Laws 1921, p. 702, Art. XVI, § 16-111, added by P.A. 90-561, Art. I, § 5, eff. Dec. 16, 1997. Amended by P.A. 90-563, § 5, eff. Dec. 16, 1997; P.A. 91-50, § 5, eff. June 30, 1999; P.A. 92-537, § 5, eff. June 6, 2002; P.A. 92-690, § 20, eff. July 18, 2002; P.A. 95-331, § 680, eff. Aug. 21, 2007; P.A. 95-481, Art. 5, § 5-935, eff. Aug. 28, 2007; P.A. 95-876, § 220, eff. Aug. 21, 2008.

Footnotes

| | |
|---|---|
| 1 | 35 ILCS 645/5-5. |
| 2 | 20 ILCS 687/6-5. |
| 3 | 305 ILCS 20/13. |
| 4 | 26 U.S.C.A. § 46. |
| 5 | 26 U.S.C.A. § 1 et seq. |

220 I.L.C.S. 5/16-111, IL ST CH 220 § 5/16-111

Current through P.A. 100-118 of the 2017 Reg. Sess.

---

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

West's Smith-Hurd Illinois Compiled Statutes Annotated
    Chapter 220. Utilities (Refs & Annos)
        Act 5. Public Utilities Act (Refs & Annos)
            Article XVI. Electric Service Customer Choice and Rate Relief Law of 1997 (Refs & Annos)

220 ILCS 5/16-115

5/16-115. Certification of alternative retail electric suppliers

Effective: August 10, 2015
Currentness

§ 16-115. Certification of alternative retail electric suppliers.

(a) Any alternative retail electric supplier must obtain a certificate of service authority from the Commission in accordance with this Section before serving any retail customer or other user located in this State. An alternative retail electric supplier may request, and the Commission may grant, a certificate of service authority for the entire State or for a specified geographic area of the State.

(b) An alternative retail electric supplier seeking a certificate of service authority shall file with the Commission a verified application containing information showing that the applicant meets the requirements of this Section. The alternative retail electric supplier shall publish notice of its application in the official State newspaper within 10 days following the date of its filing. No later than 45 days after the application is properly filed with the Commission, and such notice is published, the Commission shall issue its order granting or denying the application.

(c) An application for a certificate of service authority shall identify the area or areas in which the applicant intends to offer service and the types of services it intends to offer. Applicants that seek to serve residential or small commercial retail customers within a geographic area that is smaller than an electric utility's service area shall submit evidence demonstrating that the designation of this smaller area does not violate Section 16-115A. An applicant that seeks to serve residential or small commercial retail customers may state in its application for certification any limitations that will be imposed on the number of customers or maximum load to be served.

(d) The Commission shall grant the application for a certificate of service authority if it makes the findings set forth in this subsection based on the verified application and such other information as the applicant may submit:

(1) That the applicant possesses sufficient technical, financial and managerial resources and abilities to provide the service for which it seeks a certificate of service authority. In determining the level of technical, financial and managerial resources and abilities which the applicant must demonstrate, the Commission shall consider (i) the characteristics, including the size and financial sophistication, of the customers that the applicant seeks to serve, and (ii) whether the applicant seeks to provide electric power and energy using property, plant and equipment which it owns, controls or operates;

(2) That the applicant will comply with all applicable federal, State, regional and industry rules, policies, practices and procedures for the use, operation, and maintenance of the safety, integrity and reliability, of the interconnected electric transmission system;

(3) That the applicant will only provide service to retail customers in an electric utility's service area that are eligible to take delivery services under this Act;

(4) That the applicant will comply with such informational or reporting requirements as the Commission may by rule establish and provide the information required by Section 16-112. Any data related to contracts for the purchase and sale of electric power and energy shall be made available for review by the Staff of the Commission on a confidential and proprietary basis and only to the extent and for the purposes which the Commission determines are reasonably necessary in order to carry out the purposes of this Act;

(5) That the applicant will procure renewable energy resources in accordance with Section 16-115D of this Act, and will source electricity from clean coal facilities, as defined in Section 1-10 of the Illinois Power Agency Act, [1] in amounts at least equal to the percentages set forth in subsections (c) and (d) of Section 1-75 of the Illinois Power Agency Act. [2] For purposes of this Section:

