UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ELECTRIC POWER SUPPLY ASSOCIATION, *et al.*,
             Plaintiffs–Appellants,

      v.

ANTHONY M. STAR, *et al.*,
             Defendants–Appellees.

On Appeal from a Final Judgment of the United States District Court
for the Northern District of Illinois, No. 17 CV 1164

REPLY BRIEF OF PLAINTIFFS–APPELLANTS

Jonathan D. Schiller
David A. Barrett
BOIES, SCHILLER FLEXNER LLP
575 Lexington Ave., 7th Floor
New York, NY  10022
Telephone:  (212) 446-2300
Email:  *dbarrett@bsfllp.com*
        *jschiller@bsfllp.com*

Stuart H. Singer
Pascual Oliu
BOIES, SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL  33301
Telephone:  (954) 356-0011
Email:  *ssinger@bsfllp.com*
        *poliu@bsfllp.com*

Donald B. Verrilli, Jr.
   *Counsel of Record*
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW
Washington, DC  20004
Telephone:  (202) 220-1100
Email:  *Donald.Verrilli@mto.com*

Henry Weissmann
Fred A. Rowley, Jr.
Mark R. Yohalem
MUNGER, TOLLES & OLSON LLP
350 South Grand Ave., Ste. 5000
Los Angeles, CA  90071
Telephone:  (213) 683-9100
Email:  *Henry.Weissmann@mto.com*
        *Fred.Rowley@mto.com*
        *Mark.Yohalem@mto.com*

(Additional Counsel Listed on Inside Cover)

Leonard A. Gail
Suyash Agrawal
Paul Berks
MASSEY & GAIL LLP
50 E. Washington St., Suite 400
Chicago, IL  60602
Telephone:  (312) 283-1590
Email:  *lgail@masseygail.com*
      *sagrawal@masseygail.com*
      *pberks@masseygail.com*

Jonathan S. Massey
MASSEY & GAIL LLP
1325 G Street, N.W., Suite 500
Washington, DC  20005
Telephone:  (202) 652-4511
Email:  *jmassey@masseygail.com*

*for Plaintiffs-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................... 1

ARGUMENT .................................................................................. 3

I. PLAINTIFFS' PREEMPTION CLAIMS ARE JUSTICIABLE ....... 3

   A. Plaintiffs Have Article III Standing ........................................ 3

   B. Plaintiffs May Bring Suit in Equity to Enjoin the Operation of a Preempted State Law ..................................... 5

      1. Plaintiffs May Bring Suit in Equity Even If They Are Not the Targets of State Enforcement .................... 6

      2. Congress Did Not Intend for the FPA to Foreclose Equitable Actions Such as Plaintiffs' Suit Here .......... 13

         (a) The Text of the FPA Confirms the Availability of Plaintiffs' Right to Bring an Equitable Action to Enjoin Preempted State Law ..................................................................... 13

         (b) Other Provisions of the FPA Do Not Support the Inference that Congress Intended to Displace Traditional Equitable Remedies ............................................................. 16

II. THE ZEC PROGRAM IS FIELD-PREEMPTED ........................... 24

   A. The ZEC Subsidy Is Tethered to Wholesale Rates in the Same Manner as the Preempted Subsidy in *Hughes* ..... 25

   B. In Operation and Effect, the ZEC Program Cannot be Distinguished from the Maryland Program Preempted in *Hughes* ............................................................................... 31

   C. FERC Has Never Approved Anything Resembling the ZEC Program ......................................................................... 39

III. THE ZEC PROGRAM CONFLICTS WITH FEDERALLY ESTABLISHED WHOLESALE RATES ........................................ 44

IV.   PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION
      OF THE COMMERCE CLAUSE ..................................................... 48

      A.   Plaintiffs Have Standing to Pursue Their Dormant
           Commerce Clause Challenge ................................................. 48

      B.   Through FEJA, Illinois Is Not Participating in the
           Wholesale Energy Market But Regulating It ........................ 49

      C.   Plaintiffs Have Alleged Discrimination and *Per Se*
           Invalidity ............................................................................... 52

      D.   Plaintiffs Have Stated a *Pike* Claim .................................... 55

CONCLUSION ............................................................................................ 58

CERTIFICATE OF COMPLIANCE ......................................................... 59

CERTIFICATE OF SERVICE .................................................................. 60

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Air Evac EMS, Inc. v. Tex. Dep't of Ins.,*
  851 F.3d 507 (5th Cir. 2017) ................................................................. 8

*Allco Finance Ltd. v. Klee,*
  861 F.3d 82 (2d Cir. 2017) ......................................................... passim

*Alliance for Clean Coal v. Miller,*
  44 F.3d 591 (7th Cir. 1995) ................................................... 48, 51, 53

*Armstrong v. Exceptional Child Center, Inc.,*
  135 S. Ct. 1378 (2015) ............................................................... passim

*Avocados Plus Inc. v. Veneman,*
  370 F.3d 1243 (D.C. Cir. 2004) ......................................................... 20

*Bacchus Imports, Ltd. v. Dias,*
  468 U.S. 263 (1984) ........................................................................... 56

*Bassler v. Cent. Nat'l Bank in Chicago,*
  715 F.2d 308 (7th Cir. 1983) ............................................................ 15

*Calpine Corp. v. FERC,*
  702 F.3d 41 (D.C. Cir. 2012) ............................................................ 36

*Coal. for Competitive Electricity v. Zibelman,*
  ___ F. Supp. 3d ___, 2017 WL 3172866 (S.D.N.Y. July 25,
  2017) ................................................................................................. 23

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000) ............................................................................. 9

*Dean Milk Co. v. City of Madison,*
  340 U.S. 349 (1951) ........................................................................... 54

*Douglas v. Independent Living Center of Southern California, Inc.,*
565 U.S. 606 (2012) .................................................................. 12, 13

*FERC v. Elec. Power Supply Ass'n,*
136 S. Ct. 760 (2016) ........................................................ 23, 29, 43

*Fla. State Conference of N.A.A.C.P. v. Browning,*
522 F.3d 1153 (11th Cir. 2008) ........................................... 46

*Foster-Fountain Packing Co. v. Haydel,*
278 U.S. 1 (1928) ...................................................................... 55

*Friends of East Hampton Airport, Inc. v. Town of East Hampton,*
841 F.3d 133 (2d Cir. 2016) .................................... 11, 19, 22

*Green v. Mansour,*
474 U.S. 64 (1985) ...................................................................... 12

*Hardin v. Kentucky Utils. Co.,*
390 U.S. 1 (1968) ...................................................................... 10

*Hughes v. Alexandria Scrap Corp.,*
426 U.S. 794 (1976) ............................................................ 50, 52

*Hughes v. Oklahoma,*
441 U.S. 322 (1979) .................................................................. 54

*Hughes v. Talen Energy Marketing LLC,*
136 S. Ct. 1288 (2016) ................................................... passim

*Idaho v. Coeur d'Alene Tribe of Idaho,*
521 U.S. 261 (1997) .................................................................... 7

*Johnson v. United States Office of Personnel Management,*
783 F.3d 655 (7th Cir. 2015) ................................................... 5

*Lewis v. BT Investment Managers, Inc.,*
447 U.S. 27 (1980) .................................................. 56

*McCarthy v. Madigan,*
503 U.S. 140 (1992) ................................................ 20

*McKart v. United States,*
395 U.S. 185 (1969) ................................................ 21

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning,*
136 S. Ct. 1562 (2016) ..................................... 15, 16

*Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cty.,*
431 F.3d 277 (7th Cir. 2005) .............................. 54

*Minnesota v. Clover Leaf Creamery,*
449 U.S. 456 (1981) ....................................... 53, 55

*Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1
of Snohomish City,*
554 U.S. 527 (2008) .............................................. 34

*Nat'l Meat Ass'n v. Harris,*
565 U.S. 452 (2012) .............................................. 32

*Nat'l Paint & Coatings Ass'n v. City of Chicago,*
45 F.3d 1124 (7th Cir. 1995) ............................... 56

*New Energy Co. of Ind. v. Limbach,*
486 U.S. 269 (1988) ................................. 50, 51, 57

*New York State Conference of Blue Cross & Blue Shield
Plans v. Travelers Insurance Co.,*
514 U.S. 645 (1995) ........................................... 9, 10

*Nw. Central Pipeline Corp. v. State Corp. Comm'n,*
489 U.S. 493 (1989) .............................................. 44

*PPL EnergyPlus, LLC v. Nazarian,*
753 F.3d 467 (4th Cir. 2014)............................................30, 45, 46, 48

*PPL Energyplus, LLC v. Solomon,*
766 F.3d 241 (3d Cir. 2014) ............................................................. 10

*Park Pet Shop, Inc. v. City of Chicago,*
872 F.3d 495 (7th Cir. 2017).............................................................55

*Pharmaceutical Research & Manufacturers of America v.
Walsh,*
538 U.S. 644 (2003) ...........................................................................9

*Pike v. Bruce Church, Inc.,*
397 U.S. 137 (1970)......................................................................55, 56

*Pub. Util. Dist. No. 1 of Grays Harbor County v. IDACORP
Inc.,*
379 F.3d 641 (9th Cir. 2004)........................................................30, 45

*Schafer v. Exelon Corp.,*
619 F. Supp. 2d 507 (N.D. Ill. 2007)..................................................24

*Seminole Tribe of Florida v. Florida,*
517 U.S. 45 (1996) ...........................................................................19

*Touche Ross & Co. v. Redington,*
442 U.S. 560 (1979) .........................................................................15