  (i) (Blank);

  (ii) (Blank);

  (iii) the required sourcing of electricity generated by clean coal facilities, other than the initial clean coal facility, shall be limited to the amount of electricity that can be procured or sourced at a price at or below the benchmarks approved by the Commission each year in accordance with item (1) of subsection (c) and items (1) and (5) of subsection (d) of Section 1-75 of the Illinois Power Agency Act;

  (iv) all alternative retail electric suppliers shall execute a sourcing agreement to source electricity from the initial clean coal facility, on the terms set forth in paragraphs (3) and (4) of subsection (d) of Section 1-75 of the Illinois Power Agency Act, except that in lieu of the requirements in subparagraphs (A)(v), (B)(i), (C)(v), and (C)(vi) of paragraph (3) of that subsection (d), the applicant shall execute one or more of the following:

    (1) if the sourcing agreement is a power purchase agreement, a contract with the initial clean coal facility to purchase in each hour an amount of electricity equal to all clean coal energy made available from the initial clean coal facility during such hour, which the utilities are not required to procure under the terms of subsection (d) of Section 1-75 of the Illinois Power Agency Act, multiplied by a fraction, the numerator of which is the alternative retail electric supplier's retail market sales of electricity (expressed in kilowatthours sold) in the State during the prior calendar month and the denominator of which is the total sales of electricity (expressed in kilowatthours sold) in the State by alternative retail electric suppliers during such prior month that are subject to the requirements of this paragraph (5) of subsection (d) of this Section and subsection (d) of Section 1-75 of the Illinois Power Agency Act plus the total sales of electricity (expressed in kilowatthours sold) by utilities outside of their service areas during such prior month, pursuant to subsection (c) of Section 16-116 of this Act; or

(2) if the sourcing agreement is a contract for differences, a contract with the initial clean coal facility in each hour with respect to an amount of electricity equal to all clean coal energy made available from the initial clean coal facility during such hour, which the utilities are not required to procure under the terms of subsection (d) of Section 1-75 of the Illinois Power Agency Act, multiplied by a fraction, the numerator of which is the alternative retail electric supplier's retail market sales of electricity (expressed in kilowatthours sold) in the State during the prior calendar month and the denominator of which is the total sales of electricity (expressed in kilowatthours sold) in the State by alternative retail electric suppliers during such prior month that are subject to the requirements of this paragraph (5) of subsection (d) of this Section and subsection (d) of Section 1-75 of the Illinois Power Agency Act plus the total sales of electricity (expressed in kilowatthours sold) by utilities outside of their service areas during such prior month, pursuant to subsection (c) of Section 16-116 of this Act;

(v) if, in any year after the first year of commercial operation, the owner of the clean coal facility fails to demonstrate to the Commission that the initial clean coal facility captured and sequestered at least 50% of the total carbon emissions that the facility would otherwise emit or that sequestration of emissions from prior years has failed, resulting in the release of carbon into the atmosphere, the owner of the facility must offset excess emissions. Any such carbon offsets must be permanent, additional, verifiable, real, located within the State of Illinois, and legally and practicably enforceable. The costs of any such offsets that are not recoverable shall not exceed $15 million in any given year. No costs of any such purchases of carbon offsets may be recovered from an alternative retail electric supplier or its customers. All carbon offsets purchased for this purpose and any carbon emission credits associated with sequestration of carbon from the facility must be permanently retired. The initial clean coal facility shall not forfeit its designation as a clean coal facility if the facility fails to fully comply with the applicable carbon sequestration requirements in any given year, provided the requisite offsets are purchased. However, the Attorney General, on behalf of the People of the State of Illinois, may specifically enforce the facility's sequestration requirement and the other terms of this contract provision. Compliance with the sequestration requirements and offset purchase requirements that apply to the initial clean coal facility shall be reviewed annually by an independent expert retained by the owner of the initial clean coal facility, with the advance written approval of the Attorney General;