*Town of Barnstable v. O'Connor,*
786 F.3d 130 (1st Cir. 2015) ..............................................................8

*United States v. Locke,*
529 U.S. 89 (2000) ...........................................................................30

*Va. Office for Protection and Advocacy v. Stewart,*
563 U.S. 247 (2011) ...........................................................7, 11, 12, 18

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
535 U.S. 635 (2002) ................................................. 5, 14, 15

*West Lynn Creamery, Inc. v. Healy,*
512 U.S. 186 (1994) ........................................................... 55

*Woodford v. Ngo,*
548 U.S. 81 (2006) ............................................................. 20

*Wos v. E.M.A.,*
568 U.S. 627 (2013) ...................................................... 32, 38

*Wyoming v. Oklahoma,*
502 U.S. 437 (1992) ...................................................... 49, 51

*Ex parte Young,*
209 U.S. 123 (1908) ............................................................. 5

**REGULATORY CASES**

*Calpine Corp. v. PJM Interconnection, LLC,*
FERC Docket No. EL16-49-000 (Feb. 23, 2017) ................ 47

*Consumers Energy Co.,*
94 FERC ¶ 61,180 (2001) ................................................... 46

*Golden Spread Elec. Coop., Inc. v. Sw. Pub. Serv. Co.,*
123 FERC ¶ 61,047 (2008) ............................................ 45, 46

*ISO New England, Inc.,*
158 FERC ¶ 61,138 (2017) ............................................ 42, 43

*WSPP Inc.,*
139 FERC ¶ 61,061 (2012) ................................ 39, 40, 43, 44

**FEDERAL STATUTES**

16 U.S.C. § 824(a) ............................................................. 25

16 U.S.C. § 824a-3(h)(2)(B) ............................................... 21, 22

16 U.S.C. § 824d(a) ........................................... 24, 25, 38

16 U.S.C. § 825*l* ............................................................... 20

16 U.S.C. § 825p ................................................... passim

### STATE STATUTES AND LEGISLATIVE MATERIALS

20 ILCS 3855/1-75(d-5)(1) ...................................... 36, 53

20 ILCS 3855/1-75(c)(1)(D) ........................................ 41

20 ILCS 3855/1-75(d-5)(1)(B)(iii) ............................. 39

Act of Dec. 7, 2016, 2016 Ill. Legis. Serv. P.A. 99-906 (S.B. 2814) ........................................................... 50, 55

### OTHER AUTHORITIES

Brief of Respondent FERC, *Orangeburg, S.C. v. FERC*, No. 15-1274 (D.C. Cir.), 2016 WL 2642237 (May 9, 2016) ................ 21

Mormann, Felix, *Clean Energy Federalism*, 67 Fla. L. Rev. 1621 (2015) ..................................................... 42

**INTRODUCTION**

Illinois' zero-emissions credit (ZEC) program violates federal law by supplanting interstate wholesale rates for electricity that FERC has deemed just and reasonable. It disrupts and distorts the auction process FERC has approved for setting wholesale rates. And it discriminates against out-of-state electricity producers by subsidizing two favored Illinois power plants that dump energy into the interstate market below cost.

These legal infirmities flow directly from the regulatory means Illinois has chosen, not from the ends it claims to advance. If Illinois genuinely seeks to combat climate change by promoting zero-emissions electricity generation, it has ample means to do so without intruding on the federal government's exclusive authority over wholesale electricity markets or discriminating against out-of-state suppliers. Most obviously, the State could adopt a carbon tax or a cap-and-trade program for carbon emissions, as have many other states. While these measures might affect wholesale prices, they would operate independently of the wholesale power markets. But Illinois has not chosen to promote its ostensible environmental objectives in these ways,

or even by offering a fixed subsidy to nuclear plants.  Instead, it adjusts the amount of the subsidy based on wholesale market prices.

This price-setting mechanism is preempted because it impinges upon, and conflicts with, FERC's exclusive jurisdiction.  "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates." *Hughes v. Talen Energy Marketing LLC*, 136 S. Ct. 1288, 1298 (2016). That is precisely what the ZEC program does.  In both intended operation and effect, it is no different from the Maryland program that a unanimous Supreme Court found preempted in *Hughes*.

Defendants' assertion that the ZEC subsidy pays for the "environmental benefits" of production is beside the point.  The relevant question is not the State's characterization of the subsidy, but the structure of the payment.  If Illinois had purported to pay for the environmental benefits of nuclear plants by expressly conditioning the payment on those plants selling into wholesale markets, and expressly calibrating those payments to the amount received from such wholesale sales, the law would unquestionably be preempted under *Hughes*.  The

question in this case is whether the absence of such express provisions

matters.  As shown below, it does not.

## ARGUMENT

## I.  PLAINTIFFS' PREEMPTION CLAIMS ARE JUSTICIABLE

### A.  Plaintiffs Have Article III Standing

Plaintiffs' field and conflict preemption claims challenge the ZEC

subsidy established by Illinois' Future Energy Jobs Act (FEJA) on the

ground that it will set prices that "effectively replac[e]" and "artificially

suppress" FERC-mandated auction prices (A.32, A.36 (Compl. ¶¶ 72,

82)) resulting in "lower revenues" for other generators (A.5 (Compl.

¶ 10)), and causing Plaintiffs competitive injury (A.5, A.33-35 (Compl.

¶¶ 10, 73, 79)).  These allegations are plainly sufficient to establish

injury in fact (loss of revenue) fairly traceable to the challenged statute

(the ZEC subsidy provisions in FEJA) and that would be redressed by a

favorable judgment (an injunction against enforcement of the ZEC

subsidy).  *See Allco Finance Ltd. v. Klee*, 861 F.3d 82, 95-96 (2d Cir.

2017) (solar generating company had standing to challenge state

renewable energy policy as preempted by the Federal Power Act (FPA)

based upon allegations that the policy impermissibly excluded plaintiff's

power plants); Appellants' Opening Brief (AOB) 20.

The State does not challenge Plaintiffs' standing. Exelon does not dispute that Plaintiffs have alleged injury-in-fact, and it tacitly concedes that this injury would be redressed by a favorable judgment. Exelon nevertheless contends that Plaintiffs fail to establish traceability, suggesting that their injury can be traced only to the Base Subsidy Amount, not to the Price Adjustment Feature. Exelon's argument is without merit.

Plaintiffs' injury is traceable to the ZEC subsidy. The subsidy cannot be deconstructed into the Base Subsidy Amount and Price Adjustment, because the total subsidy is a function of the interaction of those two integrated provisions. That is clear both from the face of the statute (*see* AOB 21) and Plaintiffs' allegations about how the subsidy works (A.28-29 (Compl. ¶ 63)). In conceding that Plaintiffs have properly pleaded redressability, Exelon necessarily also concedes that the Base Subsidy Amount and the price adjustment are not severable (or, at least, that non-severability must be assumed at this stage). *See* AOB 21-24. This concession dooms Exelon's argument, as the injury is traceable to the operation of those interconnected, non-severable and elements that comprise the ZEC subsidy.

The case might be different if, as in *Johnson v. United States Office of Personnel Management*, 783 F.3d 655 (7th Cir. 2015), the statute included disparate provisions, only some of which affected Plaintiffs. AOB 24-25. Imagine, for example, a FEJA that included one section providing the ZEC subsidy and another section providing ratepayer funding for research into greenhouse gas emissions. Competing generators would not suffer competitive injury traceable to the research funding provision. But in this case, it is the ZEC subsidy that harms Plaintiffs. Because the ZEC payment is computed by combining the Base Subsidy Amount and the Price Adjustment, and those variables are interrelated and non-severable, the subsidy provision cannot be broken apart for purposes of either traceability *or* redressability.

### B. Plaintiffs May Bring Suit in Equity to Enjoin the Operation of a Preempted State Law

Plaintiffs' prayer for an injunction against enforcement of the ZEC subsidy program is a traditional claim for equitable relief under *Ex parte Young*, 209 U.S. 123 (1908), *i.e.*, a "complaint [that] alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535

U.S. 635, 645 (2002). The district court thus has jurisdiction unless the FPA manifests an intent to withdraw such jurisdiction. *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1392 (2015). Because the FPA reconfirms, rather than strips the courts of, jurisdiction over private actions in equity, the district court erred in concluding it lacked jurisdiction. See AOB 27.

Defendants advance two counter-arguments. First, they assert that Plaintiffs' claim is not a traditional equitable action, which they contend is limited to plaintiffs who are the targets of a potential enforcement action. Exelon Answering Brief (EAB) 15-16; Illinois Answering Brief (IAB) 20-21. Second, they maintain that despite the FPA's express grant of equity jurisdiction, the district court properly construed the FPA to foreclose equitable actions like Plaintiffs' suit here. EAB 16-24; IAB 21-26. Both arguments are unavailing.

### 1. Plaintiffs May Bring Suit in Equity Even If They Are Not the Targets of State Enforcement

Defendants erroneously assert that *only* a party that is the potential target of state enforcement may bring an equitable action under *Ex parte Young* to enjoin enforcement of a preempted or unconstitutional state law. Plaintiffs may not proceed under *Ex Parte*

*Young*, Defendants reason, because they are "bystanders trying to enforce federal law against others." EAB 16.