(vi) The Commission shall, after notice and hearing, revoke the certification of any alternative retail electric supplier that fails to execute a sourcing agreement with the initial clean coal facility as required by item (5) of subsection (d) of this Section. The sourcing agreements with this initial clean coal facility shall be subject to both approval of the initial clean coal facility by the General Assembly and satisfaction of the requirements of item (4) of subsection (d) of Section 1-75 of the Illinois Power Agency Act, and shall be executed within 90 days after any such approval by the General Assembly. The Commission shall not accept an application for certification from an alternative retail electric supplier that has lost certification under this subsection (d), or any corporate affiliate thereof, for at least one year from the date of revocation;

(6) With respect to an applicant that seeks to serve residential or small commercial retail customers, that the area to be served by the applicant and any limitations it proposes on the number of customers or maximum amount of load to be served meet the provisions of Section 16-115A, provided, that the Commission can extend the time for considering such a certificate request by up to 90 days, and can schedule hearings on such a request;

(7) That the applicant meets the requirements of subsection (a) of Section 16-128; and

(8) That the applicant will comply with all other applicable laws and regulations.

(d-5) (Blank).

(e) A retail customer that owns a cogeneration or self-generation facility and that seeks certification only to provide electric power and energy from such facility to retail customers at separate locations which customers are both (i) owned by, or a subsidiary or other corporate affiliate of, such applicant and (ii) eligible for delivery services, shall be granted a certificate of service authority upon filing an application and notifying the Commission that it has entered into an agreement with the relevant electric utilities pursuant to Section 16-118. Provided, however, that if the retail customer owning such cogeneration or self-generation facility would not be charged a transition charge due to the exemption provided under subsection (f) of Section 16-108 prior to the certification, and the retail customers at separate locations are taking delivery services in conjunction with purchasing power and energy from the facility, the retail customer on whose premises the facility is located shall not thereafter be required to pay transition charges on the power and energy that such retail customer takes from the facility.

(f) The Commission shall have the authority to promulgate rules and regulations to carry out the provisions of this Section. On or before May 1, 1999, the Commission shall adopt a rule or rules applicable to the certification of those alternative retail electric suppliers that seek to serve only nonresidential retail customers with maximum electrical demands of one megawatt or more which shall provide for (i) expedited and streamlined procedures for certification of such alternative retail electric suppliers and (ii) specific criteria which, if met by any such alternative retail electric supplier, shall constitute the demonstration of technical, financial and managerial resources and abilities to provide service required by subsection (d) (1) of this Section, such as a requirement to post a bond or letter of credit, from a responsible surety or financial institution, of sufficient size for the nature and scope of the services to be provided; demonstration of adequate insurance for the scope and nature of the services to be provided; and experience in providing similar services in other jurisdictions.

(g) An alternative retail electric supplier may seek confidential treatment for the following information by filing an affidavit with the Commission so long as the affidavit meets the requirements in this subsection (g):

(1) the total annual kilowatt-hours delivered and sold by an alternative retail electric supplier to retail customers within each utility service territory and the total annual kilowatt-hours delivered and sold by an alternative retail electric supplier to retail customers in all utility service territories in the preceding calendar year as required by 83 Ill. Adm. Code 451.770;

(2) the total peak demand supplied by an alternative retail electric supplier during the previous year in each utility service territory as required by 83 Ill. Adm. Code 465.40;

(3) a good faith estimate of the amount an alternative retail electric supplier expects to be obliged to pay the utility under single billing tariffs during the next 12 months and the amount of any bond or letter of credit used to demonstrate an alternative retail electric supplier's credit worthiness to provide single billing services pursuant to 83 Ill. Adm. Code 451.510(a) and (b).

The affidavit must be filed contemporaneously with the information for which confidential treatment is sought and must clearly state that the affiant seeks confidential treatment pursuant to this subsection (g) and the information for which confidential treatment is sought must be clearly identified on the confidential version of the document filed with the Commission. The affidavit must be accompanied by a "confidential" and a "public" version of the document or documents containing the information for which confidential treatment is sought.