To begin with, Defendants' characterization of this lawsuit is wrong. Plaintiffs do not seek to require Defendants to take affirmative steps to conform their conduct to federal law as enforced by federal agencies. Rather, they seek only negative relief preventing Illinois' incursion into FERC's exclusive regulatory authority in a manner that harms Plaintiffs. That request falls within the heartland of federal courts' equity jurisdiction, for the Supreme Court has made clear that any plaintiff with Article III standing may seek an injunction against enforcement of a preempted state law. "An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke … *Young*." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997); *see also id.* at 296 (O'Connor, J., concurring in part and concurring in the judgment) (*Young* requires "a straightforward inquiry into whether a complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective"); *Va. Office for Protection and Advocacy v. Stewart* ("*VOPA*"), 563 U.S. 247, 256 (2011) ("there is no warrant in our cases for

making the validity of an *Ex parte Young* action turn on the identity of the plaintiff").

There are innumerable examples of equitable actions under *Young* to enjoin preempted or otherwise unconstitutional state laws that proceeded in federal court even though the plaintiff was not a potential target of a state enforcement action. *Armstrong* itself was such a case: the plaintiffs claimed that the state's reimbursement rates for habilitation services were too low. 135 S. Ct. at 1382. The plaintiffs did not face an enforcement action, yet the Court had no doubt that the claim fell within traditional equity jurisdiction. *Id.* at 1384. The entire discussion of how the Medicare Act forecloses equity jurisdiction would have been unnecessary if, as Defendants contend, equity jurisdiction does not extend to plaintiffs, such as the provider plaintiffs in *Armstrong*, who did not face an enforcement action. *Id.*; *see also, e.g.*, *Town of Barnstable v. O'Connor*, 786 F.3d 130, 137, 139-40 (1st Cir. 2015) (lawsuit by town, nonprofit group, businesses, and residents seeking to enjoin, as preempted by FPA and in violation of dormant Commerce Clause, state officials' approval of contracts for power from offshore wind farm); *Air Evac EMS, Inc. v. Tex. Dep't of Ins.*, 851 F.3d

507, 519 (5th Cir. 2017) (the "type of direct enforcement found in *Ex parte Young*" is "not required" for lawsuit to proceed).

Many *Ex parte Young* cases have arisen in the posture here: businesses suing to enjoin the operation of a state law that favored competitors at their expense.

- In *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 367 (2000), businesses argued that federal law preempted a state statute that prohibited the state from doing business with them. They faced no enforcement action, but the federal courts nonetheless entertained their claim for injunctive relief on preemption grounds.

- In *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644, 654-56 (2003), drug manufacturers sued to enjoin, as preempted by the Medicaid Act, a state drug rebate program that benefited competitors. The plaintiffs were not potential subjects of an enforcement action.

- In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645, 650-51

(1995), commercial health insurers, asserting ERISA preemption, sued to enjoin a state law requiring hospitals to collect surcharges from commercial insurers but not from competing Blue Cross plans.

- In *Hughes* 136 S. Ct. at 1296, and *PPL Energyplus, LLC v. Solomon*, 766 F.3d 241, 249 (3d Cir. 2014), existing power generators raised an FPA preemption challenge to a state statute subsidizing new generators. *See also Allco*, 861 F.3d at 90 (preemption challenge brought by operator of facility excluded from state renewable energy program).

These cases reflect the general rule that where a statute evidences "a legislative purpose to protect a competitive interest," the injured competitor is a proper party to challenge it. *Hardin v. Kentucky Utils. Co.*, 390 U.S. 1, 6 (1968).

Defendants ask this Court to disregard these and many other cases involving equitable actions by private parties to enforce the FPA (AOB 28 n.2) because "they … precede *Armstrong*" and supposedly did not consider "the equitable-cause-of-action issue" (EAB 18).  But *Armstrong* did not purport to change the law.  Rather, it reaffirmed the

"long history of judicial review" of preempted or unconstitutional

governmental action that "is the creation of courts of equity." 135 S. Ct.

at 1384.

While there are cases in which the plaintiff faced an enforcement

action, *see, e.g.*, *Friends of East Hampton Airport, Inc. v. Town of East

Hampton*, 841 F.3d 133, 144 (2d Cir. 2016), Defendants cite no case that

*limits* equity jurisdiction to such plaintiffs. The *East Hampton* Court

had no occasion to consider whether *Ex parte Young*-type relief is

available *only* to plaintiffs who "face state 'enforcement proceedings'

requiring assertion of a preemption defense" (EAB 16 (citing *East

Hampton*, 841 F.3d at 146)), much less to consider whether a statute

that, like the FPA, broadly confers jurisdiction over "all suits in equity"

could be so construed. And far from limiting *Ex Parte Young* to lawsuits

in equity anticipating enforcement proceedings (EAB 15-16; IAB 20),

*VOPA* refutes the existence of such a limitation.

The plaintiff in *VOPA* did *not* assert its preemption claim by way

of "anticipatory defense." *Cf.* EAB 16. The plaintiff was a state agency

seeking a declaration that a state law privileging certain medical peer-

review documents was preempted. 563 U.S. at 252-53. The Court

concluded that VOPA's claim was cognizable under *Ex Parte Young* even though the plaintiff state agency could never be the subject of a state enforcement action.  *Id.* at 255.

Defendants point to Justice Kennedy's concurring opinion in *VOPA* (EAB 15-16; IAB 20), but Justice Kennedy joined the majority in recognizing equity jurisdiction over the plaintiff's non-anticipatory action, and merely observed that *Young* itself involved "the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law."  563 U.S. at 262.  Justice Kennedy did not say that equitable actions rooted in *Young* may proceed *only* in that posture.  Rather, he recognized that "[t]he Court has expanded the *Young* exception far beyond its original office in order 'to vindicate the federal interest in assuring the supremacy of federal law.'"  *Id.* (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)).

Defendants also rely on the Chief Justice's dissent in *Douglas v. Independent Living Center of Southern California, Inc.*, 565 U.S. 606, 620 (2012).  EAB 16; IAB 20.  Like Justice Kennedy's concurrence in *VOPA*, which it quotes, the *Douglas* dissent observed that *Ex Parte*

*Young* itself involved a preemptive assertion of a defense, but did not say that this is the only situation in which equity jurisdiction exists. The dissent would have rejected equity jurisdiction because the Medicaid Act evinces an intent to foreclose a private remedy. 565 U.S. at 620. Indeed, that was the holding of the Court in the subsequent decision in *Armstrong*, which the Chief Justice joined. As noted, *Armstrong* confirms that the provider plaintiffs' claim fell within the courts' traditional equity jurisdiction, but ultimately held that the Medicaid Act withdrew such jurisdiction for the claims pled.

> **2. Congress Did Not Intend for the FPA to Foreclose Equitable Actions Such as Plaintiffs' Suit Here**

Because Plaintiffs' claim is within the equitable jurisdiction of federal courts, it is justiciable unless the FPA establishes "Congress's 'intent to foreclose' equitable relief." *Armstrong*, 135 S. Ct. at 1385. No such intent appears in the FPA.

> **(a) The Text of the FPA Confirms the Availability of Plaintiffs' Right to Bring an Equitable Action to Enjoin Preempted State Law**

Section 825p of the FPA confers jurisdiction on district courts over "*all suits in equity* and actions at law … to enjoin *any* violation of[] this

chapter." 16 U.S.C. § 825p (emphases added). Congress would not have used this language if it intended to displace the settled rule that an equitable action is available to enjoin state regulatory actions preempted by the FPA. The courts would not have allowed such actions for decades if the FPA barred them. And the Supreme Court would not have reached the merits of the preemption claim in *Hughes* if it believed the FPA stripped the courts of jurisdiction. 136 S. Ct. at 1296.

Defendants' contention that section 825p does not create a cause of action (IAB 23-24; EAB 23-24) misses the point. A plaintiff invoking equity jurisdiction to enjoin preempted state law need not rely on a statutorily created private right of action because an action "to sue to enjoin unconstitutional conduct by state and federal officers *is the creation of courts of equity.*" *Armstrong*, 135 S. Ct. at 1384 (emphasis added); *see* AOB 34.

*Verizon Maryland* reinforces this point: the Court there entertained a suit seeking an injunction against an allegedly preempted state order notwithstanding the absence of any statutory provision authorizing such a claim. 535 U.S. at 642. Defendants erroneously argue that *Verizon Maryland* was a case about "jurisdiction" that "did

not address a cause of action." EAB 23-24; *accord* IAB 24. The Court considered it irrelevant that the statute did not create a private cause of action for injunctive relief, because that power is inherent in courts of equity. *Verizon Md.*, 535 U.S. at 642-43. Thus, cases holding that language similar to that of Section 825p is insufficient to create a cause of action for claims that *cannot* be brought under *Young*—such as damages actions or suits against private parties—are inapposite. *See* IAB 24; EAB 24 (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576-77 & n.17 (1979), and *Bassler v. Cent. Nat'l Bank in Chicago*, 715 F.2d 308, 312-13 (7th Cir. 1983)).

It is similarly irrelevant that the Public Utility Regulatory Policies Act (PURPA) creates a cause of action while the FPA does not. *See* IAB 23 n.8. *Verizon Maryland* teaches that PURPA's creation of a private right of action for one type of claim does not affect equity jurisdiction for a different type of claim. PURPA, enacted decades after the FPA, does not impliedly repeal the FPA's broad jurisdictional grant or disturb the courts' well-established equity jurisdiction. *See* AOB 33.