If the alternative retail electric supplier has met the affidavit requirements of this subsection (g), then the Commission shall afford confidential treatment to the information identified in the affidavit for a period of 2 years after the date the affidavit is received by the Commission.

Nothing in this subsection (g) prevents an alternative retail electric supplier from filing a petition with the Commission seeking confidential treatment for information beyond that identified in this subsection (g) or for information contained in other reports or documents filed with the Commission.

Nothing in this subsection (g) prevents the Commission, on its own motion, or any party from filing a formal petition with the Commission seeking to reconsider the conferring of confidential status on an item of information afforded confidential treatment pursuant to this subsection (g).

The Commission, on its own motion, may at any time initiate a docketed proceeding to investigate the continued applicability of this subsection (g) to the information contained in items (i), (ii), and (iii) of this subsection (g). If, at the end of such investigation, the Commission determines that a particular item of information should no longer be eligible for the affidavit-based process outlined in this subsection (g), the Commission may enter an order to remove that item from the list of items eligible for the process set forth in this subsection (g). Notwithstanding any such order, in the event the Commission makes such a determination, nothing in this subsection (g) prevents an alternative retail electric supplier desiring confidential treatment for such information from filing a formal petition with the Commission seeking confidential treatment for such information.

**Credits**

Laws 1921, p. 702, Art. XVI, § 16-115, added by P.A. 90-561, Art. I, § 5, eff. Dec. 16, 1997. Amended by P.A. 91-50, § 5, eff. June 30, 1999; P.A. 95-130, § 5, eff. Jan. 1, 2008; P.A. 95-1027, § 1-10, eff. June 1, 2009; P.A. 96-159, § 20, eff. Aug. 10, 2009; P.A. 99-332, § 5, eff. Aug. 10, 2015.

Footnotes

[1]     20 ILCS 3855/1-10.
[2]     20 ILCS 3855/1-75.
220 I.L.C.S. 5/16-115, IL ST CH 220 § 5/16-115
Current through P.A. 100-118 of the 2017 Reg. Sess.

---

          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

▢ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Smith-Hurd Illinois Compiled Statutes Annotated
    Chapter 220. Utilities (Refs & Annos)
        Act 5. Public Utilities Act (Refs & Annos)
            Article XVI. Electric Service Customer Choice and Rate Relief Law of 1997 (Refs & Annos)

220 ILCS 5/16-118

5/16-118. Services provided by electric utilities to alternative retail electric suppliers

Effective: November 9, 2007
Currentness

§ 16-118. Services provided by electric utilities to alternative retail electric suppliers.

(a) It is in the best interest of Illinois energy consumers to promote fair and open competition in the provision of electric power and energy and to prevent anticompetitive practices in the provision of electric power and energy. Therefore, to the extent an electric utility provides electric power and energy or delivery services to alternative retail electric suppliers and such services are not subject to the jurisdiction of the Federal Energy Regulatory Commission, and are not competitive services, they shall be provided through tariffs that are filed with the Commission, pursuant to Article IX of this Act.[1] Each electric utility shall permit alternative retail electric suppliers to interconnect facilities to those owned by the utility provided they meet established standards for such interconnection, and may provide standby or other services to alternative retail electric suppliers. The alternative retail electric supplier shall sign a contract setting forth the prices, terms and conditions for interconnection with the electric utility and the prices, terms and conditions for services provided by the electric utility to the alternative retail electric supplier in connection with the delivery by the electric utility of electric power and energy supplied by the alternative retail electric supplier.

(b) An electric utility shall file a tariff pursuant to Article IX of the Act that would allow alternative retail electric suppliers or electric utilities other than the electric utility in whose service area retail customers are located to issue single bills to the retail customers for both the services provided by such alternative retail electric supplier or other electric utility and the delivery services provided by the electric utility to such customers. The tariff filed pursuant to this subsection shall (i) require partial payments made by retail customers to be credited first to the electric utility's tariffed services, (ii) impose commercially reasonable terms with respect to credit and collection, including requests for deposits, (iii) retain the electric utility's right to disconnect the retail customers, if it does not receive payment for its tariffed services, in the same manner that it would be permitted to if it had billed for the services itself, and (iv) require the alternative retail electric supplier or other electric utility that elects the billing option provided by this tariff to include on each bill to retail customers an identification of the electric utility providing the delivery services and a listing of the charges applicable to such services. The tariff filed pursuant to this subsection may also include other just and reasonable terms and conditions. In addition, an electric utility, an alternative retail electric supplier or electric utility other than the electric utility in whose service area the customer is located, and a customer served by such alternative retail electric supplier or other electric utility, may enter into an agreement pursuant to which the alternative retail electric supplier or other electric utility pays the charges specified in Section 16-108, or other customer-related charges, including taxes and fees, in lieu of such charges being recovered by the electric utility directly from the customer.