Defendants argue that §825p "merely confers the same jurisdiction federal courts have under § 1331." EAB 24 (citing *Merrill*

*Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1575 (2016)).  That too misses the point.  Plaintiffs do not contend that the jurisdiction contemplated by Section 825p is broader than, or different from, Section 1331 jurisdiction, which was the issue in *Merrill Lynch*, 136 S. Ct. at 1567.  Plaintiffs instead contend that the reference to "all suits in equity … to enjoin any violation of[] this chapter" in Section 825p cannot be squared with the notion that Congress intended to foreclose *Ex parte Young* actions under the FPA.

> **(b)   Other Provisions of the FPA Do Not Support the Inference that Congress Intended to Displace Traditional Equitable Remedies**

Nor can Defendants establish that other provisions of the FPA reflect an intent to divest the courts of their power to issue equitable relief under *Ex Parte Young*.

Neither the holding nor the reasoning of *Armstrong* supports Defendants' divestiture argument.  *See* EAB 16-23; IAB 21-26.  The "two aspects" of the Medicaid Act provision that led the *Armstrong* Court to conclude that Congress had "'inten[ded] to foreclose' equitable relief" were (1) the limited remedies available under the statute and (2) the "judicially unadministrable nature" of the standard governing the

plaintiff's claim. 135 S. Ct. at 1385. Because neither of these factors is present here, let alone both, the FPA cannot be construed to foreclose equity jurisdiction.

As an initial matter, the Court's opinion demonstrates that *both* these factors must be present to infer a congressional intent to displace traditional equitable remedies. The State maintains that the presence of "either" of these factors "is sufficient to foreclose a cause of action for a preemption-based injunction where the plaintiff is not the target of an enforcement proceeding under state law." IAB 21 n.7. The State cites no authority for that view, however, and *Armstrong*'s language directly refutes it. 135 S. Ct. at 1385 (the Act's limited remedies, "*combined with* [its] judicially unadministrable nature," "preclude[d] the availability of equitable relief"(emphasis added)); *id.* at 1385 (noting that limitation on remedies "might not, *by itself*, preclude the availability of equitable relief" (emphasis added)); *see also id.* at 1388 (Breyer, J., concurring) ("several characteristics of the federal statute before us, when taken together, make clear that Congress intended to foreclose respondents from bringing this particular action for injunctive relief"). *Armstrong*, 135 S. Ct. at 1385, cites *VOPA*, 563 U.S. at 256 n.3,

which held that a statute's provision of a specific administrative enforcement method, standing alone, "does not demonstrate that Congress has 'displayed an intent not to provide the 'more complete and more immediate relief' that would otherwise be available under *Ex parte Young*."

***Available remedies***.  In *Armstrong*, the "sole remedy Congress provided for a state's failure to comply with [the] Medicaid [Act]'s requirements" was the "withholding of Medicaid funds by the Secretary of Health and Human Services."  135 S. Ct. at 1385.  That is not true here:  nothing in the FPA says that only FERC can enforce the law, or that it must do so in a single limited way; Section 825p expressly envisions that private parties may sue under the FPA; and courts have consistently entertained preemption claims by private parties.  AOB 28-29 & n.2.  If Congress were displeased with that exercise of equity jurisdiction, it would have said so in amending the FPA six times over the past 40 years.  *See id.*

None of Defendants' arguments rebuts these points.  Defendants argue that the FPA's remedial scheme, which allows parties to bring administrative complaints before FERC, is incompatible with an *Ex*

*parte Young* action. IAB 22-23; EAB 17-19. But many federal statutes

provide for administrative relief, and this has never been thought to

preclude injunction actions against state actors. AOB 31-32; *see also*

*East Hampton*, 841 F.3d at 144-47. Defendants do not identify any

particular aspect of the FPA's administrative scheme that is

incompatible with private injunctive actions. That FERC may "act on

its own initiative," "solicit stakeholders' views," and "calibrate" its

response accordingly (EAB 17) is irrelevant: those are commonplace

features of agency proceedings and are not undermined by lawsuits

such as this one.

By contrast, *Seminole Tribe of Florida v. Florida*, 517 U.S. 45

(1996), involved a remedial scheme that *was* incompatible with an *Ex

parte Young* action. *Cf.* EAB 17-18, IAB 23. The Indian Gaming

Regulatory Act created a limited equitable remedy tailored to a unique

situation: a judicial order to negotiate a tribal gaming compact for 60

days, followed by mediation and an administrative ruling. 517 U.S. at

73. A *Young* action would have "cast[] aside" the statute's limitations

on equitable relief by making "complete and more immediate relief"

available. *Id.* at 74-75. Because there are no FPA remedial provisions

that would be negated by this action, Defendants' reliance on *Seminole Tribe* is misplaced. *See* AOB 32-33.

The implication of Defendants' arguments is that Plaintiffs were required to exhaust administrative remedies before proceeding in court. But Defendants do not use the term "exhaustion," and for good reason: that doctrine is inapplicable here. Where "Congress has not *required* exhaustion" of a plaintiff's claim, courts generally do not impose such a requirement unless the claim raises the sorts of concerns exhaustion is meant to address, such as allowing an agency to "correct its own mistakes" or exercise its "special expertise." *McCarthy v. Madigan*, 503 U.S. 140, 145, 152 (1992), *superseded in part on other grounds by statute as recognized in Woodford v. Ngo*, 548 U.S. 81, 85 (2006).

None of those factors applies to this case. The FPA mandates exhaustion only for parties who have been "aggrieved by" a FERC order that they wish to challenge. 16 U.S.C. § 825*l*. Plaintiffs do not fall under this provision. For parties in Plaintiffs' position, the FPA "neither mentions exhaustion nor explicitly limits the jurisdiction of the courts." *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004). Nor are concerns about agency self-correction and technical

expertise implicated.  Plaintiffs are not challenging FERC regulations or decisions, so there are no "mistakes" for FERC to correct.  Nor is FERC's expertise needed to resolve Plaintiffs' preemption claims, a task familiar to the courts (as *Hughes* illustrates).  *See McKart v. United States*, 395 U.S. 185, 197-98 (1969).  Indeed, FERC itself recognizes that, apart from the administrative process, "[a]n entity that believes it is harmed by a state's action that conflicts with the [FPA] may pursue its claim in state or federal court."  Br. of Respondent FERC, *Orangeburg, S.C. v. FERC*, No. 15-1274 (D.C. Cir.), 2016 WL 2642237, at *36 (May 9, 2016) (collecting cases).

It does not matter that PURPA allows a right of action only to parties that first exhaust their claims before FERC.  *See* EAB 20.  This express exhaustion requirement—like PURPA's creation of the cause of action—in no way indicates that Congress intended to foreclose *Ex parte Young* actions based upon the preemptive force of *other* FPA provisions.[1]  To the contrary, the inclusion of an exhaustion

---

[1] PURPA establishes a narrow carve-out to FERC's exclusive jurisdiction over wholesale rates.  It authorizes States initially to set the rates for certain environmentally-beneficial generators.  If a generator believes a state-set wholesale rate is too low, it must seek FERC review before going to federal court.  16 U.S.C. § 824a-3(h)(2)(B).

requirement limited to specific PURPA claims, but not others, indicates that exhaustion is *not* required in ordinary FPA preemption cases. AOB 35-36.

Finally, Defendants note that other provisions of the FPA expressly authorize the federal government to sue to enjoin its violation. EAB 19.  But concurrent private and agency enforcement of statutes is routine (*see* AOB 29-31), and there is nothing unique to the FPA to suggest they are incompatible here.  As the Second Circuit recognized in *East Hampton*, "[t]he fact that Congress conferred such broad enforcement authority on [an agency], and not on private parties, does not imply its intent to bar such parties from invoking federal jurisdiction."  841 F.3d at 146.

*Judicial administrability*.  Plaintiffs' claims raise no judicial administrability concerns.  A comparison with *Armstrong* is telling. The *Armstrong* plaintiffs sought an affirmative injunction increasing their rates, which would have required the court to determine (as might an administrative agency) whether the challenged rates were "consistent with efficiency, economy and quality of care."  135 S. Ct. at 1382.  Here, by contrast, Plaintiffs seek to enjoin enforcement of a

preempted state law, a traditional remedy that turns only on whether state regulation invades FERC's jurisdiction. *See* AOB 37. That is a question well-suited to judicial resolution. *See*, *e.g.*, *Hughes*, 136 S. Ct. at 1297; *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 766 (2016) ("*EPSA*") (noting the "steady flow of jurisdictional disputes" between states and FERC because of overlapping jurisdictions); *Coal. for Competitive Electricity v. Zibelman*, ___ F. Supp. 3d ___, 2017 WL 3172866, at *6-7 (S.D.N.Y. July 25, 2017) (rejecting argument that FPA's standard is not judicially administrable).

Like the district court, Defendants attempt to bring Plaintiffs' preemption claim within the scope of *Armstrong* by arguing that it requires the court to apply the FPA's "just and reasonable" rate standard. IAB 22. The issue, however, is not *what* wholesale electricity rates should be, but *who* should set them. Plaintiffs allege the ZEC program "contraven[es] the FPA's division of authority between state and federal regulators" by seeking to set 'rates and charges … received … for or in connection with' interstate wholesale sales.'" *Hughes*, 136 S. Ct. at 1297 (quoting 16 U.S.C. § 824d(a)). That is the same issue *Hughes* addressed, and the Court's decision rested on statutory scope

language ("in connection with") that is familiar to the federal courts—including courts in this Circuit. *See, e.g.*, *Schafer v. Exelon Corp.*, 619 F. Supp. 2d 507, 515 (N.D. Ill. 2007) (holding preempted antitrust claims challenging FERC-mandated "market-based rates").