(c) An electric utility with more than 100,000 customers shall file a tariff pursuant to Article IX of this Act that provides alternative retail electric suppliers, and electric utilities other than the electric utility in whose service area the retail customers are located, with the option to have the electric utility purchase their receivables for power and energy service provided to residential retail customers and non-residential retail customers with a non-coincident peak demand of less than 400 kilowatts. Receivables for power and energy service of alternative retail electric suppliers or electric utilities other than the electric utility in whose service area the retail customers are located shall be purchased by the electric utility at a just and reasonable discount rate to be reviewed and approved by the Commission after notice and hearing. The discount rate shall be based on the electric utility's historical bad debt and any reasonable start-up costs and administrative costs associated with the electric utility's purchase of receivables. The discounted rate for purchase of receivables shall be included in the tariff filed pursuant to this subsection (c). The discount rate filed pursuant to this subsection (c) shall be subject to periodic Commission review. The electric utility retains the right to impose the same terms on retail customers with respect to credit and collection, including requests for deposits, and retain the electric utility's right to disconnect the retail customers, if it does not receive payment for its tariffed services or purchased receivables, in the same manner that it would be permitted to if the retail customers purchased power and energy from the electric utility. The tariff filed pursuant to this subsection (c) shall permit the electric utility to recover from retail customers any uncollected receivables that may arise as a result of the purchase of receivables under this subsection (c), may also include other just and reasonable terms and conditions, and shall provide for the prudently incurred costs associated with the provision of this service pursuant to this subsection (c). Nothing in this subsection (c) permits the double recovery of bad debt expenses from customers.

(d) An electric utility with more than 100,000 customers shall file a tariff pursuant to Article IX of this Act that would provide alternative retail electric suppliers or electric utilities other than the electric utility in whose service area retail customers are located with the option to have the electric utility produce and provide single bills to the retail customers for both the electric power and energy service provided by the alternative retail electric supplier or other electric utility and the delivery services provided by the electric utility to the customers. The tariffs filed pursuant to this subsection shall require the electric utility to collect and remit customer payments for electric power and energy service provided by alternative retail electric suppliers or electric utilities other than the electric utility in whose service area retail customers are located. The tariff filed pursuant to this subsection shall require the electric utility to include on each bill to retail customers an identification of the alternative retail electric supplier or other electric utility that elects the billing option. The tariff filed pursuant to this subsection (d) may also include other just and reasonable terms and conditions and shall provide for the recovery of prudently incurred costs associated with the provision of service pursuant to this subsection (d). The costs associated with the provision of service pursuant to this Section shall be subject to periodic Commission review.

(e) An electric utility with more than 100,000 customers in this State shall file a tariff pursuant to Article IX of this Act that provides alternative retail electric suppliers, and electric utilities other than the electric utility in whose service area the retail customers are located, with the option to have the electric utility purchase 2 billing cycles worth of uncollectible receivables for power and energy service provided to residential retail customers and to non-residential retail customers with a non-coincident peak demand of less than 400 kilowatts upon returning that customer to that electric utility for delivery and energy service after that alternative retail electric supplier, or an electric utility other than the electric utility in whose service area the retail customer is located, has made reasonable collection efforts on that account. Uncollectible receivables for power and energy service of alternative retail electric suppliers, or electric utilities other than the electric utility in whose service area the retail customers are located, shall be purchased by the electric utility at a just and reasonable discount rate to be reviewed and approved by the Commission, after notice and hearing. The discount rate shall be based on the electric utility's historical bad debt for receivables that are outstanding for a similar length of time and any reasonable start-up costs and administrative costs associated with the electric utility's purchase of receivables. The discounted rate for purchase of uncollectible receivables shall be included in the tariff filed pursuant to this subsection