Defendants offer no coherent theory of why the controlling preemption standard was administrable in *Hughes* but not here. Defendants suggest that arguments based upon the distortive effect of ZEC payments on the wholesale electricity market invite a judicially unadministrable inquiry into how much distortion is permissible. IAB 25; EOB 21-22. This case, however, does not turn on the magnitude of the distortion, but the tethering of the subsidy to the wholesale market—precisely the issue addressed in *Hughes*.

## II. THE ZEC PROGRAM IS FIELD-PREEMPTED

The FPA forecloses a state from setting "rates and charges … received by any public utility for or in connection with the … sale of electric energy" for resale. 16 U.S.C. § 824d(a), § 824(a). That is what the ZEC program does. It is preempted.

**A.    The ZEC Subsidy Is Tethered to Wholesale Rates in the Same Manner as the Preempted Subsidy in *Hughes***

Try as they might, Defendants cannot change the essential allegations and facts requiring preemption.  When Exelon's Clinton and Quad Cities plants sell electricity at wholesale, they receive a FERC-approved rate just like other wholesale market participants.  Unlike other wholesale sellers, however, these plants *also* receive a state-mandated subsidy—a ZEC payment—for each unit.  The amount of that subsidy is calculated based on wholesale auction rates.  It varies inversely with those rates to ensure Exelon's revenues are sufficient to cover the costs of its economically inefficient plants.  Exelon necessarily "receive[s]" ZEC payments "in connection with" sales of electricity at wholesale, *id.* § 824d(a), because the plants necessarily sell the electricity they generate on wholesale markets. The ZEC program thus "guarantees [Exelon] a rate distinct from the clearing price for its interstate sales."  *Hughes*, 136 S. Ct. at 1297.

Defendants all but concede that the ZEC program possesses the characteristics the Supreme Court found dispositive in *Hughes*:

- The favored plants sell the electricity they generate into wholesale markets and receive the subsidy for those sales. *Compare Hughes*, 136 S. Ct. at 1299, *with* IAB 10-11.

- The subsidies are tethered to the wholesale auction rates by a statutory formula that calculates the subsidy based on those rates. *Compare Hughes*, 136 S. Ct. at 1295, *with* IAB 11.

- The subsidies vary inversely with auction rates, decreasing as rates rise and increasing as they fall, to ensure that Exelon receives wholesale revenues at state-preferred levels rather than the FERC-approved levels set at auction. *Compare Hughes*, 136 S. Ct. at 1295 & n.5, *with* IAB 11, EAB 10.

- Load-serving entities ("LSEs") are required to pay Exelon to make up the difference between the FERC-approved auction rates and the compensation Illinois has dictated, and LSEs then pass that cost on to retail customers. *Compare Hughes*, 136 S. Ct. at 1295 & n.5, 1299, *with* IAB 11.

Defendants seek to distinguish the Maryland program preempted in *Hughes* on the theory that Illinois' goal was to assign value to the environmental benefits of nuclear power generation (EAB 9), not to alter the wholesale rate for electricity. As Defendants would have it, this purported objective places the ZEC program on the non-preempted side of a "bright line" that divides exclusive state authority over power generation from exclusive federal authority over wholesale rates. EAB 27-28.

As an initial matter, that account of the ZEC program's purpose is dubious. The ZEC program was plainly reverse-engineered to keep Exelon's unprofitable Clinton and Quad Cities plants in operation. (A.25-28 (Compl. ¶¶ 54-62).) The statutorily prescribed "public interest criteria" effectively dictate that only those two, and none of Exelon's other Illinois nuclear plants, will be eligible for ZEC subsidies (even though the others presumably generate power with similarly valuable environmental attributes). *See* AOB 12-13. And the statute limits the ZEC program to 16% of the State's electricity needs, almost exactly the amount produced by these two plants. AOB 12. If the ZEC truly represents compensation for environmental benefits, then all zero-

emitting facilities (other nuclear plants, wind, solar, etc.) should receive the same subsidy, and the subsidy paid to the favored plants should not fluctuate based on wholesale market prices.

Even if the ZEC program were aimed at the environmental benefits of the three favored plants, that would not distinguish this case from *Hughes*. Maryland advanced a similar purpose-based argument, contending that its pricing program aimed solely to ensure a reliable future supply of power generation, not to disrupt or alter FERC-approved mechanisms for setting wholesale rates. 136 S. Ct. at 1298. Indeed, Maryland argued that state regulation of energy generation is categorically exempt from preemption, *see id.*—just as Defendants argue here. EAB 27-28; IAB 30-31.

The Supreme Court, however, was crystal clear that "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates … even when States exercise their traditional authority over … in-state generation." *Hughes*, 136 S. Ct. at 1298-99. The relevant dividing line is between state regulatory means that impermissibly intrude on FERC's exclusive rate-setting authority and regulatory means that do

not.  The analysis is functional, not formalistic, which is why the Court

has construed the FPA to preempt not only "'direct state regulation of

the prices of interstate wholesales,'" but also "regulation that 'would

indirectly achieve the same result.'"  *EPSA*, 136 S. Ct. at 780.

Whatever its objectives, the ZEC program "interfere[s] with

FERC's authority" in precisely the same ways as did the Maryland

program because Illinois has "disregard[ed] interstate wholesale rates

FERC has deemed just and reasonable."  *Hughes*, 136 S. Ct. at 1299-

1300.  Maryland sought to add new generation capacity by

guaranteeing that a favored plant would receive subsidy payments in

addition to FERC-approved rates for electricity sold at wholesale.  It

tethered those payments to the FERC-approved rate-setting

mechanism.  Illinois seeks to ensure that two nuclear plants can

operate profitably by guaranteeing them subsidy payments for all of the

electricity they sell at wholesale.  It tethers those payments to the

FERC-approved rate-setting mechanism.  So Illinois' ZEC program

should meet the same fate as the Maryland program.

The ZEC program's displacement of FERC-mandated rates cannot

be saved, as Defendants suggest, by invoking a "presumption against

preemption." EAB 26. That presumption has no application where, as here, the question is whether a state law invades a sphere of authority with a history of significant federal involvement. *See United States v. Locke*, 529 U.S. 89, 108 (2000); *Pub. Util. Dist. No. 1 of Grays Harbor County v. IDACORP Inc.*, 379 F.3d 641, 648 (9th Cir. 2004); *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 477 (4th Cir. 2014), *aff'd on other grounds sub nom. Hughes*, 136 S. Ct. 1288. In *Hughes*, the Supreme Court decided a question like the one presented here without mentioning, much less applying, any such presumption.

Nor will giving *Hughes* its proper controlling effect have the "staggering" consequences Defendants posit. EAB 43. Unlike the ZEC program, none of the regulatory means that Defendants identify— RECs, cap-and-trade, carbon taxes, and so on—possesses the characteristics that trigger preemption here. None of these regulatory options tethers subsidy amounts to FERC-approved wholesale rates (and they certainly do not set alternative wholesale rates), and none is designed to guarantee that generators will receive the subsidies in connection with their sales on wholesale markets. As a result, none of these regulatory alternatives would transgress the line drawn in

*Hughes*, and there would be no need for a court evaluating them under

*Hughes* to conduct the burdensome analysis that Exelon hypothesizes.

EAB 43-44.  But when State subsidies *are* tethered to wholesale market

participation and wholesale rates as they were in *Hughes*, the

program's intended operation and effect amounts to preempted rate-

setting.

> **B.    In Operation and Effect, the ZEC Program Cannot be Distinguished from the Maryland Program Preempted in *Hughes***

Straining to distinguish *Hughes*, Defendants describe two

purported differences between the "regulatory means" held preempted

there, 136 S. Ct. at 1298, and the regulatory means that Illinois

employs here.  First, Defendants contend that the ZEC program is

"untethered to a generator's wholesale market participation" because

Illinois does not expressly require the Clinton and Quad Cities plants to

participate in wholesale auctions.  EAB 33 (quoting *Hughes*, 136 S. Ct.

at 1299).  Second, they contend that ZEC subsidies are not tethered to

FERC-approved wholesale rates because they are based on projected

rather than actual market prices, and therefore do not guarantee that

the payments Exelon receives will precisely match the baseline market price index that the State has set. EAB 49; IAB 39.

These are form-over-substance evasions. A "proper analysis requires consideration of what the state law in fact does, not how [a] litigant might choose to describe it." *Wos v. E.M.A.*, 568 U.S. 627, 637 (2013). A state law's "intended operation and effect" is what matters for preemption purposes. *Id.* at 636; *see also Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 462-64 (2012) (holding state law preempted based on its practical operation). In its intended operation and in its practical, real-world effect, the ZEC subsidy is tethered to the wholesale market in ways indistinguishable from *Hughes* because of the combination of two features: (1) its sole beneficiaries, Clinton and Quad Cities, necessarily sell all their output into the wholesale market, and (2) the ZEC subsidy is adjusted based on the wholesale prices set at auction.

***Participation in wholesale markets.*** Plaintiffs' complaint alleges that the nuclear plants eligible for ZEC payments have sold their output into the PJM and MISO auctions (A.25, A.32 (Compl. ¶¶ 54, 72)), and "will continue to bid into the wholesale market auctions" (A.5 (Compl. ¶ 10)), because they "have no alternative" (A.15

32

(Compl. ¶ 36)), such that the ZEC subsidy "will not occur unless the 'winning' nuclear generators sell their energy into the wholesale markets" (A.30 (Compl. ¶ 64).) *See also* AOB 10-11, 43.