(e). The electric utility retains the right to impose the same terms on these retail customers with respect to credit and collection, including requests for deposits, and retains the right to disconnect these retail customers, if it does not receive payment for its tariffed services or purchased receivables, in the same manner that it would be permitted to if the retail customers had purchased power and energy from the electric utility. The tariff filed pursuant to this subsection (e) shall permit the electric utility to recover from retail customers any uncollectable receivables that may arise as a result of the purchase of uncollectible receivables under this subsection (e), may also include other just and reasonable terms and conditions, and shall provide for the prudently incurred costs associated with the provision of this service pursuant to this subsection (e). Nothing in this subsection (e) permits the double recovery of utility bad debt expenses from customers. The electric utility may file a joint tariff for this subsection (e) and subsection (c) of this Section.

**Credits**

Laws 1921, p. 702, Art. XVI, § 16-118, added by P.A. 90-561, Art. I, § 5, eff. Dec. 16, 1997. Amended by P.A. 95-700, § 5, eff. Nov. 9, 2007.

Footnotes

1          220 ILCS 5/9-101 et seq.

220 I.L.C.S. 5/16-118, IL ST CH 220 § 5/16-118

Current through P.A. 100-118 of the 2017 Reg. Sess.

"Commission" means the Illinois Commerce Commission.

**"Community renewable generation project" means an electric generating facility that:**

> **(1) is powered by wind, solar thermal energy, photovoltaic cells or panels, biodiesel, crops and untreated and unadulterated organic waste biomass, tree waste, and hydropower that does not involve new construction or significant expansion of hydropower dams;**

> **(2) is interconnected at the distribution system level of an electric utility as defined in this Section, a municipal utility as defined in this Section that owns or operates electric distribution facilities, a public utility as defined in Section 3–105 of the Public Utilities Act, or an electric cooperative, as defined in Section 3–119 of the Public Utilities Act;**

> **(3) credits the value of electricity generated by the facility to the subscribers of the facility; and**

> **(4) is limited in nameplate capacity to less than or equal to 2,000 kilowatts.**

"Costs incurred in connection with the development and construction of a facility" means:

> (1) the cost of acquisition of all real property, fixtures, and improvements in connection therewith and equipment, personal property, and other property, rights, and easements acquired that are deemed necessary for the operation and maintenance of the facility;

> (2) financing costs with respect to bonds, notes, and other evidences of indebtedness of the Agency;

> (3) all origination, commitment, utilization, facility, placement, underwriting, syndication, credit enhancement, and rating agency fees;

> (4) engineering, design, procurement, consulting, legal, accounting, title insurance, survey, appraisal, escrow, trustee, collateral agency, interest rate hedging, interest rate swap, capitalized interest, contingency, as required by lenders, and other financing costs, and other expenses for professional services; and

> (5) the costs of plans, specifications, site study and investigation, installation, surveys, other Agency costs and estimates of costs, and other expenses necessary or incidental to determining the feasibility of any project, together with such other expenses as may be necessary or incidental to the financing, insuring, acquisition, and construction of a specific project and starting up, commissioning, and placing that project in operation.

**"Delivery services" has the same definition as found in Section 16–102 of the Public Utilities Act.**

**"Delivery year" means the consecutive 12–month period beginning June 1 of a given year and ending May 31 of the following year.**

"Department" means the Department of Commerce and Economic Opportunity.

"Director" means the Director of the Illinois Power Agency.

"Demand-response" means measures that decrease peak electricity demand or shift demand from peak to off-peak periods.

"Distributed renewable energy generation device" means a device that is:

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2017, I electronically filed the foregoing

Appellants' Joint Appendix with the United States Court of Appeals for the Seventh

Circuit by using the CM/ECF system. I certify that counsel of record for Appellees

are registered as ECF Filers and that they will be served by the CM/ECF system.


/s Paul Berks
Paul Berks