Defendants dispute these allegations, asserting that they might be eligible to receive ZEC payments for selling some of their output in other ways that bypass the FERC-approved energy and capacity auctions. EAB 38-41; see also IAB 46 n. 17. But Defendants' factual assertions cannot justify dismissal on the pleadings because Plaintiffs' allegations must be taken as true. AOB 19. Whether the favored plants in fact sell any portion of their output other than by bidding it into the wholesale auctions, and whether such purported sales have any bearing on the preemption analysis, are issues for discovery and summary judgment or trial.

At summary judgment, Plaintiffs would prove that Defendants' assertions are both immaterial and incorrect. Whether the favored plants sell their output at auction, or instead adjust the auction price through a bilateral contract, they are engaged in a wholesale transaction subject to FERC's exclusive jurisdiction. Just as it has determined that the PJM and MISO auctions produce just and

reasonable rates, so too has FERC determined that the rates set in a bilateral contract negotiated by parties that do not have market power are also just and reasonable. *Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of Snohomish City*, 554 U.S. 527, 546-48 (2008). When the ZEC subsidy adjusts auction prices directly or adjusts the price established in bilateral contracts negotiated in the shadow of auction prices, Illinois is supplanting the rate that FERC has determined to be just and reasonable by requiring that the favored plants receive an additional, state-prescribed payment that varies based on wholesale prices.

Through discovery, Plaintiffs expect to show that bilateral contracts apply to electricity that is bid into and clears the PJM and MISO auctions (thereby affecting the auction prices); there is no other way for nuclear plants to deliver power. The output of the Clinton and Quad Cities plants is scheduled into PJM and MISO auctions; the power is included in the auctions' supply stack; and the clearing price is determined after considering the output of those plants. A.56 (DeRamus Decl. ¶ 35). In typical bilateral contracts, the plant is paid the clearing price, and the counterparty pays or receives the difference

between the auction price and the contracted price. Because the resulting price is the wholesale rate that FERC has deemed just and reasonable, the ZEC necessarily alters the FERC-mandated rate, and interferes with the PJM and MISO auctions, even when it is set by bilateral contract rather than solely by auction.

In short, because the favored plants must sell their output through wholesale markets, the ZEC necessarily alters the price of wholesale transactions, whether it is fixed by auction or the contract.

Exelon attempts to avoid this conclusion by suggesting that it might be able to sell its output directly at retail. EAB 38-39. That contention contradicts the allegations of the complaint, and, at most, raises a factual issue properly developed in discovery; it is not a basis to dismiss the complaint.

That is especially so because the contention appears to lack factual foundation. Exelon does not assert that the Clinton and Quad Cities plants are physically connected to any retail consumer in a way that would allow them to deliver power except via the wholesale markets. Exelon also suggests that Mid-American—a vertically integrated utility that owns 25% of Quad Cities and therefore can draw

on Quad Cities' output to supply itself outside the auction—is eligible to receive the ZEC subsidy. EAB 38. Not so. The FEJA was specifically worded to exclude Mid-American—whose retail rates are set based on its prudent costs (not market revenues)—from receiving ZECs. *See* 20 ILCS 3855/1-75(d-5)(1); A.43 at 1 n.2.

Finally, Exelon suggests that ZEC subsidies could theoretically be paid for energy consumed at an affiliated, off-site facility (EAB 39), but Exelon does not establish that such remote self-supply can bypass the wholesale market. On the contrary, the case Exelon cites, *Calpine Corp. v. FERC*, 702 F.3d 41, 42 (D.C. Cir. 2012), upheld FERC's conclusion that it could not regulate self-supply. This means that station power must be purchased at retail from an LSE, which in turn must purchase the electricity at wholesale. The plant that generates the power must sell it into the wholesale market, whether that power is consumed at an affiliated offsite facility or by a retail customer.

Ultimately, the Maryland program at issue in *Hughes* was preempted because it "guarantees [a favored generator] a rate distinct from the clearing price for its interstate sales" at wholesale, not merely because Maryland required the favored generator to participate in the

wholesale market. 136 S. Ct. at 1297.  Maryland's participation

requirement was merely the mechanism by which the state ensured

that augmentation of FERC-approved auction rates would achieve the

state's goal of incentivizing construction of new generation capacity.

Illinois has adopted a different mechanism to guarantee the same

kind of tethered per-unit subsidy for the sale of electricity on wholesale

markets that the Supreme Court invalidated in *Hughes*.  In Illinois, no

clearing requirement is needed because (as the State knew when it

adopted the ZEC program) Exelon's plants will in fact sell the electricity

they generate at wholesale (A.15 (Compl. ¶ 36), A.25 (Compl. ¶ 54)) and

therefore will necessarily "receive" the ZEC subsidy "in connection with"

each wholesale sale.  16 U.S.C. § 824d(a).  With or without an express

participation requirement, the ZEC program's "intended operation and

effect," *Wos*, 538 U.S. at 636, is indistinguishable from the Maryland

program invalidated in *Hughes*.  It guarantees Exelon's plants a higher

rate than the FERC-approved auction clearing price.

***Calculation of the subsidy.***  The second feature of the ZEC

program that renders it preempted is that the Base Subsidy Amount

($16.50 per megawatt hour (MWh), which Defendants call the "Social

Cost of Carbon") is adjusted based on formula tied to wholesale market prices. AOB 8-9; A.57 (DeRamus Decl. ¶ 39). As the market price index increases above $31.40/MWh toward Illinois' target of $47.90/MWh, the amount of the ZEC subsidy decreases dollar for dollar until it reaches zero, and if the market price index thereafter decreases, the ZEC subsidy increases dollar for dollar, up to the level of the Base Subsidy Amount. *Id.*

Defendants do not dispute that the ZEC subsidy was set and will be adjusted in these ways based on the level of, and fluctuations in, wholesale market prices. Instead, they point out that the market revenues Exelon receives may not precisely match the market price index. EAB 11-12; *see also* Economist Amicus Brief (Doc 95) at 14-15; NRDC Amicus Br. 23-24; NEI Amicus Br. 21-22; States' Amicus Br. 13. That assertion is beside the point. The ZEC subsidy is preempted because it is tethered to wholesale market prices, and that is no less true if the subsidy does not invariably guarantee that Exelon will receive Illinois' exact target rate of $47.90/MWh and thus only insulates Exelon from most, but not quite *all*, market risk.

But Defendants' position is also incorrect. The market price index is calculated based on a formula that accounts for actually traded electricity futures contracts and actually cleared capacity bids for future delivery. *See* 20 ILCS 3855/1-75(d-5)(1)(B)(iii) (Compl. Ex. A); *see also* A.60 (DeRamus Decl. ¶¶ 43-44). As a result, when Clinton and Quad Cities sell energy into the wholesale market, they can expect to receive revenues that track closely, if not match exactly, the prices at which energy future contracts are actually traded. The same is true of capacity revenues. While the PJM and MISO capacity prices may be different, *see* Economist Amicus Br. 14, the FEJA keeps both Clinton and Quad Cities in the market, so that the capacity revenues the two plants combined can expect to receive by bidding into the PJM and MISO capacity auctions will track closely, if not match exactly, the capacity prices set by those auctions.

## C. FERC Has Never Approved Anything Resembling the ZEC Program

Defendants also claim that FERC has already determined that the ZEC program's structure does not impermissibly intrude on FERC's exclusive regulatory authority. EAB 29-32; IAB 41-43. That contention is baseless.

Defendants purport to locate FERC's imprimatur in its *WSPP Inc.* decision, which approved, "based on available information," a standard contract that facilitated trading of three classes of RECs. 139 FERC ¶ 61,061 at ¶¶ 5, 24 (2012). *WSPP* did not discuss—let alone approve— a program having the characteristics of the ZEC program, namely, a subsidy that varies inversely with wholesale prices and is available only to generators selling into wholesale markets. In *WSPP*, FERC considered a structure that provided for competitive pricing of RECs, traded on markets. FERC explained that it was approving "a service schedule through which RECs can be transferred" in order to "increase efficiency and liquidity in RECs sales, which should benefit market participants." *Id.* at ¶ 14; *cf. Allco*, 861 F.3d at 92-93 (describing tradeable nature of RECs).

In sharp contrast, ZECs are not traded on open markets at rates determined by supply and demand, and are not negotiated at arms' length. They are not traded at all. Illinois has simply required utilities to purchase ZECs from two favored generators at state-prescribed prices tethered to the rates set at wholesale auctions. Whereas REC prices can and do fluctuate based on forces independent of wholesale

production, ZEC prices fluctuate based solely on the movement of wholesale auction rates according to a formula Illinois has dictated.

Exelon cites a statute allowing Illinois regulators to consider wholesale market prices in limited circumstances when setting the upper bound for the price of RECs "procured through a competitive procurement event." EAB 52 (quoting 20 ILCS 3855/1-75(c)(1)(D)). But this provision serves only to highlight that REC prices are set in "competitive" markets. Unlike a price ceiling, which establishes the *maximum* price in a market where efficient producers are attempting to underbid one another, the ZEC establishes a *fixed amount* that wholesale purchasers must pay to nuclear generators, based not on price competition but rather on the amount needed to make the generators whole after considering expected wholesale revenues.

If ZECs were tradable commodities reflecting environmental attributes of nuclear power (as RECs are for renewable power), they would be awarded to the most efficient nuclear generators, who would compete to provide zero-emission power at the lowest possible price. This is the principle behind REC programs, and the reason why FERC's goal is to "increase efficiency and liquidity" in markets for RECs. *See,*

41

*e.g.*, Felix Mormann, *Clean Energy Federalism*, 67 Fla. L. Rev. 1621, 1632 (2015) (distinguishing RECs, which "call on the market's invisible hand to determine trading prices," from tariffs that "require[] local electric utilities to purchase the power output of [renewable] generators at above-market rates designed to cover the generator's cost and offer a reasonable return on investment").  But the ZEC program subverts the goals of market efficiency and liquidity: a generator's very *inability* to efficiently produce power with zero-emission attributes is a *criterion* for awarding ZECs.  The ZEC amount is fixed administratively precisely to prevent these generators from being underbid by more efficient generators.

Exelon fares no better in selectively quoting *ISO New England, Inc.*, 158 FERC ¶ 61,138 (2017).  *See* EAB 42.  FERC's discussion of *Hughes* in that decision was dicta, and no party argued that the program there, which encouraged renewable energy generation, was outside FERC's jurisdiction (as Illinois argues here).  Regardless, FERC's "interpretation" of *Hughes* supports preemption here: "a state program subsidizing development of generation that was required to bid into PJM in a manner that would effectively determine PJM's capacity

price violated the FPA."  158 FERC ¶ 61,138, at ¶ 8 n.19.  Such

programs are preempted under both *Hughes* and FERC precedent

because "[t]he Commission has acknowledged the right of states to

pursue their own policy interests but must be mindful of state

regulatory actions that impinge on FERC-jurisdictional market

mechanisms to set price."  *Id.* at ¶ 7.

If FERC had adopted the kind of definitive interpretation of the

line between permissible and preempted state authority that

Defendants claim, FERC would have said so in its brief to the Supreme

Court in *Hughes*.  But FERC's brief never mentioned the *WSPP*

decision.  The brief's discussion of RECs consisted of a single sentence

tentatively venturing that permissible state programs "may include …

the creation of renewable energy certificates," without elaborating on

the circumstances under which FERC would find RECs permissible.

Even if FERC's jurisdiction-defining statutory provisions were

sufficiently ambiguous to justify *Chevron* deference, *but see EPSA*, 136

S. Ct. at 773 n.5, *WSPP* cannot possibly be entitled to the "dispositive"

deference that Exelon claims.  (EAB 30.)  *WSPP* did not address a state

regulatory program with the distinctive jurisdiction-usurping features

of the ZEC program; rather, it approved a contract to facilitate the trading of RECs. 139 FERC ¶ 61,061, at ¶ 21. Additionally, FERC was careful to clarify the limited and tentative nature of its ruling. *See id.* at ¶¶ 25-26.

## III. THE ZEC PROGRAM CONFLICTS WITH FEDERALLY ESTABLISHED WHOLESALE RATES

Exelon's theory that the ZEC program survives conflict preemption because it is "plausibly" related to matters of state concern (EAB 53 (quoting *Nw. Central Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 518 (1989)), gets the analysis backwards. Under the Supremacy Clause, a state may not pass laws that conflict with federal law even when acting within areas of traditional state concern. *See, e.g.*, *IDACORP*, 379 F.3d at 650 (finding conflict preemption where plaintiff "invok[ed] a state rule (specifically, contract law) that would interfere with the method by which the federal statute was designed to reach its goals (specifically, FERC regulation of wholesale electricity rates)"). The very case Exelon cites shows that an improper purpose is a sufficient but *not necessary* condition of preemption; it holds that no analysis of the state's purpose is necessary "if state regulation prevents attainment of FERC's goals." *Nw. Central*, 489 U.S. at 516.

The ZEC program interferes with FERC's objective of setting competitive wholesale rates, and the express tethering to wholesale rates reveals Illinois' purpose is to adjust those rates. *See Nazarian*, 753 F.3d at 479 ("[T]he [contracts for differences] are structured to actually set the price received at wholesale. They therefore directly conflict with the auction rates approved by FERC."). Defendants stress that FERC has not found any conflict in accommodating RECs, but that is beside the point. As noted, these market-based subsidies in which firms compete to supply clean or renewable power at the lowest price are polar opposites of administratively determined ZEC payments, which reward the least efficient producers. None of these other subsidies uses a formula to make up the difference between the FERC-approved rate and the state's target rate.

Exelon is equally wrong to analogize its plants to vertically integrated utilities, which participate in wholesale auctions even though states allow them to recover their prudent costs through retail rates. EAB 54. FERC does not allow utilities to "cross-subsidize" wholesale transactions through retail charges imposed on their captive ratepayers. *See, e.g.*, *Golden Spread Elec. Coop., Inc. v. Sw. Pub. Serv.*

*Co.*, 123 FERC ¶ 61,047 at ¶ 41 (2008) ("The Commission has clearly sought to prevent the subsidization of shareholders at the expense of captive customers."); *Consumers Energy Co.*, 94 FERC ¶ 61,180 at *3-4 (2001). A vertically integrated utility cannot sell power below its marginal cost in wholesale auctions and recover the difference from ratepayers. The ZEC program, by contrast, provides a make-whole payment from LSEs (and ultimately ratepayers) calibrated to auction prices.

Defendants suggest that FERC can address any rate conflicts caused by the ZECs (EAB 56-57; IAB 49-50), but states "cannot regulate in a domain Congress assigned to FERC and then require FERC to accommodate [the] intrusion." *Hughes*, 136 S. Ct. at 1298 n.11. Indeed, "[t]he fact that FERC [is] forced to mitigate the … distorting effects … tends to confirm rather than refute the existence of a conflict." *Nazarian*, 753 F.3d at 479; *accord Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1168 (11th Cir. 2008) ("Federal law is not obliged to bend over backwards to accommodate contradictory state laws….").

Further, Defendants do not explain *how* FERC could address the conflicting rate set by ZECs. Exelon asserts that FERC can alter auction rules if they produce unjust or unreasonable rates (EAB 56-57), but the ZEC formula would offset any change to wholesale rates. Exelon has fought against proposed measures to mitigate the effect of ZECs precisely because they are "intended to offset the receipt of any state subsidy." *See, e.g.*, Exelon's Motion to Submit Reply, *Calpine Corp. v. PJM Interconnection, LLC*, FERC Docket No. EL16-49-000 at p.2 (Feb. 23, 2017).

Finally, Defendants suggest that there is no conflict because establishing wholesale rates through competitive markets is not FERC's sole goal. To be sure, FERC has accommodated certain deviations from free markets—like renewable-energy subsidies awarded and priced based on the free-market competition. But FERC has never countenanced a state program that alters the rates FERC has deemed just and reasonable by tethering a subsidy to the outcome of the FERC-approved wholesale market process.

In sum, the ZEC program is preempted because it is "structured to actually set the price received at wholesale," and "therefore directly

conflict[s] with the auction rates approved by FERC." *Nazarian*, 753 F.3d at 479.

## IV. PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF THE COMMERCE CLAUSE

### A. Plaintiffs Have Standing to Pursue Their Dormant Commerce Clause Challenge

Plaintiffs challenge FEJA under the Commerce Clause because the ZEC subsidy, by design, allows Exelon's favored in-state plants to dump energy into the interstate wholesale market at below-cost prices while reaping above-market returns. As Plaintiffs have pleaded (App. 27-28 (Compl. ¶ 61 & nn.5-8)), and as discovery will prove, propping up in-state businesses was the purpose and effect of the ZEC subsidy.

Exelon's plants cannot profitably sell on the interstate market. If the plants were to bid into the wholesale auctions at prices above their costs, customers would buy from out-of-state competitors like Plaintiffs, whose costs, and therefore bids, are lower. The protectionist ZEC subsidy enables favored in-state plants instead to underbid Plaintiffs, causing the kind of competitive injury the Commerce Clause recognizes. AOB 60-62; *see Alliance for Clean Coal v. Miller*, 44 F.3d 591, 594-95 (7th Cir. 1995). That injury is traceable to the ZEC subsidy and would

be remedied by invalidating it.  Plaintiffs' complaint thus establishes all three elements of standing.

Like the court below, Exelon asserts that Plaintiffs lack standing because the only injury supposedly is to out-of-state nuclear generators that are ineligible, as a practical matter, for the ZEC subsidy.  *See* EAB 58; Op. 17.  But those subsidies would never exist at all if they could flow to out-of-state nuclear plants, for the Illinois legislature's clear purpose in enacting FEJA was to protect local jobs.  (A.26-28 (Compl. ¶¶ 58, 61).)  The real injury is to Plaintiffs, who want to compete fairly in interstate commerce against the favored in-state generators for *sales*, not for subsidies.  Their injury is traceable to the protectionist subsidy, and it would be redressed by Plaintiffs' claim because the appropriate "cure" for Illinois protectionism is not the subsidy's expansion (*see* EAB 58), but its elimination.  *See Wyoming v. Oklahoma*, 502 U.S. 437, 460 (1992) (declining to change the scope of a state energy regulation in order to save part of it from a Commerce Clause challenge).

## B.   Through FEJA, Illinois Is Not Participating in the Wholesale Energy Market But Regulating It

Where a state's action can "be analogized to the activity of a private purchaser," a state—like a private purchaser—is permitted to

buy from whomever it prefers, including by preferring its own citizens. *See New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988). But the ZEC subsidy entails no purchasing by Illinois itself. Rather, the State directs *private third parties*, the LSEs, to make the ZEC subsidy payments to the favored Exelon plants, and the LSEs then pass this increased cost along to their customers. (See A.5-6, A.20-21 (Compl. ¶¶ 10-11, 46).) Telling businesses from whom to buy and what they must pay is quintessential market regulation, not participation. Indeed FEJA's enrolled bill describes itself as "an act concerning regulation." Act of Dec. 7, 2016, 2016 Ill. Legis. Serv. P.A. 99-906 (S.B. 2814) (capitalization removed).

Exelon invokes *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976), but that case turned on the inapposite market participant rule, and did not, as Exelon suggests, adopt some exemption for environmental subsidies (EAB 59-61). The law in *Alexandria Scrap* was constitutional because Maryland "entered into the market itself to bid up the[] price" of automobile hulks via "the payment of state funds in the form of bounties" for such hulks. 426 U.S. at 806, 809.

Here, Illinois is not entering the market by using state funds to buy energy from Exelon at above-market prices; it is requiring third parties (LSEs and ratepayers) to do so with private funds. Exelon claims that it is "irrelevant" whether funds come overstated. When a state uses its own money to pay third parties for goods or services, its actions can "be analogized to the activity of a private purchaser." *New Energy*, 486 U.S. at 278. But when a state compels residents and businesses to spend their own money, it "is not acting from state revenues (EAB 61), but the significance can hardly be as a purchaser of … electricity but *as a regulator* of utilities. The fact that its regulatory action has the purpose and effect of subsidizing a particular industry … does not transform it into a form of state participation in the free market." *Alliance for Clean Coal*, 44 F.3d at 596 (internal quotation marks omitted). *Wyoming v. Oklahoma* contrasted a state's direct purchasing of in-state fuel supplies through a public utility, on the one hand, with its regulation of what private utilities must buy, on the other. 502 U.S. at 459-60. While the former might be permissible market participation, the latter "cannot be characterized as anything

other than protectionist and discriminatory." *Id.* at 455.  Exelon's reliance on *Alexandria Scrap* fails for the same reason.

## C.     Plaintiffs Have Alleged Discrimination and *Per Se* Invalidity

Plaintiffs have alleged that the ZEC program violates the Commerce Clause both *per se* by discriminating on its face, and in effect by propping up favored in-state plants to the disadvantage of out-of-state power generators.  AOB 63-67.  Defendants insist that there can be no *per se* violation because the ZEC program has no express requirement that only in-state plants receive the subsidy.  IAB 54-57; EAB 61-64.  That argument misreads both the Complaint and the law.

As the Complaint alleges, the purportedly "neutral" selection criteria are a sham in that only Illinois power plants can satisfy them. (A.26-28 (Compl. ¶¶ 58-61)); *see* AOB 65-67.  It is not merely that "those criteria may to some extent favor in-state activity" (IAB 57) or that "in-state plants can satisfy them more readily" (EAB 62).  Rather, as everyone knew when the law was signed, the ZEC criteria were customized for Exelon's Illinois plants.  That is why the governor announced FEJA would save the jobs at Exelon's Quad City and Clinton plants.  (A.27-28 (Compl. ¶ 61).)  It is why Exelon announced, before

any official decision was made, that it was including hundreds of millions of dollars in ZEC revenue in its financial projections. (*Id.*) And it is why the ZEC program is capped at an energy level more or less equal to the preselected plants' output. 20 ILCS 3855/1-75(d-5)(1); A. 87-88 (DeRamus Decl. ¶ 115, ECF 38-3).

Like a bespoke suit tailored to fit a customer and then "objectively" awarded to the person whom it fits best, the ZEC subsidy was designed so that only Exelon would get it. This might be "ingenious" insofar as it "does not facially compel the use of Illinois [electricity] or forbid the use of out-of-state [electricity]," but it is no less "forbidden by the Commerce Clause" for its cleverness. *Alliance for Clean Coal*, 44 F.3d at 596.

Quoting *Minnesota v. Clover Leaf Creamery*, 449 U.S. 456, 463 n.7 (1981), Exelon insists that this Court must accept Illinois' proffered purpose as true (EAB 64-65), and Defendants jointly insist that because that proffered purpose is environmental, the law must stand. EAB 62; IAB 58. Both points are wrong.

Exelon lops off from its quotation of *Clover Leaf* the caveat "[i]n equal protection analysis...." *Compare* 449 U.S. at 463 n.7, *with* EAB

54-65.  For Commerce Clause analysis, "when considering the purpose of a challenged statute, this Court is not bound by the name, description or characterization given it by the legislature or the courts of the State, but will determine [matters] for itself."  *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979) (internal quotation marks and alteration omitted).  Otherwise, the dormant Commerce Clause would be limited to "the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods."  *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951).  Thus, the purpose of a law can inferred from "[t]he facts alleged in the complaint, the details set forth in plaintiffs' affidavits and the provisions of the act," even when the state proffers a neutral explanation.  *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 10 (1928); *see also Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cty.*, 431 F.3d 277, 281-82 (7th Cir. 2005) (holding ordinance preempted where proffered motive determined to be a "pretext" rather than a "reasonable, good-faith measure for enabling Milwaukee County to get a better quality of service from its contractors").  Here, there can be no question that FEJA was designed to "ensure that the premature closure of these [Illinois] nuclear power

plants does not occur." *See, e.g.,* Sec. 1.5, para. 8, 2016 Ill. Legis. Serv. P.A. 99-906 (S.B. 2814).

Moreover, "even if environmental preservation were the central purpose of [FEJA], that would not be sufficient to uphold a discriminatory regulation." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 205 n.20 (1994); *accord Clover Leaf Creamery*, 449 U.S. at 471.

### D. Plaintiffs Have Stated a *Pike* Claim

Even if a legitimate interest supported FEJA's protectionism (which it does not), the Complaint has pleaded facts showing that "the burden imposed on such [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); AOB 67-70. By driving out and deterring entry of more cost-efficient, environmentally sound out-of-state generators, FEJA may actually thwart, rather than advance, the putative local environmental benefits. (A.20-23 (Compl. ¶¶ 45-50).) Illinois claims that FEJA's burdens on interstate commerce are "indirect and remote" (IAB 68), but its say-so cannot overcome the Complaint. *See Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017) (to state

a *Pike* claim, plaintiff must "plead specific facts to support a plausible claim that the ordinance has a discriminatory effect on interstate commerce"); *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995) ("*Pike* may be impossible to apply without some factual inquiries.").

Defendants argue there is no cognizable burden on interstate commerce because in-state generators other than Exelon also are subject to discrimination.  IAB 67; EAB 66.  But that argument has been repeatedly rejected:

> For example, in *Bacchus Imports, Ltd. v. Dias*, [468 U.S. 263, 265 (1984)], we held unconstitutional under the Commerce Clause a special exemption from Hawaii's liquor tax for certain locally produced alcoholic beverages (okolehao and fruit wine), even though other locally produced alcoholic beverages were subject to the tax.  … And in *Lewis v. BT Investment Managers, Inc.*, [447 U.S. 27 (1980)], we held unconstitutional a Florida statute that excluded from certain business activities in Florida not all out-of-state entities, but only out-of-state bank holding companies, banks, or trust companies.  In neither of these cases did we consider the size or number of the in-state businesses favored or the out-of-state businesses disfavored relevant to our determination.  Varying the strength of the bar against economic protectionism according to the size and number of in-state and out-of-state firms affected would serve no purpose except the creation of new uncertainties in an already complex field.

*New Energy Co.*, 486 U.S. at 276-77.

Defendants' reliance on *Allco* is equally misplaced. *See* EAB 66 (citing 861 F.3d at 107-08). There, the complaint presented only "conclusory allegations" that said nothing about whether the "burden" on interstate commerce was "excessive" in relation to the law's "putative local benefits." 861 F.3d at 103. Here, by contrast, Plaintiffs have alleged both elements in detail. (A.20-31 (Compl. ¶¶ 45-67).) Moreover, the REC program at issue in *Allco* was quite different from the ZEC subsidy here. First, Connecticut's REC-purchasing requirement favored a broad, FERC-defined region—including multiple states—and did not present the same kind of in-state protectionism present here. 861 F.3d at 93. Second, the program merely differentiated between "two types of RECs [that] are different products" with "distinct legal requirements," not between the underlying fungible energy sold through PJM and MISO, as Illinois has done. *Id.* at 103, 105.

Plaintiffs' Commerce Clause claim is supported by plausible allegations, and Defendants have not justified dismissal of the Complaint without discovery into the purposes and effects of the ZEC subsidy.

# CONCLUSION

This Court should reverse the district court's decision granting Defendants' motion to dismiss and remand the case with instructions to consider Plaintiffs' motion for preliminary injunction.

Dated: December 12, 2017             Respectfully submitted,

By: */s/ Donald B. Verrilli, Jr.*
    Donald B. Verrilli, Jr.
    Henry Weissmann
    Fred A. Rowley, Jr.
    Mark Yohalem
    MUNGER, TOLLES &
     OLSON LLP

    Jonathan D. Schiller
    David A Barrett
    Stuart H. Singer
    Pascual Oliu
    BOIES, SCHILLER
     FLEXNER LLP

    Leonard A. Gail
    Jonathan S. Massey
    Suyash Agrawal
    Paul J. Berks
    MASSEY & GAIL LLP

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the word limit set by this Court's order of November 22, 2017 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,988 words, as determined by Microsoft Word 2010.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)  and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook font.


By:  */s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
*Attorney for*
*Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 12, 2017, I caused the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

By: */s/ Donald B. Verrilli, Jr.*
   Donald B. Verrilli, Jr.
   *Attorney for*
   *Plaintiffs-Appellants*